UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x

ROY DEN HOLLANDER, on behalf of himself and all  :
others similarly situated,  :
 :
     Plaintiff,  :  08 CV 7286 (LAK) (KNF)
 :
    - against -  :
 :  ECF Case
INSTITUTE FOR RESEARCH ON WOMEN AND  :
GENDER AT COLUMBIA UNIVERSITY; SCHOOL  :
OF CONTINUING EDUCATION AT COLUMBIA  :
UNIVERSITY; TRUSTEES OF COLUMBIA  :
UNIVERSITY IN THE CITY OF NEW YORK;  :
UNITED STATES DEPARTMENT OF EDUCATION;  :
MARGARET SPELLINGS, UNITED STATES  :
SECRETARY OF EDUCATION, in her official  :
capacity; BOARD OF REGENTS OF THE  :
UNIVERSITY OF THE UNIVERSITY OF THE STATE OF NEW YORK, in his  :
or her official and individual capacity; CHANCELLOR  :
OF THE BOARD OF REGENTS, ROBERT M.  :
BENNETT, in his official and individual capacity; NEW  :
YORK STATE COMMISSIONER OF THE  :
DEPARTMENT OF EDUCATION, RICHARD P.  :
MILLS, in his official and individual capacity; and  :
PRESIDENT OF THE NEW YORK STATE HIGHER  :
EDUCATION SERVICES CORPORATION, JAMES  :
C. ROSS, in his official and individual capacity,  :
 :
 :
     Defendants.  :
 :
----------------------------------------------------------------------x

### COLUMBIA DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT

FRIEDMAN KAPLAN SEILER & ADELMAN LLP
1633 Broadway
New York, New York  10019
(212) 833-1100

*Attorneys for Defendants Institute for Research on Women and Gender at Columbia University, School of Continuing Education at Columbia University, and Trustees of Columbia University in the City of New York*

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ........................................................................................... iii

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS ................................................................................................4

ARGUMENT .....................................................................................................................5

      I.      HOLLANDER DOES NOT HAVE STANDING TO SUE ....................................5

            A.      Hollander Alleges No Actual Injury ........................................................5

            B.      Hollander Alleges No Imminent Injury .....................................................7

            C.      The Class Allegations Are Irrelevant to Standing ....................................10

      II.      HOLLANDER'S SECTION 1983 CLAIM FAILS BECAUSE
               COLUMBIA IS NOT A STATE ACTOR...........................................................11

      III.     ALL OF HOLLANDER'S CLAIMS FAIL BECAUSE HE
               DOES NOT ALLEGE ACTIONABLE DISCRIMINATION ............................15

            A.      First Amendment Principles of Academic Freedom
                      Prohibit the Court from Deciding What Can, Cannot,
                      and Must Be Taught at Columbia .............................................................15

            B.      The Complaint Does Not Allege That Men
                      and Women Are Treated Differently at Columbia ....................................19

CONCLUSION..................................................................................................................24

# TABLE OF AUTHORITIES

*Page(s)*

## CASES

*Albert v. Carovano,*
    851 F.2d 561 (2d Cir. 1988)...................................................................................11

*Bhandari v. The Trustees of Columbia University. in the City of New York,*
    No. 00 Civ. 1735 JGK, 2000 WL 310344 (S.D.N.Y. Mar. 27, 2000) .............................17

*Burns & Russell Co. of Baltimore v. Oldcastle, Inc.,*
    166 F. Supp. 2d 432 (D. Md. 2001) ..............................................................................1

*Burt v. Gates,*
    502 F.3d 183 (2d Cir. 2007)....................................................................................16

*Butler v. City of Batavia,*
    545 F. Supp. 2d 289 (W.D.N.Y. 2008) ........................................................................22

*City of Los Angeles v. Lyons,*
    461 U.S. 95, 103 S. Ct. 1660 (1983)........................................................................5

*Connell v. Consolidated Edison Co.,*
    109 F. Supp. 2d 202 (S.D.N.Y. 2000)........................................................................23

*Comer v. Cisneros,*
    37 F.3d 775 (2d Cir. 1994)...................................................................................5, 7

*Curto v. Smith,*
    248 F. Supp. 2d 132 (N.D.N.Y. 2003) ...................................................................11, 13

*Fundator v. Columbia University,*
    No. 95 Civ. 9653 (DC), 1996 WL 197780 (S.D.N.Y. Apr. 23, 1996)........................11, 12

*Gilinsky v. Columbia University,*
    488 F. Supp. 1309 (S.D.N.Y. 1980)...........................................................................11

*Grafton v. Brooklyn Law School,*
    478 F.2d 1137 (2d Cir. 1973)...............................................................................11, 13

*Gratz v. Bollinger,*
    539 U.S. 244, 123 S. Ct. 2411 (2003)........................................................................7

*Grimes v. Cavazos,*
    786 F. Supp.1184 (S.D.N.Y. 1992).............................................................................6

*Page(s)*

*Grimes v. Sobol*,
    832 F. Supp. 704 (S.D.N.Y. 1993), *aff'd*, 37 F.3d 857 (2d Cir. 1994) ........................ 22-23

*Grossner v. Trustees of Columbia University*,
    287 F. Supp. 535 (S.D.N.Y. 1968) ...................................................................... 11, 12

*Grutter v. Bollinger*,
    539 U.S. 306, 123 S. Ct. 2325 (2003) .......................................................................... 16

*Hack v. The President and Fellows of Yale College*,
    237 F.3d 81 (2d Cir. 2000) ................................................................................ 11, 13

*Hayden v. County of Nassau*,
    180 F.3d 42 (2d Cir. 1999) .......................................................................................... 22

*Howe v. Town of Hempstead*,
    No. 04 Civ. 0656 (DRH)(ETB), 2006 WL 3095819 (E.D.N.Y. Oct. 30, 2006) ............... 19

*Hollander v. Copacabana Nightclub*,
    No. 07 Civ. 5873 (MGC), 2008 WL 4449429 (S.D.N.Y. Sept. 29, 2008) ....................... 11

*Jackson v. Birmingham Bd. of Educ.*,
    544 U.S. 167, 125 S. Ct. 1497 (2005) .......................................................................... 19

*Jackson v. Metropolitan Edison Co.*,
    419 U.S. 345, 95 S. Ct. 449 (1974) .............................................................................. 11

*Keyishian v. Board of Regents of the University of the State of New York*,
    385 U.S. 589, 87 S. Ct. 675 (1967) .............................................................................. 16

*Leeds v. Meltz*,
    85 F.3d 51 (2d Cir. 1996) ............................................................................................. 12

*Liburd v. Bronx Lebanon Hosp. Center*,
    No. 07 Civ. 11316 (HB), 2008 WL 3861352 (S.D.N.Y. Aug. 19, 2008) ......................... 12

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555, 112 S. Ct. 2130 (1992) .................................................................... 5, 6, 8

*Milton v. Alvarez*,
    No. 04 Civ. 8265SAS, 2005 WL 1705523 (S.D.N.Y. July 19, 2005) .............................. 11

*Murphy v. PriceWaterhouseCoopers, LLP*,
    357 F. Supp. 2d 230 (D.D.C. 2004) ............................................................................... 1

*National Wrestling Coaches Ass'n. v. United States Dep't of Educ.*,
    263 F. Supp. 2d 82 (D.D.C. 2003) ................................................................................. 8

*Page(s)*

*Odom v. Columbia University*,
    906 F. Supp. 188 (S.D.N.Y. 1995).................................................................................19

*O'Shea v. Littleton*,
    414 U.S. 488, 94 S. Ct. 669 (1974).............................................................................6, 10

*Phillips v. The Sage Colleges*,
    83 F. App'x. 340 (2d Cir. 2003) ..................................................................................11

*Powe v. Miles*,
    407 F.2d 73 (2d Cir. 1968)...........................................................................................12

*Radolf v. University of Connecticut*,
    364 F. Supp. 2d 204 (D. Conn. 2005) .........................................................................16

*Regents of the University of California v. Bakke*,
    438 U.S. 265, 98 S. Ct. 2733 (1978).............................................................................16

*Regents of the University of Michigan v. Ewing*,
    474 U.S. 214, 106 S. Ct. 507 (1985).............................................................................17

*Rendell-Baker v. Kohn*,
    457 U.S. 830, 102 S. Ct. 2764 (1982)...........................................................................12

*Sound Aircraft Servs., Inc. v. Town of East Hampton*,
    192 F.3d 329 (2d Cir. 1999).........................................................................................19

*Sweezy v. New Hampshire*,
    354 U.S. 234, 77 S. Ct. 1203 (1957).........................................................................16, 17

*Tavoloni v. Mount Sinai Medical Center*,
    984 F. Supp. 196 (S.D.N.Y. 1997)............................................................................12, 13

*Wahba v. New York University*,
    492 F.2d 96 (2d Cir. 1974)...........................................................................................11

*Weser v. Glen*,
    190 F. Supp. 2d 384 (E.D.N.Y. 2002) .....................................................................19, 22

*Wooden v. Board of Regents of the University System of Georgia*,
    247 F.3d 1262 (11th Cir. 2001) ...................................................................................10

*Yusuf v. Vassar College*,
    35 F.3d 709 (2d Cir. 1994)........................................................................................20, 22

*Page(s)*

## FEDERAL CONSTITUTIONAL PROVISIONS, STATUTES AND RULES

U.S. Const. amend. I ................................................................................................ *passim*

U.S. Const. amend. XIV, § 1 ..................................................................................... 4

U.S. Const. art. III ..................................................................................................... 5

20 U.S.C. § 1681 (2008) ............................................................................................ 4

20 U.S.C. § 3403 (2008) ............................................................................................ 18

42 U.S.C. § 1983 (2008) ............................................................................................ 4, 11

34 C.F.R. § 106.41 (2008) ......................................................................................... 21

34 C.F.R. § 106.42 (2008) ......................................................................................... 18, 21

## STATE STATUTES AND RULES

N.Y. Civ. Rights Law § 40-c (McKinney 2008) ......................................................... 4, 19

N.Y. Educ. Law § 6401 (McKinney 2008) ................................................................. 13

8 N.Y. CRR § 13.1(a) ................................................................................................ 14

8 N.Y. CRR § 52.1(b)(3) ............................................................................................ 14

8 N.Y. CRR § 52.2 ..................................................................................................... 14

## OTHER AUTHORITIES

40 Fed. Reg. 24135 (June 4, 1975) ............................................................................ 18

Defendants Institute for Research on Women and Gender at Columbia University ("IRWG"), School of Continuing Education at Columbia University ("SCE"), and The Trustees of Columbia University in the City of New York ("Columbia" or the "University"), respectfully submit this memorandum of law in support of their motion to dismiss the Complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.[1]

## PRELIMINARY STATEMENT

Plaintiff Roy Den Hollander asks the Court to prohibit the teaching of women's studies at Columbia.  Alternatively, he insists that if Columbia is to be permitted to offer courses addressed to the experiences of women, or courses that explore the vast body of feminist scholarship, the University must be required to create a curriculum in men's studies, a field he does not define and does not even claim exists as a coherent scholarly discipline.

Hollander's claim that the teaching of women's studies violates the constitutional and statutory rights of men, and must therefore be banned, is not based on an allegation that men are excluded from such courses.  Nor does Hollander dispute that thousands of courses throughout the University, many taught by men, teach the experiences and accomplishments of men, in every discipline and in every period of history.  Rather, Hollander's assertion that the Court can and should tell Columbia's faculty what they can, cannot, and must teach is based, in its entirety, on his personal hostility to feminism, his belief that feminism is a "fundamentally

---

[1]    Neither IRWG nor SCE exists as a separate legal entity capable of being sued.  Each is simply an operating unit of the University, the formal corporate name of which is The Trustees of Columbia University in the City of New York.  *See* Declaration of Patricia Sachs Catapano, dated October 21, 2008 ("Catapano Decl."), ¶¶ 2-5.  The caption of the case should be amended to remove IRWG and SCE as parties.  *See, e.g.*, *Murphy v. PriceWaterhouseCoopers, LLP*, 357 F. Supp. 2d 230, 241 (D.D.C. 2004) ("Unincorporated divisions of a corporation lack the capacity to be sued."); *Burns & Russell Co. of Baltimore v. Oldcastle, Inc.*, 166 F. Supp. 2d 432,  439-40 (D. Md. 2001) (unincorporated operating division of a corporation lacks the capacity to be sued).

false belief system" (Compl. ¶ 37) the teachers of which seek "to create and perpetuate a legal,

social and economic substratum occupied by men toiling in a Fritz Lang 'Metropolis' like

underworld" (*id.* ¶ 104). In a complaint that reads like a parody, Hollander opines that teaching

women's studies amounts to "advocat[ing] that the civil rights of today's males be minimized or

eliminated" (*id.* ¶ 31), to "training Feminist 'storm-troopers'" (*id.* ¶ 116) and "derogat[ing] males

while propagandizing the superiority of females with a harm similar [to] … the Nazification of

universities in Germany during the 1930s" (*id.* ¶ 118).

Hollander's attack does not state a claim for relief. To begin with, he is not a

Columbia student and he has never taken, or attempted to take, a women's studies course, let

alone been the victim of any discriminatory conduct in such a class. He therefore lacks standing

to sue. His section 1983 equal protection claim fails for the additional reason that Columbia is

not a "state actor." Like almost all colleges and universities, Columbia is subject to certain state

regulations and it receives some state funds, but such dealings with the state have repeatedly and

consistently been held an insufficient basis on which to treat the actions of a private university as

the actions of the state.

Most fundamentally, the Complaint does not allege discrimination against men. It

does not allege the deprivation of any opportunity or benefit available to women. Women's

studies courses are open to both men and women, and the University offers countless courses

that, whether or not denominated "men's studies," teach the thought and actions of men in every

field of human endeavor. While Hollander may feel that women's studies teaches a "false belief

system," the Court has no role to play in evaluating the substantive merits or demerits of

differing philosophies. Fundamental notions of academic freedom, rooted in the First

Amendment, prohibit the government, including the courts, from deciding which ideas are good

2

and which bad, which are worthy of being taught and which are not, which should be permitted and which prohibited.

Put otherwise, Hollander alleges no actual discriminatory conduct; he does not allege that men and women are treated differently at Columbia.  He may disagree, vehemently, with feminist ideas, as he sees them, but no law empowers the courts to adopt the political or ideological views of one litigant and, based on those views, tell a university what it can and cannot teach.  Just as Hollander thinks that women's studies courses depict men as the oppressors of women and the cause of the world's ills (*id.* ¶ 30), others might claim that African-American studies courses depict whites as the oppressors of blacks and the cause of the world's ills.  And just as the fact that some might hold the latter view would not justify an injunction barring the teaching of African-American studies, so Hollander's take on feminism does not justify barring Columbia's faculty from teaching women's studies.  In the absence of actual discriminatory behavior, an individual's objection to the content of a university course raises no issue for the Court.  To the contrary, it is the Court's duty to protect the marketplace of ideas by rejecting any demand that books be burned or classes banned.

Finally, to the extent Hollander claims that women's studies can be taught only if a men's studies curriculum is created, his contention has no support in the law.  Hollander argues that, if the existence of a men's athletic program requires the creation of a women's program, a women's studies department must require a men's studies counterpart, but the analogy is false.  Women were excluded from men's sports teams; they lacked the athletic opportunities provided to men.  Men are *not* excluded from women's studies courses, and courses concerning the ideas and actions of men are not in short supply.  The teaching of women's studies no more requires the creation of a men's curriculum than the existence of African-American studies courses would

3

require the establishment of a white curriculum, or an institute of gay and lesbian studies would require an institute on heterosexuality.

Hollander's Complaint is nothing more than his political and ideological critique of feminism.  His diatribe does not justify trampling on the central tenet of academic freedom – that universities may decide what to teach free of government interference – by banning the entire discipline of women's studies from Columbia.

## STATEMENT OF FACTS

Columbia is a private university.  Catapano Decl. ¶ 2.  It is subject to some governmental regulation, and both the University and some of its students receive some funds from the state and federal government.  The School of Continuing Education is one of the schools, along with Columbia College, the School of Law, the Graduate School of Business, the College of Physicians and Surgeons, and a dozen others, that comprise the University.  *Id.* ¶ 3. The Institute for Research and Gender is one of 223 research institutes and centers at Columbia. *Id.* ¶ 5.  (The complete list is available at www.columbia.edu/research/research_institutes.html).

Plaintiff Roy Den Hollander is not a Columbia student although he is an alumnus of the Graduate School of Business.  Compl. ¶ 127.  He asserts claims against Columbia under the equal protection clause of the Fourteenth Amendment (via 42 U.S.C. § 1983), Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, and N.Y. Civ. Rights Law § 40-c (McKinney 2008), based on the allegation that Columbia discriminates against men by teaching courses in women's studies.  Compl. ¶ 1(d).  Hollander does not allege that he has ever taken a women's studies course at Columbia, nor does he allege that men are barred from such courses or treated differently from women if they do take them.  Hollander seeks a judgment banning the

teaching of any women's studies courses at Columbia or requiring the establishment of a "men's studies" curriculum at the University.  *Id.* ¶¶ 137-38.

**ARGUMENT**

**I.**

**HOLLANDER DOES NOT HAVE STANDING TO SUE**

To invoke the jurisdiction of a federal court, the plaintiff must meet the threshold requirement of Article III by alleging an actual case or controversy.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 101, 103 S. Ct. 1660, 1665 (1983).  The Supreme Court has developed a number of rules relevant to determining the existence of a case or controversy, but "[f]oremost among these is the doctrine of standing."  *Comer v. Cisneros*, 37 F.3d 775, 787 (2d Cir. 1994).  The only allegations in the Complaint relevant to Hollander's standing are his assertions that he is an alumnus of the Columbia Graduate School of Business, and that he once "explored [] avenues for studying and benefiting from Men's Studies" at Columbia.  Compl. ¶¶ 127, 129.  These contentions do not establish the personal, concrete injury that would give Hollander standing to challenge the University's right to teach women's studies.

**A.**     **Hollander Alleges No Actual Injury**

As an "irreducible constitutional minimum," standing requires, *inter alia*, that the plaintiff "have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136 (1992) (internal citations and quotations omitted).  "Abstract injury is not enough."  *Lyons*, 461 U.S. at 101, 103 S. Ct. at 1665.  The plaintiff must have been injured "in a personal and individual way."  *Lujan*, 504 U.S. at 561 n.1, 112 S. Ct. at 2136 n.1.  Hollander alleges no such injury.

5

First, Hollander does not allege that he ever took a women's studies course when he was a student at Columbia.  While Hollander alleges that women's studies courses seek "to impose a unitary belief system of Feminist orthodoxy" on their students (Compl. ¶ 29), that the courses lead to "sex-based stereotyping of males by depicting them as the primary cause for most, if not all, the world's ills" (*id.* ¶ 30; *see also id.* ¶ 38), and that they teach a "fundamentally false belief system" (*id.* ¶ 37), he does *not* allege that he has experienced, or been injured by, any of this himself.  Simply put, he sues to shut down the women's studies program on the ground that it teaches a discriminatory curriculum, but he has never attended a single course that he attacks.  The "injury" that Hollander alleges is inflicted by the teaching of women's studies is, as to him, precisely the generalized, impersonal, abstract and hypothetical harm that does not impart standing to sue.  *See*, *e.g.*, *Lujan*, 504 U.S. at 564, 112 S. Ct. at 2138 (plaintiffs lacked standing to challenge endangered species regulation where they alleged only that they might someday visit the areas where the animals were found); *O'Shea v. Littleton*, 414 U.S. 488, 495, 94 S. Ct. 669, 676 (1974) (plaintiffs lacked standing to challenge bond-setting, sentencing, and jury-fee practices where "[n]one of the named plaintiffs is identified as himself having suffered any injury in the manner specified").

To be sure, Hollander does not allege that Columbia ever purported to *require* him to take a women's studies course.  While one can imagine a discrimination claim arising where a captive audience – such as public elementary or secondary school students – is forced to use a curriculum suffused with animus, *see, e.g., Grimes v. Cavazos*, 786 F. Supp. 1184,1186-87 (S.D.N.Y. 1992) (parents had standing where they alleged their children were injured by the public school curriculum they "must study"), it is difficult to see how a private university student could be harmed by taking a women's studies course even if one such course were required

6

among the dozens of courses a student selects.  But in any event, there is no allegation that

plaintiff (or anyone else) was required to take a women's studies course and, as noted, no

allegation that he ever did so.

   Likewise, Hollander does not allege that he was ever *excluded* from a women's

studies course.  Many civil rights cases are premised on the contention that the plaintiff is barred

from, or barred from competing for, benefits and opportunities provided to others.  *See, e.g.,*

*Gratz v. Bollinger*, 539 U.S. 244, 123 S. Ct. 2411 (2003) (plaintiff alleged race-based admissions

policy made it harder for white candidates to gain admission); *Comer*, 37 F.3d 775 (plaintiffs

alleged that discriminatory policy made it harder for them to obtain housing assistance).  Here,

plaintiff does not allege that he was barred from any course open to women, that he would have

been prevented from expressing his point of view in any such course, or that men are treated

differently than women in such courses..  He disagrees with what he assumes the professor might

say in a women's studies course – none of which he has ever taken – but that does not allege the

concrete, particularized injury that would give him standing to sue.

   In sum, Hollander's claim of injury is based entirely on the content of courses he

never took.  While the *content* of a college course, standing alone, without any allegation of

exclusion or differential treatment, would not give rise to a discrimination claim under any

circumstances (*see infra* Point III), a plaintiff who did not take the course, and thus could not

have been directly and personally injured by its content, certainly lacks standing to bring such a

claim.

**B.**  **<u>Hollander Alleges No Imminent Injury</u>**

   In addition to (nominal) damages for past injury, Hollander seeks prospective

relief – a ban on the teaching of women's studies at Columbia or an injunction mandating the

creation of a men's studies curriculum at the University.  Compl. ¶¶ 137-139.  Just as Hollander

fails to allege any past injury, he fails to allege the threat of "imminent" future injury that would

give him standing to seek prospective relief.  *Lujan*, 504 U.S. at 560, 112 S. Ct. at 2136.

To begin with, Hollander is not a Columbia student.  He alleges that he is an

alumnus, and appears to believe that this gives him standing,[2] but as an alumnus, Hollander is

situated no differently than any other member of the public.  If he qualifies, he can enroll in the

University's School of Continuing Education, or take courses in the School of General Studies,

but so can anyone else.  The possibility that he – like anyone else – might someday re-enroll at

Columbia does not present the "actual or imminent" harm required to support standing.  *Id.* at

564, 112 S. Ct. at 2138 (allegation that plaintiffs might "some day" visit the habitat of

endangered species did not constitute injury that would support standing to challenge regulation);

*see also National Wrestling Coaches Ass'n. v. United States Dep't of Educ.*, 263 F. Supp. 2d 82,

107 (D.D.C. 2003) (alumni lacked standing to challenge regulation allegedly responsible for

elimination of male sports team because there was no specific allegation that they would attend

events if the team was reinstated).  And in any event, Hollander does not allege that he would

take a women's studies class if he did re-enroll at Columbia, nor does he allege that he would be

barred from such a course if he chose to take one.  Accordingly, he would not allege an imminent

injury even if he did allege a definite and specific plan to return to Columbia.

Hollander does allege that he "explored [] avenues for studying and benefiting

from Men's Studies [at Columbia] in the Fall of 2007 but found there were no such opportunities

---

[2]    In an August 20, 2008 interview with Fox News, Hollander was asked why he had sued Columbia.  He responded, "'Cause I went there.  I graduated there, and so that gives me standing."  Media Matters, http://mediamatters.org/items/200808210007?f=h_latest (Aug. 21, 2008, 5:36 pm EDT).

. . . ." Compl. ¶ 129.  That vague and general allegation fails to allege a concrete injury for at least three independently sufficient reasons.  *First*, Hollander does not allege that he had a definite plan to apply to the School of Continuing Education, or otherwise to re-enroll at Columbia, if he could take men's studies courses.  The contention that he "explored" the possibilities falls far short of the specific allegation of injury required to create an actual case or controversy.

  *Second*, Hollander does not even attempt to explain what "men's studies" is.[3]  He cannot allege as an injury his inability to take courses in a field he cannot define and cannot even allege exists as a scholarly discipline.  The closest Hollander comes to defining men's studies is in his claim for relief where he demands the establishment of a program "focusing on concerns important to men."  Compl. ¶137.  But the Complaint does not allege – and could not rationally allege – that Columbia does not offer courses focusing on concerns important to men.  Presumably, the vast majority of the curriculum is of interest to men, who apply to Columbia and take its courses in large numbers.  Without a definition of men's studies and a coherent allegation as to why none of the thousands of courses Columbia offers fits that definition, the allegation that Columbia does not teach men's studies is essentially meaningless.  It certainly does not allege the concrete, particularized harm necessary to create an actual case or controversy.[4]

---

[3] Indeed, in an August 23, 2008 Los Angeles Times interview, Hollander said, "I don't know if men's studies even exists."  Meghan Daum, *Roy Den Hollander's War on Feminism*, L.A. TIMES, Aug. 23, 2008, *available at* http://www.latimes.com/news/opinion/la-oe-daum23-2008aug23,0,7712480.column.

[4] Even within the IRWG itself, there are courses that would seem to fit *any* definition of men's studies.  For example, in addition to the Spring 2008 course "Women and Film," the IRWG offered the Fall 2008 course "Film Narrative:  Masculinity and American Film" (taught by a man and studying the male directors Alfred Hitchcock, Sidney Lumet, Bill Condon, Gregg Araki, Gus Van Sant, Issac Julien, and Spike Lee).  In the current semester, the

*Third*, even if the supposed absence of men's studies were a coherent allegation, it would be relevant only if the teaching of women's studies were discriminatory, either because men were excluded from the women's studies courses or because they were treated in a discriminatory fashion in those courses.  As discussed above, Hollander lacks standing to bring such a claim because he has never taken a women's studies course and never attempted to do so.

### C.        The Class Allegations Are Irrelevant to Standing

Hollander purports to sue on behalf of all males who are students or alumni of Columbia.  Compl. ¶ 121.  Whether or not any members of such a class might have standing is irrelevant.  Unless the only named plaintiff – Hollander – has standing himself, the Complaint must be dismissed.  *See O'Shea*, 414 U.S. at 494, 94 S. Ct. at 675 ("if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class"); *Wooden v. Board of Regents of the University System of Georgia*, 247 F.3d 1262, 1288 (11th Cir. 2001) (before considering class certification, "the district court must determine that at least one named class representative has Article III standing").

---

IRWG is offering, among many other general interest courses, "Studies in US Imperialism," "Sexuality and the Law," "Gender, Culture and Human Rights,"  "Gender and Applied Economics,"  and "American Social Policy from the Progressives to the Present."  (The course listings for IRWG are available at www.columbia.edu/cu/irwag/crs/main/introduction/index.html.) There are far too many courses across the University as a whole that concern the activities, thoughts, and writings of men to begin to list.  And the assumption that courses concerning women or feminist thought are *not* of interest to men is simply Hollander's point of view.

## II.

### HOLLANDER'S SECTION 1983 CLAIM FAILS BECAUSE COLUMBIA IS NOT A STATE ACTOR

A private party defendant acts "under color of state law," a prerequisite to liability under 42 U.S.C. § 1983, *Phillips v. The Sage Colleges*, 83 F. App'x. 340, 341 (2d Cir. 2003), only if there is a "close nexus between the State and the challenged action" of the defendant. *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351, 95 S. Ct. 449, 453 (1974). This requirement "assure[s] that constitutional standards are invoked only when it can be said the State is *responsible* for the specific conduct of which the plaintiff complains." *Hollander v. Copacabana Nightclub*, No. 07 Civ. 5873 (MGC), 2008 WL 4449429, at *2 (S.D.N.Y. Sept. 29, 2008) (emphasis in original) (rejecting Hollander's argument that the state's regulation of liquor sales made a bar a state actor when it charged women less than men for admission). New York State is *not* responsible for Columbia's decision to teach women's studies or for the content of women's studies courses. Accordingly, the University has not acted under color of state law, and Hollander's section 1983 claim must be dismissed.

To begin with, there is abundant authority that Columbia, in particular,[5] and private colleges and universities, in general, are not state actors.[6] Hollander's contrary claim,

---

[5]   *See Milton v. Alvarez*, No. 04 Civ. 8265SAS, 2005 WL 1705523, at *3 (S.D.N.Y. July 19, 2005) (Columbia not a state actor); *Fundator v. Columbia University*, No. 95 Civ. 9653 (DC), 1996 WL 197780, at *1 (S.D.N.Y. Apr. 23, 1996) (same); *Gilinsky v. Columbia University*, 488 F. Supp. 1309, 1311-1312 (S.D.N.Y. 1980) (same); *Grossner v. Trustees of Columbia University*, 287 F. Supp. 535, 549 (S.D.N.Y. 1968) (same).

[6]   *See Phillips*, 83 F. App'x at 341 (The Sage Colleges not state actors); *Hack v. The President and Fellows of Yale College*, 237 F.3d 81, 83-85 (2d Cir. 2000) (Yale not a state actor); *Albert v. Carovano*, 851 F.2d 561, 571 (2d Cir. 1988) (Hamilton College not a state actor); *Wahba v. New York University*, 492 F.2d 96, 100-103 (2d Cir. 1974) (NYU not a state actor); *Grafton v. Brooklyn Law School*, 478 F.2d 1137, 1143 (2d Cir. 1973) (Brooklyn Law School not a state actor); *Curto v. Smith*, 248 F. Supp. 2d 132, 140 (N.D.N.Y. 2003) (Cornell not a state actor);

based on the allegation that the University receives state funds (Compl. ¶¶ 17-20, 69, 74, 76, 78), and is subject to state regulation (*id.* at ¶¶ 7-16, 64-68), finds no support in the law.  It is well-established that "[e]xtensive regulation and public funding, either alone or taken together, will not transform a private actor into a state actor."  *Leeds v. Meltz*, 85 F.3d 51, 54 (2d Cir. 1996).  Indeed, the Supreme Court has specifically rejected the argument that a private school's dependence on state funds, or its regulation by the state, converts its actions into state action.  In *Rendell-Baker v. Kohn*, 457 U.S. 830, 102 S. Ct. 2764 (1982), a constitutional challenge to the plaintiffs' discharge by a private school, the Court held that the school was not a state actor even though "virtually all of the school's income was derived from government funding," and despite the fact that the school was subject to "extensive regulation" by the state, because neither the funding nor the regulation made the state responsible for the school's decision to fire the plaintiffs.  *Id.* at 840-41, 102 S. Ct. at 2271; *see also Powe v. Miles*, 407 F.2d 73, 81 (2d Cir. 1968) (allegations that state regulates educational standards and provides financial aid insufficient to establish state action); *Liburd v. Bronx Lebanon Hosp. Center*, No. 07 Civ. 11316 (HB), 2008 WL 3861352, at *7-8 (S.D.N.Y. Aug. 19, 2008) (private hospital not a state actor simply because it received state funding and was subject to regulation); *Fundator*, 1996 WL 197780, at *1 (Columbia not a state actor because "[s]tate financial assistance … is insufficient to demonstrate state action"); *Grossner*, 287 F. Supp. at 547-48 (Columbia not a state actor because "receipt of money from the State is not, without a good deal more, enough to make the recipient an agency or instrumentality of the Government").

---

*Tavoloni v. Mount Sinai Medical Center*, 984 F. Supp. 196, 204 (S.D.N.Y. 1997) (Kaplan, J.) (Mount Sinai School of Medicine not a state actor).

Hollander also mentions that Columbia received its charter from the state legislature (*id.* at ¶ 62), and that it received state land in its "early years" (*id.* at ¶ 79). These allegations of centuries-old state aid are likewise insufficient to establish state action because they do not demonstrate state responsibility for the women's studies courses at issue. *See Tavoloni*, 984 F. Supp. at 201-02 (Kaplan, J.) (university hospital not transformed into state actor by state's provision of space, personnel and facilities because there was no "connection between the action complained of and the state support or regulation"); *see also Hack*, 237 F.3d at 83-84 (despite being "chartered by special legislation," Yale was not a state actor because the "state could not control Yale's policies and operations even if it chose to"); *Grafton*, 478 F.2d at 1141-42 (Brooklyn Law School not a state actor even though it bought its property at a deep discount from New York City and received money pursuant to N.Y. Educ. Law § 6401 for each degree conferred); *Curto*, 248 F. Supp. 2d at 139-40 (Cornell's College of Veterinary Medicine not a state actor despite its creation through state statute, its receipt of state funds, and its frequent consultation with SUNY Board of Trustees).

Doubtless aware of the insufficiency of what he can show – that Columbia receives state funding and is subject to some state regulation – Hollander also alleges that various of the state defendants "control what is taught in colleges and universities in the State" (Compl. ¶ 11), and have "established a policy by which Women's Studies programs would advocate and spread Feminism in New York colleges and universities" (*id.* ¶ 9). This is empty rhetoric. The state does not "control" what is taught at Columbia (or any private college or university), as a review of the regulations to which Hollander refers makes clear.

Hollander's argument is based on the fact that the Commissioner of the Department of Education, acting on authority delegated from the Board of Regents, establishes

13

regulations governing "the registration of courses of study in colleges, professional, technical and other schools."  8 N.Y. CRR § 13.1(a).  Hollander suggests that the authority to "register" courses of study amounts to "control" over what is taught, as if the Commissioner could or did make a content-based review of college curricula, registering those with a political, ideological or other perspective he endorsed and refusing to register those with which he lacked sympathy. *See* Compl. ¶¶ 64-70.  The registration process is, of course, nothing of the kind.

Under the Commissioner's regulations, to be registered, a college curriculum must "show evidence of careful planning," its "goals and [] objectives" must be "clearly defined in writing," the college must have a "reviewing system" to "estimate the success of students and faculty in achieving such goals and objectives," and the "content and duration of curricula" must be "designed to implement their purposes."  8 N.Y. CRR § 52.1(b)(3).  In addition, the college or university must possess the financial resources to accomplish the mission of each registered curriculum, it must have adequate classrooms, laboratories, libraries, and other facilities, its faculty must have adequate training and have earned the appropriate degrees, courses must be offered with sufficient frequency to allow students to timely earn their degrees, course descriptions must clearly state the subject matter and requirements of each course, credit must be granted only to students who successfully achieve the goals of the course, and so on.  8 N.Y. CRR § 52.2.  As these regulations make clear, "registration" turns on basic measures of institutional adequacy to administer the degree programs offered, not on the state's agreement or disagreement with the ideas expressed in those programs.  To be sure, were it otherwise, the state would be in wholesale violation of the university's First Amendment right of academic freedom. (*See infra* Point III(A)).

The courts have held, over and over again, that a state's regulation of, and financial contribution to, its private colleges and universities does not transform the actions of those institutions into state action.  The Complaint offers nothing that would allow for a contrary conclusion with respect to the teaching of women's studies, or the teaching of anything else, at Columbia.

### III.

### ALL OF HOLLANDER'S CLAIMS FAIL BECAUSE HE DOES NOT ALLEGE ACTIONABLE DISCRIMINATION

**A.      First Amendment Principles of Academic Freedom Prohibit the Court from Deciding What Can, Cannot, and Must Be Taught at Columbia**

Hollander does not allege that men are barred from women's studies courses or that the men who take those courses are treated differently than women.  His claim that the teaching of women's studies discriminates against men is based, in its entirety, on the content of the courses – on his view that feminist scholarship spreads lies about the nature of men and women and their respective roles in society.  As discussed in Point III(B), the allegation that the ideas presented in a university course are bad, or even pernicious, simply does not allege discrimination within the meaning of any of the statutes on which Hollander relies.  In addition, and as a threshold matter, Hollander's suggestion that the Court should conduct a review of feminist scholarship to determine if it is good or bad, insightful or misguided, pro-equality or anti-male, and then make a judgment whether Columbia faculty should be allowed to teach women's studies courses at all, whether they should be allowed to use some texts but not others, whether some professors' lectures are acceptable but others' are not, whether a new "male curriculum" must be developed and taught and what that male curriculum should contain, is profoundly repugnant to core values of academic freedom rooted in the First Amendment.

15

Ever since the seminal case of *Sweezy v. New Hampshire*, 354 U.S. 234, 77 S. Ct. 1203 (1957), the courts have recognized the "essentiality of freedom in the community of American universities." *Id.* at 250, 77 S. Ct. at 1211.  In light of "the dependence of a free society on free universities," *id.* at 262, 77 S. Ct. at 1217 (Frankfurter, J. concurring), the Supreme Court has held that academic freedom is protected by the First Amendment:

> Our Nation is deeply committed to safeguarding of academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned.  That freedom is therefore a special concern of the *First Amendment*, which does not tolerate laws that cast a pall of orthodoxy over the classroom.

*Keyishian v. Board of Regents of the Univ. of the State of New York*, 385 U.S. 589, 603, 87 S. Ct. 675, 683 (1967); *see also Grutter v. Bollinger*, 539 U.S. 306, 329, 123 S. Ct. 2325, 2339 (2003) (given "the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition"); *Regents of the Univ. of California v. Bakke*, 438 U.S. 265, 312, 98 S. Ct. 2733, 2759 (1978) ("Academic freedom, though not a specifically enumerated constitutional right, long has been viewed as a special concern of the *First Amendment*"); *Burt v. Gates*, 502 F.3d 183, 190 (2d Cir. 2007) (recognizing the "*First Amendment* guarantee of academic freedom").

Academic freedom "imbu[es] certain core academic decisions with *First Amendment* protection."  *Burt*, 502 F.3d at 191.  A variety of university activities are entitled to protection, but Justice Frankfurter's concurrence in *Sweezy* sets forth the "'four essential freedoms' of a university – to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study."  354 U.S. at 263, 77 S. Ct. at 1218; *see also Radolf v. University of Connecticut*, 364 F. Supp. 2d 204, 216 (D. Conn.

2005) (academic freedom includes the right of a university "to be free from government interference with its curriculum").

It is doubtful that a university's fundamental First Amendment freedom to decide what to teach and how it shall be taught – the very freedoms Hollander asks this Court to abridge – may ever be circumscribed by a court or government agency.  In *Sweezy*, in the context of an "investigation of subversive activities," 354 U.S. at 257, 77 S. Ct. at 1215, the New Hampshire attorney general asked the plaintiff to describe the content of a lecture he had given.  Although, at that time, the Court did not dispute the importance of the government's interest in rooting out subversives, it nevertheless held that the question violated Sweezy's First Amendment rights, observing that "[w]e do not now conceive of any circumstance wherein a state interest would justify infringement of rights in these fields."  *Id.* at 251, 77 S. Ct. at 1212.  Here, Hollander does not ask for *information* about the content of courses, he asks that the courses be banned.  It is impossible to imagine any state interest that would justify dictating what a university cannot (or must) teach, but what Hollander offers to justify the extraordinary inquisition he seeks – his own opinion that feminist ideas are anti-male – is no "interest" at all.  While Hollander uses the language of discrimination, he is not alleging that men and women are in any way treated differently at Columbia.  He is simply saying that he dislikes the content of women's studies courses – that speech should be banned because he disagrees with it.  That is incompatible with the First Amendment.[7]

---

[7]    Even beyond core matters such as the content of courses, both federal and New York courts have stressed that the academic decisions of colleges and universities are entitled to great deference.  *See, e.g.*, *Regents of the Univ. of Michigan v. Ewing*, 474 U.S. 214, 225, 106 S. Ct. 507, 513 (1985) ("When judges are asked to review the substance of a genuinely academic decision … they should show great respect for the faculty's professional judgment."); *Bhandari v. The Trustees of Columbia Univ. in the City of New York*, No. 00 Civ. 1735 JGK, 2000 WL

Indeed, the government itself has recognized that it has no business regulating what a university may teach, even with respect to the enforcement of the anti-discrimination laws.  In 1975, the following was added to the regulations implementing Title IX:  "Nothing in this regulation shall be interpreted as requiring or prohibiting or abridging in any way the use of particular textbooks or curricular materials."  34 C.F.R. § 106.42 (2008).  The Department of Health, Education and Welfare (the predecessor to the Department of Education) explained the reasoning behind this provision:

> The new section explicitly states the Department's position that title IX does not reach the use of textbooks and curricular materials on the basis of their portraits of individuals in a stereotypic manner or on the basis that they otherwise project discrimination against persons on account of their sex. . . . [T]he imposition of restrictions in this area would inevitably limit communication and would thrust the Department into the role of Federal censor. . . . [T]he Department has construed title IX as not reaching textbooks and curricular materials on the ground that to follow another interpretation might place the Department in a position of limiting free expression in violation of the First Amendment.

40 Fed. Reg. 24135 (June 4, 1975).  More generally, absent specific authorization, federal law prohibits the Department of Education from

> exercis[ing] any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system, over any accrediting agency or association, or over the selection or content of library resources, textbooks, or other instructional materials by any educational institution or school system …

20 U.S.C. § 3403(b) (2008).

---

310344, at *5 (S.D.N.Y. Mar. 27, 2000) ("Cognizant of the danger that judicial interference could pose to academic freedom, New York courts are deferential when reviewing university academic decisions").

Hollander asks nothing less than that the Court review the textbooks, other curricular materials, and, presumably, the lectures and comments of the professors in women's studies courses to determine if they "project discrimination" against men and, on that basis, to decide what can and cannot be taught.  Constitutional, statutory and regulatory law all prohibit such interference with the University's academic freedom.

**B.     The Complaint Does Not Allege That
<u>Men and Women Are Treated Differently at Columbia</u>**

As discussed above, no court, consistent with the First Amendment, can pass judgment on the ideological or political content of private college courses.  In addition, an attack on the content of courses to which all students are admitted on equal terms simply does not allege discrimination.  While Hollander pleads his disdain for feminism at length, he "does not refer to a single situation" in which Columbia treated him (or any other male student) differently than a similarly situated female student.  *Odom v. Columbia Univ.*, 906 F. Supp. 188, 194 (S.D.N.Y. 1995) (dismissing student's discrimination claim where no actual example of disparate treatment was alleged).  Discrimination exists when the "complainant is … subjected to differential treatment."  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174, 125 S. Ct. 1497, 1504 (2005).  Hollander alleges no such differential treatment; all of his claims should be dismissed for this reason as well.[8]

---

[8]   Differential treatment is the essence of discrimination whether alleged under Title IX, *see Jackson*, 544 U.S. at 173, 125 S. Ct. at 1503, the Equal Protection Clause, *see Sound Aircraft Servs., Inc. v. Town of East Hampton*, 192 F.3d 329, 335 (2d Cir. 1999) ("At its core, equal protection prohibits the government from treating similarly situated persons differently."); *Weser v. Glen*, 190 F. Supp. 2d 384, 395 (E.D.N.Y. 2002) ("intentional discrimination proscribed by Title IX is discrimination that violates the Equal Protection Clause"), or state law, *see Howe v. Town of Hempstead,* No. 04 Civ. 0656 (DRH)(ETB), 2006 WL 3095819, at *5 (E.D.N.Y. Oct. 30, 2006) (prima facie case of discrimination is the same for federal and state discrimination claims, including claims brought pursuant to N.Y. Civ. Rights Law § 40-c).

A "plaintiff alleging . . . gender discrimination by a university must do more than recite conclusory assertions," *Yusuf v. Vassar College*, 35 F.3d 709, 713 (2d Cir. 1994), but conclusory assertions of discrimination are all Hollander offers.  He does not allege that men are excluded from women's studies courses, nor does he allege that they are graded more harshly or otherwise treated differently than women when they take such courses.  He quarrels with the substance of what is being taught, with its concentration on the experiences of women and on feminist scholarship, but he does not allege that it is taught differently to men and women.  He does not, in other words, allege discrimination at all.  Colleges and universities are filled with courses and research centers that focus on particular subject matter, and sometimes on particular racial, ethnic or religious groups.[9]  While members of different racial, ethnic or religious groups might feel slighted, or disagree with the perspective of the textbooks or the professors, in the absence of any allegation of exclusion or differential treatment, there is no claim of discrimination.  Likewise with respect to gender.  The fact that Hollander resents what he understands to be the focus on women at the IRGW does not allege discrimination in the absence of any claim that men are excluded from or treated differently in IRGW courses.

Hollander's demand for the creation of a "men's studies" curriculum suggests he is arguing that, if a university offers courses about one group, it must offer courses about other, arguably opposing or competing groups.  *See* Compl. ¶ 90 (Columbia offers "a curriculum in Feminism (Women's Studies) without any countervailing view").  No statute or constitutional

---

[9]   Columbia has research institutes or centers on Contemporary Black History, Brazilian Studies, French and Francophone Studies, Iranian Studies, Israel and Jewish Studies, Japanese Culture, and Latin American Studies, to name just a few.  *See* Columbia University: Research Institutes and Centers, www.columbia.edu/research/research_institutes.html.

principle, however, dictates that a university offering courses on Christianity must also offer courses on Judaism, Islam, Buddhism, Hinduism, and the dozens of other religions, or that each religion must receive comparable emphasis.  The same is true with respect to racial and ethnic groups, as well as gender.[10]  Breadth of curriculum may be one way to judge the quality of a university, but curricular balance is not imposed by law.

In what appears to be a semi-facetious attempt to bring his complaint within the Title IX precedents on access to athletic opportunities, Hollander alleges that "Women's Studies programs today are the varsity sport of choice for females at Columbia in their never-ending war against men."  *Id.* ¶ 93.  From this premise, he argues that, "[i]f Title IX can require universities receiving federal financial assistance to provide a female athletics program, then it surely can require Columbia to provide a Men's Studies program."  *Id.* ¶ 94.  That proposition is mistaken for a number of reasons.

First of all, substantive academic courses are *not* sports.  Requiring the creation of women's sports teams or the provision of equivalent athletic facilities does not raise the First Amendment academic freedom problems that flow from telling a university what it must teach. As noted above, the Title IX regulations affirmatively disclaim any intention to require particular curricular materials.  34 C.F.R. § 106.42.  Moreover, even if women's studies were treated as a sport, there would be no Title IX issue.  Men are not excluded from the "team" – the women's studies courses – or otherwise treated differently than women.  *See* 34 C.F.R. § 106.41(a) (2008)

---

[10]   Columbia's Center for Contemporary Black History "promotes the critical study of black history, culture, and politics within urban America since 1900, with an emphasis on understanding the central role of black intellectuals and public leaders in the making of modern society."  *See* CCBH: About CCBH, www.columbia.edu/cu/ccbh/html/ccbh_about.html.  Following Hollander's reasoning, this would require Columbia to create another center emphasizing the role of white intellectuals and public leaders.  There is no support for that contention.

("No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics . . . ."). Similarly, even if one were to assume that women's studies courses are not of interest to men, Hollander could not plausibly deny that there are thousands of other courses available at Columbia that are. *See* 34 C.F.R. § 106.41(c)(1) (among criteria for evaluating equal athletic opportunity is whether selection of sports accommodates interests of both sexes).

Finally, the Complaint also fails because it does not allege facts from which it could be inferred that Columbia has acted with discriminatory intent. *See Yusuf*, 35 F.3d at 713 (plaintiff must allege "circumstances giving rise to a plausible inference of [] discriminatory intent"); *Weser*, 190 F. Supp. 2d at 395 (plaintiff must allege intentional discrimination to state a claim under Title IX). It is not enough to baldly assert that "there exists … an invidiously discriminatory purpose as a motivating factor" behind the creation of the women's studies program. *See Butler v. City of Batavia*, 545 F. Supp. 2d 289, 293 (W.D.N.Y. 2008) (dismissing discrimination claim where allegation of intent was based on mere speculation and a "formulaic recitation of the elements of a cause of action") (internal citations omitted). To survive a motion to dismiss, Hollander would have to allege specific facts leading to the conclusion that Columbia created a women's studies program "because of, not merely in spite of" any alleged adverse effects on men. *Hayden v. County of Nassau*, 180 F.3d 42, 50 (2d Cir. 1999); *Grimes v. Sobol*,

832 F. Supp. 704, 708 (S.D.N.Y. 1993), *aff'd*, 37 F.3d 857 (2d Cir. 1994) (same).  He can allege nothing of the kind.[11]

*          *          *

Hollander's Complaint is nothing more than an ideological attack on elective, university-level courses based solely on his personal quarrel with the feminist views he believes that the professors and curricular materials espouse.  Nothing he alleges constitutes actionable discrimination, and the suppression of free speech and academic freedom that he demands is flatly prohibited by the Constitution and laws of the United States.

---

[11]   The absence of any factual allegation suggesting anti-male bias on the part of those who run Columbia is especially significant given that both the President and the Provost of the University are male.  *See, e.g., Connell v. Consolidated Edison Co.*, 109 F. Supp. 2d 202, 209 (S.D.N.Y. 2000) (inference against discriminatory intent when decision-makers are in protected class).

## CONCLUSION

For the reasons stated herein, the Complaint should be dismissed.

Dated:   New York, New York
         October 24, 2008

Respectfully submitted,

FRIEDMAN KAPLAN SEILER &
    ADELMAN LLP

By:  s/  Robert D. Kaplan
Robert D. Kaplan (rkaplan@fklaw.com)
Daniel B. Rapport (drapport@fklaw.com)
Jennifer P. Krakowsky (jkrakowsky@fklaw.com)
1633 Broadway
New York, New York 10019
(212) 833-1100

*Attorneys for Defendants Institute for Research on Women and Gender at Columbia University, School of Continuing Education at Columbia University, and Trustees of Columbia University in the City of New York*

24