UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------------X

ROY DEN HOLLANDER, on behalf of himself and all others    :
similarly situated,                                        :
                                                           :
                              Plaintiff,                   :
                                                           : 08 Civ. 7286 (LAK)(KNF)
              -against-                                    :      ECF Case
                                                           :
INSTITUTE FOR RESEARCH ON WOMEN AND GENDER                :
AT COLUMBIA UNIVERSITY, et al.,                           :
                                                           :
                              Defendants.                  :
-------------------------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF THE STATE DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

ANDREW M. CUOMO
Attorney General of the State
 of New York
Attorney for the State Defendants
120 Broadway, 24ᵗʰ Floor
New York, New York 10271
(212) 416-8634

CLEMENT J. COLUCCI
Assistant Attorney General
of Counsel

## Table of Contents

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    Plaintiff and His Complaints . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.    The State Defendants: Powers and Responsibilities . . . . . . . . . . . . . . . . . . . . . . . 3

           1.    The Regents and the Commissioner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
           2.    HESC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    POINT I    THE ESTABLISHMENT CLAUSE CLAIMS MUST BE
                  DISMISSED BECAUSE "FEMINISM" IS NOT A
                  RELIGION AND THE STATE DEFENDANTS'
                  ACTIVITIES DO NOT TEND TO ESTABLISH
                  RELIGION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.    "Feminism" is Not a Religion for Purposes of the Establishment Clause . . . . . . . 8

    B.    Registration of Curricula and Degree Programs That Comply With
           Religion-Neutral Academic Standards Does Not Constitute an
           Establishment of Religion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

           1.    Secular Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
           2.    Primary Effect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
           3.    Entanglement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    C.    Bundy Aid May be Given Even to Religious Institutions and Programs
           Without Violating the Establishment Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

           1.    Religiously-Neutral Definition of Beneficiaries . . . . . . . . . . . . . . . . . . 17
           2.    No Indoctrination by the Government . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    D.    Because HESC Provides Grants and Loan Guarantees to Students Rather
           Than Institutions, its Activities Do Not Violate the Establishment Clause . . . . . 19

# Table of Contents

**Pages**

POINT II     THE EQUAL PROTECTION CLAIM MUST BE DISMISSED
BECAUSE THE APPLICABLE LAWS ARE GENDER-NEUTRAL
AND HAVE BEEN ADMINISTERED IN A GENDER-NEUTRAL
FASHION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

POINT III    THE CLAIMS UNDER CIVIL RIGHTS LAW §40-c MUST
BE DISMISSED BECAUSE OF ELEVENTH AMENDMENT
IMMUNITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

-ii-

## Table of Authorities

**Pages**

### Cases

Africa v. Commonwealth of Pennsylvania,
    662 F.2d 1025 (3d Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Agostini v. Felton,
    521 U.S. 203 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

Altman v. Bedford Cent. Sch. Dist.,
    245 F.3d 49 (2d Cir.), cert. denied., 534 U.S. 827 (2001) . . . . . . . . . . . . . . . . . . . . . 13, 14

Alvarado v. City of San Jose,
    94 F.3d 1223 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Bowen v. Kendrick,
    487 U.S. 589 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Brown v. City of Oneonta,
    221 F.3d 329 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Chambers v. Time Warner, Inc.,
    282 F.3d 147 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Chapman v. Houston Welfare Rights Organization,
    441 U.S. 600 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Colorado Christian Univ. v. Weaver,
    534 F.3d 1245 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Corporation of Presiding Bishop of Church of Jesus Christ of Latter-Day
    Saints v. Amos, 483 U.S. 327 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

County of Allegheny v. ACLU,
    492 U.S. 573 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Diaz v. Paterson,
    2008 U.S. App. LEXIS 21624 (2d Cir., October 17, 2008) . . . . . . . . . . . . . . . . . . . . . . . 22

Edwards v. Aguillard,
    482 U.S. 578 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14, 17

-iii-

## Table of Authorities

**Pages**

### Cases

Engel v. Vitale,
370 U.S. 421 (1962) ................................................................... 11

Excelsior College v. New York State Educ.Dept.,
306 A.D.2d 675, 761 N.Y.S.2d 700 (3d Dep't 2003) ............................. 7

Ex Parte Young,
209 U.S.123 (1908) .................................................................. 1

Ford v. McGinnis,
352 F.3d 582 (2d Cir. 2003) ......................................................... 11

Hafer v. Melo,
502 U.S. 21 (1991) ................................................................... 1

Harris v. McRae,
448 U.S. 297 (1980) .................................................................. 22

Koumantaros v. City University of New York,
2007 U.S. Dist. LEXIS 19530 (S.D.N.Y. March 19, 2007) ...................... 24

Larson v. Valente,
456 U.S. 228 (1982) .................................................................. 15

Lemon v. Kurtzman,
403 U.S. 602 (1971) .................................................................. 14

McCollum v. Board of Educ.,
330 U.S. 203 (1948)(Jackson, J., concurring) ................................. 12, 15

Mississippi Univ. for Women v. Hogan,
458 U.S. 718 (1982) .................................................................. 21

Mitchell v. Helms,
530 U.S. 793 (2000) ........................................................... 17, 18, 19

Moore v. Board of Regents,
44 N.Y.2d 593, 407 N.Y.S.2d 452 (1978) ..................................... 6, 14

## Table of Authorities

**Pages**

### Cases

Patrick v. LeFevre,
745 F.2d 153 (2d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Personnel Administrator of Massachusetts v. Feeney,
442 U.S. 256 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Pennhurst State Sch. & Hosp. v. Halderman,
465 U.S. 89 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Raygor v. Regents of the Univ. of Minnesota,
534 U.S. 533 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Salahuddin v. Coughlin,
993 F.2d 306 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Sherbert v. Verner,
374 U.S. 398 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Sioux City Bridge Co. v. Dakota County,
260 U.S. 441 (1923) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Smith v. Board of School Commissioners,
665 F. Supp. 684 (S.D. Ala.), rev'd, 827 F.2d 684 (11th Cir. 1987) . . . . . . . . . . . . . . . 11

Thomas v. Review Bd.,
450 U.S. 707 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 11

U.S. v. Allen,
760 F.2d 447 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 13

U.S. v. Meyers,
93 F.3d 1475 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

U.S. v. Moon,
718 F.2d 1210 (2d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

U.S. v. Seeger,
380 U.S. 163 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## Table of Authorities

**Pages**

### Cases

Warder v. Board of Regents,
  53 N.Y.2d 186, 440 N.Y.S.2d 875 (1981), cert. denied., 454 U.S. 1125 (1981)  . . 5, 6, 14

Weinbaum v. Cuomo,
  219 A.D.2d 554,  631 N.Y.S.2d 825 (1st Dep't 1995),
  app. dism'd, 87 N.Y.2d 917, 641 N.Y.S.2d 595 (1996)  . . . . . . . . . . . . . . . . . . . . . . . . . 23

Welsh v. U.S.,
  398 U.S. 333 (1970)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

West Virginia Bd. of Educ. v. Barnette,
  319 U.S. 624 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Wisconsin v. Yoder,
  406 U.S. 205 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Witters v. Washington Dept. of Services for the Blind,
  474 U.S. 481 (1986)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

Yick Wo v. Hopkins,
  118 U.S. 356 (1886) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Zelman v. Simmons-Harris,
  536 U.S. 639 (2002)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

### Federal Constitution

Eleventh Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 23, 24

First Amendment, Establishment Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Fourteenth Amendment, Equal Protection Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

## Table of Authorities

**Pages**

### Federal Statutes and Rules

20 U.S.C. § 1071, et seq., Federal Family Education Loan Program ("FFELP") . . . . . . . . . . . . 7
    20 U.S.C. § 1085(j) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

20 U.S.C. § 1681, et seq., Education Amendments of 1972
    Title IX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. § 1367 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

### Federal Rules of Civil Procedure
    12(b)
        12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
        12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

### Federal Rules of Evidence
    201(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

### New York State Constitution

Article 11, § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

### State Statutes

8 N.Y.C.R.R.
    Part 52 (Commissioner's Regulations) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 21
    § 3.47 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        § 3.47(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        § 3.47(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        § 3.47( c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        § 3.47(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    § 3.50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    § 52.2(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        § 52.1(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## **Table of Authorities**

**Pages**

### **State Statutes**

8 N.Y.C.R.R.

§ 52.1(f) ...................................................... 6

§ 52.2 ......................................................... 6

§ 52.2(a) ....................................................... 6

§ 52.2(b) ....................................................... 6

§ 52.2( c) ....................................................... 6

§ 52.2(c)(1) ................................................... 6

§ 52.2(d)-(f) .................................................... 6

§ 52.2(1) ....................................................... 6

New York Civil Rights Law

§ 40-c .................................................... 2, 3, 23

§ 40-c(1) ...................................................... 23

§ 40-c(2) ...................................................... 23

§ 40-d ........................................................ 23

New York Education Law

§ 101 .......................................................... 4

§ 201 .......................................................... 4

§ 202 ........................................................ 1, 4

§ 207 ........................................................ 5, 14

§ 210 .......................................................... 5

§ 214 .......................................................... 4

§ 215 .......................................................... 4

§ 652(2)(a)-( c) ................................................. 7

§ 661 .......................................................... 7

§ 666-669 ...................................................... 7

§ 670-680 ...................................................... 7

§ 680(1)(b) ..................................................... 7

§ 6401 ......................................................... 7

§ 6401(3) ..................................................... 17

### **Other Authorities**

Bart D. Ehrman, God's Problem: How the Bible Fails to Answer Our Most Important
Question - Why We Suffer (2008) ............................................. 15

## Table of Authorities

**Pages**

## Other Authorities

George C. Freeman III, The Misguided Search for the Constitutional Definition of
"Religion", 71 Geo. L. Rev. 1519, 1563-64 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Steven G. Gey, Why is Religion Special?: Reconsidering the Accomodation of
Religion Under the Religion Clauses, 52 U. Pitt. L. Rev. 75, 154 (1990) . . . . . . . . . . . 12

Stanley Ingber, Religion or Ideology: A Needed Clarification of the Religion Clauses,
41 Stan. L. Rev. 233, 264 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Laurence H. Tribe, American Constitutional Law, p. 1187 (2d ed. 1988) . . . . . . . . . . . . . 10-11

Jeffrey Usman, Defining Religion: The Struggle to Define Religion Under the First
Amendment and the Contributions and Insights of Other Disciplines of Study,
83 N. Dak. L. Rev. 123 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------------X

ROY DEN HOLLANDER, on behalf of himself and all others : 
similarly situated,                                       :
                                                          :
                         Plaintiff,                       :
                                                          : 08 Civ. 7286 (LAK)(KNF)
          -against-                                       :    ECF Case
                                                          :
INSTITUTE FOR RESEARCH ON WOMEN AND GENDER                :
AT COLUMBIA UNIVERSITY, et al.,                           :
                                                          :
                         Defendants.                      :
------------------------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF THE STATE DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

Defendants the Board of Regents of the University of the State of New York ("Regents")

and its Chancellor, Robert M. Bennett; Richard P. Mills, Commissioner of the New York State

Education Department ("SED"); and James C. Ross, President of the New York State Higher

Education Services Corporation ("HESC") (collectively, "State Defendants") submit this

memorandum of law in support of their motion to dismiss the complaint pursuant to Rules

12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.[1]

This is a case based on a metaphor. Plaintiff has invented a "religion of Feminism,"

whose Vatican he identifies as the Columbia University Women's Studies Program, and claims

that the many defendants violate the First Amendment's Establishment Clause by propagating or

---

[1]     Although the complaint names Chancellor Bennett, Commissioner Mills and
President Ross in their individual and official capacities, the complaint seeks only injunctive
relief of the type properly sought only against state officials in their official capacities. See Hafer
v. Melo, 502 U.S. 21, 27 (1991); Ex Parte Young, 209 U.S.123, 154 (1908). The complaint also
names the Board of Regents, a collective body, see New York Education Law § 202, "in his or
her individual capacity." The collective body has no individual capacity or gender. The proper
practice is to name the individual members of the Board of Regents, and sue each of them in the
appropriate capacities – in this case their official capacities.

supporting it, or even, in the case of the State Defendants, by failing to forbid its propagation and support. See Complaint ("Compl."), ¶ 67 ("If the Regents, Chancellor and Commissioner wanted the program changed or eliminated, a mere order from them would suffice.")[2]

Plaintiff also claims that the State Defendants violated his rights under the Fourteenth Amendment's Equal Protection Clause, apparently, as best the State Defendants can understand it, by permitting the existence of women's studies programs without also providing for men's studies programs, if, indeed, such programs exist. (Compl., ¶¶ 45-48, 55, 137)[3]

Finally, plaintiff claims that the State Defendants violated § 40-c of the New York Civil Rights Law, apparently for the same acts that, he contends, violate his Equal Protection rights.[4] (Compl., ¶¶ 106-111)

All these claims must be dismissed. First, the women's studies program at Columbia is a secular academic program, not a religion, and the State Defendants do not violate the Establishment Clause by registering it as an academic program and providing generally-available financial support either to Columbia or to its students. Second, the Equal Protection claim fails because plaintiff fails to identify – because he cannot identify – any State policy that explicitly

---

[2] This is not true. See pp. 4-6, infra.

[3] Plaintiff also asserts a claim under 42 U.S.C. § 1983. See Compl., ¶¶ 60-79. If plaintiff thinks it has any significance independent of the Establishment Clause and Equal Protection claims, he is wrong. Section 1983 does not itself create any substantive right – no one can "violate" § 1983 – it is simply the procedural vehicle for bringing claims established by other federal laws. See Chapman v. Houston Welfare Rights Organization, 441 U.S. 600, 617 (1979) The State Defendants will, therefore, treat plaintiff's "§ 1983 claim" as a restatement of his Establishment Clause and Equal Protection claims.

[4] The complaint also contains a claim under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq., see Compl., ¶¶ 80-105, but it is not asserted against the State Defendants.

2

discriminates on the basis of sex in education or is intentionally administered in such a way as to discriminate on the basis of sex. Finally, the claim under Civil Rights Law § 40-c must be dismissed because the Eleventh Amendment bars plaintiff from asserting it in federal court.

## FACTS

### A. Plaintiff and His Complaints

Plaintiff is an alumnus of Columbia University's Graduate School of Business. (Compl., ¶ 127) He has some potential interest in taking continuing education classes at Columbia, and has learned that Columbia has an Institute for Research on Women and Gender – a women's studies program – but no men's studies program. (Id., ¶¶ 128-29) In plaintiff's view, this lack of a men's studies program denies him and other men the educational and networking opportunities that he imagines women receive from courses in women's studies. (Id., ¶ 131) He also contends that there is a "religion of Feminism," that the faculty of Columbia's women's studies program are its priestesses, and that, by virtue of allowing the program to exist and allowing Columbia and Columbia students to receive public money, the defendants violate plaintiff's rights under the Establishment Clause. (Id., ¶¶ 2-28) To redress these alleged wrongs, plaintiff sues Columbia University, its trustees, and its women's studies program (the "Columbia Defendants"); the United States Department of Education and its Secretary (the "Federal Defendants"); and the State Defendants.

### B. The State Defendants: Powers and Responsibilities

The different State Defendants have different roles in higher education. First, the Board of Regents, its Chancellor, and the Commissioner of Education have various regulatory powers and oversee some forms of financial assistance to students and to institutions of higher education.

3

Second, HESC provides certain financial aid to students and guarantees student loans.

**1.** **The Regents and the Commissioner:** Since 1784, the Regents of the University of the State of New York have been empowered "to encourage and promote education, to visit and inspect its several institutions, to distribute to or expand or administer for them such property or funds as the state may appropriate therefor or as the university may own or hold in trust or otherwise." N.Y. Educ. Law § 201; see also § 202 (describing organization of the Board of Regents); N.Y. Constitution, Article 11, § 2 (continuing Board of Regents). The Regents appoint a Commissioner of Education to head the New York State Education Department, which "is charged with the general management and supervision of all public schools and all of the educational work of the state, including the operations of The University of the State of New York." N.Y. Educ. Law § 101.

All institutions of higher education in New York State, whether public or private, are part of the University of the State of New York, and must comply with its rules or any applicable laws. See N.Y. Educ. Law § 214. The Regents, the Commissioner, or any of their representatives "may visit, examine into and inspect, any institution in the university," and require reports. N.Y. Educ. Law § 215. The Regents may suspend the charter, or other rights and privileges, of any institution in the University of the State of New York "[f]or refusal or continued neglect . . . to make any report required, or for violation of any law or any rule of the university." Id. The Regents have broad power to "exercise legislative functions concerning the educational system of the state, determine its educational policies, and . . . establish rules for carrying into effect the

4

laws and policies of the state, relating to education." N.Y. Educ. Law § 207.[5]

Particularly relevant to the issues in this cases is the power of the Regents to "register domestic and foreign institutions in terms of New York standards, and fix the value of degrees, diplomas and certificates issued by institutions of other states or countries and presented for entrance to schools, colleges and the professions in this state." N.Y. Educ. Law § 210. Pursuant to this authority, the Regents have set requirements for earned undergraduate and graduate degrees. See 8 N.Y.C.R.R. § 3.47.

The basic requirement is that "No earned undergraduate or graduate degree shall be conferred unless the applicant has completed a program registered by the department [of Education]." 8 N.Y.C.R.R. § 3.47(a)(1). The Regents have established standards governing the eligibility of students to pursue undergraduate or graduate degrees, see 8 N.Y.C.R.R. § 3.47(a)(2), and general standards applicable to all registered undergraduate and graduate degrees. See 8 N.Y.C.R.R. § 3.47(c), (d). Currently, the Regents have registered 150 different degree programs that may be offered by qualifying institutions in New York State, including 20 in explicitly religious subjects, ranging from the S.M.B. degree for a Bachelor of Sacred Music to the S.T.D. degree for a Doctor of Sacred Theology. See 8 N.Y.C.R.R. § 3.50 (listing registered degrees).

---

[5]     One limit on the Regents's authority is relevant to the issues raised in this case: "But no enactment of the regents shall modify in any degree the freedom of the governing body of any seminary for the training of priests or clergymen to determine and regulate the entire course of religious, doctrinal, or theological instruction to be given in such institution." N.Y. Educ. Law § 207. As a result, although the Regents have broad general regulatory authority over explicitly religious educational institutions, such as seminaries, they have no authority to judge the correctness of any religious teaching. See Warder v. Board of Regents, 53 N.Y.2d 186, 440 N.Y.S.2d 875 (1981), cert. denied., 454 U.S. 1125 (1981) (denial of charter to seminary upheld when based on finding of secular, academic deficiencies).

"[E]very curriculum creditable toward a degree offered by institutions of higher education" in New York State must be registered with SED. [6] See 8 N.Y.C.R.R. § 52.1(a)(1). Under authority granted by the Regents, the Commissioner has set standards for the registration of undergraduate and graduate curricula. See 8 N.Y.C.R.R. § 52.2. The Commissioner's standards address such objective criteria as financial resources and physical plant and equipment, see 8 N.Y.C.R.R. § 52.2(a), sufficient, trained faculty, see § 52.2(b), minimum amounts of full-time equivalent study with adequately available course selections, see § 52.2(c), and various other requirements concerning admission to programs of study and administration. See § 52.2(d)-(f). "Registration or reregistration of a curriculum may be denied if the commissioner finds that curriculum, or any part thereof, not to be in compliance with statute or this Title." 8 N.Y.C.R.R. § 52.2(l).

The Commissioner and the Regents can refuse to register proposed degree programs if they fail to meet these secular, religion-neutral academic standards. See Moore v. Board of Regents, 44 N.Y.2d 593, 407 N.Y.S.2d 452 (1978) (upholding denial of registration for Ph.D. programs in English and History at the State University of New York at Albany based upon lack of sufficient faculty resources); Warder v. Board of Regents, 53 N.Y.2d 186, 440 N.Y.S.2d 875 (1981), cert. denied., 454 U.S. 1125 (1981) (upholding denial of charter to seminary based upon finding of secular, academic deficiencies).

Beyond their regulatory role in higher education, the Regents and SED also have a

---

[6] All courses offered must be "part of a registered curriculum," but individual courses are not themselves registered. See 8 N.Y.C.R.R. § 52.1(f); see also § 52.2 (describing registration standards). The institution must, however, describe courses offered in writing and state their subject matter and requirements. See 8 N.Y.C.R.R. § 52.2(c)(1).

6

financial role. Non-profit colleges and universities incorporated by the Regents maintaining one or more registered degree programs and meeting various educational standards receive cash awards, known as "Bundy Aid," see Excelsior College v. New York State Educ.Dept., 306 A.D.2d 675, 761 N.Y.S.2d 700 (3d Dep't 2003), based on the number and type of earned degrees awarded. See N.Y. Educ. Law § 6401.

**2. HESC:** HESC is an educational corporation and an agency of the State of New York created to administer New York State's financial aid programs and the Federal Family Education Loan Program ("FFELP") in New York State. See N.Y. Educ. Law, § 652(2)(a)-(c), 20 U.S.C. § 1071, et seq. HESC guarantees higher education loans made by private lenders under FFELP to New York State residents or to persons attending colleges or vocational schools in New York State. See N.Y. Educ. Law § 680(1)(b); 20 U.S.C. § 1085(j). HESC also administers programs providing direct grants of financial aid to students. See N.Y. Educ. Law §§ 666-669 (general awards), 670-680 (performance-based awards) All of these grants and loans are made to *students*, who may use the proceeds to attend any eligible institution of higher education and take any course of instruction approved for that institution. See N.Y. Educ. Law § 661.

## ARGUMENT

### POINT I

## THE ESTABLISHMENT CLAUSE CLAIMS MUST BE DISMISSED BECAUSE "FEMINISM" IS NOT A RELIGION AND THE STATE DEFENDANTS' ACTIVITIES DO NOT TEND TO ESTABLISH RELIGION

Plaintiff's claim that the State Defendants have violated his rights under the Establishment Clause by providing "aid and assistance for promoting and advocating Feminism and for training Feminists in the Women's Studies program at Columbia," (Compl., ¶ 133; see

7

also ¶ 132), fails at the threshold because "Feminism" is not a religion, but a secular academic point of view, and, as such, not the proper subject of an Establishment Clause challenge.

Furthermore, even assuming that "Feminism" is a religion, the State Defendants' enforcement of secular, religion-neutral educational standards and provision of generally-available financial aid to institutions and students do not violate the Establishment Clause.

## A.     "Feminism" is Not a Religion for Purposes of the Establishment Clause

Plaintiff appears to believe that some adherents of the secular viewpoint commonly known as "feminism" hold to it with the unreasoning fervor one associates with religion – or at least with others' religions. But the Constitution does not prohibit the establishment of, or protect the free exercise of, philosophies or viewpoints that share characteristics with religion; it prohibits the establishment, and protects the free exercise, of *religion* and only religion. "A way of life, however virtuous or admirable, may not be interposed as a barrier to reasonable state regulation . . . if it is based on purely secular considerations; to have the protection of the Religion Clauses, the claims must be rooted in religious belief." Wisconsin v. Yoder, 406 U.S. 205, 215 (1972). See also Thomas v. Review Bd., 450 U.S. 707, 713 (1981) ("Only beliefs rooted in religion are protected by the Free Exercise clause, which, by its terms, gives special protection to the exercise of religion.")

The Supreme Court, having clarified that the First Amendment's Religion Clauses apply only to religion, and abandoned suggestions that they apply as well to secular beliefs functionally equivalent to religion, has not since attempted to define "religion." See U.S. v. Seeger, 380 U.S. 163, 166 (1965); Welsh v. U.S., 398 U.S. 333, 340 (1970) (both expanding the Selective Service

8

Act's exemption for conscientious objectors to include objectors with non-religious moral or

ethical beliefs and suggesting that a different reading might violate the Religion Clauses);

Stanley Ingber, Religion or Ideology: A Needed Clarification of the Religion Clauses, 41 Stan. L.

Rev. 233, 264 (1989) ("While explicitly acknowledging the need to distinguish religion from

other belief systems, . . . the Court remains unwilling to commence the task.") In the absence of

cases requiring it to decide whether a given belief is "religious," the Court can hardly be blamed

for declining to take on "a difficult and delicate task." Thomas, 450 U.S. at 714. But lower

courts and commentators have struggled with the question, mainly in Free Exercise cases.

The scholarly commentary on how or whether to define religion is voluminous and

largely critical of the language courts use and the tests they propose.[7] Lower courts have evolved

three-part tests, see Africa v. Commonwealth of Pennsylvania, 662 F.2d 1025, 1032-1036 (3d

Cir. 1981), and ten-part tests, see U.S. v. Meyers, 93 F.3d 1475, 1482-85 (10th Cir. 1996). The

Second Circuit, for its part, has attempted a broad, but not boundless, definition:

> The term "religion" was defined by the Supreme Court nearly 100
> years ago . . . as having reference to a person's views of his
> relationship to his Creator. This definition seems unduly narrow
> today. In every religion there is an awareness of what is called
> divine and a response to that divinity. . . . But, there are religions
> which do not positively require the assumption of a God, for
> example, Buddhism and the Unitarian Church. Hence a broader
> definition of the word religion – one which we think more
> accurately captures its essence – is that formulated by the
> pre-eminent American philosopher, William James, who said
> religion means: "the feelings, acts, and experiences of individual
> men in their solitude, so far as they apprehend themselves to stand

---

[7]     An up-to-date summary of the scholarly literature can be found in Jeffrey Usman,
Defining Religion: The Struggle to Define Religion Under the First Amendment and the
Contributions and Insights of Other Disciplines of Study, 83 N. Dak. L. Rev. 123 (2007), citing
and discussing the principal works appearing in the last few decades.

> in relation to whatever they may consider the divine." . . . In
> referring to an individual's relation to what he considers the
> divine, Professor James used the word "divine" in its broadest
> sense as denoting any object that is godlike, whether it is or is
> not a specific deity.

U.S. v. Moon, 718 F.2d 1210, 1226-27 (2d Cir. 1983) (citations omitted).

One common thread in all these purported tests and definitions is that, at least in Free

Exercise cases, what matters is the subjective perspective of the *believer*, not an objective

examination of whether the purportedly religious belief is shared by others or doctrinally correct.

See Patrick v. LeFevre, 745 F.2d 153, 157 (2d Cir. 1984) ("courts have jettisoned the objective,

content-based approach previously employed to define religious belief, in favor of a more

subjective definition of religion, which examines an individual's inward attitudes towards a

particular belief system").

This "expansive definition of religion has been developed primarily to protect an

individual's free exercise of religion, recognizing that an individual's most sincere beliefs do not

necessarily fall within traditional religious categories." U.S. v. Allen, 760 F.2d 447, 450 (2d Cir.

1985). "Free Exercise cases generally involve claims brought by individuals or groups claiming to

belong to a cognizable religion," Alvarado v. City of San Jose, 94 F.3d 1223, 1227 (9th Cir. 1996),

and thus necessarily involve determining whether the *claimants'* beliefs are religious.

In contrast, "[e]stablishment cases usually, though not always, involve well known

religions, because these are most likely to generate the dangers the clause is designed to prevent."

Alvarado, 94 F.3d at 1227; see also George C. Freeman III, The Misguided Search for the

Constitutional Definition of "Religion", 71 Geo. L. Rev. 1519, 1563-64 (1983) (Establishment

Clause cases turn on the meaning of "establishment," not the meaning of "religion"); Laurence H.

10

Tribe, American Constitutional Law, p. 1187 (2d ed. 1988) (the meaning of "religion" rarely arises in Establishment Clause cases). But see Smith v. Board of School Commissioners, 665 F. Supp. 684 (S.D. Ala.), rev'd, 827 F.2d 684 (11th Cir. 1987) (district court erroneously held that "secular humanism" was a religion, that it was taught in schools, and that such teaching violated the Establishment Clause).

In Establishment Clause cases, relying on the claimants' beliefs about the religious character of the practice they oppose is problematic, especially where the claimants "ask [the court] to recognize as a 'religion' what that religion's alleged adherents have not identified as such." Allen, 760 F.2d at 450. In a Free Exercise case, claimants with a purely subjective and idiosyncratic viewpoint that is, nevertheless, religious put the government to the often manageable burden of accommodating objections to generally-applicable laws or government programs by, for example, paying unemployment insurance to persons whose religious beliefs prevent them from working on particular days, see Sherbert v. Verner, 374 U.S. 398 (1963), or at particular jobs, see Thomas v. Review Bd., 450 U.S. 707 (1981), or exempting objecting students from flag salute ceremonies, see West Virginia Bd. of Educ. v. Barnette, 319 U.S. 624 (1943), or providing a particular diet, see Ford v. McGinnis, 352 F.3d 582 (2d Cir. 2003), or the time, place, and wherewithal to pray. See Salahuddin v. Coughlin, 993 F.2d 306 (2d Cir. 1993). In an Establishment Clause case, by contrast, the claimant seeks to stop the government from enforcing its laws or pursuing its programs at all. See, e.g., Engel v. Vitale, 370 U.S. 421 (1962) (state-sponsored prayer in public school); Edwards v. Aguillard, 482 U.S. 578 (1987) (teaching of "creation science" in public schools).

Government cannot function, however, if every individual can claim that some program or

11

activity offends his or her subjective and idiosyncratic conception of "religion" and, in the name

of the Establishment Clause, bring it to a halt. See Steven G. Gey, Why is Religion Special?:

Reconsidering the Accommodation of Religion Under the Religion Clauses, 52 U. Pitt. L. Rev.

75, 154 (1990) ("applying the same broad definition in establishment cases could shut down the

modern regulatory state"). The educational system is particularly vulnerable to claims that it

violates the Establishment Clause by promoting some arguably religious teaching with which a

plaintiff might disagree:

> Authorities list 256 separate and substantial religious bodies to
> exist in the continental United States. Each of them . . . has as
> good a right as this plaintiff to demand that the courts compel
> the schools to sift out of their teaching everything inconsistent
> with their doctrines. If we are to eliminate everything that is
> objectionable to any of these warring sects or inconsistent with
> any of their doctrines, we will leave public education in shreds.

McCollum v. Board of Educ., 330 U.S. 203, 235 (1948) (Jackson, J., concurring). The threat

Justice Jackson saw to the educational system is exponentially greater when the universe of

potential claimants is expanded, as it has been in Free Exercise cases, beyond "separate and

substantial religious bodies" to subjective and idiosyncratic individual religious belief.

The Second Circuit, however, avoids that exponentially expanded threat in Establishment

Clause cases by defining "religion" not subjectively and idiosyncratically, but objectively, as that

which is conventionally recognized as "religion":

> we adopt for establishment clause purposes the conventional,
> majority view, rather than the appellant's view, of what is
> religious and what is political. . . . That the Government
> advances what is, conceivably, someone's religion, however,
> does not make what most citizens consider a political or
> military action a violation of the establishment clause.

12

Allen, 760 F.2d at 450 (rejecting Establishment Clause defense to charge of destroying military property allegedly used to advance "religion" of "Nuclearism"). This approach recognizes that governments generally act in response to the desires of politically significant constituencies; if they do something that establishes "religion," they generally do it in response to communally-recognized religious sentiment, not idiosyncratic, individual religious claims. It is, in addition, consistent with the Supreme Court's holding that whether a government action has the primary effect of advancing religion is determined objectively, by whether a reasonable observer would perceive the practice as having that effect. See County of Allegheny v. ACLU, 492 U.S. 573, 620, 635-36, 642-43 (1989); Altman v. Bedford Cent. Sch. Dist., 245 F.3d 49, 75 (2d Cir.), cert. denied., 534 U.S. 827 (2001).

A court may rely on judicially-noticeable facts in granting a motion to dismiss. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002). The "conventional, majority view" of the community on a topic of general interest – which judges, being members of the community are likely either to share or to know – is "not subject to reasonable dispute in that it is . . . generally known within the territorial jurisdiction of the trial court." Fed. R. Evid. 201(b). This Court can take judicial notice that, under the "conventional, majority view," what plaintiff identifies as the "religion of Feminism" is a secular point of view, not a religion. Therefore, the Establishment Clause claim fails at the threshold, and must be dismissed.

**B.    Registration of Curricula and Degree Programs That Comply With Religion-Neutral Academic Standards Does Not Constitute an Establishment of Religion**

Whether "Feminism" is a religion or not, the actions of the Regents and the Commissioner in registering degree programs and approving curricula do not establish religion. Rather, the State

13

applies secular, religion-neutral academic criteria to determine which educational institutions – be they secular or religious – may offer what degrees in what subjects. See N.Y.C.R.R. Part 52 (Commissioner's Regulations).

To survive an Establishment Clause challenge, government practices must (1) "have a secular legislative purpose," (2) have a "principal or primary effect . . . that neither advances nor inhibits religion," and (3) "not foster an excessive government entanglement with religion." Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971); see also Altman, 245 F.3d at 75. The State's registration and approval of degree programs and curricula easily passes all three parts of the test.

**1.    Secular Purpose:** The question to be answered in determining whether the challenged activities have a secular purpose is "whether government's actual purpose is to endorse or disapprove of religion." Edwards v. Aguillard, 482 U.S. 578, 585 (1987). The purpose of the State's regulatory scheme for registering degree programs and approving curricula is apparent on its face. Nothing in it refers to religion.[8] The criteria governing whether to register a degree program – in a secular or a religious subject – or to approve a curriculum, are objective, secular criteria designed to advance educational quality, and nothing else. See pp. 4-6, supra. Both secular and religious programs have been approved and both secular and religious programs have been denied for purely secular reasons. See Moore, 44 N.Y.2d 593, 407 N.Y.S.2d 452 (1978) (denying registration for Ph.D. programs in English and History); Warder, 53 N.Y.2d 186, 440 N.Y.S.2d 875 (1981), cert. denied., 454 U.S. 1125 (1981) (denying charter to seminary). Nothing in the complaint suggests that this comprehensive, secular, religion-neutral scheme to assure educational

---

[8]    Except for N.Y. Educ. Law § 207, which denies the Regents and the Commissioner the power to interfere with the academic freedom of religious institutions to determine religious orthodoxy. See fn. 5, supra.

14

quality is nevertheless intended to advance religion. Therefore, it passes the "secular purpose" test.

**2. Primary Effect:** "For a law to have forbidden 'effects' under Lemon, it must be fair to say that the *government itself* has advanced religion through its own activities and influence." Corporation of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos, 483 U.S. 327, 337 (1987) (emphasis in original). The State's registering degree programs and approving curricula do not themselves advance religion. At most, they permit the academic teaching of religious subjects with some assurance of quality. It is by no means a foregone conclusion that the study even of explicitly religious subjects will enhance religious faith. See Bart D. Ehrman, God's Problem: How the Bible Fails to Answer Our Most Important Question – Why We Suffer (2008) (prominent religious scholar explains how his scholarly explorations into the foundations of his faith led to loss of belief). Because the State's activities neither advance nor inhibit religion, they pass the "effects" test.

**3. Entanglement:** "[T]he First Amendment rests upon the premise that both religion and government can best achieve their lofty aims if each is left free from the other within its respective sphere." McCollum, 333 U.S. at 212. Entanglement issues particularly arise when the State's activities create the danger of "state inspection and evaluation of the religious content of a religious organization." Larson v. Valente, 456 U.S. 228, 255 (1982). No such danger exists in this case. The regulations that the Regents and the Commissioner enforce do not require, authorize, or even permit, examination into the religious content of curricula or courses. See pp 4-6, supra. The examination required to register a doctoral program in theology is the same type of examination required to register a doctoral program in American history. If the institution has the

15

proper resources and systems, its program is registered. Whether the theology faculty teaches Arianism or Donatism is as irrelevant to registration as whether the historian of the American South is pro- or anti-slavery.

The Commissioner and the Regents must review proposed programs before registering them, and may periodically review them for compliance with regulations, but that does not amount to excessive entanglement. See Bowen v. Kendrick, 487 U.S. 589, 615-17 (1988) (no excessive entanglement where government reviews adolescent counseling programs of religious institutions receiving government grants, reviews the materials used, and monitors the program by periodic visits). The State's system for registering degree programs and curricula creates no danger of entanglement with religion.

## C. Bundy Aid May be Given Even to Religious Institutions and Programs Without Violating the Establishment Clause

Plaintiff also contends that "the Commissioner provides direct financial aid to Columbia University, [its women's studies program] and Continuing Education that go into promoting Feminism of the Women's Studies program." Compl., ¶ 18 The State Defendants' best guess is that plaintiff refers to the Bundy aid given to all qualifying institutions (including Columbia) *per capita*, based upon the graduates produced. See pp. 6-7, supra. Plaintiff appears to believe that this aid violates the Establishment Clause. Compl., ¶ 28 Under the controlling Supreme Court precedents, it does not.

At the outset, however, it is not clear just what plaintiff thinks the Establishment Clause violation is. Columbia is a private, non-sectarian university. Financial aid to private, non-sectarian universities presents no Establishment Clause problem. Universities may offer courses and majors

16

in explicitly religious subjects without violating the Establishment Clause. See Edwards v. Aguillard, 482 U.S. at 594. Even assuming that there is a "religion of Feminism," and the women's studies department at Columbia teaches about it – and the complaint alleges nothing more – aid to Columbia would not violate the Establishment Clause.

Whatever plaintiff's theory may be, even direct financial aid to sectarian institutions that teach explicitly religious subjects presents no Establishment Clause issue so long as the aid (1) has a secular purpose, (2) neither results in religious indoctrination by government nor defines its recipients by reference to religion, and (3) does not create excessive entanglement. See Mitchell v. Helms, 530 U.S. 793, 807 (2000); Agostini v. Felton, 521 U.S. 203, 222-23 (1997). Because Bundy aid is given to all qualifying institutions of higher education, see pp. 6-7, supra, and involves nothing more than the cutting of a check and periodic review to see that the qualifying institutions continue to qualify, there can be no serious question concerning either the first or third prongs of the test, secular purpose or entanglement. The only issues warranting discussion are whether Bundy aid results in religious indoctrination by government or defines its recipients by reference to religion.

**1. Religiously-Neutral Definition of Beneficiaries:** Bundy aid is distributed to any qualifying institution of higher education, based solely on the number and type of degrees earned. See N.Y. Educ. Law § 6401(3). The religious affiliation, if any, of either the student or the institution is irrelevant. It cannot, therefore, be said that the State defines Bundy aid recipients by reference to religion. See Mitchell, 503 U.S. at 830 (upholding aid program directed to a "[b]road array of schools eligible for aid without regard to their religious affiliations or lack thereof" based on enrollment); Agostini, 521 U.S. at 231 (noting that Court has "sustained programs that

17

provided aid to *all* eligible children regardless of where they attend school").

**2. No Indoctrination by the Government:** The key issue is whether an institution's use of government aid to indoctrinate students in religion is attributable to the government. See Agostini, 521 U.S. at 230. Where, as here, "the religious, irreligious, and a-religious alike are eligible for governmental aid, no one would conclude that any indoctrination that any particular recipient conducts has been done at the behest of the government." Mitchell, 530 U.S. at 809. Furthermore, because the aid is given in a non-discriminatory fashion and is based entirely on where students choose to go to college and whether they graduate, it follows that students' private choices, not governmental action, determine whether the students are exposed to religious indoctrination. See Mitchell, 530 U.S. at 810 ("if numerous private choices, rather than the single choice of a government, determine the distribution of aid pursuant to neutral eligibility criteria, then a government cannot, or at least cannot easily, grant special favors that might lead to a religious establishment"). If Bundy aid were distributed in a way that created incentives for students to choose colleges or universities where they might undergo religious indoctrination, an Establishment Clause issue might arise, but "[t]his incentive is not present . . . where the aid is allocated on the basis of neutral, secular criteria that neither favor nor disfavor religion, and is made available to both religious and secular beneficiaries on a nondiscriminatory basis." Agostini, 521 U.S. at 231.

Private colleges and universities in New York State, whether secular or religious, receive the same dollar amount of Bundy aid per student, per degree. Aid distributed on this basis creates no economic incentive that would cause a student to prefer a religious over a secular school, or vice versa. The aid, if large enough, might create an incentive for a student to attend *some* college

18

rather than none at all, but the Bundy aid distribution formula does not tilt the playing field or otherwise influence the students' private choice of which college to attend. Using state money to facilitate such private choice does not violate the Establishment Clause. "If aid to schools, even 'direct aid,' is neutrally available and, before reaching or benefitting any religious school, first passes through the hands (literally or figuratively) of numerous private citizens who are free to direct the aid elsewhere, the government has not provided any 'support of religion.'" Mitchell, 530 U.S. at 816 (upholding government aid to private schools, including religious schools, distributed on the basis of enrollment).

## D.    Because HESC Provides Grants and Loan Guarantees to Students Rather Than Institutions, its Activities Do Not Violate the Establishment Clause

HESC has a separate and distinct ground for dismissal of the Establishment Clause claim, entirely independent of whether Columbia University's women's studies program inculcates a "religion of feminism." Because HESC's programs work by giving aid to individual students, not institutions, the independent choices of those students about which institutions and programs to attend insulate HESC from an Establishment Clause challenge.

Providing generally-available financial aid to students who choose to attend religiously-affiliated colleges or pursue explicitly religious studies is permitted under the Establishment Clause. See Witters v. Washington Dept. of Services for the Blind, 474 U.S. 481, 485-89 (1986) (Establishment Clause does not forbid use of generally-available vocational education aid to student planning to study for ministry). See also Zelman v. Simmons-Harris, 536 U.S. 639, 652 (2002) ("where a government aid program is neutral with respect to religion, and provides assistance directly to a broad class of citizens who, in turn, direct government aid to religious

19

schools wholly as a result of their own genuine and independent private choice, the program is not readily subject to challenge under the Establishment Clause."); Colorado Christian Univ. v. Weaver, 534 F.3d 1245, 1253 (10th Cir. 2008) ("It is now settled that the Establishment Clause permits evenhanded funding of education – religious and secular – through student scholarships.").

HESC administers financial aid and guarantees loans to *students* pursuing higher education at qualifying institutions. See p. 7, supra. Students are free to use the grant or loan proceeds – only some of which are state funds – at any qualifying institution for any qualifying educational program. (Id.) Students may use the proceeds to attend religiously-affiliated colleges and take explicitly religious courses. (Id.) As a provider of generally-available aid to students whom make their own independent, private educational choices, HESC comes squarely within the Witters-Zelman rule, which requires that the Establishment Clause claim against HESC be dismissed.

## POINT II

### THE EQUAL PROTECTION CLAIM MUST BE DISMISSED BECAUSE THE APPLICABLE LAWS ARE GENDER-NEUTRAL AND HAVE BEEN ADMINISTERED IN A GENDER-NEUTRAL FASHION

Plaintiff also contends that Columbia's having a women's studies program, and the State Defendants' allowing it to exist while failing to provide for a men's studies program, violate his rights under the Equal Protection Clause. See Compl., ¶¶ 45-48, 55, 137. Insofar as the State Defendants are concerned, plaintiff bases his Equal Protection claim on unspecified "policies and practices [that] effectively ban Men's Studies from Columbia," Compl., ¶ 47, and thereby "deny[] males the same educational opportunity as provided females," Compl., ¶ 48, because "no

20

comparable public assistance is provided to further the interests of male students and male alumni and no equivalent governmental largess is provided to counter anti-male discrimination." Compl., ¶ 55 So understood, plaintiff fails to state an equal protection claim based on sex discrimination.

It is long-settled law that "the purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." Sioux City Bridge Co. v. Dakota County, 260 U.S. 441, 445 (1923). Plaintiff identifies no statute, regulation, or other source of law that imposes by its terms a discriminatory sex-based classification, and he cannot because there is none. Likewise, plaintiff fails to identify any administration or enforcement of facially neutral laws "with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations." Yick Wo v. Hopkins, 118 U.S. 356, 373-74 (1886).

If a "challenged policy explicitly discriminates . . . on the basis of gender," the party seeking to uphold the policy "must carry the burden of showing an 'exceedingly persuasive justification' for the classification." Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 723-24 (1982) (striking down female-only policy at state nursing school). In this case, no statute or regulation "explicitly discriminates . . . on the basis of gender." The regulations governing standards for registration of degree programs are completely general. By their terms, they apply to all academic subjects. See 8 N.Y.C.R.R. Part 52. Nothing in the regulations favors women's studies programs or disfavors men's studies programs – whatever plaintiff may conceive them to be. Therefore, plaintiff's equal protection claim must be based on unequal administration.

"A facially neutral statute violates equal protection only if it 'has been applied in an

21

intentionally discriminatory manner' or 'has an adverse effect and . . . was motivated by discriminatory animus.'" Diaz v. Paterson, 2008 U.S. App. LEXIS 21624 at *36 (2d Cir., October 17, 2008), quoting Brown v. City of Oneonta, 221 F.3d 329, 337 (2d Cir. 2000). To state an Equal Protection Clause violation, a complaint must allege that "the decision maker. . . selected or reaffirmed a particular course of conduct at least in part *because of* not merely *in spite of* its adverse effects on a particular group." Personnel Administrator of Massachusetts v. Feeney, 442 U.S. 256, 279 (1979); see also Harris v. McRae, 448 U.S. 297, 323 n. 26 (1980) ("it is incumbent upon the challenger to prove that Congress selected or reaffirmed a particular course of action 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group").

Plaintiff's claims that the State Defendants have violated the Equal Protection Clause by registering and funding women's studies programs, but not men's studies programs, do not allege action with an adverse effect on men at all, let alone action taken "because of" adverse effects on men. Plaintiff does not allege that the State Defendants have ever refused to register or fund any men's studies programs for any reason, let alone a discriminatory one. See Compl., ¶¶ 44-59. Plaintiff does not allege that any men's studies program ever sought registration or funding, or even that any men's studies program was deterred from seeking registration or funding because the State Defendants' bias would render any such attempt. Id. For all that appears in the complaint, moreover, men's studies programs may not even exist. If so, plaintiff's grievance is with the private sector for failing to create them, not with the State Defendants for failing to register or fund non-existent programs.

Because the laws and regulations governing registration and funding of degree programs are, by their terms, gender-neutral, and because the State Defendants are not alleged to have

22

administered them in an unequal way, plaintiff's Equal Protection claims must be dismissed.

## POINT III

## THE CLAIMS UNDER CIVIL RIGHTS LAW § 40-c MUST BE DISMISSED BECAUSE OF ELEVENTH AMENDMENT IMMUNITY

Plaintiff asserts claims under § 40-c of the New York Civil Rights Law, see Compl., ¶¶ 106-111, and seeks injunctive and declaratory relief based, in part, on alleged violations of this state law. (Compl., ¶¶ 134-138) Insofar as he asserts these claims against the State Defendants and seeks equitable relief requiring the State Defendants to comply with state law, they are barred by the Eleventh Amendment.

Section 40-c of the New York Civil Rights Law consists of two parts. The first essentially re-states the Constitutional requirement that all persons in the State are entitled to equal protection of the laws.[9] See N.Y. Civ. Rts. Law § 40-c(1). The second provides, in relevant part, that no person shall be deprived of civil rights because of, *inter alia*, sex.[10] See N.Y. Civ. Rts. Law § 40-c(2). The civil remedy for violations of § 40-c is a penalty of between 100 and 500 dollars, recoverable by the person aggrieved, see N.Y. Civ. Rts Law § 40-d, although plaintiff has not asked for this penalty and seems to seek declaratory and injunctive relief instead. Compl., ¶¶ 132-

---

[9]     To the extent that plaintiff relies on § 40-c(1), the claim fails for the reasons given in Point II, supra.

[10]     It is unclear what particular "civil right" plaintiff claims to have been denied because of his sex. Plaintiff does not, for example, allege that he has been excluded from women's studies programs because of his sex; he just does not like them. But there is no "civil right" to higher education of a particular form or content. See Weinbaum v. Cuomo, 219 A.D.2d 554, 556, 631 N.Y.S.2d 825, 838 (1st Dep't 1995), app. dism'd, 87 N.Y.2d 917, 641 N.Y.S.2d 595 (1996) (allegation that largely white State University system is better-funded than largely minority City University system fails to state claim under § 40-c because there is no civil right to a publicly-financed higher education).

23

39.

Although 28 U.S.C. § 1367 generally grants the Court supplemental jurisdiction over

related state law claims, it does not abrogate the Eleventh Amendment immunity of unconsenting

states. See Raygor v. Regents of the Univ. of Minnesota, 534 U.S. 533, 542 (2002) (supplemental

jurisdiction does not abrogate Eleventh Amendment immunity of state to state law claims);

Koumantaros v. City University of New York, 2007 U.S. Dist. LEXIS 19530, at *19 (S.D.N.Y.

March 19, 2007) (same). Moreover, the Eleventh Amendment forbids federal courts to enjoin

state agencies or officials to conform their conduct to the requirements of state law, even if the

requirements of state law are the same as those of comparable federal laws. See Pennhurst State

Sch. & Hosp. v. Halderman, 465 U.S. 89, 106 (1984). Therefore, the state law claims must be

dismissed.

## CONCLUSION

For the reasons given, the complaint should be dismissed as against the State Defendants,

together with such further relief as the Court deems just and proper.

Dated: New York, New York
       October 24, 2008

                                ANDREW M. CUOMO
                                Attorney General of the
                                 State of New York
                                Attorney for the State Defendants
                                By:

                                CLEMENT J. COLUCCI
                                Assistant Attorney General
                                120 Broadway
                                New York, New York 10271
                                (212) 416-8634
                                Clement.Colucci@oag.state.ny.us

24