UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------------------x
Roy Den Hollander and William A. Nosal,

               Docket No. 08 Civ 7286

    Plaintiffs on behalf of themselves
    and all others similarly situated,     **FIRST AMENDED**
                  **CLASS ACTION**
                  <u>**COMPLAINT**</u>

      -against-

Institute for Research on Women & Gender at Columbia University;
School of Continuing Education at Columbia University;
Trustees of Columbia University in the City of New York;
U.S. Department of Education;
Margaret Spellings, U.S. Secretary of Education in her official capacity;
Board of Regents of the University of the State of New York, in his
   or her official and individual capacity;
Chancellor of the Board of Regents, Robert M. Bennett, in his official
   and individual capacity;
New York State Commissioner of the Department of Education,
   Richard P. Mills, in his official and individual capacity; and
President of the New York State Higher Education Services Corp.,
   James C. Ross, in his official and individual capacity;

    Defendants.
-----------------------------------------------------------------------------------x

# I.  Introduction

1.  This class action seeks declaratory and injunctive relief and nominal damages against the
    defendants for the following:

    a.  The New York State and Federal defendants violate the 1st Amendment to the U.S.
        Constitution by aiding the establishment of the religion **Feminism** at Columbia
        University through the University's Women's Studies program;
    b.  The U.S. Department of Education and its Secretary violate equal protection under the 5th
        Amendment to the U.S. Constitution by aiding the intentional discriminatory impact
        against men by Columbia University's Women's Studies program;
    c.  The New York State defendants violate the equal protection clause of the 14th
        Amendment to the U.S. Constitution (enforced by 42 U.S.C. § 1983), and Title IX of the
        Education Amendments of 1972 (20 U.S.C. 1681 *et seq*.) by fostering, supporting and
        assisting the intentional discriminatory impact against men by Columbia University's
        Women's Studies program; and
    d.  Columbia University, its Institute for Research on Women and Gender, and its School of
        Continuing Education carry out the intentional discriminatory impact against men of the

Women's Studies program in violation of the equal protection clause of the 14th Amendment to the U.S. Constitution (enforced by 42 U.S.C. § 1983), Title IX of the Education Amendments of 1972 (20 U.S.C. 1681 *et seq*.), and N.Y. Civil Rights Law § 40-c.

## II.  Violation of the Establishment Clause of the First Amendment

2.  The New York State ("State")[1] and the Federal defendants ("USDOE") violate the establishment clause of the First Amendment to the U.S. Constitution by aiding and advancing the modern-day religion of Feminism proselytized and indoctrinated through the Women's Studies program by Columbia University's Institute for Research on Women and Gender ("IRWG"), which also propagates Feminism in the School of Continuing Education ("Continuing Education") and the University as a whole.

3.  Women's Studies programs are much "broader than what happens in the classroom," and work "to transform [college] curriculum, the campus environment, and society at large," according to the National Women's Studies Association, www.nwsa.org/center/index.php, of which Columbia is an institutional member.

4.  The establishment clause forbids government action that benefits a religion.  A belief system need not be theistic in nature to be a religion but rather can stem from moral, ethical or even malevolent tenets that are held with the strength of traditional religious convictions.  Gods or goddesses are not needed for a religion.

5.  The Feminism practiced at Columbia University, Continuing Education and IRWG:
    a.  Indoctrinates theories as to the place in the order of nature for males and females.
    b.  Propagates basic attitudes to the fundamental problems of life.
    c.  Defines the fundamental concerns for humans in modern day society.
    d.  Proselytizes moral codes of right and wrong.
    e.  Personalizes the political, social and cultural aspects of life.
    f.  Foists a broad system for conduct in all spheres of existence, including appropriate acts of volition; correct thinking; acceptable language, such as "issues" for "problems," "gender" for "sex," unless verbally attacking a man, "conversation" for "monologue."
    g.  Inculcates comprehensive beliefs on matters ranging from the insignificant through the ordinary to the material which are accepted as true, such as the difference between right and wrong, good and evil, how to live one's life and die one's death.
    h.  Provides a series of answers to questions on how to live, work and relate to others in this existence.
    i.  Provides answers on how to deal with certain situations that arise throughout life.
    j.  Mandates a lifestyle.
    k.  Combines Feminist research on various topics into a comprehensive belief system that has spread throughout Columbia into the society as a whole.

---

[1] The term "State" is also used to refer collectively to all the New York defendants.

      l.   Validates the spirit of its followers with importance, meaning, purpose, and security, which the weak can only find in numbers and conformity.

      m.  Combines beliefs on politics, philosophies, culture, history, sociology, religion, pseudo-science, government, education, media, labor and other areas of human endeavors into a holistic system of a Feminist world view with tenets for comprehension and commandments for conduct.

      n.   Inculcates beliefs based on the teachings of certain prophet-like individuals, such as Betty Freidan.

6.   The core of Columbia University's Feminist apple is IRWG:

      a.   IRWG is a well-organized institution with its own budget, mission, goals, and structure that places the director on top, followed by tenured instructors, then untenured instructors, and lastly the budding followers.

      b.   IRWG's administrators and teachers act similarly to priestesses by keeping and teaching Feminist tenets.

      c.   IRWG, as it admits, propagates Feminism through the Women's Studies program and throughout the University and into society.

      d.   IRWG exalts certain Feminists to apostle-like status and celebrates certain days of the year as important to Feminism.

7.   Religion includes an irrational belief system that has the power to cause its followers to act against their self-interest.

8.   The Feminism propagated by Women's Studies at Columbia University has, among others, the following irrationalities in that it:

      a.   advocates a quota-ocracy as opposed to a meritocracy,

      b.   promotes a female commander in chief but not female draft registration,

      c.   wants the best jobs for females but for them to be protected them from the worst,

      d.   believes an accident of nature, being born female, entitles females to preferential treatment,

      e.   complains about females being disenfranchised by males, yet there are seven million more voting females in the American democracy,

      f.   lobbied for and received Federal and State offices dedicated to female health when ladies live longer than males, and

      g.   propagates the belief that females are divine princesses and men the minions of Satan, a proposition for which there is no proof, only faith.

9.   The irrationality of Feminism propagated by Columbia University's Women's Studies program is illustrated by the motto:  "I am women; I am strong.  I am women; I am victim." Clearly contradictory concepts, since it is the weak who are victimized.

10.  The adherence to Feminism causes female followers to act against their self-interest.  For example, Feminism generally alienates men with the result that Feminists often wake up in the middle of the night crying because they are alone.

11. IRWG adopts and propagates the modern-day religion of Feminism with its denominational tenets through IRWG lectures, seminars, consciousness indoctrination sessions, publications, career preparations, counseling, historical revisionism, propagandizing, unanimity of thought labeled "politically correct," a pantheon of idols such as Mary Wollstonecraft, *de facto* disciples and apostles, and three public lecture series.

12. The IRWG website states that the Institute "is the locus of interdisciplinary feminist scholarship and teaching at Columbia University" and "[t]he [Women's Studies] program is intended to introduce students to the long arc of feminist discourse about the cultural and historical representation of nature, power, and the social construction of difference.  It encourages them to engage the debates regarding the ethical and political issues of equality and justice that emerge in such discussions.  And it links the questions of gender and sexuality to those of racial, ethnic, and other kinds of hierarchical difference."

13. In Columbia University's Women's Studies program, scientific differences between the sexes are replaced with the faith-based premise that differences between the sexes are socially constructed, are the result of social programming.  This blind ignorance of neuroscience, evolution, and biology is essential for Feminism to use political means to reshape social relations between the sexes in which females are considered the chosen ones.

14. Feminism at Columbia University avoids the scientific method in that its tenets are not the result of knowledge gained by testing hypotheses to develop understanding through the elucidation of facts or evaluation by experiments.

15. Unlike scientific knowledge, Feminism ignores later refinement of its doctrine in the face of new information.  Columbia's Women's Studies, as with the Catholic Church in the Middle Ages, decides which scientific evidence is acceptable and which unacceptable depending on whether it supports its dogma.

16. Columbia University's Continuing Education furthers the spreading of the religion Feminism by providing post-baccalaureate studies for graduate school preparation and alumni Women's Studies instruction and training established by IRWG.

17. The Board of Regents of the University of the State of New York, in his or her official and individual capacity, and the Chancellor of the Board of Regents, in his official and individual capacity, ("Regents") have promulgated policies and plans for the propagation of the modern-day religion of Feminism by requiring Women's Studies programs in higher education in New York.

18. The Regents have provided further assistance to inculcating Feminism into higher education and New York State as a whole by reviewing and approving Women's Studies programs, such as Columbia University's, and providing financial support, whether direct or indirect, for Women's Studies programs that include Columbia's.

19. While the Regents have no authority to judge the correctness of any religious teaching, they have effectively done so with their policy advancing the propagation of Feminism through Women's Studies programs.

20. USDOE assists the propagation of Feminism at Columbia University by the delegation of its accreditation powers to the Regents, which the Regents, with USDOE knowledge, use to approve USDOE funds to support Columbia University's Women's Studies program.

21. USDOE funds are paid both directly to Columbia University and indirectly to the students who then pay over the funds to Columbia.

22. The religion Feminism has spread across the land due to Women's Studies programs providing faith-based, unscientific rationales for the preferential treatment of females.

23. Neither Federal nor State government may favor any sect; they may not adopt programs or practices that aid any religion, but both have done that.  The State by the Regents requiring Women's Studies programs that propagate Feminism and then providing such programs support and approval, directly and indirectly.  And the USDOE by delegating its accrediting power to the Regents, which employed that power under USDOE auspices to further the religion Feminism by approving Columbia University and other institutions eligible for Federal student aid programs.

### III.  Higher Education's Structure and Imposition of Feminist Orthodoxy

24. The Regents and the University of the State of New York (not to be confused with the State University of New York (SUNY)) form the oldest, continuous educational entity in America.

25.  The Regents are responsible for the general supervision of educational activities within the State, presiding over the University of the State of New York and New York's Education Department ("N.Y. Education").

26. The University of the State of New York is America's most comprehensive and unified educational system, which encompasses all the institutions, both public and private, offering education in the State.  It is a unified and widely inclusive holding company embracing all educational activity in the State.

27. The Regents mission is to provide educational programs and services to the residents of the State.

28. The Regents exercise legislative functions concerning the higher educational system in the State, determine higher education policies, and establish the rules for carrying those policies into effect throughout the higher educational institutions of the State, which includes Columbia University.

29. The Regents are responsible for planning, coordinating, evaluating quality, and promoting equity and access in the programs of higher educational institutions.

30. The Regents determine in which subject areas tenure will be offered and have designated Women's Studies as one, but there has been no such designation for Men's Studies.

31. Every eight years the Regents develop or update their master plan for higher education in New York called the Statewide Plan for Higher Education, and every four years the Regents review the plan's implementation by institutions, such as Columbia University.

32. The formation of Statewide Plans begin when the Regents receive from higher educational institutions, such as Columbia University, each individual institution's long range master plan for providing education programs, such as a Women's Studies program.

33. The Regents review these plans and formulate a plan for the development of higher education in the State as a whole that becomes effective on approval by the Governor.

34. On information and belief, Columbia University's master plan for Women's Studies was approved by its incorporation into the Regents' Statewide Plans.  Without such approval, Columbia would not be able to offer a curriculum for credit in Women's Studies, nor receive direct financial aid from the State for each degree awarded in Women's Studies, nor be eligible for student financial aid from New York State or USDOE for students who enroll in its Women's Studies program.  The student aid funds are either paid directly to Columbia or first to the students and then to Columbia.

35.  The Regents' Statewide Plans
    a.  define the missions and objectives of higher education;
    b.  set goals, describe the time for meeting those goals, identify the resources needed, and establish priorities; and
    c.  evaluate the effectiveness of educational programs.

36. The Regents' Statewide Plans of 1984 and 2004 advanced the establishment of Feminist doctrine in New York colleges and universities through Women's Studies programs with the objective of remaking New York State's education, government, business, and culture in the image of Feminist tenets.

37. The Regents also periodically issue policy statements to supplement or emphasize the direction that institutions, such as Columbia University, should be taking in their educational programs.

38. The Regents established objectives through policy statements in 1972, 1984, and 1993 by which Women's Studies programs would advocate and spread Feminism in New York colleges and universities in order to change society-at-large by giving preferential treatment to females, at the expense of males, in education, the work place, government, and the courts.

39. The Regents' policies and plans of action for Feminism and Women's Studies programs have been a systematic effort to require accountability from those who oversee components of the

State's extensive educational community to assure the inculcation of Feminist beliefs into New York's educational system and society-at-large—a type of "Big Sister is Watching."

40. In order to achieve the objectives and effect the changes envisioned for the advancement of Women's Studies programs and Feminism, the State's 1993 "Equity for Women in the 1990s" requires
    a.  the entire educational community must be accountable,
    b.  particular care be taken with curriculum in both <u>content</u> and methods of instruction,
    c.  major revisions in curriculum and teaching are necessary,
    d.  changes in teaching strategies and cultural attitudes,
    e.  that differences in leadership style between males and females must be understood and accepted,
    f.  the educational community to take the lead in providing females access to a broad spectrum of career opportunities by promoting female friendly strategies for recruitment, selection, and advancement,
    g.  special female protection on campus and in the work place,
    h.  employment of females in a quota similar to males in all educational and cultural institutions and career work sites of the State,
    i.  people's thought patterns be changed,
    j.  the elimination of evolutionary differences between the sexes in education and employment opportunities,
    k.  statewide compliance with affirmative action policies,
    l.  cooperation from members of the faculties, boards of trustees, colleges, employers and community members,
    m.  implementing change through education and appropriate action,
    n.  N.Y. Education Department collect data necessary to carry out the Regents' action strategies,
    o.  college teachers undergo training and their teaching regularly monitored and reinforced with Women's Studies tenets,
    p.  N.Y. Education Department conduct academic reviews at colleges and universities to assure teaching practices comport with the Regents' Feminist objectives,
    q.  traditional role models be eliminated,
    r.  females be given extra assistance to obtain jobs in certain fields,
    s.  appropriate textbooks be used in all courses,
    t.  athletic programs for both sexes receive similar support, including financial, salaries, coaching, scheduling and publicity,
    u.  affirmative action for females in recruitment and promotion in professional and managerial programs overseen by college affirmative action officers who provide reports to N.Y. Education Department,
    v.  practices that advantage females with support, recruitment, and promotion be replicated while all others be eliminated with reports as to compliance provided N.Y. Education Department's Affirmative Action Officer,
    w.  human resources personnel for colleges, universities, libraries, museums, and the Education Department be trained to execute the affirmative action policies so that parity in hiring between the sexes is reached as determined by affirmative action officers,

 x. colleges and universities to focus their support networks and create others to promote the hiring and placement of females,

 y. research on current issues facing females be developed, supported, and promoted, and

 z. those responsible to bring about the above changes are college faculty, administrators, staff members, students, deans, athletic directors, governing boards, and executive officers of all New York educational institutions, cultural institutions, N.Y. Education Department, employers, business, and industry in the State.

41. Through the Regents power to suspend the charters of higher educational institutions in New York and its duty to approve or disapprove educational programs and curricula, which means not only courses but all planned school activities, the Regents control what is taught in colleges and universities in the State, including Columbia University.

42. The Regents preside over the N.Y. Education Department, which functions as the Regents' administrative arm in carrying out the Regents' mandates, policies and plans.  The N.Y. Education Department's regulations for effecting the mandates, policies and plans of the Regents must be approved or authorized by the Regents.

43. On behalf of the Regents, the N.Y. Education Department administers State and Federal grants and scholarships that promote equity in higher education.

44. The N.Y. Education Department, headed by the Commissioner, formulates plans, provides funds, monitors, and coordinates higher educational programs, such as Women's Studies programs, in New York colleges and universities, including Columbia, in order to assure that institutional programs are consistent with the Statewide Plan and policy statements formulated by the Regents.

45. Under 8 N.Y.C.R.R. Pt. 52.1, the N.Y. Education Department, on behalf of the Regents, evaluates a higher educational institution's curriculum content, planning, objectives, testing, and whether it complies with the Regents Statewide Plan and policy statements.

46. The New York State Commissioner for the Department of Education ("Commissioner"), in his official and individual capacity, under a grant of authority from the Regents, approved the initial registration and subsequent re-registrations of Columbia's Women's Studies program.

47. Registration and re-registration of Columbia's Women's Studies program required the program to be consistent with the Regents' Statewide Plans, policy statements, rules, and the N.Y. Education Department's regulations.  Without conforming to such, the Commissioner could not approve the program, and without approval Columbia's Women's Studies program would not be credited toward a degree, graduate certification, or post-baccalaureate study, and students could not receive State or Federal financial aid to help pay for their studies in the program, and Columbia could not receive direct aid from the State for each Women's Studies degree conferred.

48. In order to approve the Women's Studies program, which furthers Feminist orthodoxy, the Commissioner reviewed for compliance with the Regents' standards the program's

curriculum, content, faculty, library, academic advising, administrative oversight, financial resources, and physical facilities as provided by IRWG and Continuing Education.

49. The Regents and Commissioner provide direct financial aid to Columbia University under Education Law § 6401, known as "Bundy Aid," which benefits IRWG and Continuing Education in promoting the Feminism advanced by the Women's Studies program.

50. The Commissioner, acting under authority from the Regents, administers Federal and State student grants and scholarships to promote higher educational programs, such as, on information and belief, the Women's Studies program at Columbia.

51. The Regents and Commissioner approved Columbia University as a beneficiary of State student aid programs, which imposes various requirements on the University under 8 N.Y.C.R.R. § 2205.3.

52. Student aid programs provide money to students so that they can pay an approved college in order to obtain an education in a curriculum approved by the State.

53. The Regents have been delegated by USDOE the responsibility for determining which higher educational institutions are eligible for Federal student aid programs.  In effect, the Regents and Commissioner act as USDOE's agents for accrediting colleges and universities for participation in Federal student aid programs.  The Regents and Commissioner are the only state governmental divisions to be delegated the USDOE accrediting function.

54. On information and belief, USDOE also provides grants to the Regents and the N.Y. Education Department.

55. USDOE provides grants, direct loans of federal funds, guarantees for loans from private lenders, and work-study programs that finance student education at Columbia.

56. USDOE grants can be paid directly to Columbia University or to the student, direct loans are paid directly to Columbia, and work study directly to the student.  On information and belief, all of these funding methods benefit the Women's Studies program and the furthering of Feminism at Columbia.

57. USDOE provides Federal Stafford Loans to post-baccalaureate students in Continuing Education some of whom, on information and belief, are preparing for graduate school or academic advancement in Feminism through Women's Studies provided by IRWG.

58. By the end of fiscal year 2007, Federal advances to Columbia University, which are listed as liabilities on Columbia's balance sheet, totaled $61.5 million, which, on information and belief, a proportion of went to students participating in Columbia's Women's Studies program.

59. By the end of fiscal year 2007, USDOE had made available to Columbia University students $192.2 million from the Stafford Loan and Federal Plus Loan programs of which, on

information and belief, a proportion went to students participating in Columbia's Women's Studies program.

60. Federal tuition aid grants, federal supplemental educational opportunity grants, and Pell grants were awarded to Columbia University students in the amount of $9.3 million in 2007 of which, on information and belief, a proportion went to students training in Feminism at Columbia's Women's Studies program.

61. On information and belief, USDOE provides research grants to IRWG that advance the propagation of Feminism.

62. Total Federal awards to Columbia University in 2007, as opposed to Columbia students, were $601,300,000.  Columbia's total operating budget was $2.83 billion.  Of the total federal awards to Columbia, $15.9 million originated with USDOE.

63. The President of the New York State Higher Education Services Corporation, in his official and individual capacity ("HESC"), approves and provides financial assistance to Columbia University by way of its admitted or attending students that benefits the Women's Studies program and its promoting of Feminism.

64. HESC provides loan guarantees, grants, and scholarships that enable students to fund their education at Columbia University in the Women's Studies program provided by IRWG.  The money passes through students' hands into the coffers of Columbia and is used, in part, to promote Feminism through the Women's Studies program.

65. HESC requires that any financial aid is limited to students attending an approved institution, such as Columbia University.

66. Financial aid provided or guaranteed by HESC is made based on information given by both the student and the institution of attendance.  8 N.Y.C.R.R. § 2205.1

67. For academic years 2004 through 2006, HESC provided Columbia University students around eight million dollars in grants, scholarships and other awards.

68. Students in Columbia's Women's Studies program, on information and belief, receive financial aid from New York State's Tuition Assistance Program, Aid for Part Time Study program, and Federal assistance programs.

## IV.  Violation of Equal Protection under the 5th and 14th Amendments

69. Columbia University invests significant resources and assets into its Women's Studies program, which its managerial accounting practices have translated into a dollar amount that will be revealed through discovery.

70. Columbia University, IRWG and Continuing Education treat males and females differently by advocating, instructing, promoting, inculcating, supporting, and providing training in Feminist doctrine that advances misandry and demeans men.

71. Columbia University, IRWG and Continuing Education apply the misandry doctrine of Feminism in order to impose a unitary belief system of Feminist orthodoxy that dictates the thoughts, speech, and conduct of members of the University and society-at-large, which has a predominantly negative impact on males.

72. Columbia University, IRWG and Continuing Education, with the assistance of the State and USDOE, have banished from the marketplace of ideas Men's Studies and its masculine perspective that benefits primarily males.

73. Columbia University, IRWG and Continuing Education, with the assistance of the State and USDOE, permit primarily only female shoppers to benefit from the produce of "gender studies" in the market place of ideas.

74. Columbia University, IRWG and Continuing Education advocate that the civil rights of today's males be minimized or eliminated not just as punishment for the alleged past wrongs of their forefathers but to assure the preferential treatment of modern-day females in determining the occupants of the prestigious and influential positions in current American society and into the indefinite future.

75. The IRWG Women's Studies program instructs, trains, supports, furthers, cultivates and advocates strategies, and tactics for demeaning and abridging the rights of men—rights that are guaranteed by the U.S. Constitution and advocated by the Declaration of Independence and the Universal Declaration of Human Rights.

76. The propagation and advocacy by the Women's Studies program that the civil rights of males be diminished or eliminated infers that one motivation behind the program is ill will toward men and infers that Columbia University is a bastion of bigotry toward men.

77. The Feminist agenda, instruction and practices at Columbia University, IRWG and Continuing Education stereotype males as the primary cause for most, if not all, the world's ills throughout history.  Females, on the other hand are credited with inherent goodness who were oppressed and colonized by men.  Such outmoded, negative stereotyping of men infers that one motivation behind Columbia's Women's Studies program is prejudice toward men.

78. Columbia University, IRWG and Continuing Education propagate the false belief that males are responsible for most of the battering between the sexes when females batter males to the same extent or more.  Such blatant misrepresentations based on old fashion stereotyping of males indicates that at least one motive behind Columbia Women's Studies is enmity towards males.

79. Columbia University, IRWG and Continuing Education also propagate the false beliefs that (a) males are more likely to <u>initiate</u> violence against a partner when in fact females are more

likely, and (b) males are more likely to engage in <u>severe violence</u> that is <u>not reciprocated</u> when in fact females are more likely.  Such blatant misrepresentations based on old fashion stereotyping of males indicates that at least one motive behind Columbia's Women's Studies is enmity towards males.

80. Columbia University, IRWG and Continuing Education inculcate the falsehood that masculinity is about males believing they can batter females when manhood has always rested on males protecting females.  Such propaganda indicates preconceived judgments are behind Columbia's Women's Studies.

81. Columbia University, IRWG and Continuing Education advance the stereotypical inequity that a female is not responsible for her acts when intoxicated but that her male date is responsible, not only for the female's conduct, but his own even though he too is intoxicated.

82. Columbia University, IRWG and Continuing Education cultivate the preconceived judgment that children raised by single mothers do better in comparison to children raised by single fathers, which evinces a motivation of bias toward males.

83. Columbia University, IRWG and Continuing Education provide information on how females can engage in violence against males, even premeditated murder, and escape just punishment by falsely accusing the male of abuse.  This indicates a motive of enmity toward males.

84. According to the IRWG course guide, "[p]rimary courses focus on women, gender, and/or feminist or [lesbian] perspectives."  IRWG has 71 members on its faculty but only four are males.  Such lopsided instruction and faculty infer a motivation of preconceived judgment toward men.

85. Columbia University's Women's Studies program is deficient of texts and instruction that offer a male-positive perspective of men, which infers that one motivation for the program is antipathy toward men.

86. Columbia University, IRWG and Continuing Education do not balance the Feminist doctrine and dogma with a masculine curriculum or program.  Such a failure infers one motivation for the Women's Studies program is misandry.

87. The few Columbia University male students or alumni who do participate in the Women's Study program are denigrate, silenced, ignored, chastised for being "machismo," treated as second class citizens, treated as the disposable sex, graded more harshly, prevented from expressing their points of view if contrary to Feminist tenets, frozen out of the advantages the program provides to females, and all around treated negatively and differently than females in the program, as though they were capitalists attending Moscow State University in the former Soviet Union.  Such treatment indicates a bias against men in the Women's Studies program.

88. The indoctrination of Feminist orthodoxy in Columbia University's Women's Studies program is much more aggressive and hostile when directed toward males in the program, an indication of ill will toward men.

89. The negative stereotyping of men and lack of balance between the female and male perspectives at Columbia University, IRWG, and Continuing Education reveal a discriminatory intent motivated by bigotry and fail to serve the acquisition of knowledge for men that develops and trains the individual both mentally and morally.

90. The following are just a few of the anti-male practices driven by prejudice that have been taken by the directors of IRWG:
    a. Carolyn Heilbrun, who committed suicide in 2003, used "theory and scholarship at the expense of the lives of [men]."
    b. Jean Howard developed a $15 million hiring program at Columbia that discriminates against male teachers and stifles the freedom of thought of men.  Any male applicant for a teaching position must demonstrate a rigid conformity of thought and speech to Feminism.
    c. Marianne Hirsch and Elizabeth Povinelli, the current heads of IRWG, maintain IRWG as a center for the National Council for Research on Women, which uses IRWG work and that of other higher educational tax-exempt institutions to influence legislation through Congressional briefings that result in the discrimination of men, such as with the passage of the Violence Against Women Act.  The Council's efforts are less educational and more akin to converting others to the Feminist belief system.

91. Simply put:  Columbia's Women's Studies program demonizes men and exalts women as a manifestation of the ill will that lies behind the program, which is used to justify discrimination against men based on collective guilt and old fashion stereotypes.

92. Even if the impact of Columbia University, IRWG and Continuing Education's negative stereotyping of men is rationalized under "equity for women," the existence of a permissible purpose cannot sustain conduct that has an impermissible effect when ill will is present.

93. Since one of the greatest powers over human beings is the power of belief, Columbia University, IRWG, and Continuing Education's propagation of the one-sided and fundamentally false belief system of Feminism, and its misandry, has a disproportionately adverse impact on men and the class representatives.

94. Columbia's Women's Studies program not only creates a hostile learning environment for males, but has engendered such a hostile environment throughout the University. Columbia's learning environment for males has taken on attributes similar to the hostile work environments that the courts have repeatedly found discriminatory.

95. Columbia University's hostile learning environment for males stifles their development and growth by pressuring many of them into acceding to the beliefs that they are somehow guilty for acts they never did, that they are the inferior sex, and their unalienable rights should be

sacrificed to justify nefarious conduct by females.  In sum, the environment tramples under the boot-heel of Feminism the self-respect and pride of males.

96. Columbia University, IRWG and Continuing Education's ill will exalting of females over males has the effect of predominantly depriving male students and male alumni of equal educational opportunities and benefits as compared with females.  (See below Title IX for dissimilar treatment with respect to opportunities and benefits).

97. On the other side of the coin of the hostile environment for men in Columbia's Women's Studies program is the preferential and deferential treatment that female alumni and students receive in the program, which encourages them to pursue the opportunities of undergraduate degrees, graduate certifications, and post-baccalaureate studies in Feminism, or auditing of Feminist courses to further their careers.

98. Columbia University's Women's Studies program also uniquely benefits Columbia female students, female alumni and females in general with female oriented consciousness raising, instillation of pride and self-respect, networking and support systems, inside tracts to career opportunities, strategies and tactics for gaining advantages based on sex, and financing without any equivalent Columbia program for providing similar male oriented benefits to male students, male alumni or males in general.

99. As a result of the hostile environment for men in the program, the University, and society-at-large, men are the ones most likely to participate in a program providing contrary perspectives to Feminism, but they have no opportunity to do so whether current students, or alumni or post-baccalaureate students that take courses through Continuing Education.

100.   Since the policies and practices of the Regents, Chancellor, Commissioner, Columbia, IRWG and Continuing Education created or approved the anti-male Feminist Women's Studies at Columbia with no countervailing pro-male Men's Studies, these defendants have shutout a substantial number of men from educational opportunities needed to counter the dissembling Feminist dogma prevalent in the governmental, social, business, political, media, and domestic spheres of modern-day life in America.

101.   Columbia University, IRWG, and Continuing Education, as a result of the bias against men, teach females to compete unfairly with men without providing any programs for men on how to individually defeat such unfair and discriminatory practices against them whether in college, the work force, or before governmental bodies.

102.   Female students and female alumni of Columbia University receive a public benefit promulgated and supported by the Regents and, in part, financed, directly and indirectly, by the State and USDOE while no comparable benefits are provided to male students and alumni.

103.   In 1984, when the Regents promulgated its Statewide Plan to enhance higher educational opportunities for females by furthering Feminism, which caused the creation of women's studies programs, there were already more females in colleges and universities than males.

Such indicates the plan was in part motivated by prejudice against males because it did not provide a leveling playing field, rather the plan tilted the field even more to the benefit of females, which also served no substantial state interest.

104.    In 1993, when the Regents made their major policy statement "Equity for Women" that required "establishing specific goals, indicators of progress, and a timetable for action" to address discrimination against females in New York educational institutions, in effect affirmative action that supported and promoted women's studies programs, there were already significantly more female college students than males, and females earned significantly more associate, bachelor and master's degrees.  All of which indicates the policy was in part motivated by prejudice against male students; otherwise, it would have required a balancing off of the existing inequities for males.

105.    The 2004 Regents' Statewide Plan recognizes that 60% of all college students are female and in 2003 females earned 63% of the Master's degrees and a majority of the Doctoral degrees in New York State, yet the Regents showed no concern for rebalancing the numbers to achieve equity for men, which indicates a continuing motivation of ill will disparate treatment for males by the Regents.

106.    While the Regents, Chancellor, Commissioner, Columbia, IRWG and Continuing Education will claim that their policies and practices are to remove obstacles to women's access to educational and career opportunities, there exists behind the public relations an invidiously discriminatory purpose as a motivating factor.

107.    One of the duties of the Regents is to promote equity in education, but for the past quarter of a century, they have promoted inequity for men.

108.    No Regent Plan or policy statement has called for Men's Studies programs for higher education, which infers a motivation of partiality against men.

109.    There are virtually no Men's Studies programs in New York State, which infers a motivation of neglect toward men by the Regents.

110.    The Regents, Chancellor, Commissioner, Columbia University, IRWG and Continuing Education's polices and practices effectively ban Men's Studies from Columbia with the effect of institutionalizing anti-male prejudice at the University and propagating such in the society as a whole.

111.    The Regents, Chancellor, Commissioner, Columbia, IRWG and Continuing Education's discriminatory actions are arbitrary and completely unrelated to the goal of providing higher education.

112.    Knowing that their actions created and perpetuate the institutionalization of prejudice toward men and the attendant harm that follows, the Regents, Chancellor, Commissioner, Columbia, IRWG and Continuing Education intentionally continue their polices and

practices of ensconcing anti-male bigotry, continuing a hostile educational environment for males, and denying males the same educational opportunities as provided females.

113.    The purposes of education to enlighten, elucidate, provide the practical means for furthering oneself in society, and to defend oneself against unjust attacks are thwarted when doctrines favorable to one group, even that of the majority, advocate different treatment harmful to the minority and administrators fail to provide programs helpful to the minority in countering such discrimination because of bias toward that minority.

114.    The Regents on behalf of USDOE and the State earmark State and Federal student aid to colleges and universities, including Columbia University, that provide Women's Studies in accordance with the Regent's plans and policies.

115.    Some of the USDOE and the State aid accrue to the benefit of Women's Studies programs, including the one at Columbia University, thereby advancing the disparate treatment of males and the harmful impact of those programs.

116.    The Regents' Women's Studies programs over the past decades have provided an academic acceptance of a plethora of intentional falsehoods used to rationalize the ubiquitous discrimination of men and provide females preferential treatment at the violation of the rights of males.

117.    The USDOE and State aid and assistance to Women's Studies programs, including Columbia University's, contribute to treating males and females differently in society-at-large to the detriment of males.  For example, there are government offices of Women's Health in every state but none for men, and there is a Federal office of Women's Health yet none for men even though men die sooner.

118.    The USDOE and State aid and assistance to Women's Studies programs contribute in society to men having few if any shelters to turn to, no hotlines to call, ignorance of *ex parte* restraining orders, and police who arrest the husband even when he's the one who called them to prevent his wife's violence against him or his children.

119.    The USDOE and State aid and assistance to Women's Studies programs contribute to the societal assumption of female victim-hood that results in mandatory arrests policies for males and *ex parte* restraining orders based on intentional falsehoods that destroy the occupations and loot the bank accounts of males.

120.    The USDOE and State aid and assistance to Women's Studies programs contribute to the inequity of laws shielding a female's sexual past from being used against her in court while there are no laws to shield a male's sexual past from being used against him.

121.    The USDOE and State aid and assistance to Women's Studies programs contribute to the creation of pseudo-science defenses based on research at Women's Studies programs for females taking the lives of others.

16

122.    The USDOE and State aid and assistance to Women's Studies programs contribute to Hollywood and television relying on Feminist anti-male, pseudo-scholarly work to foist misandry in American culture.

123.    USDOE and HESC student aid directly result in disparate treatment of men at Columbia University, IRWG and Continuing Education because no comparable public financial aid is provided to further the interests of male students and male alumni and no equivalent governmental largess is provided to counter anti-male discrimination.

124.    USDOE and HESC knowingly assist the prejudicial dissimilar treatment of men by providing financial funds to Columbia University, IRWG and Continuing Education, either directly or indirectly.

125.    USDOE's knowingly aiding invidious discriminatory practices at Columbia University, IRWG, and Continuing Education violates the equal protection clause of the 5th Amendment to the U.S. Constitution.

126.    The Regents, Chancellor, Commissioner, HESC, Columbia University, IRWG and Continuing Education's aiding, furthering and conducting of invidiously discriminatory practices at Columbia University violates the equal protection clause of the 14th Amendment to the U.S. Constitution.

127.    The Regents, Chancellor, Commissioner, and HESC have a duty to conform educational assistance and programs to 14th Amendment standards to assure against the deprivation of rights to equal protection.  They have <u>not</u> done so with respect to the IRWG Women's Studies program at Columbia.

## V.  42 U.S.C. 1983

128.    A suit to enforce individual rights protected by the 14th Amendment requires an action pursuant to 42 U.S.C. 1983:  "Every person who, under color of  [state law] … subjects [another] … to the deprivation of any rights … secured by the Constitution and [federal] laws, shall be liable to the party injured …."

129.    While IRWG and Continuing Education are not separate legal entities, they are part of and controlled by Columbia University, which is a "person" under 42 U.S.C. 1983 and operates under the color of state law.

130.    According to Columbia University's Statutes §§ 350 and 351, institutes, such as IRWG, conform to the policies of appropriate faculty bodies as designated by the University President.  An institute may have a budget for research expenses, clerical and technician help, and for allocations to departmental budgets for other research expenses or salaries.  The direction of each institute shall be assigned to a coordinating committee or an administrative committee of the University.

131.    Under Columbia University Statutes §§ 30 and 250, the Continuing Education is a faculty body within the University.

132.    Columbia University is today classified as an independent private institution of higher education, but unlike most others in New York, Columbia received its charter directly from the legislature of New York in 1787.

133.    On March 23, 1810, Columbia's charter was amended, but the amendment required an Act of the State Legislature.

134.    Columbia University was <u>not</u> formed under the not-for-profit corporation law of New York.

135.    The history of Columbia's formation follows:
    a.  In 1784, the N.Y. State Legislature created the "Regents of the University of the State of New York," an arm of the State, and gave the Regents <u>full</u> authority to govern and manage any college or university in New York.  All such institutions were part of the Regents of the University of the State of New York.
    b.  In 1784, Columbia University, called Columbia College at the time, was a part of the Regents of the University of the State of New York and fully under its control.
    c.  In 1787, the New York State legislature transferred from the Regents to a Board of Trustees the day-to-day operations of Columbia.
    d.  On April 13, 1787, the N.Y. Legislature transferred from the Regents of the University of the State of New York to the Trustees of Columbia College real estate in the City of New York that subsequently proved extremely lucrative as real estate values soared over the years.

136.    To this day, Columbia University remains a part of the Regents of the University of the State of New York, which retains the power to determine Columbia's educational policies, grant or deny it registration for complying with New York educational standards, set rules by which Columbia must comply or face suspension of its charter, conduct inspections to determine whether Columbia is complying with Regent rules, and approve or disapprove programs offered by Columbia.

137.    The Regents and N.Y. Education Department are arms of the State of New York.

138.    The N.Y. Education Department is the administrative arm of the Regents that oversees Columbia University's degree granting programs and assures the programs meet Regent requirements.

139.    Through the Regents and N.Y. Education Department, New York State has undertaken a policy to actively control not only the curricula and its content at private universities, such as Columbia, but also the faculty, library, academic advising, administrative oversight, financial resources, and physical facilities.

140.   Registration and re-registration of higher educational institutions and programs is the basis for determining educational program eligibility for graduation credits, State student aid, and for professional licensure or teacher certification.

141.   The N.Y. Education Department visits and inspects Columbia, IRWG and Continuing Education for compliance with the Regents' rules and the Department's regulations.

142.   Through the registration and re-registration of programs by the Regents and N.Y. Education Department, the State authorized and continues to authorize the Women's Studies program provided by IRWG at Columbia University.  If the Regents and N.Y. Education Department wanted the program changed or eliminated, a mere order from them would suffice.

143.   Without State authorization, the Women's Studies program and IRWG would not exist at Columbia University because no credit toward an undergraduate degree, graduate certification, or a post-baccalaureate course could be offered.

144.   Without State authorization, Columbia University, IRWG and Continuing Education would not receive USDOE or State money that contributes to supporting the Feminist Women's Studies program.

145.   The Regents and N.Y. Education Department are therefore involved not simply with some activity at Columbia University, IRWG, and Continuing Education but with the very activity that violates the equal protection rights of the plaintiffs—the Women's Studies program.

146.   Since the Regents and N.Y. Education Department comprise a quasi-legislative and administrative body that rules over Columbia, IRWG, and Continuing Education in order to implement State education law and policy, their involvement is not ministerial but substantive.

147.   The Regents have promulgated and N.Y. Education Department executes the policies and plans for instituting misandry and discriminatory Feminist Women's Studies programs into higher education in New York.

148.   HESC is also an arm of the State of New York and abides by the Regents plans and policies for instituting misandry and discriminatory Feminist Women's Studies programs into New York's higher education system by supporting such programs with State financial aid.

149.   HESC provides tuition funding for Columbia University students through various loan, scholarship and grant plans, including the nation's largest grant plan:  the Tuition Assistance Program.

150.   On information and belief, students at IRWG and Continuing Education receive HESC financing.

151.    The operating revenue of Columbia University relies on tuition much more heavily than endowment on which Columbia's institutional competitors largely rely, and tuition in turn relies heavily USDOE and State aid.

152.    Approximately 50% of Columbia University's undergraduates receive some sort of financial assistance, and about 80% of first-year students applying for financial aid for the 2006-2007 year received a need-based aid award.

153.    Since 1998, thousands of Columbia University students have received Federal or State aid to attend Columbia University, much of which was paid directly to Columbia.

154.    Students attending New York's private colleges, which includes Columbia, annually receive $241 million in Federal Pell grants and $277 million in New York Tuition Assistance grants.

155.    The tuition funding provided by HESC and USDOE to Columbia, on information and belief, provides crucial financing for the anti-male discriminatory impact of its Feminist Women's Studies program.

156.    HESC and USDOE are therefore involved in the very practice that discriminates against male students and male alumni.

157.    Further involvement of the State in the Feminist Women's Studies program include:
   a.  The N.Y. Education Department grants Columbia a monetary sum for every degree awarded under N.Y. Education Law § 6401 ("Bundy Aid"), which includes degrees in Women's Studies that are the product of discrimination against men.
   b.  Columbia received Bundy direct State aid in the amount of $3,405,000 for its fiscal year 2007 and a total of nearly $39.9 million since 1996.  On information and belief, an amount of the State aid was provided to Continuing Education and IRWG.
   c.  A variety of State programs are administered by Columbia University that provide financial aid to students in the form of direct grants and loans that are paid over to Columbia and, on information and belief, contribute to Continuing Education and IRWG's operations.
   d.  New York State helps finance the construction of facilities at Columbia, which, on information and belief, frees up financing for Continuing Education and IRWG.

## VI.  Discrimination under Title IX of the Education Amendments of 1972

158.    "No person in the United States shall, on the basis of sex, be … denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681 (emphasis added).

159.    45 C.F.R. 86.31 and 34 C.F.R. 106.31 state that "education program or activity" includes any academic, … research, occupational training, or other education program or activity operated by a recipient which receives Federal financial assistance."

160.   20 U.S.C. § 1687 and the implementing definitions at 34 C.F.R. § 106.2 specifically read: "the term 'program or activity' and 'program' mean all of the operations of—a college, university, or other postsecondary institution" and "a department, agency, … or other instrumentality of a State or the entity of such State …  that distributes [Federal] assistance …."

161.   Columbia University receives federal financial assistance; therefore, Title IX requirements apply to all of the University's operations, which include the Women's Studies program provided by IRWG.

162.   Columbia University, IRWG, and Continuing Education are considered educational institutions under 20 U.S.C. § 1681(c).

163.   Even if no federal funds are earmarked for Columbia's Women's Studies program or IRWG, or Continuing Education, Title IX still prohibits their discriminatory treatment of men.

164.   Columbia, IRWG, and Continuing Education knowingly made decisions to provide preferential treatment for females by offering Women's Studies and not to provide equal educational, training, networking, and career opportunities to males through a Men's Studies program.

165.   Columbia, as with every other Ivy League College except Princeton, offers more courses in Feminism through Women's Studies programs than economics, and none offer a Men's Studies program.

166.   Columbia, IRWG, and Continuing Education based their decisions on stereotypical assumptions of males as oppressors and females as innocent victims, of males as reaping the rewards of society and females the burdens, of America as a patriarchy as opposed to what it is—a *de facto* matriarchy.

167.   Columbia, IRWG, and Continuing Education use the Women's Studies program to indoctrinate antipathy toward men.

168.   Columbia, IRWG, and Continuing Education have created a hostile education environment for males, not only in the Women's Studies program, but throughout the University.

169.   Columbia, IRWG, and Continuing Education provide different benefits, based on sex, to its students and alumni by offering a Women's Studies program but not a Men's Studies program.

170.   Columbia, IRWG, and Continuing Education deny male students and male alumni similar benefits that female students and female alumni receive from their Women's Studies program.

171.   Columbia, IRWG, and Continuing Education not only limit but actively work against providing male students and male alumni the same advantages and opportunities that the Women's Studies program gives to female students and female alumni.

172.   At Columbia University, the deleterious impact of its policies and practices in favoring Women's Studies falls disproportionately on men:
   a.   Male students have no opportunity to earn an undergraduate degree or a graduate certification in Men's Studies, which would "testif[y] to mastery of a body of cross-disciplinary literature and enhance employability, especially in" academia.[2]
   b.   Male alumni have no opportunity to gain knowledge in a field of Men's Studies by taking continuing education courses or post-baccalaureate studies to prepare for graduate school.
   c.   Male students and alumni have no opportunity to participate in or inter-react with "a vibrant interdisciplinary community of scholars, researchers and students" in the field of Men's Studies.
   d.   Male students and alumni do not have the advantage of a "thoroughly interdisciplinary framework, methodological training and substantive guidance in specialized areas of research" into men's issues.
   e.   The lack of a Men's Studies program denies male students and alumni the opportunity for "an education that is both comprehensive and tailored to individual needs."
   f.   Male students and alumni are denied the opportunity to "undertake original research and produce advanced scholarship" in Men's Studies.
   g.   Male students and alumni cannot prepare "for future scholarly work" in Men's Studies or "for careers and future training in law, public policy, social work, community organizing, journalism, medicine, and all those professions in which there is a need for critical and creative interdisciplinary thought" from the male perspective.
   h.   Male students and alumni who enroll in doctoral programs and professional schools cannot take graduate courses in contra "feminist theory, inquiry, and method."

173.   Columbia, IRWG, and Continuing Education, through Women's Studies, provide training for effectively protesting female inequalities but not male inequalities.

174.   Columbia, IRWG, and Continuing Education fail to effectively accommodate the educational interests and abilities of male students and male alumni by offering only a curriculum in Feminism (Women's Studies) without any countervailing masculine view.

175.   Columbia, IRWG, and Continuing Education provide only the Feminist perspective on men in the Women's Studies program.

176.   Columbia, IRWG, and Continuing Education have so extensively propagated the doctrine of Feminism from the Women's Studies program throughout the University's activities that any opposing voice is quickly and summarily silenced.

---

[2] All the quotations in this paragraph are taken from the website of Columbia's IRWG.

177.    In an analogy to athletics, Women's Studies programs are today the varsity sport of choice for females at Columbia in its never-ending war against men.

178.    On information and belief, females can compete with males for positions in some athletic programs, but they will spend their time in humiliation sitting on the bench and miss developing those unique abilities that come from competitive sports.

179.    Males taking Women's Studies at Columbia will in effect spend their time on the bench in humiliation while females metaphorically walk all over them.  The males will also miss developing the knowledge and abilities to defend their rights against Feminism in modern-day America.

180.    Male athletic programs are geared primarily toward benefiting men while Women's Studies programs are geared primarily toward benefiting females with Feminist ideology, strategy, tactics, and training for exploiting the modern-day social bias against men.

181.    The Women's Studies program at Columbia gives female students and female alumni an exclusive opportunity over their male competitors in the University and society by using Federal and State resources to provide females with a golf-like handicap in America.

182.    Without a Men's Studies program, Columbia's male students and male alumni are disadvantaged in competing with females on America's current uneven playing field of life.

183.    There is no substantial proportionality between the ratios of the number of females in the Women's Studies program and the ratio of males in a Men's Studies program because Columbia has no such team of teachers, courses, activities, and benefits for male students and male alumni.

184.    The disproportionately high number of females in the Women's Studies program evinces the harmful discriminatory impact on men, which Columbia has failed to address.

185.    Once Columbia, IRWG, and Continuing Education provided educational opportunities inuring to the benefit of its female students and female alumni, they were required to provide equal educational opportunities for male students and male alumni so as to balance the dissimilar impact of Women's Studies on males and females.

186.    Columbia, IRWG, and Continuing Education's provision of a Women's Studies program results in disparities of a substantial and unjustified nature in the benefits, treatment, services and opportunities granted females and males with the males receiving disproportionately less. For example, Columbia provides disproportionately more financial assistance for the propagation of Feminism, which disadvantages men, than for contrary pedagogies.

187.    On information and belief, IRWG provides disproportionately more assistance in making employment opportunities available to female students than males in violation of 34 C.F.R. 106.38.

188.    The disparate impact of the Women's Studies program is not counter-balanced by an exceedingly persuasive justification.  The assertion that American females are disadvantaged compared to males is nothing more than the "big lie" strategy.  For example:

a.  Females earn more per unit of time worked than males.  The average man spends 44% more time working or doing work related activities than the average woman, U.S. Department of Labor, Bureau of Labor Statistics, Time Use Survey 2007, Table A-1, while the average woman makes 77% that of the average man.  If the two were paid equally for their time actually worked, then the pay for the average woman should be 69.5% that of the average man—not 77%.

b.  Females working part-time earn 115% of part-time male workers.  Denise Venable, The Wage Gap Myth, National Center for Policy Analysis, April 12, 2002.

c.  Females control over a majority of the assets in America.  *See* Lucie Schmidt and Purvi Sevak, Gender, Marriage and Asset Accumulation in the United States, University of Michigan, 2005.

d.  Females make 80% of the purchases in America.  Marc Rudov, Why Women Don't Negotiate, 2007.

e.  The 25 most dangerous occupations in America are 90% occupied by men.

f.  Males are 20 times more likely to be killed or injured on the job.

g.  Over all occupations, men suffer 92% of the job related deaths while making up 54% of the work force.  US Department of Labor, Bureau of Labor Statistics, Current Population Survey, Employment and fatalities, by gender of worker, 2006.

h.  Since 1973, abortion has allowed females to murder over 40 million incipient human beings, Center for Disease Control, Abortion Surveillance—U.S. 2004, Table 2, often as a means of birth control.

i.  Females, but not men, have various excuses that permit them to dramatically lessen their punishment for murdering their newborns (Postpartum Depression), their husbands or boyfriends (Battered Spouse Syndrome or Paroxysmal Insanity), and even their children for which society often blames the husband.

j.  Females are generally not punished for perjury in family actions, sexual harassment, rape cases, or paternity suits.

k.  In some jurisdictions, the husband of the mother of a child born during the marriage will be responsible for child support even though the wife cheated on the husband, conceived with another man, and DNA evidence proves it.

l.  Wives receive child custody ten times more often than men, Geoffrey P. Miller, Being There, N.Y.U. School Law, Public Law and Legal Theory Research Paper Series, No. 22, July 2000, p. 11, n. 17, while initiating 70% of the divorces, Marc Rudov, Why Women Don't Negotiate, 2007.

m. Debtor prisons for nonpayment of child support incarcerate mainly men.

n.  Males generally receive more prison time than females for any crime.

o.  The life expectancy for females in America is five years longer than males.

p.  Breast cancer kills around 41,000 females a year and prostate cancer 27,000 males, yet there is twice as much Federal money dedicated to breast cancer than prostate cancer, and there are seven breast cancer drugs for every one prostate cancer drug.  Catherine Arnst, A Gender Gap in Cancer, Business Week, June 13, 2007.

q.  The United States has an office dedicated to women's health while there is none for men.

r. Social Security, Medicare, Medicaid, and welfare programs are paid for mostly by male taxpayers, and all have a majority of female beneficiaries.
s. Over 52,000 American service men died in Vietnam but only eight women.
t. Females still do not have to register for the draft.
u. Females make up 57% of the nation's college students but just over 51% of the population.
v. Nightclubs often allow ladies in for free or a fraction of what they charge men, which over time adds up to a significant transfer of wealth from males to females.
w. Females batter their partners as often as males do or more.
x. In New York City, females in their 20s working full-time make 117% of males, females in their 30s make as much as males, and 53% of females in their 20s working in New York City are college graduates, compared with only 38% of males that age. New York Times, Sam Roberts, August 3, 2007.
y. By the fifth year after divorce, females on average are 10% better off financially than before divorce.

189.    The actual aim of Women's Studies is not affirmative action but to create and perpetuate a legal, social and economic substratum occupied by men toiling in a Fritz Lang "Metropolis" like underworld.

190.    By offering only a Women's Studies program, Columbia, IRWG, and Continuing Education denigrate, demean and disadvantage men, effect artificial restraints on the individual opportunities for men, and fail to advance the full development of the talents and capacities of this nation's men.

191.    By offering only a Women's Studies program, Columbia, IRWG, and Continuing Education violate Title IX and its implementing regulations.

192.    The Regents and N.Y. Education Department as agencies of the State that distribute Federal funds to Columbia also violate Title IX and its implementing regulations.

193.    If Title IX can require universities receiving federal financial assistance to provide separate female athletic programs, then it surely can require Columbia University to provide a Men's Studies program that takes the masculine point of view.

## VII.  Plaintiffs' Class

194.    There are questions of law and fact presented in this action that are common to the entire class and that affect the rights of the class.

195.    This class action is maintainable under Fed. R. Civ. P. § 23(b)(2) because the defendants have acted on grounds generally applicable to the class, thereby making declaratory and injunctive relief and nominal damages appropriate to the class as a whole.

196.    The putative class in this action consists of all males who were students, full or part time, at some point in time during the three years prior to the filing of this action or all males who

currently maintain the status of student or alumni, or all males who will in the future acquire the status of student or alumni and would have taken advantage of a Men's Studies program had one existed by enrolling in the program, taking courses in the program, participating in the program's networking, receiving support from the program, pursuing career and academic opportunities provide by the program, gaining a male perspective on modern day issues, or furthering their knowledge and understanding of mankind and society.

197.    The exact number of members of the class is not known, but it is estimated to be too large for joinder of all members to be practical.

198.    The Federal and State defendants are responsible for aiding the establishment of a religion—Feminism—at Columbia University and giving that religion their official imprimatur in violation of the class members' fundamental liberty interests by *de facto* forcing them to conform to the establishment of Feminism or keep silent.

199.    All the defendants violate the equal protection rights of the plaintiff class members secured under the 5th and 14th Amendments to the U.S. Constitution.

200.    Defendants Columbia, IRWG and Continuing Education violate Title IX to the Education Amendments of 1972 by denying similar benefits to males and unjustifiably treating males and females in a diverse manner to the harm of the plaintiff class members.

201.    Defendants Columbia University, IRWG and Continuing Education discriminate against the class members in violation of N.Y. Civil Rights Law § 40-c.

202.    Defendant Columbia University is considered a public accommodation under N.Y. Civil Rights Law § 40 because it is a college that solicits contributions from the general public.

203.    In 2006, Columbia University kicked off a $4 billion fundraising campaign that solicits contributions from the general public.

204.    Roy Den Hollander, resident of New York County, and William A. Nosal, resident of Kings County, are the class representatives, former students, and alumni of Columbia University.

205.    The class members, because of their sex, are being denied opportunities for education, knowledge, career advancement, and acquiring skills for defending against fraudulent Feminist attacks as a result of Columbia, IRWG and Continuing Education's failure to offer a Men's Studies program.

206.    The class members are treated dissimilarly and with ill will by the defendants promotion of Feminist Women's Studies programs that negatively impact the class.

## VIII.  Injury

207.    By singling out for special benefits the religion of Feminism propagated by the Women's Studies program at Columbia University, the Federal and State defendants create a governmental sectarian preference that infringes an unalienable right of the plaintiff class members.

208.    "The Religion … of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate. This right is in its nature an unalienable right."  Memorial and Remonstrance Against Religious Assessments, as reproduced in the Appendix to the dissenting opinion of Rutledge, J., in Everson v. Board of Education, 330 U.S. 1, 63 (2 The Writings of James Madison 183-191 (G. Hunt ed. 1901)).

209.    "The Rulers [Federal and State defendants] who are guilty of … encroachment [on that right] exceed the commission from which they derive their authority, and are Tyrants.  The People who submit to it are governed by laws made neither by themselves, nor by an authority derived from them, and are slaves."  Id.

210.    The conduct of all the defendants in promoting only Women's Studies programs effectively denies the members of the plaintiff class the opportunity to take Men's Studies courses that will prepare and assist them for dealing with, defending against, and fighting the anti-male climate that is pervasive in America today.

211.    Because of the defendants' policies and practices in advocating and furthering Feminism and training Feminist "storm-troopers" through the Women's Studies program at Columbia University, the plaintiffs face obstacles to educational access and career opportunities solely as the result of an accident of nature that made them men.

212.    The defendants' contributions to the establishment and continuation of Feminism as the primary belief system in this society impairs the plaintiffs' rights to fair treatment in employment, business, politics, the courts, the media, by the police, and before executive government agencies.

213.    The defendants' advocacy and furthering of Feminism and training of Feminists derogates and demeans males while propagandizing the superiority of females with a harm similar, although not yet as egregious, as the Nazification of universities in Germany during the 1930s when education demonized the Jews while demanding genuflection to an Aryan throne.

214.    The Women's Studies program at Columbia perpetuates false myths that have created deep-seated anger and ill will toward males, including the class representatives.

215.    As alumni, the class representatives may take courses in Continuing Education's auditing program without meeting the qualifications required of the general public, prepare for further graduate work through its Post Baccalaureate Studies, or pursue undergraduate studies

through the School of General Studies, which offers the same courses with the same teachers as other Columbia undergraduate programs.

216.    Mr. Den Hollander has been and continues to bring lawsuits to enforce his rights and the rights of other men under the U.S. Constitution.  At present he has three lawsuits in Federal court and more on the way.  Mr. Den Hollander intends to continue fighting for the rights of men in the only way he knows how—lawsuits in Federal or state courts.

217.    Every current and future lawsuit requires a countering of Feminist tenets supported by the spurious scholarship of Feminist Women's Studies programs as declared by the Regents and promoted by Columbia University.

218.    Feminist organizations and activists have the advantage of relying on a body of self-serving, fraudulent information created by Columbia University and other institutions to further the violation of men's rights thanks to the Regents' policies and State and Federal funding.

219.    In order to offset the advantage of counterfeit scholarship provided by Women's Studies programs, Mr. Den Hollander formulated a definite plan to attend Columbia as an alumnus to educate himself with scholarly research in Men's Studies for use in the lawsuits and general enlightenment by enrolling in a Men's Studies program.

220.    In 2007, Mr. Den Hollander contacted the Columbia School of Continuing Education to determine whether he could audit courses as a graduate of the Business School.  Continuing Education stated he could and provided him with the procedures for enrolling in classes.

221.    Mr. Den Hollander on reviewing Continuing Education course offerings found no Men' Studies program or courses

222.    Mr. Den Hollander then examined the offerings for Post Baccalaureate and General Studies where he also found no programs or course offerings for Men's Studies.

223.    Mr. Den Hollander then examined all of the University's offerings and found no programs or course offerings for Men's Studies.

224.    Mr. Den Hollander intends to enroll in a Men's Studies program the moment one is offered.

225.    Mr. Nosal, who graduated from Columbia College in 2008, had as a student intended to enroll in a Men's Studies program but was unable to because none existed at Columbia.  As a graduate, he continues to intend to participate in a Men's Studies program if one is provided.

226.    Due to the State's promulgation of Women's Studies programs and Columbia University's prejudice toward men, Columbia only provides the feminist view, which requires Mr. Den Hollander to develop his own research and scholarship on the subject matter for his lawsuits and general education at significant cost and time to him.

227.   Until Columbia institutes a Men's Studies program, future cases brought by Mr. Den Hollander will continue to require him to invest substantial cost and time to counter Feminist tenets created and propagated by Women's Studies programs.

228.   Of course, Mr. Den Hollander and Mr. Nosal can always submit to the violation of their constitutional rights and the rights of other men, but the concept of unalienable rights is meaningless without the right to fight for those rights, which would be facilitated by a Men's Studies program.

229.   Men's Studies is an interdisciplinary program that uses facts rather than propaganda to describe the truth about the differences and similarities of the sexes and their relationships in society.  Men's Studies counters the falsehoods of Women's Studies programs with facts, such as those included in this Amended Complaint at ¶ 188.

230.   Men's Studies provides to men the benefits and opportunities which are listed in this Amended Complaint at ¶ 172, that are now lacking in other Columbia University programs.

231.   Further, Men's Studies trains males to recognize and handle the powers females often use to manipulate them, such as the male-paralyzing power of beauty, sexual power, verbal skills, victim power, and the male biological instinct to protect females at the price of harm to himself.

232.   Men's Studies shows that the strength of females is in their façade of weakness.

233.   Men's Studies provides a focus on understanding fathers, which none of the other programs at Columbia University provide while the Women's Studies program depicts fathers as bad parents, abusers, rapists, and molesters.  Men's Studies offers both a factual perspective and solutions for the problems unique to fathers, such as the
   a. transformation of their marriages into alimony payments,
   b. alienation of their children by ex-wives,
   c. connivance of domestic relations courts with Feminist groups to violate their rights and throw fathers into the street like bags of garbage without the houses they bought or to use them solely as wallets,
   d. dismissal of them as unimportant in the rearing of their children whose genes are half composed of their fathers, and
   e. sacrifice of their dreams to pursue a particular calling in order to support families that buy into the view of fathers as either barbarians or buffoons.

234.   Men's Studies explains, as history and other educational programs at Columbia do not, that throughout most of the past, the dominant force was not men but a need to survive, and the oppressor was not men but fear of starvation.  That today America is not a patriarchy but a *de facto* matriarchy, and the real oppressors can be determined by who lives longer, who controls a greater percentage of the nation's wealth, on whom the government spends more money for health care, who serves less time for the same crimes, and who consumes more food—it is not men.

235.   Men's Studies counters the historic belief in America, often used by Women's Studies programs, that females have a cart blanche to do whatever they want regardless of ethics or law.   For example, Mary Harris shot her former fiancée in the Treasury Department and was found <u>not</u> guilty due menstrual symptoms.  The New York Times editorialized, "the verdict only furnishes a new illustration of what must be regarded as a settled principle in American Law—that any women who considers herself aggrieved in any way by a member of the opposite sex, may kill him with impunity…."  July 1865.

236.   Today, Women's Studies has taken such excuses to the point of condoning the murder of tens of millions of incipient human beings, the boiling of new born babies, the drowning of sons one after another, the liquidation of boyfriends or husbands, or the commission of hate crimes with no or laughingly inadequate punishment for females.  Men's Studies provides the counter arguments that could save lives by exposing such lunatic excuses as pseudo-science.

237.   Men's Studies exposes the self-serving, schizoid paradigm of Feminist doctrine that females are strong and independent when they want something, but victims when they violate the law.  A hypocrisy that allows females to commit perjury almost with impunity in family courts even when it results in a man going to jail or destroying a father's reputation and career.

238.   Men's Studies alerts future husbands, as other educational programs at Columbia University do not, that among the elderly, caretaker wives are most likely to abuse their older, sicker husbands.

239.   Men's Studies educates males, as other educational programs at Columbia do not, that college females worldwide commit more dating violence than their male counterparts.

240.   Men's Studies instructs males, as other educational programs at Columbia do not, on how to avoid false accusations by females of sexual harassment or rape, which could send a man to prison for decades because the female who had previously consented woke up the next morning with second thoughts.

241.   Men's Studies accurately portrays, as Women's Studies does not, the sacrifice that men make in America for others.  For instance, all the firefighters and police who died on 9/11 were men.

242.   Men's Studies counters the training in Women's Studies that sends forth Feminists to pervert American ideals, ignore the rule of law, selectively enforce the Constitution, and destroy men with impunity.

243.   Men's Studies does not say males have rights and females do not, but neither does it advocate what Women's Studies does:  that females should receive preferential treatment at the expense of the violation of men's rights because men are the disposal sex.

244.    Men's Studies, unlike Women's Studies, factors in the contribution both sexes make to their families by not only considering female housework but the husband's work in making house repairs, raking the lawn, shoveling the snow, emptying the garbage, keeping the car running, painting the house, mowing the lawn, fertilizing the lawn, preparing the taxes, keeping the household records, moving the furniture, hanging paintings, and balancing precariously two stories above the ground on a ladder with only a hammer to repair some siding.

245.    Men's Studies focuses on men's health concerns while Women's Studies neglects them.

246.    Men's Studies, unlike any other curricula at Columbia University, alerts males to the prevalent danger of female paternity fraud where the female lies about using birth control and then sues the tricked father for child support, and if he does not have the money, it's off to debtor's prison he goes.

247.    Men's Studies, unlike any other curricula at Columbia, alerts males to the prevalent danger of marriage fraud where the female becomes pregnant by another man but marries the man she falsely claims is the child's father.  Even if the defrauded dad after marriage proves through DNA testing that the child is not his, he is still liable in most states to support the child.  The person defrauded, when a man, has to pay the defrauder for the privilege of being defrauded.

248.    While Columbia's Women's Studies program complains loudly against female circumcision, it and Columbia's other programs are silent about forced male circumcision, without anesthesia, that has been performed on tens of millions of males, not in some backwater country, but right here in the U.S.

249.    Men's Studies advocates a meritocracy where the person most qualified receives the position.  It opposes the Women's Studies quota-imposed unisex society regardless of the facts of life, voluntary choice, human nature, common sense, or documented merit.

250.    If quotas are going to be imposed, then Men's Studies advocates they apply all the way down, so if females hold 51% of the positions above the "glass ceiling," then they should hold 51%, instead of 10%, of the positions in the most toxic careers—those in the "tombstone basement."

251.    Men's Studies provides males the opportunities and lessons that are invaluable in attaining career and life success in a culture biased against men.

252.    Men's Studies exposes the other curricula at Columbia University as having an underlying premise that females have problems and those problems are males, not a female's volitional choices.

253.    The ongoing lack of a Men's Studies program at Columbia prevents Mr. Den Hollander, Mr. Nosal and other male alumni and male students from securing the same educational,

career, and networking advantages that female alumni and female students gain from the Women's Studies program.

254.    The class representatives, whose intentions to enroll in Men's Studies continues, have been denied a public benefit comparable to the public benefit offered female alumni and female students of Columbia.

255.    Mr. Den Hollander and Mr. Nosal have been intentionally placed at a disadvantage with respect to female Columbia students and alumni by the State's policies and Columbia's provision of training, instruction, and tactics for unfairly competing with the plaintiffs in the political, social, economic, cultural, and government spheres of society.

256.    Columbia's Women's Studies program trains females to use tears, tantrums, fraud, threats of an unjust legal system, and sex to take advantage of men and any institution that involves men in order to get what they want but may not deserve.

257.    The absence of a Men's Studies program at Columbia shuts out Mr. Den Hollander and Mr. Nosal from educational opportunities needed to counter the strategies, tactics, and dissembling Feminist dogma employed by adherents of Women's Studies that is so effective in the governmental, social, business, political, media, and domestic spheres of modern-day life in America.

258.    The State and Columbia fail to provide the benefits of a counter balance to the belief system of Feminism just as many colleges once failed to provide similar benefits to females as they did males in the area of athletics.

259.    The class members continuing deprivation of equal educational opportunities includes their not being able to earn degrees in Men's Studies, do graduate work in Men's Studies, become Men's Studies professors, or access an extensive network for career benefits dedicated to men.

260.    Since Columbia is a state actor and females in similar positions as Mr. Den Hollander and Mr. Nosal can benefit from Columbia's Women's Studies program, the absence of a Men's Studies program creates an obstacle to equal treatment, which itself is an injury.

261.    Unequal treatment between the sexes are inequities which contribute to unequal career opportunities later on.  Males have a disproportionate share of the dangerous jobs, are frequently overqualified for their work, and do not get the same economic return per unit of time or unit of risk from their education as females.  This long-standing disparity is harmful to individuals and to society.  Males often find it difficult to provide for their families.  Their opportunities are curtailed; and our State and nation, competing in the global marketplace, are deprived of much valuable talent.

262.    The Columbia Women's Studies courses that might be considered Men's Studies are really Feminist men's studies that tell men how they can forfeit their rights and subscribe to the belief that when men are disadvantaged it is solely their fault:  whether dying sooner than

females, committing suicide at a much higher rate, doing worse in almost everything in school, being less likely to attend college, paying for children their ex-wives have turned against them, being sentenced to more time for the same crime, having to register for the draft, suffering 94% of the work place deaths, or comprising more of the homeless.

263.     In Feminist studies, female disadvantages are blamed on males, and in Feminist men's studies, men's disadvantages are also blamed on males.

264.     In Feminist men's studies, the male perspective is not presented.  Columbia's program is not list with the N.Y. Education Department as "Women's and Men's Studies" but as "Women's and Gender Studies."

265.     Feminists cannot be relied on to provide a genuine male perspective because no one has less empathy for men than Feminists.  As Dr. Warren Farrell said,  "Feminists call it sexism to refer to God as He; they don't call it sexism to refer to the Devil as He."

266.     Women's Studies programs declared by the Regents, funded by the Federal and State governments, have and continue to impose a unitary belief system of Feminist orthodoxy that dictates the speech and conduct of students and alumni of Columbia and society at large.

267.      Women's Studies programs have created a dictatorship of the majority—not just in campuses across America but throughout the fabric of society.  Women's Studies programs punish men for speaking as they will and acting as they chose even when such actions do not violate any laws.

268.     Columbia's Women's Studies program functions as recruitment and networking centers that exclude the class representatives from similar benefits because the Feminist tenet of affirmative action requires ginning up the number of females in education, government, and the work place well beyond their proportion in the population.

269.     As a result, females have an inside track to jobs in academia, government, media, business, and nonprofit groups through Feminists already in positions in those fields.  The Feminists in those fields are not about to hire any man, while the men in those fields so fear the Feminists that they hire largely females.

270.     Females, not males, are trained on how to exploit state court systems that are biased against men by using fraudulent sexual harassment suits to obtain fat settlements, and false accusations of domestic mistreatment to obtain custody, child support and put a man in jail.

271.     Females, not males, are trained on how to obtain and use tax dollars from a government that subsidizes disparate treatment of men; to lobby politicians into supporting unconstitutional legislation that harms men, such as the Violence Against Women Act, and to use tax exempt organizations for disseminating Feminist tenets that excuse the most reprehensible deeds of females by blaming men.

272.    Women's Studies programs train a large network of females who work tirelessly behind the scenes to transform American institutions according to strict feminist specifications.

273.    The heart of the harm is that Women's Studies programs, such as Columbia's, continue to influence how people think, believe, and behave in a manner that violates the rights of a minority—men.

274.    Feminists, aided by Women's Studies, are trying to do the same thing that the Communists did in Russia—socially re-engineer men using the power of the state to fit the model of what they want men to be.

## IX.  Relief Sought

275.    Declare and enjoin the State defendants' policies and plans that are restructuring New York's higher education system in accordance with the tenets of the Feminist religion, which includes the promulgation and approval of Women's Studies programs such as the one at Columbia University, for violating the establishment clause of the 1st Amendment.

276.    Declare and enjoin the aid and assistance provided by the State defendants for restructuring New York's higher education system in accordance with the tenets of the Feminist religion, which includes the aid and assistance provided to institutions with Women's Studies programs such as the one at Columbia University, for violating the establishment clause of the 1st Amendment.

277.    Declare and enjoin the USDOE's delegation of its powers to the Regents and N.Y. Education Department for determining which colleges and universities are eligible to receive student federal funds as unconstitutionally advancing the establishment of the religion Feminism because the Regents and N.Y. Education Department accredit institutions and Women's Studies programs, including the one at Columbia, that propagate the religion of Feminism.

278.    Declare and enjoin all the financial assistance that USDOE provides to New York higher education institutions that offer Women's Studies programs, including Columbia University, for violating the establishment clause of the 1st Amendment by aiding the religion of Feminism.

279.    Declare and enjoin the State's policies and plans for restructuring New York's higher education system in accordance with Feminist tenets, which includes the promulgation and approval of Women's Studies programs such as the one at Columbia University, for invidiously discriminating against the plaintiff class members based on sex in violation of the 14th Amendment.

280.    Declare and enjoin the furnishing of aid and assistance by the State to carry out its policies and plans for remaking higher education in the Feminist image, including the aid and assistance to institutions such as Columbia University that provide Women's Studies

programs, for invidiously discriminating against the plaintiff class members based on sex in violation of the 14th Amendment.

281.   Declare and enjoin the USDOE's delegation of its powers to the Regents and N.Y. Education Department for determining which colleges and universities are eligible to receive student federal funds as unconstitutionally advancing the invidious discrimination against the plaintiff class members based on sex in violation of the 5th Amendment because the Regents and N.Y. Education Department accredit institutions and Women's Studies programs that invidiously discriminate against males, including the class members.

282.   Declare and enjoin all the financial assistance that USDOE provides to New York higher educational institutions that offer Women's Studies programs, including Columbia University, for violating the 5th Amendment by aiding the invidious discrimination of males, including the plaintiff class.

283.   Declare that the Women's Studies program at Columbia University invidiously discriminates against the plaintiff class based on sex.

284.   Enjoin Columbia University, IRWG, and Continuing Education from offering to students and alumni any of the Women's Studies program curriculum, activities, opportunities or benefits unless an equivalent Men's Studies program focusing on concerns important to men is established by Columbia.

285.   Level the playing field by either instituting a Men's Studies program or eliminating the Women's Studies program at Columbia University, which will assure that male students and male alumni are no longer at a disadvantage when competing with female students and female alumni for the benefits of society nor at a disadvantage of ending up with the worst of society's burdens.

286.   Award nominal damages in the amount of one dollar to the class of plaintiffs and any other relief the Court deems proper.

## X.  Subject Matter Jurisdiction

287.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. 1331 because this action raises federal questions under the 5th and 14th Amendments to the U.S. Constitution and Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 et seq.

288.   This Court has supplemental jurisdiction under 28 U.S.C. 1367(a) over the State cause of action, N.Y. Civil Rights § 40-c, for civil rights violations by defendants Columbia University, IRWG, and Continuing Education.

## XI.  Personal Jurisdiction

289.   This Court has personal jurisdiction over the defendants in accordance with Fed. R. Civ. P. 4(e)(2)(C), 4(h)(1)(B), 4(i)(2), 4(j)(2)(B) and N.Y. C.P.L.R. § 307(1) & (2)(1).

## XII.  Venue

290.    This Court has venue under 28 U.S.C. 1391(b)(3) & (e)(3) and under N.Y. Civil Rights Law § 40-d.

## XIII.  Conclusion

291.    University and college Women's Studies programs are busy across the land spreading prejudice and fostering animosity and distrust toward men with the result of the wholesale violation of men's rights due to ignorance, falsehoods and malice.

292.    There are numerous problems of national importance that lie under the surface of this litigation in which the plaintiffs have made an initial move to compel colleges and universities to change policies having extensive implications for society at large.


Dated: December 1, 2008
         New York, N.Y.


                                        /S/
                                        _____
                                        Roy Den Hollander, Esq. (1957)
                                        Class attorney and representative
                                        545 East 14 Street, 10D
                                        New York, N.Y. 10009
                                        (917) 687-0652