UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------x
Roy Den Hollander, William A. Nosal,

      Plaintiffs on behalf of themselves      Docket No. 08 Civ 7286
      and all others similarly situated,       (LAK)(KNF)(ECF)

        -against-

Institute for Research on Women & Gender at Columbia University;
School of Continuing Education at Columbia University;
Trustees of Columbia University in the City of New York;
U.S. Department of Education;
Margaret Spellings, U.S. Secretary of Education in her official capacity;
Board of Regents of the University of the State of New York, in his
   or her official and individual capacity;
Chancellor of the Board of Regents, Robert M. Bennett, in his official
   and individual capacity;
New York State Commissioner of the Department of Education,
   Richard P. Mills, in his official and individual capacity; and
President of the New York State Higher Education Services Corp.,
   James C. Ross, in his official and individual capacity;

      Defendants.
--------------------------------------------------------------------------------x


**MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANTS' MOTION TO
<u>DISMISS THE COMPLAINT</u>**


Roy Den Hollander
Attorney and co-representative
545 East 14 Street, 10D
New York, N.Y. 10009
Tel.: (917) 687-0652
Email:  rdhhh@yahoo.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ............................................................................... 1

STATEMENT OF FACTS ....................................................................................... 2

ARGUMENT ........................................................................................................... 3

    I.  Defendants curtail academic freedom .................................................... 3

    II.  Columbia and the State violate Title IX, 20 U.S.C. § 1681 *et seq.*, and
        its implementing regulations ................................................................... 5

    III.  The defendants violate Equal Protection under the 5th and 14th Amendments .... 11

    IV.  Columbia's invidious discrimination occurs under the color of law,
        42 U.S.C. § 1983 ................................................................................... 18

    V.  Columbia violates N.Y. Civil Rights Law § 40-c ................................. 21

    VI.  The State and USDOE violate the Establishment Clause of the
        First Amendment ................................................................................... 21

CONCLUSION ......................................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

**Cases**

Adarand Constructors v. Pena, 515 U.S. 200 (1995) …………………………….………… 17

Agostini v. Felton, 521 U.S. 203 (1997) …………………………………………… 24, 24 n. 11

Altman v. Bedford Cent. School Dist., 45 F.Supp.2d 368 (S.D.N.Y. 1999),
*revd. on other grounds,* 245 F.3d 49 (2d Cir. 2001) ………………………………….. 22

Back v. Hastings On Hudson Union Free School Dist. 365 F.3d 107 (2d Cir. 2004) …..… 12, 14

Baer v. Nyquist, 40 A.D.2d 925, 338 N.Y.S.2d 257 (A.D. 3rd Dept. 1972) ……………….. 18

Blum v. Yaretsky, 457 U.S. 991 (1982) ……………………………………………… 19, 20

Bd. of Ed. v. Allen, 20 N.Y.2d 109, 281 N.Y.S.2d 799 (1967), *affd.* 392 U.S. 236 ……. 24 n. 12

Bd. of Ed. Kiryas Joel Vil. School Dist. v. Grumet, 512 U.S. 687 (1994) ………………… 23

Brown v. Henderson 257 F.3d 246 (2d Cir. 2001) ……………………………………… 11

Bryant v. Yellen, 447 U.S. 352 (1980) ………………………………………………... 17

Burt v. Gates, 502 F.3d 183 (2d Cir. 2007) ……………………………………………… 4

Butler v. City of Batavia, 545 F. Supp. 2d 289 (W.D.N.Y. 2008) ……………….…...…….… 8

Cohen v. Brown University, 991 F.2d 888 (1st Cir. 1993), *aff'd in part,* 101 F.3d 155
(1st Cir. 1996), *cert. denied*, 520 U.S. 1186 (1997) …………………………….……. 6, 7, 9

De La Cruz v. Tormey, 582 F.2d 45 (9th Cir. 1978), *cert den.*441 U.S. 965 (1979) …..... 7, 12, 13

Engel v. Vitale, 370 U.S. 421 (1962) ………………………………………………….. 24

Epperson v. State of Ark., 393 U.S. 97 (1968) ……………………………………...…… 25

Evers v. Dwyer, 358 U.S. 202 (1958) …………………………………………………… 16

Everson v. Bd. of Educ., 330 U.S. 1 (1947)(Rutledge, J. dissenting) …………………… 22 n. 8

Frazier v. Coughlin, 850 F.2d 129 (2d Cir. 1988) ……………………………………...… 3

Gomes v. R.I. Interscholastic League, 469 F. Supp. 665 (D. R.I. 1979)(vacated as moot) … 7

Gratz v. Bollinger, 539 U.S. 244 (2003) ………………………………………………… 18

Grimes v. Sobol, 832 F. Supp. 704 (S.D.N.Y. 1993), aff'd, 37 F.3d 857 (2d Cir. 1994) …... 8

Grove City Col. V. Bell, 465 U.S. 555 (1984) ………………………………………… 5

Guardians Ass'n v. Civil Service Com'n of City of New York, 463 U.S. 582 (1983) ……… 8

Haffer v. Temple Univ., 678 F. Supp. 517 (E.D. Pa. 1987) ………………………………… 8

Hayden v. County Nassau, 180 F.3d 42 (2d Cir. 1999) ………………………………….. 8

Heckler v. Mathews, 465 U.S. 728 (1984) …………………………………………….. 16

In re U.S. Catholic Conference, 885 F.2d 1020 (2d Cir. 1989) …………………………….. 17

International Broth. of Teamsters v. U.S., 431 U.S. 324 (1977) ……………………..……… 7

Jackson v. Metro. Edison Co., 419 U.S. 345 (1974) ………………………………...…… 19

Keyishian v. Board of Regents of University of State of N. Y., 385 U.S. 589 (1967) ……… 3

LaViolette v. Daley, E.E.O.C. No. 01A01748 (Sept. 13, 2002) …………………………….. 22

Lee v. City of Los Angeles, 250 F.3d 668 (9th Cir. 2001) ………………………………… 23 n. 9

Lee v. Weisman, 505 U.S. 577 (1992) ………………………………………………… 25

Lozano v. Ashcroft, 258 F.3d 1160 (10th Cir. 2001) …………...……………………..…… 23 n. 9

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ………………………………….. 9

Lynch v. Donnelly, 465 U.S. 668 (1984)(O'Connor, J. concurring) …………………..……… 24

Lynn v. Regents of Univ. of Cal., 656 F.2d 1337 (9th Cir. 1981) ……………..………..… 13

Malnak v. Yogi, 592 F.2d 197 (3d Cir. 1979)(Adams, J. concurring) ………….…………… 22

Mass. v. E.P.A., 127 S.Ct. 1438 (2007) ……………………………………….…………….. 10

McCormick ex rel. McCormick v. School Dist. of Mamaroneck, 370 F.3d 275
(2d Cir. 2004) ………………………………………………………………….……………….. 10

Meyer v. Nebraska, 262 U.S. 390 (1923) …………………………………………..……… 16
Moore v. Bd. Regents Univ. of New York, 44 N.Y.2d 593, 407 N.Y.S.2d 452 (1978)   2, 14, 18

Northeastern Fla. Assoc. Gen. Contractors Am. v. Jacksonville, 508 U.S. 656 (1993) ……… 17

Norwood v. Harrison, 413 U.S. 455 (1972) ……………………………………….……. 19

Oklahoma v. U.S. Civ. Srvc. Comm., 330 U.S. 127 (1947) …………………………..…… 16

Powe v. Miles, 407 F.2d 73 (2d Cir. 1968) …………………………………………….…… 19

Pratt v. Ind. School Dist. 831, Forest Lake, Minn., 670 F.2d 771 (8th Cir. 1982) ………..... 12

Public Utilities Comm. v. Pollak, 343 U.S. 451 (1953) ………………………………….…….. 19

Regents of University of California v. Bakke, 438 U.S. 265 (1978) ………………….…….... 5

Reitman v. Mulkey, 387 U.S. 369 (1967) ……………………………………………… 19

Ridgefield Women's Pol. Caucus v. Fossi, 458 F.Supp. 117 (D. Conn. 1978) ………….... 16

Robinson v. Overseas Mil. Sales Corp., 21 F.3d 502 (2d Cir. 1994) ……………………….. 3

Santa Fe Ind. Sch. Dist. V. Doe, 530 U.S. 290 (2000) ………………………………… 25

Shelton v. Tucker, 364 U.S. 479 (1960) ……………………………………………...………… 11

Torasco v. Watkins, 367 U.S. 488 (1961) ……………………………………………... 22

U.S. v. Seeger, 380 U.S. 163 (1965) …………………………………………...………… 22

Vil. Arlington Hts. v. Met. Housing Dev. Cp., 429 U.S. 252 (1977) ……………………… 7, 9, 15

Wallace v. Jaffree, 472 U.S. 38 (1985)(O'Connor, J. concurring) …………………..…… 15, 25

Warth v. Seldin, 422 U.S. 490 (1975) ……………………………………………..……. 9

Washington v. Davis, 426 U.S. 229 (1976) ……………………………………………..…… 13

Weise v. Syracuse Univ., 522 F.2d 397 (2d Cir. 1975) ……………………………….…….. 7

Welsh v. U.S., 398 U.S. 333 (1970) …………………………………………………… 22

West Va. State Bd. Education v. Barnette, 319 U.S. 624 (1943) …………………….…… 3, 19

Wright v. Council City of Emporia, 407 U.S. 451 (1972) ………………………….…….. 15

Zorach v. Clauson, 343 U.S. 306 (1952) ……………………………………….……… 23

**Statutes**

Fed R. Civ. P. 12(b)(1) ……………………………………………..…. 3

Fed R. Civ. P. 12(b)(6) …………………………………………………. 3

20 U.S.C. § 1070(a)(5) …………………………………………………... 21

20 U.S.C. § 1687 ………………………………………………... 6, 6 n. 1

20 U.S.C. § 3402(1) …………………………………………….……... 15

20 U.S.C. § 3403(b) ………………………………………………... 6 n. 1

28 U.S.C. 1367 ……………………………………………...……………. 13

N.Y. Civ. Rts. § 40 ……………………………………………...……… 21

N.Y. Educ. Law § 207 ……………………………………………... 18, 23

N.Y. Educ. Law § 215 ……………………………………...……………... 18

**Regulations**

29 C.F.R. §1605.1 …………………………………………………… 22

34 C.F.R. § 106 …………………………………………………….…… 6

34 C.F.R. § 106.31 …………………………………………………... 6, 7

34 C.F.R. § 106.41 …………………………………………………... 6 n.1

34 C.F.R. § 106.42 …………………………………………………... 6

45 C.F.R. § 86.31 …………………………………………………….…… 6, 7

8 N.Y.C.R.R. Part 52 …………………………………………………… 23

8 N.Y.C.R.R.  § 52.1 ………………………………………………... 23 n. 10

**Other**

Cook & Sobieski, Civ. Rts. Actions, ¶ 17.29 ……………………………………… 6

N.Y. Civ. Rts. § 40-c, Historical & Statutory Notes, L.2002, c.2, § 1……………………… 21

## PRELIMINARY STATEMENT

This case is about the demise of the marketplace of ideas and equal treatment for men brought about by those in government and education who can only countenance one brand of thinking, one brand of belief, and one brand of speech—their own.  State and Federal officials and Columbia University have created a climate of intolerance that effectively bans concepts and facts not considered "Feminist."  The winds of a cult-like conformity blow through the abandoned marketplace of ideas when government and centers of learning believe they have discovered the one and only truth, in this case Feminism.  Believers benefit and are encouraged to speak while dissenters are silenced and denied opportunities for advancement.

Today in America, the popular, academically approved ideology of "Feminism" is used to justify the imprisonment of thought, speech and action.  "Feminism" newspeak paints a false reality for those minds all too willing to conform in order to feel important as part of the "correct sect of believers."  Whenever dissent rears up to threaten the unanimity of belief among the chosen, it is crushed with a choir of vituperation against the person who raises an alternative idea.  True believers even portray themselves as the victims of those who disagree with them, and in a 1984 doublethink reversal of meaning, proclaim dissenters guilty of chilling academic freedom.  In such a climate, the enforcers of "correct thinking" audaciously declare themselves the true facilitators of education, when in reality they are fostering an Orwellian absurdity where authority proclaims all ideas equal but some more equal than others.

This Opposition uses the following nomenclature:  U.S. Department of Education and its Secretary as "USDOE"; the Institute for Research on Women & Gender as "IRWG," the School of Continuing Education as "Continuing Education," and "Columbia" for the entire institution of Columbia University; the Chancellor and Board of Regents of the University of the State of New

York as "Regents," the New York State Commissioner of and the Department of Education as "N.Y. Education," the President of and the New York State Higher Education Services Corporation as "HESC," and all the New York State defendants collectively as "State."  The First Amended Complaint is referred to as "Compl.," Columbia's Memorandum of Law as "Col. Memo.," the New York State defendants Memorandum of Law as "State Memo.," and the Federal defendants Memorandum of Law as "U.S. Memo."  New York's institutions of higher learning, whether colleges or universities, are referred to as "colleges."

## STATEMENT OF FACTS

Columbia exists as the result of a charter from the New York State Legislature and amendments to that charter require an act of the Legislature.  (Compl. ¶¶ 132-36).  The State holds the power of life and death over Columbia because the State can suspend its charter for failure to follow the State's educational policies and adhere to its rules and regulations.  Moore v. Bd. Regents Univ. of New York, 44 N.Y.2d 593, 599-600, 407 N.Y.S.2d 452 (1978).  Since 1998, thousands of students have received Federal or State aid paid directly or via students to Columbia while it also directly received other government funds.  (Compl. ¶¶ 55-67, 152-54, 157).

The Women's Studies program at Columbia, as made clear by its website and course guide, does much more than instruct and train adherents in the Feminist belief system.  It creates and furthers a communal system for the coherence of belief focusing on acceptable thought, practices, values, traditions and ritualistic language, such as the use of "gender" instead of "sex," unless accusing a man of "sexual" harassment.  Women's Studies provides followers with the certainty that they are the sole possessors of the highest form of truth—Feminism.  Feminism is a cultural and linguistic framework or medium that shapes the entirety of its followers' lives with

thought patterns similar to an idiom that make possible the description of realities, the formulation of beliefs, and the experiencing of inner attitudes, feelings, and sentiments. Women's Studies advances Feminism as a worldview that dictates the thoughts, speech, and actions of all.  It provides a conscious push toward an ultimacy and transcendence that provide norms and power for the rest of life.  (Compl. ¶¶ 5-15).  In literate societies, religious beliefs tend to be codified, which is another function of Women's Studies at Columbia.

## ARGUMENT

The allegations of the First Amended Complaint are deemed true on the defendants' facial Rule 12(b)(1) motion to dismiss, *see* <u>Robinson v. Overseas Mil. Sales Corp.</u>, 21 F.3d 502, 507 (2d Cir. 1994)(citations omitted), and on their Rule 12(b)(6) motion to dismiss, <u>Frazier v. Coughlin</u>, 850 F.2d 129, 129 (2d Cir. 1988).

## I. Defendants curtail academic freedom.

The defendants wrongly waive the red flag of academic freedom to justify their imposition of a unitary belief system of Feminist orthodoxy for dictating the thought, speech, and conduct of members of the Columbia community and society-at-large.  "If there is any fixed star in [the] constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."  <u>West Va. State Bd. Education v. Barnette</u>, 319 U.S. 624, 642 (1943).   The 1st Amendment does not tolerate direct or indirect government action that casts a pall of orthodoxy over the classroom.  <u>Keyishian v. Board of Regents of University of State of N. Y.,</u> 385 U.S. 589, 603 (1967).

> "To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation.  No field of education is so thoroughly comprehended by man that new discoveries cannot yet be made. Particularly is that true in the social sciences, where few, if any, principles are

accepted as absolutes.  Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die."  Id.

The State's promulgation, approval, and partial financing of Columbia's Women's Studies program, USDOE's delegation to the State of accreditation for financial aide that benefits Women's Studies, and Columbia's enthusiastic and exclusive propagation of Feminism through Women's Studies prevent countervailing masculine perspectives, such as Men's Studies, from entering Columbia's ivy tower to challenge Feminist orthodoxy.  (Compl. ¶¶17-21).  The banishment of Men's Studies scholarship from Columbia fosters acceptance of Feminism's invidious discrimination against men, which is inimical to the defendants educational missions of fostering equal justice, ensuring a diverse student and alumni body, and helping both find appropriate careers.  It also has a deleterious impact on society as a whole, since "[n]o one should underestimate the vital role in a democracy that is played by those who guide and train our youth."  Id.

The Supreme Court's academic-freedom jurisprudence protects the "marketplace of ideas" in the university, Burt v. Gates, 502 F.3d 183, 191 (2d Cir. 2007).  In Burt, the Court would not stretch academic freedom to allow the barring of military recruiters, which is much more attenuated from the free flow of ideas than barring Men's Studies.  See id.  Yet for decades the defendants have limited the marketplace of ideas to Feminism by banishing Men's Studies.  Freedom of speech is key to the flow of ideas and forbids the State, USDOE, and Columbia, as a state actor, from invidiously treating differently those with unpopular viewpoints by suppressing their speech in favor of popular speech.  The defendants' conduct in furthering the Feminist driven Women's Studies program, Compl. ¶¶ 30-68, quashes discussion of the currently unpopular masculine perspective beneficial to males, Compl. ¶¶ 229-51.

Further, academic freedom does not give Columbia the right to provide benefits to one group based on sex but not the other because of stereotyping.  As the Complaint clearly alleges, Columbia's Women's Studies program is about much more than instructing Feminism in the classroom.  (Compl. ¶¶ 3, 94, 97, 98, 181, 186-87, 189, 266-71).  Columbia, however, chooses to ignore the allegations and self-servingly re-writes them as concerning only course instruction.  The Women's Studies program goes beyond instructing a doctrine.  It also provides benefits and opportunities exclusively to adherents of that doctrine, mainly females, to the detriment to others, mainly males.  (Id.).  "Fairness in individual competition for opportunities … is a widely cherished American ethic.  Indeed, in a broader sense, an underlying assumption of the rule of law is the worthiness of a system of justice based on fairness to the individual," which still includes males.  Regents of University of California v. Bakke, 438 U.S. 265, 319 n. 53 (1978).

## II.  Columbia and the State violate Title IX, 20 U.S.C. § 1681 *et seq.*, and its implementing regulations.

Title IX applies to colleges that receive Federal financial assistance when they enroll students who receive federal funds earmarked for educational expenses.  Grove City Col. V. Bell, 465 U.S. 555, 563-70 (1984).  Title IX does not distinguish between direct institutional assistance and other aid received by a school through its students.  Id.  Financial assistance encompasses all forms of Federal aid to education.  Id.  Columbia receives Federal financial assistance, as does the State.  (Compl. ¶¶ 54-62).

Columbia attempts to mislead by claiming that Title IX only applies to college sports—it does not.  "[T]he term 'program or activity' and 'program' mean all of the operations of … a college, university, or other postsecondary institution" and "a department, agency, … or other instrumentality of a State or the entity of such State …  that distributes [Federal] assistance …."

20 U.S.C. § 1687; 34 C.F.R. § 106.  Columbia is a university, the Regents are an agency of the State, and N.Y. Education and HESC distribute USDOE assistance.

Further indications of the broad sweep of Title IX are found in its implementing regulations for educational programs.  45 C.F.R. § 86.31 and 34 C.F.R. § 106.31 state that treating persons differently based on sex is prohibited "under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient which receives Federal financial assistance."[1]  The Complaint alleges that Columbia's Women's Studies is such a program, and it is listed with N.Y. Education as a "Registered Program," under program coded 20233 with the full title "Women's and Gender Studies."  So whether academic, occupational training or other, Title IX applies to Columbia's Women's Studies program.

The heart of Title IX is prohibition of sex-based discrimination in all programmatic aspects of educational institutions.  Cohen v. Brown University, 991 F.2d 888, 894 (1st Cir. 1993), aff'd in part, 101 F.3d 155 (1st Cir. 1996), cert. denied, 520 U.S. 1186 (1997).  Its focus is remedial by prohibiting biased discrimination against the potential beneficiaries of educational programs.  Cook & Sobieski, Civ. Rts. Actions, ¶ 17.29.  Title IX does not tell a college what to teach, just that in its operations it cannot treat one group differently from another based on outmoded stereotypical characterizations of the sexes.

The alleged violations of Title IX and the implementing regulations are not the exclusion of males from Columbia's Women's Studies program.  The Complaint asserts the more subtle variety of discrimination that focuses on the results of the State and Columbia's conduct.  De La

---

[1] Columbia misrepresents 34 C.F.R. § 106.42 as applying to educational programs when it only focuses on specific textbooks or course materials.  (Col. Memo. pp 18, 21).  If it applied to educational programs, then 20 U.S.C. § 1687 and the related regulations would be superfluous.  Columbia also mistakenly relies on 34 C.F.R. 106.41, which applies to athletic programs not educational programs.  (Id. pp. 21, 22).  Further, Columbia misrepresents 20 U.S.C. § 3403(b) as preventing the application of Title IX to educational programs when it only limited the authority of the then newly created USDOE.  There is nothing in 20 U.S.C. § 3403(b) repealing Title IX or any of its sections.

Cruz v. Tormey, 582 F.2d 45, 50 (9th Cir. 1978), *cert den.*441 U.S. 965 (1979).  In violation of

45 C.F.R. § 86.31(b) and 34 C.F.R. § 106.31(b), Columbia treats males differently than females

in providing benefits and services, provides males different benefits and services, subjects males

to different treatment, limits males as compared to females in the enjoyment of advantages and

opportunities, and as for the State, it renders assistance to Columbia, an organization that

discriminates on the basis of sex.   Columbia, with State encouragement, also invidiously

withholds facilities for the furtherance of scholarship and research in Men's Studies from a

particular class of citizens, which shares a similar degree of offensiveness as in the arbitrary

exclusion of a group of people.  Weise v. Syracuse Univ., 522 F.2d 397, 405 (2d Cir. 1975).

        The unmet needs of the disadvantaged sex, here males, also indicate disparate treatment.

Cohen, 991 F.2d at 895.  A male can enroll in Women's Studies just as the boy in Gomes v. R.I.

Interscholastic League, 469 F. Supp. 665 (D. R.I. 1979)(vacated as moot), made the girls

volleyball team, but he was not allowed to play.  Males in Columbia's program are demeaned as

members of a Fritz Lang underclass and effectively cut out of the benefits and opportunities

provided females.  (Compl. ¶¶ 87, 88).  No program at Columbia provides males the

opportunities to nurture their talents as females do in Women's Studies because there is no

Men's Studies program.  The State and Columbia simply treat males, whether in Women's

Studies programs or not, less favorably than females, which in turn has a discriminatory impact.

International Broth. of Teamsters v. U.S., 431 U.S. 324, 335 n. 15 (1977).

        As for discriminatory intent, it only requires a motivating factor that can be one among

others, and that factor can be inferred from the mere differences in treatment.  Vil. Arlington Hts.

v. Met. Housing Dev. Cp., 429 U.S. 252, 265-66 (1977).  The plaintiffs allege that one

motivation on the part of the State and Columbia is ill will toward males, which is reasonably inferred from numerous acts by the Columbia and the State.  (Compl. ¶¶ 76-90, 103-09).

Col. Memo. p. 22 cites to <u>Butler v. City of Batavia</u>, 545 F. Supp. 2d 289, 293 (W.D.N.Y. 2008), where the court found the complaint allegations insufficient to allege a discriminatory intent or purpose.  Of course, Columbia fails to state the allegations in that case found speculative or compare them to the allegations in this case because there is no similarity.  Col. Memo. p. 22 also misleads by citing to <u>Hayden v. County Nassau</u>, 180 F.3d 42, 50 (2d Cir. 1999), as requiring "specific facts leading to the conclusion that Columbia created a women's studies program 'because of, not merely in spite of' adverse effects on men."  <u>Hayden</u> does <u>not</u> require "specific facts" on a motion to dismiss, but does require that "the decisionmaker ... selected or reaffirmed a particular course of action <u>at least in part</u> 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."  <u>Hayden</u> at 50 (emphasis added).  Columbia left out the qualifier "at least in part" not only from <u>Hayden</u> but also from its cite to <u>Grimes v. Sobol</u>, 832 F. Supp. 704, 708 (S.D.N.Y. 1993), *aff'd*, 37 F.3d 857 (2d Cir. 1994). [2]

Even had the Complaint not alleged discriminatory intent or purpose on the part of the State and Columbia, the allegations alone of dissimilar impact suffice to establish liability when a suit is brought to enforce Title IX's implementing regulations because that is the standard under Title VI of the Civil Right Act on which Title IX is patterned.  <u>Haffer v. Temple Univ.</u>, 678 F. Supp. 517, 539-40 (E.D. Pa. 1987); *see* <u>Guardians Ass'n v. Civil Service Com'n of City of New York</u>, 463 U.S. 582, 607 n. 27 (1983).

---

[2] Columbia also argues there is no Title IX ill will discrimination because the President and Provost of Columbia are males.  (Col. Memo. p. 23 n. 11).  Just as in Nazi Germany, some Jews turned against other Jews, some lefties against other lefties, so too today some men, mainly in fear of Feminist storm troopers, turn against members of their own sex.  For example, Vice President Joe Biden sponsored the Violence Against Women Act, part of which has been found unconstitutional, and other parts are being challenged as violating equal protection.

Any argument that the lack of a Men's Studies program merely reflects a different level of interest among males than females is nothing more than 40 year-old stereotypical notions of males.  *See* <u>Cohen</u>, 101 F.3d 155, 178-79.  Over the past 40 years, male interests have evolved as a result of the systemic unfair treatment they receive in society in order to give females preferential benefits and opportunities.  Perhaps during the turmoil of the sixties, Columbia provided male perspective programs—but no longer.  Today in America's *de facto* matriarchy the experience at Columbia is the Feminist perspective dominating and censoring other viewpoints. (Compl. ¶ 176).

<u>Standing</u>

For purposes of ruling on a motion to dismiss in which standing is challenged, a court accepts as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.  <u>Warth v. Seldin</u>, 422 U.S. 490, 501 (1975).  Columbia cites to <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992) for the standing requirements, but <u>Lujan</u> is a summary judgment case.  The Supreme Court has stated that at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss the Court presumes that general allegations embrace those specific facts that are necessary to support the claim.  <u>Id</u>. at 561 (citation omitted).

The class representatives allege the necessary:  they have been injured (such injury may be indirect), the injuries are ongoing and traceable to the defendants' conduct, and are redressable by the relief sought.  <u>Vil. Arlington Hts.</u>, 429 U.S. at 261.  Title IX cases do not require that a person actually take a program to have standing.  It is the continuing absence of the opportunity for an equivalent educational experience or ill will, dissimilar treatment that is the injury.  The Title IX injuries are denial of access at Columbia to a Men's Studies program

and the ill will, disparate treatment that males receive at Columbia, in and outside the Women's Studies program.  These injuries stem from the State's education policies that promulgate, approve, and finance Women's Studies programs but not Men's Studies, and Columbia providing Women's Studies but no Men's Studies.  Such conduct grants females a real competitive advantage that can be redressed by the implementation of a State policy and Columbia program for Men's Studies or the elimination of Women's Studies.  *See* Mass. v. E.P.A., 127 S.Ct. 1438, 1458 (2007)(some measure of relief suffices for redressability).

     The class representatives allege their prior and <u>continuing</u> intent to enroll in Men's Studies at Columbia:  Mr. Den Hollander as an alumnus and Mr. Nosal as first a student and now an alumnus.  (Compl. ¶ 254).  The class representatives are affected in a personal and individual way because the lack of Men's Studies has and <u>continues</u> to deny them equivalent benefits and opportunities from a masculine perspective without the demeaning and infringing of speech that Women's Studies provides with its Feminist perspective.  *See* <u>McCormick ex rel. McCormick v. School Dist. of Mamaroneck</u>, 370 F.3d 275, 284-85 (2d Cir. 2004)(standing for injunction when girls who intended to play soccer in the Fall were denied the opportunity because school did not field a girls' soccer team in the Fall).

     Columbia asserts Men's Studies is not defined; therefore, there is no injury that results from Columbia not providing Men's Studies.  (Col. Memo. p. 9).  The Complaint at ¶¶ 229-52 provides some examples of what a Men's Studies program means, and the Complaint at ¶¶ 172 some of the benefits now lacking.  As for other programs at Columbia providing male sensitive views, there are none.[3]   Forty years ago, this would have been a better argument for Columbia,

---

[3] The quote of Mr. Den Hollander in the L.A. Times, Col. Memo. p. 9 n. 3, refers to whether there were accredited college programs providing Men's Studies programs as described in the Complaint—unfortunately there are none that Mr. Den Hollander is are aware of.

but as the Complaint alleges at ¶¶ 36, 71-73, 176, 266, the Feminism of Women's Studies has infiltrated throughout the University as well as society to create an established orthodoxy.

## III.  The defendants violate Equal Protection under the 5th and 14th Amendments.

Slamming the door in a person's face is one way to keep him out.  Another way is to make the environment within so hostile, traducing, and demeaning that he will not enter. Columbia's Women's Studies program does not physically bar males from participating in the program, but the opprobrious treatment males receive, the belligerence of castigations, the collective guilt heaped on them, and the denial of similar perks given females because of the program's bias effectively locks the gates to all but a few.  Even outside the program, Women's Studies dissemination of Feminism throughout Columbia has created an environment for males with the attributes of a hostile work environment similar to those described by the courts under Title VII, 42 U.S.C. § 2000e *et seq*.  *See* <u>Brown v. Henderson</u> 257 F.3d 246, 252 (2d Cir. 2001). Learning in a non-sexually discriminating environment is necessary for developing the full potential of America's citizens.

<u>Discrimination</u>

The protection of individual constitutional rights is a central part of the role assigned to the judiciary under the separation of powers.  When the Federal Government, states and state actors conflict with the Constitution, the Federal courts mandate is to intervene, especially to vindicate civil rights.  "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools."  <u>Shelton v. Tucker</u>, 364 U.S. 479, 487 (1960).  The First Amendment, at the very least, prevents authorities from imposing a "pall of orthodoxy" on classroom instruction which implicates the state in the propagation of a particular religious or

ideological viewpoint.  Pratt v. Ind. School Dist. 831, Forest Lake, Minn., 670 F.2d 771, 776 (8th Cir. 1982)(citation omitted).

The maximization of constitutional freedoms and equality of opportunity should be the hallmarks of educational institutions, but due to the spread of Feminist orthodoxy in higher education, females are treated more equally than males.  Dissimilar treatment can mean, but does not only mean, that one group receives "less favorable" treatment than the other.  Discrimination also occurs when the impact of a policy falls overwhelmingly on one group.  De La Cruz, 582 F.2d at 47.  "Challenges which rely upon disparate impact inevitably will involve consequences which are not restricted in their operation to one group or another.  The essence of this sort of legal attack is imbalance and disproportionality.  The lack of pure gender-specificity is no bar [to an action]."  Id. at 57.

The Complaint alleges both less favorable treatment of the class members by the State, USDOE, and Columbia, and the disproportional effects on the class members by the State's Women's Studies policies, USDOE's funding, and Columbia's program.  As a result of the defendants' polices and practices, educational opportunities are not made available or are made available on an unequal basis or are of less value to the class members because of the existence of a Women's Studies program and the lack of a Men's Studies one.  (Compl. ¶¶ 207-74).

Even without allegations of less favorable treatment or disproportionate impact, there is an argument analogy with employment discrimination.  "In determining whether an employee has been discriminated against because of such individual's sex, the courts have consistently emphasized that the ultimate issue is the reasons for the individual plaintiff's treatment, not the relative treatment of [or impact on] different groups within the workplace."  See Back v. Hastings On Hudson Union Free School Dist. 365 F.3d 107, 121 (2d Cir. 2004).  One reason

behind the State and Columbia's foisting of Feminist Women's Studies on higher education and the USDOE's funding is their archaic stereotyping of males, which indicates an ill will motivation that may be inferred from a totality of the Complaint's allegations, *see* Washington v. Davis, 426 U.S. 229, 242 (1976).  Such an inappropriate reason is sufficient for finding the defendants invidiously discriminate against the class members.

Using another analogy to employment discrimination, Columbia demonstrates a disdain for men's issues and a diminished opinion of males concerned with those issues, Col. Memo. pp. 2, 9, 21, which is evidence of a discriminatory attitude toward men.  *See* Lynn v. Regents of Univ. of Cal., 656 F.2d 1337, 1343 (9th Cir. 1981).  The existence of a discriminatory attitude tends to establish that it is more likely than not that Columbia's conduct is based on an impermissible criterion, and therefore tends to establish the class members' prima facie case.

The Complaint alleges discriminatory intent or purpose as a motivation inferred from the defendants conduct.  Such are deemed true for both the defendants facial Rule 12(b)(1) and Rule 12(b)(6) motions, and that's all that is needed, since it is too early to determine whether the defendants' conduct is free from a discriminatory intent or purpose.  *See* De La Cruz, 582 F.2d at 59.  Columbia asserts, however, that the Complaint's allegations of disparate treatment and ill will are "conclusory."  (Col. Memo. pp. 20, 22).  Columbia does not cite to which specific allegations are conclusory so that it can compare them with allegations that the courts have found conclusory.  Columbia only makes the conclusory assertion that the allegations are conclusory.

Columbia also tries to euphemize the prejudice behind the Women's Studies program and the lack of Men's Studies by contending that Women's Studies is the same as Black or other group programs.  (Col. Memo. pp. 20-21).  This case does not concern them, only the Women's

Studies program.  Sex discrimination may be shown by sex-based stereotyping, which in turn

evinces a discriminatory intent.  <u>Back</u>, 365 F.3d at 119-120.  The Complaint alleges such

stereotyping by the State, Columbia and USDOE.  Whether stereotyping of different groups exist

in other Columbia programs will have to await suits by others.  Besides, there's no comparison

between the reasons for the Feminism propagated at Columbia and say "Contemporary Black

History."  When was the last time a feminist was lynched, shot dead on the front stoop of her

home, or on the balcony of the motel she was staying in?  For the past four centuries, the

institutions of this nation have had their boot heels on the back of the necks of Blacks.  Over that

same period white females have received nothing but preferential treatment.  Try stumbling out

of the Copacabana at three in the morning and hailing a cab if you happen to be black.  Then

watch the cabbies play bumper cars as a white female hails one.

   The State argues there is no New York "statute, regulation, or other source of law that

imposes by its terms a discriminatory sex-based classification…."  (State Memo. p 21).  The

Complaint at ¶¶ 36-40 specifically cites to the Regents Statewide Plans and major policy

statements that use sex-based classification to allocate benefits unequally by promulgating

Women's Studies programs to foster and advance Feminism in colleges and society.  Since the

Regents act as the legislature for colleges, and N.Y. Education as the Regents administrator,

<u>Moore v. Bd. Regents University of New York</u>, 44 N.Y.2d at 600, the Statewide Plans and policy

statements are in effect laws, rules or regulations that cultivate misandry, which indicates a

motivating factor of prejudice toward men.  By inspecting and re-registering Columbia's Women

Studies program, N.Y. Education continues to apply and enforce the Regents invidiously

discriminatory policies, and HESC continues to provide financing, without both of which the

program would not exist.

Part of the motivation behind the State fostering Feminism and Women's Studies in colleges is partiality toward females and enmity toward males.  Evidence of the State's enmity towards men is that for nearly thirty years, the Regents have never advocated Men's Studies programs but only Women's Studies that propagate the misandry of Feminism.  The State claims it is only requiring equity in higher education for females, but its measurement of such equity is a quota system that has shown since the 1980s that more females attend and graduate college in New York than males.  (Compl. ¶¶ 40, 103-06).  The State even admits this in its "Equity for Women in the 1990s" at p. 3 and its "2004 Statewide Plan" at p. 70.  The only reasonable inference to draw from the State treating females preferentially when the State's own measurements show males are the disadvantaged group is a motivation of ill will toward males. *See* Vil. Arlington Hts., 429 U.S. 252, 265-67 (factors taken into account in determining whether discriminatory purpose was a motivating factor).  "The existence of a permissible purpose cannot sustain an action that has an impermissible effect," Wright v. Council City of Emporia, 407 U.S. 451, 462 (1972), and it is the duty of the courts "to distinguish a sham secular purpose from a sincere one."  Wallace v. Jaffree, 472 U.S. 38, 75 (1985)(O'Connor, J. concurring).

Congress created USDOE, in part, to "strengthen the Federal commitment to ensuring access to equal educational opportunity for every individual …."  20 U.S.C. § 3402(1).  The USDOE has failed to do that by delegating its accreditation responsibilities to the State.  (Complaint ¶ 20).  Since the State's policies promote Feminism and Women's Studies programs in colleges, and USDOE relies on the State's accreditation of colleges for distributing student aid, often directly to the college, and USDOE knows that part of such aid supports Feminist Women's Studies, USDOE is therefore complicit in furthering the ill will disparate treatment of males at Columbia.  USDOE has the power to fix the terms on which its money allotments are

disbursed, *see* <u>Oklahoma v. U.S. Civ. Srvc. Comm.</u>, 330 U.S. 127, 142-43 (1947); therefore, it has the authority to prevent the expenditure of Federal dollars to fund unequal educational opportunities for males.  USDOE has chosen not to, which creates another inference of bias motivation against males.

The public financial benefits and assistance the State and the student aid USDOE give Columbia for its Women's Studies not only supports Columbia's invidious discrimination but also discriminate in their own right because they benefit females without any comparable benefit to males.  <u>Ridgefield Women's Pol. Caucus v. Fossi</u>, 458 F.Supp. 117, 122 (D. Conn. 1978).

<u>Standing</u>

Fifty years ago when a black man wanted to take a bus from one location to another, he could only do so by sitting in the back.  <u>Evers v. Dwyer</u>, 358 U.S. 202 (1958).  Today, when any man wants to take his education to another level in the area of "gender studies" he's relegated to the back of the bus of Women's Studies—the only transportation available to an education in "gender studies" and the attendant benefits.  Education and acquisition of knowledge are matters of supreme importance and liberty interests that should be diligently promoted.  <u>Meyer v. Nebraska</u>, 262 U.S. 390, 399-400 (1923).  The defendants continue to obstruct those interests by the class members by doing the contrary with respect to Men's Studies but promoting Feminism through Women's Studies.  "Discrimination itself, by perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' and therefore as less worthy participants in the political community, … can cause serious noneconomic injuries to those persons who are personally denied equal treatment…." <u>Heckler v. Mathews</u>, 465 U.S. 728, 739-740 (1984)(citation omitted).

USDOE's financial assistance facilitates, State policies aid and approve, and Columbia's Women's Studies provides:  (1) instruction, training, and preparation in Feminism that leads to undergraduate degrees and graduate certifications; (2) a post-baccalaureate program in Feminism; (3) alumni auditing of Feminist courses; (4) networking and career opportunities within the Feminist establishment; and (5) support from a Feminist perspective.  No such backing and opportunities are provided for males from a masculine perspective.  The dominance of Feminism achieved by Women's Studies and the lack of the countervailing viewpoint of Men's Studies results in obstacles for males obtaining education, knowledge, career opportunities, training, acquiring skills, and developing their mental abilities and moral character in order to not only lead productive, self-satisfying lives but to counter the Feminist establishment and its antipathy against males.[4]

The defendants ongoing, one-sided propagation of Feminism is not only offensive and stigmatizing to the class representatives but denies them equal treatment by preventing them from pursuing Men's Studies and competing on an equal footing with females in education, the work place, the courts, the culture, and society as a whole. *See* <u>Northeastern Fla. Assoc. Gen. Contractors Am. v. Jacksonville</u>, 508 U.S. 656, 666-67 (1993); <u>In re U.S. Catholic Conference</u>, 885 F.2d 1020, 1025, 1028-31 (2d Cir. 1989)(concerning competitive advocate standing)(citations omitted).  The injury is males <u>not</u> being considered equally because of discriminatory obstacles that cause the plaintiffs to suffer a continuing loss of opportunities. *See* <u>Bryant v. Yellen</u>, 447 U.S. 352, 366-67 (1980).  Immediacy is the plaintiffs alleging they will enroll in Men's Studies when offered.  <u>Adarand Constructors v. Pena</u>, 515 U.S. 200, 211 (1995). Causality exists because the class representatives are able and ready to pursue Men's Studies that

---

[4] Establishment means a unitary belief system held by enough influential persons so that it dominates over other beliefs in a society.  In America today, that belief system is Feminism.  (Complaint ¶¶ 212, 226).

the defendants prevent by not supporting or providing.  <u>Gratz v. Bollinger</u>, 539 U.S. 244, 262 (2003).  The remedy is restoring equality, which can occur by withdrawing the benefits and opportunities provided by the Feminist Women's Studies program, or extending similar opportunities and benefits to adherents of masculinity through a Men's Studies program.  Either will profit the plaintiffs in some personal interest.

**IV.  Columbia's invidious discrimination occurs under the color of law, 42 U.S.C. 1983.**

The Regents act as a legislature over higher education in New York that sets statewide education polices and enact rules for carrying the policies into effect.  N.Y. Educ. Law § 207. The Regents periodically develop a master plan for the development and expansion of higher education in New York, <u>Moore</u>, 44 N.Y.2d 593, 598, which includes promulgating Feminism and Women's Studies programs.  The Regents also determine in which subject areas, such as Women's Studies, tenure will be offered.  <u>Baer v. Nyquist</u>, 40 A.D.2d 925, 926, 338 N.Y.S.2d 257 (A.D. 3rd Dept. 1972).  Further, the Regents and N.Y. Education have the power to visit, examine, inspect, and require reports from colleges as often as the Regents desire and provide whatever information the Regents want.  N.Y. Educ. Law § 215.  Any refusal or undue delay in providing information, or violation of a policy or implementing rule and the Regents may suspend the charter or any rights and privileges of that college.  <u>Id</u>.  The State's involvement with Columbia is much more than Columbia pretends, but the key point is the State's connection to the Feminist Women's Studies program that has an invidiously discriminatory impact on the class members and treats males differently than females.

The Regents' Statewide Plans of 1984 and 2004, based in part on Columbia's master plans, and the Regents' major policy statements of 1972, 1984, and 1993 approved and encouraged the ill will treatment and prejudicial impact of Columbia's Women's Studies

program on males.  The Regents knew of the program's practices because it was patterned on the

Regents' requirements for higher education to provide programs in Women's Studies for

instituting Feminism and to remake New York into the Feminist image.  The Regents

euphemistically called their policies "equity for women."  But even if that were the objective,

"[t]he equal protection clause would be a sterile promise if state involvement in possible private

activity could be shielded altogether from constitutional scrutiny simply because its ultimate end

was not discrimination, but some higher goal."  Norwood v. Harrison, 413 U.S. 455, 466-67

(1972).

State action exists where the state (1) authorizes or encourages the invidiously

discriminatory activities, Reitman v. Mulkey, 387 U.S. 369, 375 (1967); or (2) is involved with

the activity that discriminates, Powe v. Miles, 407 F.2d 73, 81 (2d Cir. 1968)(Friendly, J.); or (3)

affirmatively approves discrimination through its regulatory powers, Public Utilities Comm. v.

Pollak, 343 U.S. 451, 462 & n. 8 (1953), by in effect placing a state's imprimatur on the

prohibited activities, Jackson v. Metro. Edison Co., 419 U.S. 345, 357 (1974).  In determining

state action in sex discrimination cases, the standard is a less onerous one than used in the

college cases cited in by Columbia, Col. Memo. pp. 11-14.  Weise, 522 F.2d at 405-06.

Columbia ignores the tests and asserts that for state action to exist, the State is required to

be "responsible" for the specific conduct alleged as discriminatory.  (Col. Memo. pp. 11-13).

Columbia cites to a N.Y. Southern District Court case for its "responsible" proposition, but omits

that case's cite to Blum v. Yaretsky, 457 U.S. 991 (1982).  As is often the situation in the law,

courts provide specific meanings to every day words in order to avoid confusion that might result

from the common understanding of a word.  The Supreme Court in Blum defined what it meant

by the word "responsible" in the area of state action, and that is how the Southern District Court

used the term.  <u>Blum</u>, citing in part to <u>Jackson</u>, ruled that "a State normally can be held responsible for a private decision only when it has exercised coercive power <u>or</u> has provided such significant <u>encouragement</u>, either overt or covert, that the choice must in law be deemed to be that of the State."  <u>Id</u>. at 1004 (emphasis added).  The common use of "responsible" does not include "encouragement."  Columbia knew this, but chose to mislead this Court by failing to provide the original citation that defined "responsible" or indicate its omission.

Given the extent of the Regents and N.Y. Education's power over higher education, the Regents' plans and policies calling for preferential treatment of females through Feminist Women's Studies, the Regents' detailed requirements for instilling Feminist tenets into higher education, the Regents' creation of Feminist agents called "affirmative action officers" to enforce and punish those for not dutifully adhering to the Regents' Feminist polices, the Regents and N.Y. Education <u>not</u> regarding their functions as ministerial, and the Regents' approval of Columbia's master plan for education by incorporating its Women's Studies section into the Regents' Statewide Plans; the Regents and N.Y. Education plainly authorize, encourage, and involve themselves in the invidiously discriminatory practices of Columbia's Women's Studies program.  In addition, by reviewing, approving, re-reviewing and re-approving every aspect of the Women's Studies program at Columbia to assure it complies with the Regents' policies and plans, N.Y. Education stamps the State's imprimatur on a program known to practice and promote invidious discrimination.[5]  Since here the State is involved with the very activities that discriminate, the many cases cited by Columbia that held no such involvement do not apply.

Further, without the State's authorization, encouragement, involvement, and stamp of approval on the Feminist misandry activities at Columbia, the University could not grant credit

---

[5] Columbia essentially argues the Complaint's allegations of the State's control over Columbia's Women's Studies program are untrue.  (Columbia Memo. pp 13-14).  But on the defendants' motions to dismiss, the allegations are assumed true.  They'll be plenty of time for proof later during the appropriate stage of this action.

or degrees in Women's Studies nor receive financing, either directly or indirectly[6], for the continuation of the Women's Studies program.

## V.  Columbia violates N.Y. Civil Rights Law § 40-c.

The N.Y. Civil Rights Law § 40-c cause of action is withdrawn as to the State but <u>not</u> Columbia, over which this Court has supplemental jurisdiction, 28 U.S.C. § 1367.  Section 40-c prohibits discrimination against persons based on sex by any institution in New York that fails to provide equal opportunity, whether because of prejudice, discrimination or inadequate education opportunities.  N.Y. Civ. Rts. § 40-c, <u>Historical & Statutory Notes</u>, L.2002, c.2, § 1. "Institution" includes colleges supported in whole or in part by contributions solicited from the general public.  N.Y. Civ. Rts. § 40.  Columbia launched a major fundraising campaign in 2006 that solicits contributions from the general public.

## VI.  The State and USDOE violate the Establishment Clause of the First Amendment.

The Complaint alleges that Feminism propagated by Columbia is a religion, Complaint ¶¶ 4-14).  On the defendants' motions to dismiss, the allegations are accepted as true.  Naturally, on a summary judgment motion following discovery or at trial, the class will have to prove that Columbia's Feminism is a religion under U.S. Supreme Court standards.  All the cases, except for three,[7] cited by the State and USDOE that deal with whether a belief system is a religion are decisions made after trial, administrative hearings, or summary judgment motions and therefore had the benefit of an evidentiary record that does not exist here.

---

[6] One of the stated purposes of student aid provided by USDOE is to provide assistance to institutions of higher learning.  Pub. L. 92-318, § 1001(c)(1), 20 U.S.C. § 1070(a)(5).

[7] Of the three motions on the pleadings cases, the two cited by the State did not involve the issue of defining religion, and the case cited by USDOE actually found a violation of the establishment clause.

Religion

Religion for establishment clause purposes is not as narrow a concept as the State and USDOE argue.  (State Memo. pp. 8-13; U.S. Memo. 6, 8).  In Torasco v. Watkins, 367 U.S. 488, 495 n. 11 (1961), the Supreme Court in dictum rejected the view that religion is defined solely in terms of a Supreme Being by noting that Ethical Culture, Secular Humanism and other non-theistic belief systems are religions.  In two conscientious objector cases determining whether the objectors' beliefs amounted to a religion, the Supreme Court held that secular beliefs of a purely ethical or moral source and content which impose a duty of conscience can function as a religion. Welsh v. U.S., 398 U.S. 333, 340 (1970); U.S. v. Seeger, 380 U.S. 163, 184-85 (1965).  Intense personal convictions that may appear incomprehensible or incorrect come within the meaning of religious belief.  Id.  The Equal Employment Opportunity Commission in Title VII employment cases includes as religion moral or ethical beliefs sincerely held with the strength of traditional religions.  LaViolette v. Daley, E.E.O.C. No. 01A01748 (Sept. 13, 2002); 29 C.F.R. §1605.1.  In Altman v. Bedford Cent. School Dist., 45 F.Supp.2d 368, 378, (S.D.N.Y. 1999), *revd. on other grounds,* 245 F.3d 49 (2d Cir. 2001), the Court used an expansive definition of religion for establishment clause cases from Malnak v. Yogi, 592 F.2d 197, 208-210 (3d Cir. 1979)(Adams, J. concurring).[8]  The Malnak test looks at three indicia:  whether the belief system (1) addresses fundamental and ultimate questions having to do with deep and imponderable matters, (2) consists of a belief-system comprehensive in nature, (3) has formal and external signs such as structure, organization, efforts at propagation, and observance of holidays.  Not all of the indicia

---

[8] Judge Adams's concurring opinion is one of the better reviews of the establishment clause cases for determining religion, and his guidelines have been adopted by the Third, Eighth, Ninth and Tenth Circuit Courts of Appeals. Judge Adams also argued, as did Justice Rutledge in his dissent in Everson v. Bd. of Educ., 330 U.S. 1, 32 (1947) for a definition of religion as expansive for establishment clause purposes as for the free exercise clause.

need be satisfied for a belief system to be a religion, but in the case of Feminism, all three are met.  (Compl. ¶¶ 4-15).[9]

     While N.Y. Education § 207 prohibits the State from regulating doctrinal instruction in seminaries, the State clearly regulates the Feminist doctrine in Women's Studies under 8 N.Y.C.R.R. Part 52, which reaches content.[10]   But that does <u>not</u> mean Feminism is <u>not</u> a religion.  Governments often do things they don't have the authority to do, such as the Vietnam War, wire tapping citizens without court orders, or foisting the religion of Feminism in colleges.

<u>Aiding the religion Feminism</u>

     The State and USDOE argue that even if Feminism is a religion, their conduct does not aid it.  The ban on aiding a religion means "[g]overnment may not finance religious groups nor undertake religious instruction nor blend secular and sectarian education nor use secular institutions to force one or some religion on any person."  <u>Zorach v. Clauson</u>, 343 U.S. 306, 314 (1952).  "[T]he heart of the Establishment Clause, [is] that government should not prefer one religion to another, or religion to irreligion."  <u>Bd. of Ed. Kiryas Joel Vil. School Dist. v. Grumet</u>, 512 U.S. 687, 703 (1994)(N.Y. State created a separate school district for a religious faith).

     Beginning in 1972, the State started to remake higher education and New York society in accordance with Feminist tenets by promulgating Feminism through its Statewide Plans and policy statements that called for Women's Studies programs.  The State promoted, approved,

---

[9] The State requests this Court to take judicial notice of an adjudicative fact that Feminism is <u>not</u> a religion under the establishment clause.  Here there is a genuine dispute over whether Feminism is a religion; therefore, judicial notice does not apply.  <u>Lee v. City of Los Angeles</u>, 250 F.3d 668, 689 (9th Cir. 2001); <u>Lozano v. Ashcroft</u>, 258 F.3d 1160, 1165-66 (10th Cir. 2001).

[10] The State mistakenly claims that registration of <u>non</u>-seminary instruction does not involve content.  8 N.Y.C.R.R. § 52.1(b)(3) states that to register curricula, "[t]he content and duration of curricula shall be designed to implement" a curriculum's purposes; § 52.1(c) requires curricula to be consistent with the Regents Statewide Plan; and § 52.1(h) states that new registration is required for any curriculum in which changes affect the title, focus, design or requirements.  So whether a course teaches Arianism, Donatism, pro-slavery, or anti-slavery, it impacts its registration.  (<i>Contra</i> State Memo. p. 16).

registered, and financed Feminist Women's Studies programs.  USDOE, by delegating its

college accrediting responsibilities to the State, knowingly facilitated the State's advancing of

Feminism and provided indirect funding to Women's Studies programs.  While the type of

benefits provided for the instruction of Feminist doctrine are similar to those given mathematics,

or other programs, the benefits granted Women's Studies end up indoctrinating a religion

promulgated by the State and aided by USDOE.  Government benefits—approval, registering,

and financing,[11] even through neutral means, cannot further a government end to advance and

endorse a religion.  *See* Agostini v. Felton, 521 U.S. 203, 222-23 (1997).  The establishment

clause prohibits such government endorsement of religious activities because "endorsement

sends a message to nonadherents that they … are outsiders of the political community, and … to

adherents that they are insiders, favored members of the political community."  Lynch v.

Donnelly, 465 U.S. 668, 688 (1984)(O'Connor, J. concurring).

> "The Establishment Clause, unlike the Free Exercise Clause, does not depend upon any
> showing of **direct** governmental compulsion and is violated by the enactment of laws
> which establish an official religion whether those laws operate directly to coerce
> nonobserving individuals or not….  When the power, prestige and financial support of
> government [are] placed behind a particular religious belief, the **indirect** coercive
> pressure upon religious minorities to conform to the prevailing officially approved
> religion is plain.  But the purposes underlying the Establishment Clause go much further
> than that….  The history of governmentally established religion, both in England and in
> this country, showed that whenever government had allied itself with one particular form
> of religion, the inevitable result had been that [government] had incurred the hatred,
> disrespect and even contempt of those who held contrary beliefs."  Engel v. Vitale, 370
> U.S. 421, 430-31(1962)(emphasis added).[12]

Nor can government prohibit theories that are deemed antagonistic to a particular dogma,

such as Feminism, which the State and USDOE have done by failing to set policies or provide

---

[11] N.Y. Bundy dollars and student aid money from the State and USDOE end up in the coffers of Columbia, which
distinguishes this case from Agostini, 521 U.S at 228.

[12] The N.Y. Court of Appeals in Bd. of Ed. v. Allen, 20 N.Y.2d 109, 116, 281 N.Y.S.2d 799 (1967), *affd.* 392 U.S.
236, held that it did not matter for establishment clause purposes whether the means of attaining the prohibited end
of aiding religion is described with "the words 'direct' [or] 'indirect.'"

aid for Men's Studies.  Epperson v. State of Ark., 393 U.S. 97, 106-07 (1968).  By fostering only

Women's Studies, they use social pressure to enforce orthodoxy, which is just as impermissible

as more direct means," Lee v. Weisman, 505 U.S. 577, 594 (1992), and do nothing to protect

minority views of males, Santa Fe Ind. Sch. Dist. V. Doe, 530 U.S. 290, 304 (2000).

Standing

     The values protected by the establishment clause are fundamental liberty interests, such

as the individual freedom of conscience to embrace the right to select any religious faith or none

at all.  Wallace, 472 U.S. at 52-53.  The "preservation and transmission of religious beliefs and

worship is a responsibility and a choice committed to the private sphere," not the government.

Lee v. Weisman, 505 U.S. at 589.

## CONCLUSION

     When government and institutions channel unpopular concepts out of education, a curtain

of ignorance falls across the academic landscape of inquiry.  The accepted ideology of the day

takes precedence over facts, and subjective anecdotal experiences trump science all because

those in positions of authority believe their views are "correct" and others are wrong.

     For the reasons stated, the Complaint should not be dismissed.


Dated: December 1, 2008
      New York, N.Y.


                  /S/
                  _____
                  Roy Den Hollander, Esq. (1957)
                  Class attorney and representative
                  545 East 14 Street, 10D
                  New York, N.Y. 10009
                  (917) 687-0652