UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

ROY DEN HOLLANDER and WILLIAM A. NOSAL,　:
on behalf of themselves and all others similarly situated,　:
　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　Plaintiffs,　　　　　　　　:　　08 CV 7286 (LAK) (KNF)
　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　- against -　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　:　　ECF Case
INSTITUTE FOR RESEARCH ON WOMEN AND　　:
GENDER AT COLUMBIA UNIVERSITY; SCHOOL　:
OF CONTINUING EDUCATION AT COLUMBIA　　:
UNIVERSITY; TRUSTEES OF COLUMBIA　　　　:
UNIVERSITY IN THE CITY OF NEW YORK;　　　:
UNITED STATES DEPARTMENT OF EDUCATION;　:
MARGARET SPELLINGS, UNITED STATES　　　:
SECRETARY OF EDUCATION, in her official　　:
capacity; BOARD OF REGENTS OF THE　　　　:
UNIVERSITY OF THE UNIVERSITY OF THE STATE OF NEW YORK, in his　:
or her official and individual capacity; CHANCELLOR　:
OF THE BOARD OF REGENTS, ROBERT M.　　:
BENNETT, in his official and individual capacity; NEW　:
YORK STATE COMMISSIONER OF THE　　　　:
DEPARTMENT OF EDUCATION, RICHARD P.　　:
MILLS, in his official and individual capacity; and　　:
PRESIDENT OF THE NEW YORK STATE HIGHER　:
EDUCATION SERVICES CORPORATION, JAMES　:
C. ROSS, in his official and individual capacity,　　　:
　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　Defendants.　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　:
-------------------------------------------------------------------x

## COLUMBIA DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT

FRIEDMAN KAPLAN SEILER & ADELMAN LLP
1633 Broadway
New York, New York  10019
(212) 833-1100

*Attorneys for Defendants Institute for Research on Women and Gender at Columbia University, School of Continuing Education at Columbia University, and Trustees of Columbia University in the City of New York*

## TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ........................................................................................... iii

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS ................................................................................................4

ARGUMENT ....................................................................................................................5

    I.      PLAINTIFFS DO NOT HAVE STANDING TO SUE ........................................5

          A.     Plaintiffs Do Not Allege a Concrete
               and Particularized Injury ...........................................................................5

          B.     The Class Allegations Are Irrelevant to Standing ...................................10

    II.     PLAINTIFFS' SECTION 1983 CLAIM FAILS BECAUSE
          COLUMBIA IS NOT A STATE ACTOR ...........................................................10

    III.    ALL OF PLAINTIFFS' CLAIMS FAIL BECAUSE THEY
          DO NOT ALLEGE ACTIONABLE DISCRIMINATION .................................15

          A.     First Amendment Principles of Academic Freedom
               Prohibit the Court from Deciding What Can, Cannot,
               and Must Be Taught at Columbia .............................................................15

          B.     The Complaint Does Not Allege That Men
                and Women Are Treated Differently at Columbia ...................................18

CONCLUSION ................................................................................................................24

# TABLE OF AUTHORITIES

*Page(s)*

## CASES

*Albert v. Carovano*,
  851 F.2d 561 (2d Cir. 1988)............................................................................11

*Bhandari v. The Trustees of Columbia University. in the City of New York*,
  No. 00 Civ. 1735 JGK, 2000 WL 310344 (S.D.N.Y. Mar. 27, 2000) ..............................17

*Burns & Russell Co. of Baltimore v. Oldcastle, Inc.*,
  166 F. Supp. 2d 432 (D. Md. 2001) ................................................................1

*Burt v. Gates*,
  502 F.3d 183 (2d Cir. 2007)............................................................................16

*Butler v. City of Batavia*,
  545 F. Supp. 2d 289 (W.D.N.Y. 2008) ...........................................................22

*City of Los Angeles v. Lyons*,
  461 U.S. 95, 103 S. Ct. 1660 (1983).............................................................5, 6

*Comer v. Cisneros*,
  37 F.3d 775 (2d Cir. 1994)...........................................................................6, 8

*Curto v. Smith*,
  248 F. Supp. 2d 132 (N.D.N.Y. 2003) ........................................................11, 13

*Den Hollander v. Chertoff*,
  No. 08 Civ. 1521 (WHP), 2008 WL 5191103 (S.D.N.Y. Dec. 3, 2008) ......................7, 10

*Den Hollander v. Copacabana Nightclub*,
  No. 07 Civ. 5873 (MGC), 2008 WL 4449429 (S.D.N.Y. Sept. 29, 2008) ......................11

*Fundator v. Columbia University*,
  No. 95 Civ. 9653 (DC), 1996 WL 197780 (S.D.N.Y. Apr. 23, 1996).........................11, 12

*Gilinsky v. Columbia University*,
  488 F. Supp. 1309 (S.D.N.Y. 1980)...............................................................11

*Grafton v. Brooklyn Law School*,
  478 F.2d 1137 (2d Cir. 1973)......................................................................11, 13

*Gratz v. Bollinger*,
  539 U.S. 244, 123 S. Ct. 2411 (2003)...............................................................7

*Page(s)*

*Grimes v. Cavazos,*
786 F. Supp.1184 (S.D.N.Y. 1992)....................................................................7

*Grimes v. Sobol*,
832 F. Supp. 704 (S.D.N.Y. 1993), *aff'd*, 37 F.3d 857 (2d Cir. 1994)..............22

*Grossner v. Trustees of Columbia University,*
287 F. Supp. 535 (S.D.N.Y. 1968)..................................................................11

*Grutter v. Bollinger*,
539 U.S. 306, 123 S. Ct. 2325 (2003)..............................................................16

*Hack v. The President and Fellows of Yale College*,
237 F.3d 81 (2d Cir. 2000).......................................................................11, 12

*Hayden v. County of Nassau*,
180 F.3d 42 (2d Cir. 1999)..............................................................................22

*Howe v. Town of Hempstead,*
No. 04 Civ. 0656 (DRH)(ETB), 2006 WL 3095819 (E.D.N.Y. Oct. 30, 2006)...............19

*Jackson v. Birmingham Bd. of Educ.*,
544 U.S. 167, 125 S. Ct. 1497 (2005)..............................................................19

*Jackson v. Metropolitan Edison Co.*,
419 U.S. 345, 95 S. Ct. 449 (1974)..................................................................11

*Keyishian v. Board of Regents of the University of the State of New York*,
385 U.S. 589, 87 S. Ct. 675 (1967)..................................................................16

*Leeds v. Meltz*,
85 F.3d 51 (2d Cir. 1996) ...............................................................................11

*Liburd v. Bronx Lebanon Hosp. Center*,
No. 07 Civ. 11316 (HB), 2008 WL 3861352 (S.D.N.Y. Aug. 19, 2008)..................12

*Lujan v. Defenders of Wildlife*,
504 U.S. 555, 112 S. Ct. 2130 (1992)................................................................6

*Milton v. Alvarez*,
No. 04 Civ. 8265SAS, 2005 WL 1705523 (S.D.N.Y. July 19, 2005)...............11

*Murphy v. PriceWaterhouseCoopers, LLP*,
357 F. Supp. 2d 230 (D.D.C. 2004).................................................................1

*Page(s)*

*Odom v. Columbia University*,
    906 F. Supp. 188 (S.D.N.Y. 1995)......................................................................19

*O'Shea v. Littleton*,
    414 U.S. 488, 94 S. Ct. 669 (1974)..................................................................6, 10

*Phillips v. The Sage Colleges*,
    83 F. App'x. 340 (2d Cir. 2003) ......................................................................10

*Powe v. Miles*,
    407 F.2d 73 (2d Cir. 1968)..............................................................................12

*Radolf v. University of Connecticut*,
    364 F. Supp. 2d 204 (D. Conn. 2005)..............................................................16

*Regents of the University of California v. Bakke*,
    438 U.S. 265, 98 S. Ct. 2733 (1978)................................................................16

*Regents of the University of Michigan v. Ewing*,
    474 U.S. 214, 106 S. Ct. 507 (1985)................................................................17

*Rendell-Baker v. Kohn*,
    457 U.S. 830, 102 S. Ct. 2764 (1982)..............................................................12

*Sound Aircraft Servs., Inc. v. Town of East Hampton*,
    192 F.3d 329 (2d Cir. 1999)............................................................................19

*Sweezy v. New Hampshire*,
    354 U.S. 234, 77 S. Ct. 1203 (1957)........................................................15, 16, 17

*Tavoloni v. Mount Sinai Medical Center*,
    984 F. Supp. 196 (S.D.N.Y. 1997)..............................................................11, 12

*Wahba v. New York University*,
    492 F.2d 96 (2d Cir. 1974)..............................................................................11

*Weser v. Glen*,
    190 F. Supp. 2d 384 (E.D.N.Y. 2002) ........................................................19, 22

*Wooden v. Board of Regents of the University System of Georgia*,
    247 F.3d 1262 (11th Cir. 2001) ......................................................................10

*Yusuf v. Vassar College*,
    35 F.3d 709 (2d Cir. 1994)..........................................................................19, 22

*Page(s)*

## FEDERAL CONSTITUTIONAL PROVISIONS, STATUTES AND RULES

U.S. Const. amend. I ............................................................................................ *passim*

U.S. Const. amend. XIV, § 1 ...........................................................................................5

U.S. Const. art. III ...........................................................................................................5

20 U.S.C. § 1681 (2008) ..................................................................................................5

20 U.S.C. § 3403 (2008) ................................................................................................18

42 U.S.C. § 1983 (2008) ...........................................................................................5, 10

34 C.F.R. § 106.41 (2008) ........................................................................................21, 22

34 C.F.R. § 106.42 (2008) ........................................................................................17, 21

## STATE STATUTES AND RULES

N.Y. Civ. Rights Law § 40-c (McKinney 2008) ......................................................5, 19

N.Y. Educ. Law § 6401 (McKinney 2008) ...................................................................13

8 N.Y. CRR § 13.1(a) .....................................................................................................13

8 N.Y. CRR § 52.1(b)(3) ...............................................................................................14

8 N.Y. CRR § 52.2...........................................................................................................14

## OTHER AUTHORITIES

40 Fed. Reg. 24135 (June 4, 1975) ................................................................................18

Defendants Institute for Research on Women and Gender at Columbia University ("IRWG"), School of Continuing Education at Columbia University ("SCE"), and The Trustees of Columbia University in the City of New York ("Columbia" or the "University"), respectfully submit this memorandum of law in support of their motion to dismiss the First Amended Class Action Complaint (the "Complaint") for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.[1]

## PRELIMINARY STATEMENT

Plaintiffs Roy Den Hollander and William A. Nosal ask the Court to prohibit the teaching of women's studies at Columbia.  Alternatively, they insist that if Columbia is to be permitted to offer courses addressed to the experiences of women, or courses that explore the vast body of feminist scholarship, the University must be required to create a curriculum in men's studies, a field plaintiffs do not even claim exists as a coherent scholarly discipline.

Plaintiffs' claim that the teaching of women's studies violates the constitutional and statutory rights of men, and must therefore be banned, is not based on an allegation that men are excluded from such courses.  Nor can plaintiffs dispute that thousands of courses throughout the University, many taught by men, teach the experiences and accomplishments of men, in every discipline and in every period of history.  Rather, plaintiffs' assertion that the Court can and should tell Columbia's faculty what they can, cannot, and must teach is based, in its entirety, on their personal hostility to what they believe to be the content of women's studies courses.  In

---

[1]   As plaintiffs now admit (Compl. ¶ 129), neither IRWG nor SCE exists as a separate legal entity capable of being sued.  Each is simply an operating unit of the University, the formal corporate name of which is The Trustees of Columbia University in the City of New York.  *See* Declaration of Patricia Sachs Catapano, dated October 21, 2008 ("Catapano Decl.") (Docket No. 11), ¶¶ 2-5.  The caption of the case should be amended to remove IRWG and SCE as parties.  *See*, *e.g.*, *Murphy v. PriceWaterhouseCoopers, LLP*, 357 F. Supp. 2d 230, 241 (D.D.C. 2004) ("Unincorporated divisions of a corporation lack the capacity to be sued."); *Burns & Russell Co. of Baltimore v. Oldcastle, Inc.*, 166 F. Supp. 2d 432,  439-40 (D. Md. 2001) (unincorporated operating division of a corporation lacks the capacity to be sued).

plaintiffs' opinion, women's studies courses teach that "females are divine princesses and men the minions of Satan" (Compl. ¶ 8(g)), and the "actual aim of Women's Studies is . . . to create and perpetuate a legal, social and economic substratum occupied by men toiling in a Fritz Lang 'Metropolis' like underworld" (*id.* ¶ 189). In a complaint that reads like a parody, plaintiffs claim that women's studies courses, *inter alia*:

- "advocate that the civil rights of today's males be minimized or eliminated" (*id.* 74);

- "advance the stereotypical inequity that a female is not responsible for her acts when intoxicated but that her male date is" (*id.* ¶ 81);

- "provide information on how females can engage in violence against males, even premeditated murder, and escape just punishment" (*id.* ¶ 83);

- "train[] Feminist 'storm-troopers'" (*id.* ¶ 211);

- "derogate[] and demean[] males while propagandizing the superiority of females with a harm similar [to] … the Nazification of universities in Germany during the 1930s" (*id.* ¶ 213);

- "depict[] fathers as bad parents, abusers, rapists, and molesters" (*id.* ¶ 233);

- "condon[e] . . . the boiling of new born babies, the drowning of sons one after another, the liquidation of boyfriends or husbands" (*id.* ¶ 236); and

- "train[] females to use tears, tantrums, fraud, threats of an unjust legal system, and sex to take advantage of men" (*id.* ¶ 256).

Indeed, plaintiffs allege that, ultimately, even women are harmed by women's studies courses because the ideas taught "alienate[] men with the result that Feminists often wake up in the middle of the night crying because they are alone." Compl. ¶10.

Plaintiffs' attack does not state a claim for relief. To begin with, neither Den Hollander nor Nosal has ever taken, or attempted to take, a women's studies course, let alone been the victim of any discriminatory conduct in such a class. Both plaintiffs therefore lack standing to sue. Plaintiffs' section 1983 equal protection claim fails for the additional reason that

Columbia is not a "state actor."  Like almost all colleges and universities, Columbia is subject to certain state regulations and it receives some state funds, but such dealings with the state have repeatedly and consistently been held an insufficient basis on which to treat the actions of a private university as the actions of the state.

Most fundamentally, the Complaint does not allege discrimination against men.  It does not allege the deprivation of any opportunity or benefit available to women.  Women's studies courses are open to both men and women, and the University offers countless courses that, whether or not denominated "men's studies," teach the thought and actions of men in every field of human endeavor.  While plaintiffs may feel that women's studies teaches a "false belief system" (*id.* ¶ 93), the Court has no role to play in evaluating the substantive merits or demerits of differing philosophies.  Fundamental notions of academic freedom, rooted in the First Amendment, prohibit the government, including the courts, from deciding which ideas are good and which bad, which are worthy of being taught and which are not, which should be permitted and which prohibited.

Put otherwise, plaintiffs allege no actual discriminatory conduct; they do not allege that men and women are treated differently at Columbia.  In fact, their Complaint does not allege anything at all about any actual class ever taught at the University.  The Complaint is a wholly abstract, ideological polemic against plaintiffs' version of feminism.  But while plaintiffs may disagree, vehemently, with feminist ideas, as they see them, no law empowers the courts to adopt the political or ideological views of one pair of litigants and, based on those views, tell a university what it can and cannot teach.  Just as plaintiffs think that women's studies courses depict men as the oppressors of women and the cause of the world's ills (*id.* ¶ 77), others might claim that African-American studies courses depict whites as the oppressors of blacks and the

cause of the world's ills.  And just as the fact that some might hold the latter view would not justify an injunction barring the teaching of African-American studies, so plaintiffs' take on feminism does not justify barring Columbia's faculty from teaching women's studies.  In the absence of actual discriminatory behavior, two individuals' disagreement with the content of a university course raises no issue for the Court.  To the contrary, it is the Court's duty to protect the marketplace of ideas by rejecting any demand that books be burned or classes banned.

Finally, to the extent plaintiffs claim that women's studies can be taught only if a men's studies curriculum is created, their contention has no support in the law.  Plaintiffs suggest that, if the existence of a men's athletic program requires the creation of a women's program, a women's studies program must require a men's studies counterpart (*see id.* ¶193), but the analogy is false.  Women were excluded from men's sports teams; they lacked the athletic opportunities provided to men.  Men are *not* excluded from women's studies courses, and courses concerning the ideas and actions of men are not and never have been in short supply.  The teaching of women's studies no more requires the creation of a men's curriculum than the existence of African-American studies courses requires the establishment of a white curriculum, or an institute of gay and lesbian studies requires an institute on heterosexuality.

Plaintiffs' Complaint is nothing more than their personal critique of feminism.  Their diatribe does not justify trampling on the central tenet of academic freedom – that universities may decide what to teach free of government interference – by banning the entire discipline of women's studies from Columbia.

## STATEMENT OF FACTS

Columbia is a private university.  *Id.* ¶ 132; Catapano Decl. ¶ 2.  It is subject to some governmental regulation, and both the University and some of its students receive some funds from the state and federal government.  The School of Continuing Education is one of the

4

schools, along with Columbia College, the School of Law, the Graduate School of Business, the

College of Physicians and Surgeons, and a dozen others, that comprise the University.  Catapano

Decl. ¶ 3.  The Institute for Research and Gender is one of 223 research institutes and centers at

Columbia.  *Id.* ¶ 5.[2]

Den Hollander and Nosal are University alumni.  Compl. ¶ 204.  Den Hollander

filed the original complaint in this action on August 18, 2008, asserting claims against Columbia

under the equal protection clause of the Fourteenth Amendment (via 42 U.S.C. § 1983), Title IX

of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, and N.Y. Civ. Rights Law

§ 40-c (McKinney 2008), based on the allegation that Columbia discriminates against men by

teaching courses in women's studies.  On October 24, 2008, Columbia (as well as the state and

federal defendants) moved to dismiss the complaint.  Den Hollander filed an amended complaint

asserting the same causes of action and adding Nosal as a plaintiff on December 3, 2008.

Plaintiffs, neither of whom alleges that he took a women's studies course while at

Columbia, seek a judgment banning the teaching of any women's studies courses or requiring the

establishment of a "men's studies" curriculum at the University.  Compl. ¶¶ 284-85.

## ARGUMENT

## I.

## PLAINTIFFS DO NOT HAVE STANDING TO SUE

### A.    Plaintiffs Do Not Allege A Concrete and Particularized Injury

To invoke the jurisdiction of a federal court, a plaintiff must meet the threshold

requirement of Article III by alleging an actual case or controversy.  *City of Los Angeles v.*

---

[2] *See* Columbia University Research Institutes and Centers,
www.columbia.edu/research/research_institutes.html.

*Lyons*, 461 U.S. 95, 101, 103 S. Ct. 1660, 1665 (1983).  The Supreme Court has developed a

number of rules relevant to determining the existence of a case or controversy, but "[f]oremost

among these is the doctrine of standing."  *Comer v. Cisneros*, 37 F.3d 775, 787 (2d Cir. 1994).

As an "irreducible constitutional minimum," standing requires, *inter alia*, that the

plaintiff "have suffered an injury in fact – an invasion of a legally protected interest which is

(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136 (1992) (internal

citations and quotations omitted).  "Abstract injury is not enough."  *Lyons*, 461 U.S. at 101, 103

S. Ct. at 1665.  The plaintiff must have been injured "in a personal and individual way."  *Lujan*,

504 U.S. at 561 n.1, 112 S. Ct. at 2136 n.1.  Plaintiffs in this case allege no such injury.

Neither plaintiff alleges that he ever took a women's studies course at Columbia.

While they allege that women's studies courses "impose a unitary belief system of Feminist

orthodoxy" on their students (Compl. ¶ 266), that the courses "stereotype males as the primary

cause for most, if not all, the world's ills throughout history" (*id.* ¶ 77), and that the courses teach

a "fundamentally false belief system" (*id.* ¶ 93), plaintiffs do *not* allege that they have

experienced, or been injured by, any of this themselves.  Simply put, plaintiffs sue to shut down

the women's studies program on the ground that it teaches a discriminatory curriculum, but

neither of them has ever attended a single course that he attacks.  The "injury" that plaintiffs

allege is inflicted by the teaching of women's studies is, as to them, precisely the generalized,

impersonal, abstract and hypothetical harm that does not impart standing to sue.  *See*, *e.g.*, *Lujan*,

504 U.S. at 564, 112 S. Ct. at 2138 (plaintiffs lacked standing to challenge endangered species

regulation where they alleged only that they might someday visit the areas where the animals

were found); *O'Shea v. Littleton*, 414 U.S. 488, 495, 94 S. Ct. 669, 676 (1974) (plaintiffs lacked

6

standing to challenge bond-setting, sentencing, and jury-fee practices where "[n]one of the named plaintiffs is identified as himself having suffered any injury in the manner specified"); *Den Hollander v. Chertoff*, No. 08 Civ. 1521 (WHP), 2008 WL 5191103, at *3-4 (S.D.N.Y. Dec. 3, 2008) (dismissing Den Hollander's challenge to the Violence Against Women Act because he was not personally subjected to any of the harms he alleged the statute would cause).[3]

To be sure, plaintiffs do not allege that Columbia ever purported to *require* them to take a women's studies course. While one can imagine a discrimination claim arising where a captive audience – such as public elementary or secondary school students – is forced to use a curriculum suffused with animus, *see, e.g., Grimes v. Cavazos*, 786 F. Supp. 1184, 1186-87 (S.D.N.Y. 1992) (parents had standing where they alleged their children were injured by the public school curriculum they "must study"), it is difficult to see how a private university student could be harmed by taking a women's studies course even if one such course were required among the dozens of courses a student selects. But in any event, there is no allegation that plaintiffs (or any other students) were required to take a women's studies course and, as noted, no allegation that they ever did so.

Likewise, plaintiffs do not allege that they were ever *excluded* from a women's studies course. Many civil rights cases are premised on the contention that the plaintiff is barred from, or barred from competing for, benefits and opportunities provided to others. *See, e.g., Gratz v. Bollinger*, 539 U.S. 244, 123 S. Ct. 2411 (2003) (plaintiff alleged race-based admissions

---

[3] Although there was no such allegation in the original complaint, plaintiffs now allege that men who do take women's studies courses are mistreated in their classes, "as though they were capitalists attending Moscow State University in the former Soviet Union." Compl. ¶ 87. Again, plaintiffs do not allege that they personally ever suffered such treatment. Indeed, their wholly conclusory allegation is unsupported by a single allegation of fact concerning any action taken with respect to *any* student in any class. Like most of the Complaint, this charge of mistreatment is simply rhetoric.

policy made it harder for white candidates to gain admission); *Comer*, 37 F.3d 775 (plaintiffs

alleged that discriminatory policy made it harder for them to obtain housing assistance).  Here,

plaintiffs do not allege that they were barred from any course open to women.  They disagree

with what they assume the professor might say in a women's studies course – none of which they

have ever taken – but that does not allege the concrete, particularized injury that would give

them standing to sue.

      In short, plaintiffs' claim of injury is based entirely on the content of courses they

never took.  While the *content* of a college course, standing alone, without any allegation of

exclusion or differential treatment, would not give rise to a discrimination claim under any

circumstances (*see infra* Point III), plaintiffs who did not take the course, and thus could not

have been directly and personally injured by its content, certainly lack standing to bring such a

claim.

      Finally, Nosal's assertion that he would have taken a men's studies course if one

had been available (Compl. ¶ 225), and Den Hollander's claim that he will do so "the moment

one is offered" (*id.* ¶ 224), do not allege a concrete injury that would confer standing.  The

supposed absence of men's studies would be relevant only if men were excluded from women's

studies courses or if women's studies courses somehow discriminated against men.  As discussed

above, plaintiffs lack standing to bring such a claim because neither has ever taken a women's

studies course or attempted to do so.

      Moreover, the allegation that Columbia does not teach men's studies is essentially

meaningless.  While the Complaint demands the establishment of a "Men's Studies program

focusing on concerns important to men" (*id.* ¶ 284) – if the teaching of women's studies is not

enjoined outright – plaintiffs cannot rationally allege that the Columbia curriculum is devoid of

courses that are of interest to male students.[4]  Presumably, the vast majority of the curriculum is of interest to men, who apply to Columbia and take its courses in large numbers.[5]  To the extent that "men's studies," as plaintiffs use the term, is something more than the study of topics that are of interest to men, plaintiffs cannot even allege that it exists.[6]  They point to no body of writing, no existing courses or programs, no professional journals, and no recognized scholars.

Indeed, plaintiffs do not describe the men's studies program they ask the Court to require as a scholarly discipline at all, but simply as a counterweight to feminism, as they see it. According to plaintiffs, men's studies "trains males to recognize and handle the powers females often use to manipulate them" (*id.* ¶ 231), teaches that "America is . . . a *de facto* matriarchy" (*id.* ¶ 234), "counters the historic belief in America . . . that females have a carte blanche to do whatever they want regardless of ethics or law" (*id.* ¶ 235), "exposes the self-serving, schizoid paradigm of Feminist doctrine" (*id.* ¶ 237), "instructs males . . . on how to avoid false accusations by females of sexual harassment or rape" (*id.* ¶ 240), "counters the training in Women's Studies that sends forth Feminists to pervert American ideals" (*id.* ¶ 242), "alerts males to the prevalent danger of female paternity fraud where the female lies about using birth

---

[4] Approximately half of the Columbia student body is male.  *See* Columbia University Fall enrollment by school and gender, 2008, www.columbia.edu/cu/opir/abstract/enrollment-gender-2008.htm.

[5]  Even within the IRWG itself, there are courses that would seem to be of equal interest to men.  For example, in addition to the Spring 2008 course "Women and Film," the IRWG offered the Fall 2008 course "Film Narrative:  Masculinity and American Film" (taught by a man and studying the male directors Alfred Hitchcock, Sidney Lumet, Bill Condon, Gregg Araki, Gus Van Sant, Issac Julien, and Spike Lee).  In the fall 2008 semester, the IRWG offered, among many other general interest courses, "Studies in US Imperialism," "Sexuality and the Law," "Gender, Culture and Human Rights,"  "Gender and Applied Economics,"  and "American Social Policy from the Progressives to the Present."  *See* Institute for Research on Women & Gender Courses, www.columbia.edu/cu/irwag/crs/main/introduction/index.html.  There are far too many courses across the University as a whole that concern the activities, thoughts, and writings of men to begin to list.

[6]  In an August 23, 2008 Los Angeles Times interview, Den Hollander said, "I don't know if men's studies even exists."  Meghan Daum, *Roy Den Hollander's War on Feminism*, L.A. TIMES, Aug. 23, 2008, www.latimes.com/news/opinion/la-oe-daum23-2008aug23,0,7712480.column.

control and then sues the tricked father for child support" (*id.* ¶ 246), and "alerts males to the prevalent danger of marriage fraud where the female becomes pregnant by another man but marries the man she falsely claims is the child's father" (*id.* ¶ 247).  This is not a description of a body of scholarship but a call to arms in plaintiffs' gender war.

Plaintiffs are free to espouse their views on the relationship between the sexes but they lack standing to sue Columbia University over the teaching of women's studies.  In its entirety, their Complaint is an ideological assault on a body of ideas, rather than an allegation of any discriminatory conduct to which either of them was ever exposed in any class at Columbia.

**B.     The Class Allegations Are Irrelevant to Standing**

Plaintiffs purport to sue on behalf of a class of male Columbia students and alumni.  *Id.* ¶ 196.  Whether or not any members of such a class might have standing is irrelevant.  Unless one of the named plaintiffs has standing himself, the Complaint must be dismissed.  *See O'Shea*, 414 U.S. at 494, 94 S. Ct. at 675 ("if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class"); *Wooden v. Board of Regents of the University System of Georgia*, 247 F.3d 1262, 1288 (11th Cir. 2001) (before considering class certification, "the district court must determine that at least one named class representative has Article III standing"); *Den Hollander v. Chertoff*, 2008 WL 51911103, at *3 (named plaintiffs must show that they personally have been injured).

## II.

## PLAINTIFFS' SECTION 1983 CLAIM FAILS BECAUSE COLUMBIA IS NOT A STATE ACTOR

A private party defendant acts "under color of state law," a prerequisite to liability under 42 U.S.C. § 1983, *Phillips v. The Sage Colleges*, 83 F. App'x. 340, 341 (2d Cir. 2003),

only if there is a "close nexus between the State and the challenged action" of the defendant. *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351, 95 S. Ct. 449, 453 (1974).  This requirement "assure[s] that constitutional standards are invoked only when it can be said the State is *responsible* for the specific conduct of which the plaintiff complains."  *Den Hollander v. Copacabana Nightclub*, No. 07 Civ. 5873 (MGC), 2008 WL 4449429, at *2 (S.D.N.Y. Sept. 29, 2008) (emphasis in original) (rejecting Den Hollander's argument that the state's regulation of liquor sales made a bar a state actor when it charged women less than men for admission).  New York State is *not* responsible for Columbia's decision to teach women's studies or for the content of women's studies courses.  Accordingly, the University has not acted under color of state law, and plaintiffs' section 1983 claim must be dismissed.

To begin with, there is abundant authority that Columbia, in particular,[7] and private colleges and universities, in general, are not state actors.[8]  Plaintiffs' contrary claim, based on the allegation that the University receives state funds (Compl. ¶¶ 49-51, 63-68, 149-54, 157), and is subject to state regulation (*id.* at ¶¶ 24-48, 136-43), finds no support in the law.  It is well-established that "[e]xtensive regulation and public funding, either alone or taken together, will not transform a private actor into a state actor."  *Leeds v. Meltz*, 85 F.3d 51, 54 (2d Cir. 1996).  Indeed, the Supreme Court has specifically rejected the argument that a private school's

---

[7]  *See Milton v. Alvarez*, No. 04 Civ. 8265SAS, 2005 WL 1705523, at *3 (S.D.N.Y. July 19, 2005) (Columbia not a state actor); *Fundator v. Columbia University*, No. 95 Civ. 9653 (DC), 1996 WL 197780, at *1 (S.D.N.Y. Apr. 23, 1996) (same); *Gilinsky v. Columbia University*, 488 F. Supp. 1309, 1311-1312 (S.D.N.Y. 1980) (same); *Grossner v. Trustees of Columbia University*, 287 F. Supp. 535, 549 (S.D.N.Y. 1968) (same).

[8]  *See Phillips*, 83 F. App'x at 341 (The Sage Colleges not state actors); *Hack v. The President and Fellows of Yale College*, 237 F.3d 81, 83-85 (2d Cir. 2000) (Yale not a state actor); *Albert v. Carovano*, 851 F.2d 561, 571 (2d Cir. 1988) (Hamilton College not a state actor); *Wahba v. New York University*, 492 F.2d 96, 100-103 (2d Cir. 1974) (NYU not a state actor); *Grafton v. Brooklyn Law School*, 478 F.2d 1137, 1143 (2d Cir. 1973) (Brooklyn Law School not a state actor); *Curto v. Smith*, 248 F. Supp. 2d 132, 140 (N.D.N.Y. 2003) (Cornell not a state actor); *Tavoloni v. Mount Sinai Medical Center*, 984 F. Supp. 196, 204 (S.D.N.Y. 1997) (Kaplan, J.) (Mount Sinai School of Medicine not a state actor).

dependence on state funds, or its regulation by the state, converts its actions into state action.  In *Rendell-Baker v. Kohn*, 457 U.S. 830, 102 S. Ct. 2764 (1982), a constitutional challenge to the plaintiffs' discharge by a private school, the Court held that the school was not a state actor even though "virtually all of the school's income was derived from government funding," and despite the fact that the school was subject to "extensive regulation" by the state, because neither the funding nor the regulation made the state responsible for the school's decision to fire the plaintiffs.  *Id.* at 840-41, 102 S. Ct. at 2271; *see also Powe v. Miles*, 407 F.2d 73, 81 (2d Cir. 1968) (allegations that state regulates educational standards and provides financial aid insufficient to establish state action); *Liburd v. Bronx Lebanon Hosp. Center*, No. 07 Civ. 11316 (HB), 2008 WL 3861352, at *7-8 (S.D.N.Y. Aug. 19, 2008) (private hospital not a state actor simply because it received state funding and was subject to regulation); *Fundator*, 1996 WL 197780, at *1 (Columbia not a state actor because "[s]tate financial assistance . . . is insufficient to demonstrate state action"); *Grossner*, 287 F. Supp. at 547-48 (Columbia not a state actor because "receipt of money from the State is not, without a good deal more, enough to make the recipient an agency or instrumentality of the Government").

Plaintiffs also mention that Columbia received its charter from the state legislature in 1787 (*id.* ¶ 132), and that it received state land in the same year (*id.* ¶ 135).  These allegations of centuries-old state aid are likewise insufficient to establish state action because they do not demonstrate state responsibility for the women's studies courses at issue.  *See Tavoloni*, 984 F. Supp. at 201-02 (Kaplan, J.) (university hospital not transformed into state actor by state's provision of space, personnel and facilities because there was no "connection between the action complained of and the state support or regulation"); *see also Hack*, 237 F.3d at 83-84 (despite being "chartered by special legislation," Yale was not a state actor because the "state

could not control Yale's policies and operations even if it chose to"); *Grafton*, 478 F.2d at 1141-42 (Brooklyn Law School not a state actor even though it bought its property at a deep discount from New York City and received money pursuant to N.Y. Educ. Law § 6401 for each degree conferred); *Curto*, 248 F. Supp. 2d at 139-40 (Cornell's College of Veterinary Medicine not a state actor despite its creation through state statute, its receipt of state funds, and its frequent consultation with SUNY Board of Trustees).

Doubtless aware of the insufficiency of what they can show – that Columbia receives state funding and is subject to some state regulation – plaintiffs also allege that the state defendants "control what is taught . . . [at] Columbia University" (Compl. ¶ 41), and have "established objectives . . . by which Women's Studies programs would advocate and spread Feminism in New York colleges and universities" (*id.* ¶ 38) with the goal of "remaking New York State's education, government, business, and culture in the image of Feminist tenets (*id.* ¶ 36)." This is empty rhetoric. The state does not "control" what is taught at Columbia (or any private college or university), as a review of the regulations to which plaintiffs refer makes clear.

Plaintiffs' argument is based on the fact that the Commissioner of the Department of Education, acting on authority delegated from the Board of Regents, establishes regulations governing "the registration of courses of study in colleges, professional, technical and other schools." 8 N.Y. CRR § 13.1(a). Plaintiffs suggest that the authority to "register" courses of study amounts to "control" over what is taught, as if the Commissioner could or did make a content-based review of college curricula, registering those with a political, ideological or other perspective he endorsed and refusing to register those with which he lacked sympathy. *See* Compl. ¶¶ 139-43. The registration process is, of course, nothing of the kind.

13

Under the Commissioner's regulations, to be registered, a college curriculum must "show evidence of careful planning," its "goals and [] objectives" must be "clearly defined in writing," the college must have a "reviewing system" to "estimate the success of students and faculty in achieving such goals and objectives," and the "content and duration of curricula" must be "designed to implement their purposes."  8 N.Y. CRR § 52.1(b)(3).  In addition, the college or university must possess the financial resources to accomplish the mission of each registered curriculum, it must have adequate classrooms, laboratories, libraries, and other facilities, its faculty must have adequate training and have earned the appropriate degrees, courses must be offered with sufficient frequency to allow students to timely earn their degrees, course descriptions must clearly state the subject matter and requirements of each course, credit must be granted only to students who successfully achieve the goals of the course, and so on.  8 N.Y. CRR § 52.2.  As these regulations make clear, "registration" turns on basic measures of institutional adequacy to administer the degree programs offered, not on the state's agreement or disagreement with the ideas expressed in those programs.  To be sure, were it otherwise, the state would be in wholesale violation of the university's First Amendment right of academic freedom. (*See infra* Point III(A)).

The courts have held, over and over again, that a state's regulation of, and financial contribution to, its private colleges and universities does not transform the actions of those institutions into state action.  The Complaint offers nothing that would allow for a contrary conclusion with respect to the teaching of women's studies, or the teaching of anything else, at Columbia.

**III.**

**ALL OF PLAINTIFFS' CLAIMS FAIL BECAUSE THEY DO NOT
ALLEGE ACTIONABLE DISCRIMINATION**

A.     **First Amendment Principles of Academic Freedom Prohibit the
<u>Court from Deciding What Can, Cannot, and Must Be Taught at Columbia</u>**

Plaintiffs do not allege that men are barred from women's studies courses.[9]  Their

claim that the teaching of women's studies discriminates against men is based on the content of

the courses – on plaintiffs' view that feminist scholarship spreads lies about the nature of men

and women and their respective roles in society.  As discussed in Point III(B), the allegation that

the ideas presented in a university course are bad, or even pernicious, simply does not allege

discrimination within the meaning of any of the statutes on which plaintiffs rely.  In addition, and

as a threshold matter, plaintiffs' suggestion that the Court should conduct a review of feminist

scholarship to determine if it is good or bad, insightful or misguided, pro-equality or anti-male,

and then make a judgment whether Columbia faculty should be allowed to teach women's

studies courses at all, whether they should be allowed to use some texts but not others, whether

some professors' lectures are acceptable but others' are not, whether a new "male curriculum"

must be developed and taught and what that male curriculum should contain, is profoundly

repugnant to core values of academic freedom rooted in the First Amendment.

Ever since the seminal case of *Sweezy v. New Hampshire*, 354 U.S. 234, 77 S. Ct.

1203 (1957), the courts have recognized the "essentiality of freedom in the community of

American universities."  *Id.* at 250, 77 S. Ct. at 1211.  In light of "the dependence of a free

---

[9] As discussed above, *see* note 3, *supra*, plaintiffs have added to their amended pleading a conclusory allegation that men are abused in women's studies classes but that is unsupported by any factual allegation about any student, any professor, or any course.

society on free universities," *id.* at 262, 77 S. Ct. at 1217 (Frankfurter, J. concurring), the

Supreme Court has held that academic freedom is protected by the First Amendment:

> Our Nation is deeply committed to safeguarding of academic
> freedom, which is of transcendent value to all of us and not merely
> to the teachers concerned.  That freedom is therefore a special
> concern of the *First Amendment*, which does not tolerate laws that
> cast a pall of orthodoxy over the classroom.

*Keyishian v. Board of Regents of the Univ. of the State of New York*, 385 U.S. 589, 603, 87 S. Ct.

675, 683 (1967); *see also Grutter v. Bollinger*, 539 U.S. 306, 329, 123 S. Ct. 2325, 2339 (2003)

(given "the expansive freedoms of speech and thought associated with the university

environment, universities occupy a special niche in our constitutional tradition"); *Regents of the*

*Univ. of California v. Bakke*, 438 U.S. 265, 312, 98 S. Ct. 2733, 2759 (1978) ("Academic

freedom, though not a specifically enumerated constitutional right, long has been viewed as a

special concern of the *First Amendment*"); *Burt v. Gates*, 502 F.3d 183, 190 (2d Cir. 2007)

(recognizing the "*First Amendment* guarantee of academic freedom").

   Academic freedom "imbu[es] certain core academic decisions with *First*

*Amendment* protection."  *Burt*, 502 F.3d at 191.  A variety of university activities are entitled to

protection, but Justice Frankfurter's concurrence in *Sweezy* sets forth the "'four essential

freedoms' of a university – to determine for itself on academic grounds who may teach, what

may be taught, how it shall be taught, and who may be admitted to study."  354 U.S. at 263, 77

S. Ct. at 1218; *see also Radolf v. University of Connecticut*, 364 F. Supp. 2d 204, 216 (D. Conn.

2005) (academic freedom includes the right of a university "to be free from government

interference with its curriculum").

   It is doubtful that a university's fundamental First Amendment freedom to decide

what to teach and how it shall be taught – the very freedoms plaintiffs ask this Court to abridge –

may ever be circumscribed by a court or government agency.  In *Sweezy*, in the context of an

"investigation of subversive activities," 354 U.S. at 257, 77 S. Ct. at 1215, the New Hampshire attorney general asked the plaintiff to describe the content of a lecture he had given.  Although, at that time, the Court did not dispute the importance of the government's interest in rooting out subversives, it nevertheless held that the question violated Sweezy's First Amendment rights, observing that "[w]e do not now conceive of any circumstance wherein a state interest would justify infringement of rights in these fields."  *Id.* at 251, 77 S. Ct. at 1212.  Here, plaintiffs do not ask for *information* about the content of courses, they ask that the courses be banned.  It is impossible to imagine any state interest that would justify dictating what a university cannot (or must) teach, but what plaintiffs offer to justify the extraordinary inquisition they seek – their own opinion that feminist ideas are anti-male – is no "interest" at all.  While plaintiffs use the language of discrimination, they are not alleging that men and women are in any way treated differently at Columbia.  They are simply saying that they dislike the content of women's studies courses – that speech should be banned because they disagree with it.  That is incompatible with the First Amendment.[10]

        Indeed, the government itself has recognized that it has no business regulating what a university may teach, even with respect to the enforcement of the anti-discrimination laws.  In 1975, the following was added to the regulations implementing Title IX:  "Nothing in this regulation shall be interpreted as requiring or prohibiting or abridging in any way the use of particular textbooks or curricular materials."  34 C.F.R. § 106.42 (2008).  The Department of

---

        [10]   Even beyond core matters such as the content of courses, both federal and New York courts have stressed that the academic decisions of colleges and universities are entitled to great deference.  *See, e.g.*, *Regents of the Univ. of Michigan v. Ewing*, 474 U.S. 214, 225, 106 S. Ct. 507, 513 (1985) ("When judges are asked to review the substance of a genuinely academic decision . . . they should show great respect for the faculty's professional judgment."); *Bhandari v. The Trustees of Columbia Univ. in the City of New York*, No. 00 Civ. 1735 JGK, 2000 WL 310344, at *5 (S.D.N.Y. Mar. 27, 2000) ("Cognizant of the danger that judicial interference could pose to academic freedom, New York courts are deferential when reviewing university academic decisions").

Health, Education and Welfare (the predecessor to the Department of Education) explained the

reasoning behind this provision:

> The new section explicitly states the Department's position that
> title IX does not reach the use of textbooks and curricular materials
> on the basis of their portraits of individuals in a stereotypic manner
> or on the basis that they otherwise project discrimination against
> persons on account of their sex. . . . [T]he imposition of restrictions
> in this area would inevitably limit communication and would thrust
> the Department into the role of Federal censor. . . . [T]he
> Department has construed title IX as not reaching textbooks and
> curricular materials on the ground that to follow another
> interpretation might place the Department in a position of limiting
> free expression in violation of the First Amendment.

40 Fed. Reg. 24135 (June 4, 1975).  More generally, absent specific authorization, federal law

prohibits the Department of Education from

> exercis[ing] any direction, supervision, or control over the
> curriculum, program of instruction, administration, or personnel of
> any educational institution, school, or school system, over any
> accrediting agency or association, or over the selection or content
> of library resources, textbooks, or other instructional materials by
> any educational institution or school system …

20 U.S.C. § 3403(b) (2008).

Plaintiffs ask nothing less than that the Court review the textbooks, other

curricular materials, and, presumably, the lectures and comments of the professors in women's

studies courses to determine if they "project discrimination" against men and, on that basis, to

decide what can and cannot be taught.  Constitutional, statutory and regulatory law all prohibit

such interference with the University's academic freedom.

**B.    The Complaint Does Not Allege That**
**Men and Women Are Treated Differently at Columbia**

As discussed above, no court, consistent with the First Amendment, can pass

judgment on the ideological or political content of private college courses.  In addition, an attack

on the content of courses to which all students are admitted on equal terms simply does not

18

allege discrimination.  While plaintiffs plead their disdain for feminism at length, they "do[] not

refer to a single situation" in which Columbia treated them (or any other male student)

differently than a similarly situated female student.  *Odom v. Columbia Univ.*, 906 F. Supp. 188,

194 (S.D.N.Y. 1995) (dismissing student's discrimination claim where no actual example of

disparate treatment was alleged).  Discrimination exists when the "complainant is . . . subjected

to differential treatment."  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174, 125 S. Ct.

1497, 1504 (2005).  Plaintiffs allege no such differential treatment; all of their claims should be

dismissed for this reason as well.[11]

>    A "plaintiff alleging . . . gender discrimination by a university must do more than

recite conclusory assertions," *Yusuf v. Vassar College*, 35 F.3d 709, 713 (2d Cir. 1994), but

conclusory assertions of discrimination are all plaintiffs offer.  They do not allege that men are

excluded from women's studies courses, nor do they allege a single instance of a male student

treated differently than his female counterparts in any women's studies class.  Plaintiffs quarrel

with the substance of what is being taught, with its concentration on the experiences of women

and on feminist scholarship, but they do not allege that it is taught differently to men and

women.  Plaintiffs do not, in other words, allege discrimination at all.  Colleges and universities

are filled with courses and research centers that focus on particular subject matter, and

---

[11]  Differential treatment is the essence of discrimination whether alleged under Title IX, *see Jackson*, 544 U.S. at 173, 125 S. Ct. at 1503, the Equal Protection Clause, *see Sound Aircraft Servs., Inc. v. Town of East Hampton*, 192 F.3d 329, 335 (2d Cir. 1999) ("At its core, equal protection prohibits the government from treating similarly situated persons differently."); *Weser v. Glen*, 190 F. Supp. 2d 384, 395 (E.D.N.Y. 2002) ("intentional discrimination proscribed by Title IX is discrimination that violates the Equal Protection Clause"), or state law, *see Howe v. Town of Hempstead*, No. 04 Civ. 0656 (DRH)(ETB), 2006 WL 3095819, at *5 (E.D.N.Y. Oct. 30, 2006) (prima facie case of discrimination is the same for federal and state discrimination claims, including claims brought pursuant to N.Y. Civ. Rights Law § 40-c).

sometimes on particular racial, ethnic or religious groups.[12]  While members of different racial, ethnic or religious groups might feel slighted, or disagree with the perspective of the textbooks or the professors, in the absence of any allegation of exclusion or differential treatment, there is no claim of discrimination.  Likewise with respect to gender.  The fact that plaintiffs resent what they understand to be the focus on women at the IRWG does not allege discrimination in the absence of any claim that men are excluded from IRWG courses, or any factual allegation supporting an inference that men who take IRWG courses are treated differently than their female classmates.

Plaintiffs' demand for the creation of a "men's studies" curriculum suggests they are arguing that, if a university offers courses about one group, it must offer courses about other, arguably opposing or competing groups.  In plaintiffs' words, the existence of women's studies courses demands "countervailing pro-male Men's Studies . . . to counter the dissembling Feminist dogma."  Compl. ¶ 100; *see also id.* ¶ 86 ("Columbia . . . do[es] not balance the Feminist doctrine and dogma with a masculine curriculum").[13]  No statute or constitutional principle, however, dictates that a university offering courses on Christianity must also offer courses on Judaism, Islam, Buddhism, Hinduism, and the dozens of other religions, or that each religion must receive comparable emphasis.  The same is true with respect to racial and ethnic

---

[12]   Columbia has research institutes or centers on Contemporary Black History, Brazilian Studies, French and Francophone Studies, Iranian Studies, Israel and Jewish Studies, Japanese Culture, and Latin American Studies, to name just a few.  *See* Columbia University: Research Institutes and Centers, www.columbia.edu/research/research_institutes.html.

[13] As discussed above, plaintiffs cannot even allege that the field of "men's studies" (as opposed to the virtually limitless number of courses that cover the thoughts, writings, and actions of men) exists as a distinct scholarly discipline, and plaintiffs' description of what a "masculine curriculum" might teach, *see* pp. 9-10, *supra*, bears no resemblance to a legitimate college course of study.

groups, as well as gender.[14]  Breadth of curriculum may be one way to judge the quality of a university, but curricular balance is not imposed by law.

In what appears to be a semi-facetious attempt to bring their complaint within the Title IX precedents on access to athletic opportunities, plaintiffs allege that "Women's Studies programs are today the varsity sport of choice for females at Columbia in its never-ending war against men."  *Id.* ¶ 177.  From this premise, they argue that, "[i]f Title IX can require universities receiving federal financial assistance to provide separate female athletics programs, then it surely can require Columbia University to provide a Men's Studies program that takes the masculine point of view."  *Id.* ¶ 193.  That proposition is mistaken for a number of reasons.

First of all, substantive academic courses are *not* sports.  Requiring the creation of women's sports teams or the provision of equivalent athletic facilities does not raise the First Amendment academic freedom problems that flow from telling a university what it must teach.  As noted above, the Title IX regulations affirmatively disclaim any intention to require particular curricular materials.  34 C.F.R. § 106.42.  Moreover, even if women's studies were treated as a sport, there would be no Title IX issue.  Men are not excluded from the "team" – the women's studies courses – or otherwise treated differently than women.  *See* 34 C.F.R. § 106.41(a) (2008) ("No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics . . . .").  Similarly, even if one were to

---

[14]  Columbia's Center for Contemporary Black History "promotes the critical study of black history, culture, and politics within urban America since 1900, with an emphasis on understanding the central role of black intellectuals and public leaders in the making of modern society."  *See* Center for Contemporary Black History: The Mission of CCBH, www.columbia.edu/cu/ccbh/html/ccbh_about.html.  Following plaintiffs' reasoning, this would require Columbia to create another center emphasizing the role of white intellectuals and public leaders.  There is no support for that contention.

assume that women's studies courses are not of interest to men, plaintiffs could not plausibly

deny that there are thousands of other courses available at Columbia that are.  *See* 34 C.F.R.

§ 106.41(c)(1) (among criteria for evaluating equal athletic opportunity is whether selection of

sports accommodates interests of both sexes).

   Finally, the Complaint also fails because it does not allege facts from which it

could be inferred that Columbia has acted with discriminatory intent.  *See Yusuf*, 35 F.3d at 713

(plaintiff must allege "circumstances giving rise to a plausible inference of [] discriminatory

intent"); *Weser*, 190 F. Supp. 2d at 395 (plaintiff must allege intentional discrimination to state a

claim under Title IX); *Butler v. City of Batavia*, 545 F. Supp. 2d 289, 293 (W.D.N.Y. 2008)

(dismissing discrimination claim where allegation of intent was based on mere speculation and a

"formulaic recitation of the elements of a cause of action") (internal citations omitted).  To

survive a motion to dismiss, plaintiffs would have to allege specific facts leading to the

conclusion that Columbia created a women's studies program "because of, not merely in spite

of" any alleged adverse effects on men.  *Hayden v. County of Nassau*, 180 F.3d 42, 50 (2d Cir.

1999); *Grimes v. Sobol*, 832 F. Supp. 704, 708 (S.D.N.Y. 1993), *aff'd*, 37 F.3d 857 (2d Cir.

1994) (same).  They can allege nothing of the kind.

   Plaintiffs do not even attempt to explain why Columbia University would be

motivated by anti-male bias.  Nor do they attempt to identify who it is at Columbia that is

prejudiced against men.  Instead, to justify an inference that Columbia permits the teaching of

women's studies because of anti-male animus, they simply repeat their allegations that women's

studies courses are anti-male.  *See*, *e.g.*, Compl. ¶ 91 ("Columbia's Women's Studies program

demonizes men and exalts women as a manifestation of the ill will that lies behind the

program"); *id.* ¶ 85 ("Columbia University's Women's Studies program is deficient of texts and

instruction that offer a male-positive perspective of men, which infers [sic] that one motivation for the program is antipathy toward men"); *id.* ¶ 89 ("The negative stereotyping of men and lack of balance between female and male perspectives . . . reveal a discriminatory intent motivated by bigotry").  Plaintiffs' circular reasoning does not give rise to an inference of discriminatory intent.  Columbia, like virtually every other major university, offers courses in women's studies.[15]  Plaintiffs' anti-feminist polemic cannot transform that simple fact into evidence of anti-male animus.  The Complaint alleges nothing that would support an inference that the administration or faculty of the University wants "the civil rights of today's males [] minimized or eliminated," *id.* ¶ 74, or otherwise seeks to harm men.

*          *          *

The Complaint in this case is nothing more than an ideological attack on elective, university-level courses based solely on the plaintiffs' personal quarrel with the ideas they believe are being taught.  Nothing alleged constitutes actionable discrimination, and the suppression of free speech and academic freedom plaintiffs demand is flatly prohibited by the Constitution and laws of the United States.

---

[15] Every Ivy League university has a program in women's studies.  *See* www.pembrokecenter.org/about/ (Brown); www.arts.cornell.edu/fgss/ (Cornell); www.dartmouth.edu/~wstudies/ (Dartmouth); www.fas.harvard.edu/~wgs/undergraduate%20program/Undergraduate%20program.html (Harvard); www.sas.upenn.edu/wstudies/ (Penn.); www.princeton.edu/~prowom/ (Princeton); www.yale.edu/wgss/ (Yale).

## CONCLUSION

For the reasons stated herein, the Complaint should be dismissed.

Dated:  New York, New York
        January 9, 2009

                                          Respectfully submitted,

                                          FRIEDMAN KAPLAN SEILER &
                                             ADELMAN LLP

                                          By:  s/  Robert D. Kaplan
                                          Robert D. Kaplan (rkaplan@fklaw.com)
                                          Daniel B. Rapport (drapport@fklaw.com)
                                          Jennifer P. Krakowsky (jkrakowsky@fklaw.com)
                                          1633 Broadway
                                          New York, New York 10019
                                          (212) 833-1100

                                          *Attorneys for Defendants Institute for Research on Women*
                                          *and Gender at Columbia University, School of Continuing*
                                          *Education at Columbia University, and Trustees of*
                                          *Columbia University in the City of New York*