UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------X
ROY DEN HOLLANDER and WILLIAM A. NOSAL, on behalf :
of themselves and all others similarly situated,           :
                                                           :
                          Plaintiffs,                      :
                                                           : 08 Civ. 7286 (LAK)(KNF)
            -against-                                      :      ECF Case
                                                           :
INSTITUTE FOR RESEARCH ON WOMEN AND GENDER  :
AT COLUMBIA UNIVERSITY, et al.,                           :
                                                           :
                          Defendants.                      :
-------------------------------------------------------------------------------X


### MEMORANDUM OF LAW IN SUPPORT OF STATE DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT


                          ANDREW M. CUOMO
                          Attorney General of the State
                            of New York
                          Attorney for the State Defendants
                          120 Broadway, 24th Floor
                          New York, New York 10271
                          (212) 416-8634


CLEMENT J. COLUCCI
Assistant Attorney General
 of Counsel

                          Dated: New York, New York
                                 January 9, 2009

## Table of Contents

**Pages**

Table of Authorities .............................................................. iii

FACTS ......................................................................... 3

A.      The Plaintiffs ...................................................... 3

B.      The State Defendants ................................................ 4

        1.      The Regents And The Commissioner of Education .................... 4

        2.      HESC ........................................................ 7

ARGUMENT ..................................................................... 7

STANDARD OF REVIEW ........................................................... 7

POINT I          -       THE ESTABLISHMENT CLAUSE CLAIMS MUST
                         BE DISMISSED BECAUSE "FEMINISM" IS NOT A
                         RELIGION AND THE STATE DEFENDANTS'
                         ACTIVITIES DO NOT TEND TO ESTABLISH
                         RELIGION ............................................. 8

        A.      "Feminism" Is Not A Religion For Purposes Of The Establishment
                Clause ........................................................ 9

        B.      The Registration Of Curricula And Degree Programs That Comply
                With Religion-Neutral Academic Standards Does Not Constitute
                An Establishment of Religion ................................... 14

                1.      Secular Purpose ........................................ 15

                2.      Primary Effect of Advancing or Inhibiting Religion ............ 15

                3.      Danger of Excessive Entanglement ........................ 16

        C.      Bundy Aid May Be Given Even To Religions Institutions And
                Programs Without Violating the Establishment Clause ............... 17

                1.      Religiously-Neutral Definition of Beneficiaries .............. 18

                2.      No Indoctrination by the Government ....................... 18

## Table of Contents

**Pages**

| | | |
|---|---|---|
| D. | Because HESC Provides Grants And Loan Guarantees To Students Rather Than Institutions, Its Activities Do Not Violate the Establishment Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20 | |

POINT II    -    THE EQUAL PROTECTION CLAIM MUST BE DISMISSED BECAUSE THE APPLICABLE LAWS ARE GENDER-NEUTRAL AND HAVE BEEN ADMINISTERED IN A GENDER-NEUTRAL FASHION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

POINT III    -    THE TITLE IX CLAIMS MUST BE DISMISSED BECAUSE TITLE IX DOES NOT REQUIRE OFFERING MEN'S STUDIES PROGRAMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

A.    Statutory Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

B.    Regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

C.    Case Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## Table of Authorities

**Pages**

**Cases**

Africa v. Commonwealth of Pennsylvania,
662 F.2d 1025 (3d Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Agostini v. Felton,
521 U.S. 203 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

Altman v. Bedford Cent. Sch. Dist.,
245 F.3d 49 (2d Cir.), cert. denied., 534 U.S. 827 (2001) . . . . . . . . . . . . . . . . . . . . . . . 14, 15

Alvarado v. City of San Jose,
94 F.3d 1223 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Bastian v. New York City Bd. of Educ.,
2008 U.S. Dist. LEXIS 57467 (S.D.N.Y. July 29, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Benzman v. Whitman,
523 F.3d 119 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Bowen v. Kendrick,
487 U.S. 589 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Brown v. City of Oneonta,
221 F.3d 329 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Chambers v. Time Warner, Inc.,
282 F.3d 147 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 14

Chapman v. Houston Welfare Rights Organization,
441 U.S. 600 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Colorado Christian Univ. v. Weaver,
534 F.3d 1245 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Corporation of Presiding Bishop of Church of Jesus Christ of Latter-Day
Saints v. Amos, 483 U.S. 327 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-16

County of Allegheny v. ACLU,
492 U.S. 573 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## Table of Authorities

**Pages**

## Cases

Diaz v. Paterson,
547 F.3d 88 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Edwards v. Aguillard,
482 U.S. 578 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15, 17

Engel v. Vitale,
370 U.S. 421 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Excelsior College v. New York State Educ.Dept.,
306 A.D.2d 675, 761 N.Y.S.2d 700 (3d Dep't 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Ex Parte Young,
209 U.S.123 (1908) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Ford v. McGinnis,
352 F.3d 582 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Galvan v. Levine,
490 F.2d 1255 (2d Cir. 1973), cert. denied, 417 U.S. 936 (1974) . . . . . . . . . . . . . . . . . . . . . 3

Hafer v. Melo,
502 U.S. 21 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Harris v. McRae,
448 U.S. 297 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Hayut v. State Univ. of New York,
352 F.3d 733 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

In re Optionable Securities Litigation,
577 F. Supp. 2d 681 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Jackson v. Birmingham Bd. of Educ.,
544 U.S. 167 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Larson v. Valente,
456 U.S. 228 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

# Table of Authorities

**Pages**

## Cases

Lemon v. Kurtzman,
  403 U.S. 602 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

McCollum v. Board of Educ.,
  330 U.S. 203 (1948)(Jackson, J., concurring) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 16

McCormack ex rel. McCormack v. School District of Mamaroneck,
  370 F.3d 275 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Mississippi Univ. for Women v. Hogan,
  458 U.S. 718 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Mitchell v. Helms,
  530 U.S. 793 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 20

Moore v. Board of Regents,
  44 N.Y.2d 593, 407 N.Y.S.2d 452 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 15

Patrick v. LeFevre,
  745 F.2d 153 (2d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Personnel Administrator of Massachusetts v. Feeney,
  442 U.S. 256 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Salahuddin v. Coughlin,
  993 F.2d 306 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Sherbert v. Verner,
  374 U.S. 398 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Sioux City Bridge Co. v. Dakota County,
  260 U.S. 441 (1923) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Smith v. Board of Sch. Comm'rs,
  665 F. Supp. 684 (S.D. Ala.), rev'd, 827 F.2d 684 (11th Cir. 1987) . . . . . . . . . . . . . . . . . 11

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
  –U.S.–, 127 S.Ct. 2499 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## Table of Authorities

**Pages**

## Cases

Thomas v. Review Bd.,
450 U.S. 707 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 12

U.S. v. Allen,
760 F.2d 447 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 13

U.S. v. Meyers,
93 F.3d 1475 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

U.S. v. Moon,
718 F.2d 1210 (2d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

U.S. v. Seeger,
380 U.S. 163 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Ward v. New York Univ.,
2000 U.S. Dist. LEXIS 14067 (S.D.N.Y. Sept. 25, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Warder v. Board of Regents,
53 N.Y.2d 186, 440 N.Y.S.2d 875 (1981), cert. denied., 454 U.S. 1125 (1981)  . . . . 5, 6, 15

Welsh v. U.S.,
398 U.S. 333 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

West Virginia Bd. of Educ. v. Barnette,
319 U.S. 624 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Wisconsin v. Yoder,
406 U.S. 205 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Witters v. Washington Dept. of Services for the Blind,
474 U.S. 481 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

Yick Wo v. Hopkins,
118 U.S. 356 (1886) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Zelman v. Simmons-Harris,
536 U.S. 639 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

## Table of Authorities

**Pages**

### Federal Constitution

First Amendment, . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 16
Establishment Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Fourteenth Amendment, . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
Equal Protection Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 22, 23

### Federal Statutes, Regulations and Rules

#### Federal Statutes
20 U.S.C. § 1071, et seq., Federal Family Education Loan Program ("FFELP") . . . . . . . . . . . . . . . 7
20 U.S.C. § 1085(j) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

20 U.S.C. § 1681, et seq., Education Amendments of 1972 ("Title IX") . . . . . . . . . . . . 2, 23, 24, 25
20 U.S.C. § 1681(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

#### Federal Regulations
34 C.F.R.
§ 106.34(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
§ 106.42 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

45 C.F.R. § 86.42 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

#### Federal Rules of Civil Procedure
12(b)
12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

#### Federal Rules of Evidence
201(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

### New York State Constitution

Article 11, § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## Table of Authorities

**Pages**

**State Statutes**

8 N.Y.C.R.R.
    Part 52 (Commissioner's Regulations) .................................... 14, 22
    § 3.47 ......................................................... 5
        § 3.47(a)(1) ............................................... 5
        § 3.47(a)(2) ............................................... 5
        § 3.47( c) .................................................. 5
        § 3.47(d) .................................................. 5
    § 3.50 ......................................................... 5
    § 52.1
        § 52.1(a)(1) ............................................... 6
        § 52.1(f) .................................................. 6
    § 52.2 ......................................................... 6
        § 52.2(a) .................................................. 6
        § 52.2(b) .................................................. 6
        § 52.2( c) .................................................. 6
        § 52.2(c)(1) ............................................... 6
        § 52.2(d)-(f) ............................................... 6
        § 52.2(1) .................................................. 6

**New York Education Law**
    § 101 ......................................................... 4
    § 201 ......................................................... 4
    § 202 ......................................................... 1, 4
    § 207 ......................................................... 5, 15
    § 210 ......................................................... 5
    § 214 ......................................................... 4
    § 215 ......................................................... 4
    § 652(2)(a)-( c) ................................................ 7
    § 661 ......................................................... 7
    § 666-669 ..................................................... 7
    § 670-680 ..................................................... 7
    § 680(1)(b) .................................................... 7
    § 6401 ........................................................ 7, 17
        § 6401(3) ................................................. 18, 19

**Other Authorities**

Bart D. Ehrman, God's Problem: How the Bible Fails to Answer Our Most Important
Question - Why We Suffer (2008) ............................................ 16

# Table of Authorities

**Pages**

George C. Freeman III, The Misguided Search for the Constitutional Definition of
"Religion", 71 Geo. L. Rev. 1519, 1563-64 (1983) ................................. 11

Steven G. Gey, Why is Religion Special?: Reconsidering the Accomodation of
Religion Under the Religion Clauses, 52 U. Pitt. L. Rev. 75, 154 (1990) .............. 12

Stanley Ingber, Religion or Ideology: A Needed Clarification of the Religion Clauses,
41 Stan. L. Rev. 233, 264 (1989) ................................................. 9-10

Laurence H. Tribe, American Constitutional Law, p. 1187 (2d ed. 1988) .................. 11

Jeffrey Usman, Defining Religion: The Struggle to Define Religion Under the First
Amendment and the Contributions and Insights of Other Disciplines of Study,
83 N. Dak. L. Rev. 123 (2007) ................................................... 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------------X

ROY DEN HOLLANDER and WILLIAM A. NOSAL, on behalf :
of themselves and all others similarly situated,

                                Plaintiffs,

                                            08 Civ. 7286
                -against-                        (LAK)(KNF)

INSTITUTE FOR RESEARCH ON WOMEN AND GENDER     :       (ECF)
AT COLUMBIA UNIVERSITY, et al.,

                            Defendants.

-------------------------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF STATE DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

Defendants the Board of Regents of the University of the State of New York ("Regents")

and its Chancellor, Robert M. Bennett; Richard P. Mills, Commissioner of the New York State

Education Department ("SED"); and James C. Ross, President of the New York State Higher

Education Services Corporation ("HESC") (collectively, "State Defendants"), by their attorney

ANDREW M. CUOMO, Attorney General of the State of New York, submit this memorandum

of law in support of their motion to dismiss the amended complaint pursuant to Rule12(b)(6) of

the Federal Rules of Civil Procedure.[1]

This is a case based on a metaphor. Plaintiffs have invented a "religion of Feminism,"

whose Vatican they identify as the Columbia University Women's Studies Program, and claim

that the defendants violate the First Amendment's Establishment Clause by propagating or

---

[1]      Although the complaint names Chancellor Bennett, Commissioner Mills, and President
Ross in their individual and official capacities, the complaint seeks only injunctive relief of the type
properly sought only against state officials in their *official* capacities. See Hafer v. Melo, 502 U.S. 21, 27
(1991); Ex Parte Young, 209 U.S.123, 154 (1908). The complaint also names the Board of Regents, a
collective body, see N.Y. Educ. Law § 202, "in his or her individual capacity." The collective body has
no individual capacity or gender.

supporting it, by certifying women's studies programs, or giving financial aid to students who wish to study, or schools that offer, women's studies. (Compl., ¶¶ 2-68) Plaintiffs also claim that the State Defendants have violated their rights under the Fourteenth Amendment's Equal Protection Clause by approving women's studies programs without also providing for men's studies programs, if, indeed, such programs exist.[2] (Compl., ¶¶ 69-127, 229-252) Finally, plaintiffs claim that the State Defendants violate Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq., by approving women's studies programs without also providing for men's studies programs. (Compl., ¶¶ 158-193)

These claims must be dismissed. First, the women's studies program at Columbia is a secular academic program, not a religion, and the State Defendants do not violate the Establishment Clause by registering and approving it as an academic program and providing generally-available financial support either to Columbia or to its students. Second, the Equal Protection claim fails because plaintiffs do not and cannot identify any State policy that explicitly discriminates on the basis of sex or is intentionally administered in such a way as to discriminate on the basis of sex. Finally, the Title IX claim must be dismissed because Title IX does not require provision of specific academic programs, so long as students of all sexes are allowed to participate in the programs offered. The State Defendants' motion to dismiss should, accordingly, be granted.

---

[2]     Plaintiffs also assert a claim under 42 U.S.C. § 1983. (Compl., ¶¶ 128-157) But § 1983 does not provide a right of action independent of plaintiffs' Establishment Clause and Equal Protection claims. Section 1983 does not itself create any substantive right, it is simply the procedural vehicle for bringing claims established by other federal laws. See Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 617 (1979). Therefore, the State Defendants will treat plaintiffs' "§ 1983 claim" is addressed as a restatement of their Establishment Clause and Equal Protection claims.

## FACTS

### A. The Plaintiffs

Plaintiffs are alumni of Columbia University. (Compl., ¶ 204) They claim some interest in taking continuing education classes at Columbia, and have learned that Columbia has an Institute for Research on Women and Gender – a women's studies program – but no men's studies program. (Id., ¶¶ 219-225) In plaintiffs' view, the lack of a men's studies program denies them and other men the educational and networking opportunities that they imagine women receive from courses in women's studies. (Id., ¶¶ 164-170) They also contend that there is a "religion of Feminism," that the faculty of Columbia's women's studies program are its priestesses, and that, by virtue of allowing the program to exist and allowing Columbia and Columbia students to receive public money, the defendants collectively violate plaintiff's rights under the Establishment Clause. (Id., ¶¶ 2-68) To redress these alleged wrongs, plaintiffs sues Columbia University, its trustees, and its women's studies program (the "Columbia Defendants"); the United States Department of Education and its Secretary (the "Federal Defendants"); and the State Defendants.[3]

### B. The State Defendants

The various State Defendants have different roles with respect to higher education. The Board of Regents, its Chancellor, and the Commissioner of Education have various regulatory

---

[3]     Although addressing plaintiffs' class action allegations now would be premature, it is worth noting that because the declaratory and injunctive relief plaintiffs seek would, if granted, benefit the entire putative class even without certification, the certification of this matter as a class action is unnecessary. See Galvan v. Levine, 490 F.2d 1255 (2d Cir. 1973), cert. denied, 417 U.S. 936 (1974) ("[Where] the relief sought is prohibitory, an action seeking declaratory or injunctive relief against state officials on the ground of unconstitutionality of a statute or administrative practice is the archetype of one where class action designation is largely a formality.").

3

powers and oversee some forms of financial assistance to students and to institutions of higher education. HESC provides certain financial aid to students and guarantees student loans.

**1. The Regents and The Commissioner of Education:** Since 1784, the Regents of the University of the State of New York have been empowered "to encourage and promote education, to visit and inspect its several institutions, to distribute to or expand or administer for them such property or funds as the state may appropriate therefor or as the university may own or hold in trust or otherwise." N.Y. Educ. Law § 201; see also N.Y. Educ. Law § 202 (describing organization of the Board of Regents); N.Y. Constitution, Article 11, § 2 (regarding Board of Regents). The Regents appoint a Commissioner of Education to head the New York State Education Department ("SED"), which "is charged with the general management and supervision of all public schools and all of the educational work of the state, including the operations of The University of the State of New York." N.Y. Educ. Law § 101.

All institutions of higher education in New York State, whether public or private, are part of the University of the State of New York, and must comply with its rules or any applicable laws. See N.Y. Educ. Law § 214. The Regents, the Commissioner, or any of their representatives "may visit, examine into and inspect, any institution in the university," and require reports. N.Y. Educ. Law § 215. The Regents may suspend the charter, or other rights and privileges, of any institution in the University of the State of New York "[f]or refusal or continued neglect . . . to make any report required, or for violation of any law or any rule of the university." Id. The Regents have broad power to "exercise legislative functions concerning the educational system of the state, determine its educational policies, and . . . establish rules for carrying into effect the

4

laws and policies of the state, relating to education."[4] N.Y. Educ. Law § 207.

Particularly relevant is the power of the Regents to "register domestic and foreign institutions in terms of New York standards, and fix the value of degrees, diplomas and certificates issued by institutions of other states or countries and presented for entrance to schools, colleges and the professions in this state." N.Y. Educ. Law § 210. By this authority, the Regents have set requirements for earned undergraduate and graduate degrees. See 8 N.Y.C.R.R. § 3.47.

The basic requirement is that "[n]o earned undergraduate or graduate degree shall be conferred unless the applicant has completed a program registered by the department [of Education]." 8 N.Y.C.R.R. § 3.47(a)(1). The Regents have established standards governing the eligibility of students to pursue undergraduate or graduate degrees, see 8 N.Y.C.R.R. § 3.47(a)(2), and general standards applicable to all registered undergraduate and graduate degrees, see 8 N.Y.C.R.R. §§ 3.47(c), (d). Currently, the Regents have registered 150 different degree programs that may be offered by qualifying institutions in New York State, including 20 in explicitly religious subjects, ranging from the S.M.B. degree for a Bachelor of Sacred Music to the S.T.D. degree for a Doctor of Sacred Theology. See 8 N.Y.C.R.R. § 3.50 (listing registered degrees).

---

[4]     One limit on the Regents's authority is relevant to the issues raised in this case: "But no enactment of the regents shall modify in any degree the freedom of the governing body of any seminary for the training of priests or clergymen to determine and regulate the entire course of religious, doctrinal, or theological instruction to be given in such institution." N.Y. Educ. Law § 207. As a result, although the Regents have broad general regulatory authority over explicitly religious educational institutions, such as seminaries, they have no authority to judge the correctness of any religious teaching. See Warder v. Board of Regents, 53 N.Y.2d 186, 440 N.Y.S.2d 875 (1981), cert. denied, 454 U.S. 1125 (1981) (denial of charter to seminary upheld when based on finding of secular, academic deficiencies).

5

"[E]very curriculum creditable toward a degree offered by institutions of higher education" in New York State must be registered with SED.[5] See 8 N.Y.C.R.R. § 52.1(a)(1). Under authority granted by the Regents, the Commissioner has set standards for the registration of undergraduate and graduate curricula. See 8 N.Y.C.R.R. § 52.2. The Commissioner's standards address such objective criteria as: (1) financial resources and physical plant and equipment, see 8 N.Y.C.R.R. § 52.2(a); (2) sufficient, trained faculty, see 8 N.Y.C.R.R. § 52.2(b); (3) minimum amounts of full-time equivalent study with adequately available course selections, see 8 N.Y.C.R.R. § 52.2(c); and (4) various other requirements concerning admission to programs of study and administration, see 8 N.Y.C.R.R. § 52.2(d)-(f). "Registration or reregistration of a curriculum may be denied if the commissioner finds that curriculum, or any part thereof, not to be in compliance with statute or this Title." 8 N.Y.C.R.R. § 52.2(l).

The Commissioner and the Regents can and do refuse to register proposed degree programs if they fail to meet these secular, religion-neutral academic standards. See Moore v. Board of Regents, 44 N.Y.2d 593, 407 N.Y.S.2d 452 (1978) (denied registration for Ph.D. programs in English and History at the State University of New York at Albany for insufficient faculty resources); Warder v. Board of Regents, 53 N.Y.2d 186, 440 N.Y.S.2d 875 (1981), cert. denied, 454 U.S. 1125 (1981) (denied charter to seminary for secular academic deficiencies).

Beyond their regulatory role in higher education, the Regents and SED also have a financial role. Non-profit colleges and universities incorporated by the Regents maintaining one

---

[5]     All courses offered must be "part of a registered curriculum," but individual courses are not themselves registered. See 8 N.Y.C.R.R. § 52.1(f); see also § 52.2 (describing registration standards). The institution must, however, describe courses offered in writing and state their subject matter and requirements. See 8 N.Y.C.R.R. § 52.2(c)(1).

6

or more registered degree programs and meeting various educational standards receive cash awards, known as "Bundy Aid," see Excelsior College v. New York State Educ.Dep't, 306 A.D.2d 675, 761 N.Y.S.2d 700 (3d Dep't 2003), based on the number and type of earned degrees awarded. See N.Y. Educ. Law § 6401.

**2. HESC:** HESC is an educational corporation and an agency of the State of New York created to administer New York State's financial aid programs and the Federal Family Education Loan Program ("FFELP") in New York State. See N.Y. Educ. Law § 652(2)(a)-(c), 20 U.S.C. § 1071 et seq. HESC guarantees higher education loans made by private lenders under FFELP to New York State residents or to persons attending colleges or vocational schools in New York State. See N.Y. Educ. Law § 680(1)(b); 20 U.S.C. § 1085(j). HESC also administers programs providing direct grants of financial aid to students. See N.Y. Educ. Law §§ 666-669 (general awards), 670-680 (performance-based awards). All of these grants and loans are made to *students*, who may use the proceeds to attend any eligible institution of higher education and take any course of instruction approved for that institution. See N.Y. Educ. Law § 661.

## ARGUMENT

### STANDARD OF REVIEW

"In deciding a motion to dismiss, the Court ordinarily accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiffs' favor. In order to survive such a motion, however, the plaintiff must provide the grounds upon which the claim rests through factual allegations sufficient to raise a right to relief above the speculative." In re Optionable Securities Litigation, 577 F. Supp. 2d 681, 687 (S.D.N.Y. 2008) (LAK) (quotations and citations omitted). Where "a claim [is] not plausible, it would have to be supported by an

7

allegation of some subsidiary facts to survive a motion to dismiss." Benzman v. Whitman, 523

F.3d 119, 129 (2d Cir. 2007) (dismissing claim that Environmental Protection Agency head and

White House knowingly issued false press releases as "not plausible in the absence of some

supporting facts"). Although a motion to dismiss is addressed to the face of the pleadings, the

Court may also consider documents referred to in the complaint and matters subject to judicial

notice. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., – U.S. – , 127 S. Ct. 2499, 2509 (2007);

Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002).

　　　Here, plaintiffs' claims are implausible and unsupported by "subsidiary facts." Even

taken as true, they fail to state a claim upon which relief can be granted. Therefore, plaintiffs'

amended complaint should be dismissed, with prejudice.

## POINT I

## THE ESTABLISHMENT CLAUSE CLAIMS MUST BE DISMISSED BECAUSE "FEMINISM" IS NOT A RELIGION AND THE STATE DEFENDANTS' ACTIVITIES DO NOT TEND TO ESTABLISH RELIGION

　　　Plaintiffs' claim that the State Defendants have violated their rights under the

Establishment Clause "by aiding and advancing the modern-day religion of Feminism

proselytized and indoctrinated through the Women's Studies program by Columbia University's

Institute for Research on Women and Gender," (Compl., ¶ 2), fails at the threshold because

"Feminism" is not a religion, but a secular academic point of view, and not the proper subject of

an Establishment Clause challenge. Furthermore, even assuming that "Feminism" is a religion,

the State Defendants' enforcement of secular, religion-neutral educational standards and

provision of generally-available financial aid to institutions and students do not violate the

Establishment Clause.

8

## A.   "Feminism" Is Not A Religion For Purposes Of The Establishment Clause

Plaintiffs appear to believe that some adherents of the secular viewpoint commonly known as "feminism" hold to it with the fervor often associated with religion. (Compl., ¶¶ 5, 7-10) But the Constitution does not prohibit the establishment of, or protect the free exercise of, philosophies or viewpoints that share characteristics with religion; it prohibits the establishment, and protects the free exercise, of *religion* and only religion. "A way of life, however virtuous or admirable, may not be interposed as a barrier to reasonable state regulation . . . if it is based on purely secular considerations; to have the protection of the Religion Clauses, the claims must be rooted in religious belief." Wisconsin v. Yoder, 406 U.S. 205, 215 (1972); see also Thomas v. Review Bd., 450 U.S. 707, 713 (1981) ("Only beliefs rooted in religion are protected by the Free Exercise clause, which, by its terms, gives special protection to the exercise of religion.").

The Supreme Court, having clarified decades ago that the First Amendment's Religion Clauses apply only to religion and abandoned earlier suggestions that they be similarly applied to secular beliefs functionally equivalent to religion, see U.S. v. Seeger, 380 U.S. 163, 166 (1965) and Welsh v. U.S., 398 U.S. 333, 340 (1970) (both expanding the Selective Service Act's exemption for conscientious objectors to include objectors with non-religious moral or ethical beliefs and suggesting that a different reading might violate the Religion Clauses), has not since attempted to define "religion." See Stanley Ingber, Religion or Ideology: A Needed Clarification of the Religion Clauses, 41 Stan. L. Rev. 233, 264 (1989) ("While explicitly acknowledging the need to distinguish religion from other belief systems, . . . the Court remains unwilling to commence the task."). In the absence of cases requiring it to decide whether a given belief is

9

"religious," the Court can hardly be blamed for declining to take on "a difficult and delicate

task." Thomas, 450 U.S. at 714. But lower courts and commentators have struggled with the

question, mainly in Free Exercise cases, although not, as relevant here, in Establishment Clause

cases.

The scholarly commentary on how or whether to define religion is voluminous and often

critical of the language courts use and the tests they propose.[6] Lower courts have evolved three-

part tests, see, e.g., Africa v. Commonwealth of Pennsylvania, 662 F.2d 1025, 1032-1036 (3d

Cir. 1981), and ten-part tests, see, e.g., U.S. v. Meyers, 93 F.3d 1475, 1482-85 (10th Cir. 1996).

The Second Circuit, for its part, has attempted a broad, though not boundless, definition in Free

Exercise cases:

> The term "religion" was defined by the Supreme Court nearly
> 100 years ago . . . as having reference to a person's views of his
> relationship to his Creator. This definition seems unduly narrow
> today. In every religion there is an awareness of what is called
> divine and a response to that divinity. . . . But, there are religions
> which do not positively require the assumption of a God, for
> example, Buddhism and the Unitarian Church. Hence a broader
> definition of the word religion – one which we think more accurately
> captures its essence – is that formulated by the pre-eminent
> American philosopher, William James, who said religion means:
> "the feelings, acts, and experiences of individual men in their
> solitude, so far as they apprehend themselves to stand in relation
> to whatever they may consider the divine." . . . In referring to
> to an individual's relation to what he considers the divine, Professor
> James used the word "divine" in its broadest sense as denoting
> any object that is godlike, whether it is or is not a specific deity.

U.S. v. Moon, 718 F.2d 1210, 1226-27 (2d Cir. 1983) (citations omitted).

---

[6]     An up-to-date summary of the scholarly literature can be found in Jeffrey Usman,
Defining Religion: The Struggle to Define Religion Under the First Amendment and the Contributions
and Insights of Other Disciplines of Study, 83 N. Dak. L. Rev. 123 (2007), citing and discussing the
principal works appearing in the last few decades.

One common thread in all of these tests and definitions is that, in Free Exercise cases,

what matters is the subjective perspective of the *believer*, not an objective examination of

whether the purportedly religious belief is shared by others or doctrinally correct. See Patrick v.

LeFevre, 745 F.2d 153, 157 (2d Cir. 1984) ("courts have jettisoned the objective, content-based

approach previously employed to define religious belief, in favor of a more subjective definition

of religion, which examines an individual's inward attitudes towards a particular belief system").

This "expansive definition of religion has been developed primarily to protect an

individual's free exercise of religion, recognizing that an individual's most sincere beliefs do not

necessarily fall within traditional religious categories." U.S. v. Allen, 760 F.2d 447, 450 (2d Cir.

1985). "Free Exercise cases generally involve claims brought by individuals or groups claiming to

belong to a cognizable religion," Alvarado v. City of San Jose, 94 F.3d 1223, 1227 (9th Cir.

1996), and thus necessarily involve determining whether the *claimants'* beliefs are religious.

In contrast, "Establishment cases usually, though not always, involve well known

religions, because these are most likely to generate the dangers the clause is designed to prevent."

Alvarado, 94 F.3d at 1227; see also George C. Freeman III, The Misguided Search for the

Constitutional Definition of "Religion", 71 Geo. L. Rev. 1519, 1563-64 (1983) (Establishment

Clause cases turn on the meaning of "establishment," not the meaning of "religion"); Laurence H.

Tribe, American Constitutional Law, p. 1187 (2d ed. 1988) (the meaning of "religion" rarely

arises in Establishment Clause cases). But see Smith v. Board of Sch. Comm'rs, 665 F. Supp. 684

(S.D. Ala.), rev'd, 827 F.2d 684 (11th Cir. 1987) (district court erroneously held that "secular

humanism" was a religion, and that teaching it in schools violated the Establishment Clause).

In Establishment Clause cases, as opposed to Free Exercise cases, relying on the

11

claimants' beliefs about the religious character of the practice giving rise to litigation is problematic, especially where the claimants "ask [the court] to recognize as a 'religion' what that religion's alleged adherents have not identified as such." Allen, 760 F.2d at 450. In a Free Exercise case, claimants with a purely subjective and idiosyncratic viewpoint that is, nevertheless, religious put the government to the often manageable burden of accommodating objections to generally-applicable laws or government programs by, for example, paying unemployment insurance to persons whose religious beliefs prevent them from working on particular days, see Sherbert v. Verner, 374 U.S. 398 (1963), or at particular jobs, see Thomas v. Review Bd., 450 U.S. 707 (1981), or exempting objecting students from flag salute ceremonies, see West Virginia Bd. of Educ. v. Barnette, 319 U.S. 624 (1943), or providing a particular diet, see Ford v. McGinnis, 352 F.3d 582 (2d Cir. 2003), or the time, place, and wherewithal to pray, see Salahuddin v. Coughlin, 993 F.2d 306 (2d Cir. 1993). In an Establishment Clause case, by contrast, the claimant seeks to stop the government from enforcing its laws or pursuing its programs at all. See, e.g., Engel v. Vitale, 370 U.S. 421 (1962) (state-sponsored prayer in public school); Edwards v. Aguillard, 482 U.S. 578 (1987) (teaching of "creation science" in public schools).

Government cannot function, however, if every individual can claim that some program or activity offends his or her subjective and idiosyncratic conception of "religion" and, in the name of the Establishment Clause, bring it to a halt. See Steven G. Gey, Why is Religion Special?: Reconsidering the Accommodation of Religion Under the Religion Clauses, 52 U. Pitt. L. Rev. 75, 154 (1990) ("applying the same broad definition in establishment cases could shut down the modern regulatory state"). The educational system is particularly vulnerable to claims that it

12

violates the Establishment Clause by promoting some arguably religious teaching with which a

plaintiff might disagree:

> Authorities list 256 separate and substantial religious bodies to
> exist in the continental United States. Each of them . . . has as
> good a right as this plaintiff to demand that the courts compel
> the schools to sift out of their teaching everything inconsistent
> with their doctrines. If we are to eliminate everything that is
> objectionable to any of these warring sects or inconsistent with
> any of their doctrines, we will leave public education in shreds.

McCollum v. Board of Educ., 330 U.S. 203, 235 (1948) (Jackson, J., concurring). The threat

Justice Jackson saw to the educational system is exponentially greater when the universe of

potential claimants is expanded, as it has been in Free Exercise cases, beyond "separate and

substantial religious bodies" to subjective and idiosyncratic individual religious belief.

The Second Circuit, however, has pre-empted that threat in Establishment Clause cases by

defining "religion" for Establishment Clause purposes not subjectively and idiosyncratically, but

objectively, as that which is conventionally recognized as "religion":

> we adopt for establishment clause purposes the conventional,
> majority view, rather than the appellant's view, of what is religious
> and what is political. . . . That the Government advances what is,
> conceivably, someone's religion, however, does not make what
> most citizens consider a political or military action a violation
> of the establishment clause.

Allen, 760 F.2d at 450 (rejecting Establishment Clause defense to charge of destroying military

property allegedly used to advance "religion" of "Nuclearism"). The Second Circuit's approach

recognizes that governments generally act in response to the desires of politically significant

constituencies; if they do something that establishes "religion," they generally do it in response to

communally-recognized religious sentiment, not idiosyncratic, individual religious claims. It is, in

13

addition, consistent with the Supreme Court's holding that whether a government action has the

primary effect of advancing religion is determined objectively, by whether a reasonable observer

would perceive the practice as having that effect. See County of Allegheny v. ACLU, 492 U.S.

573, 620, 635-36, 642-43 (1989); Altman v. Bedford Cent. Sch. Dist., 245 F.3d 49, 75 (2d Cir.),

cert. denied, 534 U.S. 827 (2001).

A court may rely on judicially-noticeable facts in granting a motion to dismiss. See

Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002). The "conventional, majority

view" of the community on a topic of general interest – which judges, being members of the

community are likely either to share or to know – is "not subject to reasonable dispute in that it is

. . . generally known within the territorial jurisdiction of the trial court." Fed. R. Evid. 201(b).

This Court can and should take judicial notice that, under the "conventional, majority view," what

plaintiffs identify as the "religion of Feminism" is a secular point of view, not a religion.

Therefore, the Establishment Clause claim fails at the threshold, and must be dismissed.

## B. The Registration Of Curricula And Degree Programs That Comply With Religion-Neutral Academic Standards Does Not Constitute An Establishment of Religion

Whether "Feminism" is a religion or not, the Regents and the Commissioner do not

establish religion by in registering degree programs and approving curricula. Rather, they apply

secular, religion-neutral academic criteria to determine which educational institutions – be they

secular or religious – may offer what degrees in what subjects, both secular and religious. See

N.Y.C.R.R. Part 52 (Commissioner's Regulations).

To survive an Establishment Clause challenge, government practices must (1) "have a

secular legislative purpose," (2) have a "principal or primary effect . . . that neither advances nor

14

inhibits religion," and (3) "not foster an excessive government entanglement with religion." Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971); see also Altman, 245 F.3d at 75. The State's registration and approval of degree programs and curricula easily passes all three parts of the test.

**1. Secular Purpose:** The question to be answered in determining whether the challenged activities have a secular purpose is "whether government's actual purpose is to endorse or disapprove of religion." Edwards v. Aguillard, 482 U.S. 578, 585 (1987). The purpose of the State's regulatory scheme for registering degree programs and approving curricula is apparent on its face. Nothing in it refers to religion.[7] The criteria governing whether to register a degree program or approve a curriculum in either a secular or a religious subject are objective, secular criteria designed to advance educational quality, and nothing else. See pp. 4-6, supra. Both secular and religious programs have been approved and both secular and religious programs have been disapproved, for purely secular reasons each time. See Moore, 44 N.Y.2d 593, 407 N.Y.S.2d 452 (1978) (denying registration for Ph.D. programs in English and History); Warder, 53 N.Y.2d 186, 440 N.Y.S.2d 875 (1981), cert. denied., 454 U.S. 1125 (1981) (denying charter to seminary). Nothing in the complaint suggests that this comprehensive, secular, religion-neutral scheme to assure educational quality is nevertheless intended to advance religion. Therefore, the State's practices pass the "secular purpose" test.

**2. Primary Effect of Advancing or Inhibiting Religion:** "For a law to have forbidden 'effects' under Lemon, it must be fair to say that the *government itself* has advanced religion through its own activities and influence." Corporation of Presiding Bishop of Church of Jesus

---

[7]    With the notable exception of N.Y. Educ. Law § 207, which denies the Regents and the Commissioner the power to interfere with the academic freedom of religious institutions to determine religious orthodoxy. See fn. 4, supra.

Christ of Latter-Day Saints v. Amos, 483 U.S. 327, 337 (1987) (emphasis in original). The State's registering degree programs and approving curricula do not themselves advance religion. See pp. 4-6, supra. At most, they permit the academic teaching of religious subjects with some assurance of quality, and it is by no means a foregone conclusion that such study will enhance religious faith. See Bart D. Ehrman, God's Problem: How the Bible Fails to Answer Our Most Important Question – Why We Suffer (2008) (prominent religious scholar's scholarly explorations into the foundations of his faith led to loss of belief). Because the State's activities neither advance nor inhibit religion, they pass the "effects" test.

**3. Danger of Excessive Entanglement:** "[T]he First Amendment rests upon the premise that both religion and government can best achieve their lofty aims if each is left free from the other within its respective sphere." McCollum, 333 U.S. at 212. Entanglement issues particularly arise when the State's activities create the danger of "state inspection and evaluation of the religious content of a religious organization." Larson v. Valente, 456 U.S. 228, 255 (1982). No such danger exists in this case. The regulations that the Regents and the Commissioner enforce do not require, authorize, or even permit, examination into the religious content of curricula or courses. See pp 4-6, supra. The review process used to determine whether to register a doctoral program in theology is the same review process used to determine whether to register a doctoral program in American history. If the institution has the proper resources and systems (which includes a rationally-designed curriculum), its program is registered. Whether the theology faculty teaches Arianism or Donatism is as irrelevant to registration as whether the faculty member who is a historian of the American South is pro- or anti-slavery.

The Commissioner and the Regents must review proposed programs before registering

16

them, and may periodically review them for compliance with regulations, but that does not amount to excessive entanglement. See Bowen v. Kendrick, 487 U.S. 589, 615-17 (1988) (no excessive entanglement where government reviews adolescent counseling programs of religious institutions receiving government grants, reviews the materials used, and monitors the program by periodic visits). Thus, the State's system for registering degree programs and curricula creates no danger of entanglement with religion.

## C. Bundy Aid May Be Given Even To Religious Institutions And Programs Without Violating the Establishment Clause

Plaintiffs also contend that "the Regents and Commissioner provide direct financial aid to Columbia University under Education Law § 6401, known as 'Bundy Aid,' which benefits [Columbia's women's studies program] and Continuing Education in promoting the Feminism advanced by the Women's Studies program." (Compl., ¶ 49) Bundy Aid is given to all qualifying institutions *per capita*, based upon the graduates produced. See pp. 6-7, supra. Plaintiffs appear to believe that this violates the Establishment Clause. (Compl., ¶¶ 49-50) Under controlling Supreme Court precedent, it does not.

It is not clear just what plaintiffs think the Establishment Clause violation is. Columbia is a private, non-sectarian university. Financial aid to private, non-sectarian universities presents no Establishment Clause problem. Universities may offer courses and majors in explicitly religious subjects without violating the Establishment Clause. See Edwards, 482 U.S. at 594. Moreover, even assuming that there is a "religion of Feminism," and the women's studies department at Columbia teaches about it – and the complaint alleges nothing more – aid to Columbia would not violate the Establishment Clause.

17

Whatever plaintiffs' theory may be, even direct financial aid to sectarian institutions that teach explicitly religious subjects presents no Establishment Clause issue so long as the aid: (1) has a secular purpose, (2) neither results in religious indoctrination by government nor defines its recipients by reference to religion, and (3) does not create excessive entanglement. See Mitchell v. Helms, 530 U.S. 793, 807 (2000); Agostini v. Felton, 521 U.S. 203, 222-23 (1997). Because Bundy Aid is given to *all* qualifying institutions of higher education, see pp. 6-7, supra, and involves nothing more than the cutting of a check and periodic review to see that the qualifying institutions continue to qualify, there can be no serious question concerning either the first prong of the test, secular purpose, or the third prong of the test, entanglement. The only issues warranting discussion are whether the State defines Bundy Aid recipients by reference to religion or whether the aid results in religious indoctrination by government.

**1.      Religiously-Neutral Definition of Beneficiaries:** Bundy Aid is distributed to any qualifying institution of higher education, based solely on the number and type of degrees earned. See N.Y. Educ. Law § 6401(3). The religious affiliation, if any, of either the student or the institution is irrelevant. It cannot, therefore, be said that the State defines Bundy Aid recipients by reference to religion. See Mitchell, 530 U.S. at 830 (upholding aid program directed to a "[b]road array of schools eligible for aid without regard to their religious affiliations or lack thereof" based on enrollment); Agostini, 521 U.S. at 231 (noting that Court has "sustained programs that provided aid to *all* eligible children regardless of where they attend school").

**2.      No Indoctrination by the Government:** The key issue is whether an institution's use of government aid to "indoctrinate" students in religion is attributable to the government. See Agostini, 521 U.S. at 230. Where, as here, "the religious, irreligious, and a-religious alike are

18

eligible for governmental aid, no one would conclude that any indoctrination that any particular recipient conducts has been done at the behest of the government." Mitchell, 530 U.S. at 809.

Furthermore, because the aid is given in a non-discriminatory fashion, based entirely on where students choose to go to college and whether they graduate, students' private choices, not governmental action, determine whether students are exposed to religious indoctrination. See Mitchell, 530 U.S. at 810 ("if numerous private choices, rather than the single choice of a government, determine the distribution of aid pursuant to neutral eligibility criteria, then a government cannot, or at least cannot easily, grant special favors that might lead to a religious establishment"). If Bundy Aid created incentives for students to prefer colleges or universities where they might undergo religious indoctrination, an Establishment Clause issue might arise, but "[t]his incentive is not present . . . where the aid is allocated on the basis of neutral, secular criteria that neither favor nor disfavor religion, and is made available to both religious and secular beneficiaries on a nondiscriminatory basis." Agostini, 521 U.S. at 231.

Private colleges and universities in New York State, whether secular or religious, receive the same dollar amount of Bundy Aid per student, per degree. See N.Y. Educ. Law § 6401(3). Aid distributed on this basis creates no economic incentive that would cause a student to prefer a religious over a secular school, or vice versa. While the aid might create an incentive for a student to attend *some* college, the distribution formula does not tilt the playing field or otherwise influence the students' private choice of which college to attend. Using state money to facilitate such private choice does not violate the Establishment Clause. "If aid to schools, even 'direct aid,' is neutrally available and, before reaching or benefitting any religious school, first passes through the hands (literally or figuratively) of numerous private citizens who are free to direct the aid

19

elsewhere, the government has not provided any 'support of religion.'" Mitchell, 530 U.S. at 816

(upholding government aid to private schools, including religious schools, distributed on the basis

of enrollment). Thus, the State's distribution of Bundy Aid does not violate the Establishment

Clause.

## D.     Because HESC Provides Grants And Loan Guarantees To Students Rather Than Institutions, Its Activities Do Not Violate the Establishment Clause

HESC is referred to in only six of the amended complaint's 292 paragraphs. (Compl.,

¶¶ 60-68) The gist of plaintiffs' complaint about HESC is that it guarantees loans or awards grants

to students who, ultimately, attend Columbia and take women's studies courses. (Id.) Because

HESC's programs work by giving aid to individual students, not institutions, however, the

independent choices of those students about which institutions and programs to attend insulate

HESC from an Establishment Clause challenge.

Providing generally-available financial aid to students who choose to attend religiously-

affiliated colleges or pursue explicitly religious studies is permitted under the Establishment

Clause. See Witters v. Washington Dep't of Serv. for the Blind, 474 U.S. 481, 485-89 (1986)

(Establishment Clause does not forbid use of generally-available vocational education aid to

student planning to study for ministry); see also Zelman v. Simmons-Harris, 536 U.S. 639, 652

(2002) ("where a government aid program is neutral with respect to religion, and provides

assistance directly to a broad class of citizens who, in turn, direct government aid to religious

schools wholly as a result of their own genuine and independent private choice, the program is not

readily subject to challenge under the Establishment Clause."); Colorado Christian Univ. v.

Weaver, 534 F.3d 1245, 1253 (10th Cir. 2008) ("It is now settled that the Establishment Clause

20

permits evenhanded funding of education – religious and secular – through student scholarships.").

HESC administers financial aid and guarantees loans to *students* pursuing higher education at qualifying institutions. See p. 7, supra. Students are free to use the grant or loan proceeds – only some of which are state funds – at any qualifying institution for any qualifying educational program. Id. Students may use the proceeds to attend religiously-affiliated colleges and take explicitly religious courses. Id. As a provider of generally-available aid to students who make their own independent, private educational choices, HESC comes squarely within the Witters-Zelman rule, which requires that the Establishment Clause claim against HESC be dismissed.

## POINT II

### THE EQUAL PROTECTION CLAIM MUST BE DISMISSED BECAUSE THE APPLICABLE LAWS ARE GENDER-NEUTRAL AND HAVE BEEN ADMINISTERED IN A GENDER-NEUTRAL FASHION

Plaintiffs also contend that the mere existence of Columbia's women's studies program, and the State Defendants' allowing it to exist while failing to provide for a men's studies program, violates their rights under the Equal Protection Clause. (Compl., ¶¶ 100-102, 108-110) Insofar as the State Defendants are concerned, plaintiffs base their Equal Protection claim on unspecified "policies and practices [that] effectively ban Men's Studies from Columbia," (Compl., ¶ 110), while "no comparable benefits are provided to male students and alumni," (Compl., ¶ 102). So understood, plaintiffs fail to state an equal protection claim based on sex discrimination.

It is long-settled law that "the purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and

21

arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." Sioux City Bridge Co. v. Dakota County, 260 U.S. 441, 445 (1923). Plaintiffs identify no statute, regulation, or other source of law that imposes by its terms a discriminatory sex-based classification, (Compl., §§ 69-127), and cannot because there is none.[8] Likewise, plaintiffs fail to identify any act of administration or enforcement of these facially neutral laws undertaken "with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations." Yick Wo v. Hopkins, 118 U.S. 356, 373-74 (1886).

If a "challenged policy explicitly discriminates . . . on the basis of gender," the party seeking to uphold the policy "must carry the burden of showing an 'exceedingly persuasive justification' for the classification." Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 723-24 (1982) (striking down female-only policy at state nursing school). In this case, no statute or regulation "explicitly discriminates . . . on the basis of gender." Id. The regulations governing standards for registration of degree programs are completely general. By their terms, they apply to all academic subjects. See 8 N.Y.C.R.R. Part 52. Nothing in the regulations favors women's studies programs or disfavors men's studies programs – whatever plaintiffs may conceive them to be. Therefore, plaintiffs' equal protection claim must be based on unequal administration.

"A facially neutral statute violates equal protection only if it 'has been applied in an intentionally discriminatory manner' or 'has an adverse effect and . . . was motivated by discriminatory animus.'" Diaz v. Paterson, 547 F.3d 88, 101 (2d Cir. 2008) (quoting Brown v. City of Oneonta, 221 F.3d 329, 337 (2d Cir. 2000)). To state an Equal Protection Clause violation,

---

[8]     Although plaintiffs identify a 1993 Regents policy statement, "Equity for Women in the 1990s," policy statements of 1972 and 1984, and the 1984 and 2004 statewide plans, (Compl., ¶¶ 36, 38, 40, 103-105), none of these statements or plans make any reference to women's studies.

22

a complaint must allege that "the decision maker. . . selected or reaffirmed a particular course of conduct at least in part *because of* not merely *in spite of* its adverse effects on a particular group." Personnel Administrator of Massachusetts v. Feeney, 442 U.S. 256, 279 (1979) (emphasis added); see also Harris v. McRae, 448 U.S. 297, 323 n. 26 (1980) ("it is incumbent upon the challenger to prove that Congress selected or reaffirmed a particular course of action 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group").

Plaintiffs do not allege action with an adverse effect on men at all, let alone action taken "because of" adverse effects on men. Plaintiffs do not allege that the State Defendants have refused to register or fund any men's studies programs for any reason, let alone a discriminatory one. (Compl., ¶¶ 103-127) Plaintiffs do not allege that any men's studies program ever sought registration or funding, or even that any men's studies program was deterred from seeking registration or funding because the attempt would be futile. (Id.) For all that appears in the complaint, men's studies programs may not even exist. If so, plaintiffs' grievance is not with the State Defendants for failing to register or fund non-existent programs.

Because the laws and regulations governing registration and funding of degree programs are, by their terms, gender-neutral, and because the State Defendants are not alleged to have administered them in an unequal way, plaintiffs' Equal Protection claims must be dismissed.

## POINT III

### THE TITLE IX CLAIMS MUST BE DISMISSED BECAUSE TITLE IX DOES NOT REQUIRE OFFERING MEN'S STUDIES PROGRAMS

Plaintiffs' Title IX claim, (Compl., ¶¶ 158-193), like their equal protection claim, is based on Columbia's having a women's studies program and not a men's studies program. (Compl., ¶¶

23

169-172, 174, 182, 183, 190; see also Compl., ¶ 193 ("If Title IX can require universities receiving federal financial assistance to provide separate female athletic programs, then surely it can require Columbia University to provide a Men's Studies program that takes the masculine point of view")). The only reference in the Title IX section of the amended complaint to the State Defendants is in paragraph 192: "The Regents and N.Y. Education Department as agencies of the State that distribute Federal funds to Columbia violate Title IX and its implementing regulations."

Whatever Title IX claims plaintiffs are trying to assert against the State Defendants must be dismissed because nothing in the text of the statute, the implementing regulations, or the case law supports a claim based on the alleged failure to offer courses on a particular subject or taking a particular "point of view," masculine or otherwise.

## A.   Statutory Text

Title IX provides that no person shall, on account of sex, be "excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving federal funds." 20 U.S.C. § 1681(a). Plaintiffs are not "excluded from," or "denied the benefits of," or "subjected to discrimination under" Columbia's women's studies program. They admit that they are free to take women's studies courses, but anticipate that they will not like them. (Compl., ¶¶ 177-179) They are not, however, "excluded from" women's studies programs or "denied" whatever "benefits" such programs may afford them; and their likely disagreement with what they might learn does not threaten to "subject" them "to discrimination."

## B.   Regulations

The regulations implementing Title IX require, with exceptions not relevant here, that any federal funding recipient "shall not provide or otherwise carry out any of its educational programs

24

or activities separately on the basis of sex, or require or refuse participation therein by any of its students on the basis of sex." See 34 C.F.R. § 106.34(a); see also 45 C.F.R. § 86.42 (same). So long as the recipient's programs, whatever they may be, are available to all regardless of sex, the regulations not only do not address, they specifically disclaim any authority to address, the substance of what is taught. See 34 C.F.R. § 106.42 ("Nothing in this regulation shall be interpreted as requiring or abridging in any way the use of particular textbooks or curricular materials"); see also 45 C.F.R. § 86.42 (same).

## C. Case Law

Finally, nothing in the case law holds or even suggests that Title IX governs the content of instruction or choice of subjects to be taught. Title IX has been applied to such issues as access to athletic programs, see McCormack ex rel. McCormack v. School District of Mamaroneck, 370 F.3d 275 (2d Cir. 2004), sexual harassment, see Hayut v. State Univ. of New York, 352 F.3d 733 (2d Cir. 2003), retaliation, see Jackson v. Birmingham Bd. of Educ., 544 U.S. 167 (2005), and, in some courts, employment, see Bastian v. New York City Bd. of Educ., 2008 U.S. Dist. LEXIS 57467 (S.D.N.Y. July 29, 2008) (noting conflicting authorities on availability of Title IX as remedy for employment discrimination).

No case law has applied Title IX to the content of instruction or the choice of courses offered, and for excellent reasons because it is well-established that "[e]ducational institutions are afforded considerable deference when making decisions concerning academic standards." Ward v. New York Univ., 2000 U.S. Dist. LEXIS 14067, at *7 (S.D.N.Y. Sept. 25, 2000). Plaintiffs rightly state that Title IX condemns decisions based on outmoded sex-based stereotypes. (Compl., ¶ 166) Nevertheless, they advocate making curriculum decisions based on stereotypes about what courses

25

would interest or benefit men. In demanding that Columbia offer, and the State Defendants

approve, courses of study plaintiffs think men, specifically as men, want or need, plaintiffs invoke

Title IX in the service of precisely the sex-based stereotyping the statute forbids.

## CONCLUSION

For the reasons given, the amended complaint should be dismissed, with prejudice, as

against the State Defendants, together with such other relief as the Court deems just and proper.

Dated: New York, New York
        January 9, 2009

ANDREW M. CUOMO
Attorney General of the
State of New York
Attorney for State Defendants
By:

CLEMENT J. COLUCCI
Assistant Attorney General
120 Broadway
New York, New York 10271
(212) 416-8634
Clement.Colucci@oag.state.ny.us