UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROY DEN HOLLANDER and WILLIAM A. NOSAL,<br><br>      Plaintiffs on behalf of themselves and all<br>       others similarly situated,<br><br>            v.<br><br>INSTITUTE FOR RESEARCH ON WOMEN & GENDER AT COLUMBIA UNIVERSITY; SCHOOL OF CONTINUING EDUCATION AT COLUMBIA UNIVERSITY; TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK; U.S. DEPARTMENT OF EDUCATION; MARGARET SPELLINGS, U.S. SECRETARY OF EDUCATION in her official capacity; BOARD OF REGENTS OF THE UNIVERSITY OF THE STATE OF NEW YORK, in his or her official and individual capacity; CHANCELLOR OF THE BOARD OF REGENTS, ROBERT M. BENNETT, in his official and individual capacity; NEW YORK STATE COMMISSIONER OF THE DEPARTMENT OF EDUCATION, RICHARD P. MILLS, in his official and individual capacity; PRESIDENT OF THE NEW YORK STATE HIGHER EDUCATION SERVICES CORP., JAMES C. ROSS, in his official and individual capacity,<br><br>       Defendants. | 08 Civ. 7286 (LAK) (KNF)<br><br>ECF Case |

## MEMORANDUM OF LAW IN SUPPORT OF THE FEDERAL DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT

LEV L. DASSIN
Acting United States Attorney for the
Southern District of New York
Attorney for the U.S. Department of Education and
  Margaret Spellings, Secretary of Education
86 Chambers Street, 3rd Floor
New York, New York 10007

JEAN-DAVID BARNEA
Assistant United States Attorney
    Of Counsel

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    Plaintiffs' Amended Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    The U.S. Department of Education and Columbia University . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    I.    Standard for a Motion to Dismiss and Judicial Notice . . . . . . . . . . . . . . . . . . . 8

    II.    Plaintiffs' Establishment Clause Claim Must Be Dismissed . . . . . . . . . . . . . . 10

        A.    The Federal Defendants' Assistance to Columbia and Its Students Does
              Not Violate the Establishment Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            1.    The Student-Aid Programs Are Constitutional Because They
                  Merely Support Students' Private Choices to Study Religious
                  or Nonreligious Topics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            2.    Plaintiffs' Allegations of Direct Federal Funding for Columbia's
                  Teaching at Issue Are Contrary to Judicially Noticeable Facts
                  and Must Be Rejected . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

            3.    Plaintiffs' Allegation that the Federal Defendants Delegated Any
                  "Accreditation Power" to the Regents Is Contrary to Judicially
                  Noticeable Facts, and Insufficient as a Matter of Law to Hold
                  the Federal Defendants Responsible for the Regents' Actions . . 13

        B.    The Institute's Courses Are Not "Religious" for Purposes of the
            Establishment Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    III.    Plaintiffs' Due Process Claim Should Be Dismissed. . . . . . . . . . . . . . . . . . . . 19

        A.    Plaintiffs Do Not Have Standing to Assert a Due Process Claim
            Against the Federal Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        B.    The Federal Programs Do Not Violate Due Process Because Plaintiffs
            Can Point to No Purposeful Government Discrimination . . . . . . . . . . . 21

    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## TABLE OF AUTHORITIES

**PAGE**

### CASES

*Altman v. Bedford Cent. Sch. Dist.*,
    245 F.3d 49 (2d Cir. 2001)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Alvarado v. City of San Jose*,
    94 F.3d 1223 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Bell Atlantic Corp. v. Twombly*,
    127 S. Ct. 1955 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Buyers & Renters United to Save Harlem v. Pinnacle Group N.Y. LLC*,
    575 F. Supp. 2d 499 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Collier v. Barnhart*,
    473 F.3d 444 (2d Cir. 2007)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Comm. for Public Education & Religious Liberty v. Nyquist*,
    413 U.S. 756 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*,
    551 F. Supp. 2d 210 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*,
    218 F. Supp. 2d 369 (S.D.N.Y.2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Flagg v. Yonkers Sav. & Loan Ass'n, FA*,
    396 F.3d 178 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Frasier v. Gen. Elec. Co.*,
    930 F.2d 1004 (2d Cir. 1991)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Gettman v. Drug Enforcement Admin.*,
    290 F.3d 430 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Gleave v. Graham*,
    954 F. Supp. 599 (W.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Grimes ex rel. Grimes v. Sobol*,
    832 F. Supp. 704 (S.D.N.Y.1993), *aff'd*, 37 F.3d 857 (2d Cir. 1994) . . . . . . . . 23, 24, 25

*Heckler v. Mathews*,
   465 U.S. 728 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Hiwassee Coll., Inc. v. S. Ass'n of Colls. & Schs.*,
   531 F.3d 1333 (11th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Immediato v. Rye Neck Sch. Dist.*,
   73 F.3d 454 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Livent, Inc. Noteholders Secs. Litig.*,
   151 F. Supp. 2d 371 (S.D.N.Y.2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12, 14

*Iqbal v. Hasty*,
   490 F.3d 143 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Jones v. Astrue*,
   526 F. Supp. 2d 455 (S.D.N.Y.2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Kramer v. Time Warner, Inc.*,
   937 F.2d 767 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ.*,
   24 F.3d 519 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Minn. Fed. of Teachers v. Randall*,
   891 F.2d 1354 (8th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Mulroy v. Block*,
   569 F. Supp. 256 (N.D.N.Y. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Ocean Conservancy v. Evans*,
   260 F. Supp. 2d 1162 (M.D. Fla. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Or. Ass'n of Homes for Aging, Inc. v. Oregon ex rel. Dep't of Human Res.*,
   5 F.3d 1239 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Perot v. FEC*,
   97 F.3d 553 (D.C. Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Personnel Adm'r of Mass. v. Feeney*,
   442 U.S. 256 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 24

iii

*Port Washington Teachers' Ass'n v. Bd. of Educ. of Port Washington Union Free Sch.*,
   478 F.3d 494 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Raiser v. United States*,
   325 F.3d 1182 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Riverbend Farms v. Madigan*,
   958 F.2d 1479 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Rohan v. Am. Bar Ass'n*,
   No. 93 CV 1338 (SJ), 1995 WL 347035  (E.D.N.Y. May 31, 1995),
   *aff'd*, 1996 WL 75767 (2d Cir. Feb. 21, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Trujillo v. State*,
   809 S.W.2d 593 (Tex. Ct. App. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Allen*,
   760 F.2d 447 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*United States v. Meyers*,
   95 F.3d 1475 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Valley Forge Christian Coll v. Americans United for Separation of Church & State, Inc.*,
   454 U.S. 464 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Weinberger v. Wiesenfeld*,
   420 U.S. 636 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Witters v. Wash. Dep't of Servs. for the Blind*,
   474 U.S. 481 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Zelman v. Simmons-Harris*,
   536 U.S. 639 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 12

## FEDERAL STATUTES

20 U.S.C. § 1001  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 12

20 U.S.C. § 1001(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 14

20 U.S.C. § 1060 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

20 U.S.C. § 1067 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

20 U.S.C. § 1070a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

20 U.S.C. § 1070a-14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

20 U.S.C. § 1071 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

20 U.S.C. § 1087a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

20 U.S.C. § 1087aa . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

20 U.S.C. § 1099b . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 14, 15

20 U.S.C. § 1134 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

20 U.S.C. § 1138 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

20 U.S.C. § 1140 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

20 U.S.C. § 1232a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 20, 23, 24

20 U.S.C. § 3403(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

20 U.S.C. § 6861 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

20 U.S.C. § 7283 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

20 U.S.C. § 7283b(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 13

22 U.S.C. § 2452 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. § 2751 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## FEDERAL RULES AND ADMINISTRATIVE MATERIALS

Fed. R. Evid. 201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

Fed. R. Civ. P. 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 9, 21

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 26

34 C.F.R. § 602.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 15

Dep't of Educ., *Nationally Recognized Accrediting Agencies and State Approval Agencies*,
65 Fed. Reg. 53 (Sept. 1, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

Office of Commc'ns & Outreach, U.S. Dep't of Educ.,
*Guide to U.S. Department of Education Programs* (2008),
*available at* http://www.ed.gov/programs/gtep/gtep.pdf . . . . . . . . . . . . . . . . . . . . . . . 5, 7

Office of Innovation & Improvement, Dep't of Educ.,
*Women's Educational Equity Act Program (WEEA); Notice Inviting Applications
for New Awards for Fiscal Year (FY) 2009*, 74 Fed. Reg. 101 (Jan. 2, 2009) . . . . . . . . . 7

U.S. Dep't of Educ., *Women's Educational Equity–Awards*,
*available at* http://www.ed.gov/programs/equity/awards.html . . . . . . . . . . . . . . . . . . 7, 13

## OTHER AUTHORITIES

Scott C. Idleman, *The Underlying Causes of Divergent First Amendment Interpretations*,
27 Miss. C. L. Rev. 67, 73-81 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Middle States Comm'n on Higher Educ., *Institution Directory — Columbia University*,
*available at* http://www.msche.org/institutions_view.asp?idinstitution=144 . . . . . . . . . . 5

N.Y. State Bd. of Regents & Comm'r of Educ., *Handbook of Institutional Accreditation*
(June 2007), *available at* http://www.highered.nysed.gov/ocue/accreditation/
handbook/documents/AccreditationHandbookRevisedJune2007.pdf. . . . . . . . . . . . . . . 5

## PRELIMINARY STATEMENT

The U.S. Department of Education (the "Department"), and Margaret Spellings, Secretary of Education (collectively, the "Federal Defendants"), by their attorney Lev L. Dassin, Acting United States Attorney for the Southern District of New York, respectfully submit this memorandum of law in support of their motion to dismiss the First Amended Class Action Complaint ("Am. Compl.") as against them, pursuant to Federal Rule of Civil Procedure 12(b)(1) and (b)(6).

Plaintiffs Roy Den Hollander and William A. Nosal ("Plaintiffs"), who are proceeding *pro se*, seek injunctive and declaratory relief to prevent the Federal Defendants from providing funds that benefit Columbia University, its Institute for Research on Women & Gender (the "Institute") and its School of Continuing Education (collectively, "Columbia"), including student aid, grants, and loans. Their complaint proceeds on two theories: (1) that the Institute espouses a "religious" ideology in that its teachings are infused with the philosophy of "Feminism," in supposed violation of the Establishment Clause of the First Amendment; and (2) that Columbia and the Institute discriminate on the basis of gender because their teachings "demonize[] men and exalt[] women," and because they do not have a "Men's Studies" department, in supposed violation of the Due Process Clause of the Fifth Amendment. Plaintiffs' claims against the Federal Defendants are predicated upon these defendants' alleged provision of funds directly to the university, their provision of financial assistance to students attending the university, and the Department's supposed "delegat[ion] [of] its accrediting power to the [Board of] Regents [of the University of the State of New York]" (the "Regents"), a state agency.

Both of Plaintiffs' constitutional arguments are so plainly without merit that this Court should dismiss the lawsuit. Plaintiffs' First Amendment argument with regard to funds provided

to students is foreclosed by Establishment Clause jurisprudence which makes it plain that it is constitutional for a government program to offer public financial assistance to students to defray the cost of their education, even if some of the students use the funds to pursue religious studies or study at a religious institution.  Moreover, the Court may take judicial notice of materials demonstrating that Plaintiffs' allegations regarding the Department's funding of Women's Studies and the teaching of "Feminism" at Columbia and the Institute and regarding the Department's supposed "delegation" of its accreditation duties to the Regents are demonstrably false, and thus should not be credited for the purposes of this motion.  Furthermore, Plaintiffs' allegations are insufficient to establish that "Feminism" is a religion for the purposes of the Establishment Clause.

As for Plaintiffs' Fifth Amendment claim against the Federal Defendants, they lack standing because they cannot point to any cognizable harm they have suffered as a result of the existence of the federal programs at issue, and the Court thus lacks subject matter jurisdiction over their claim.  In any event, Plaintiffs' due process claim fails because their complaint does not allege sufficient facts to show that the programs at issue, or the manner in which they are administered by the Federal Defendants, discriminate on the basis of gender.

## BACKGROUND

### A.      Plaintiffs' Amended Complaint

Plaintiffs' Establishment Clause claim is predicated on their view that Columbia and the Institute "propagate[] Feminism" in their course offerings, which is a "modern-day religion." Am. Compl. ¶ 2.  The "religion" of "Feminism," Plaintiffs allege, is not "theistic in nature" but rather "stem[s] from moral, ethical or even malevolent tenets that are held with the strength of

traditional religious convictions," *id.* ¶ 4, and its "tenets" include "historical revisionism, propagandizing, unanimity of thought labeled 'politically correct,' a pantheon of idols such as Mary Wollstonecraft, [and] *de facto* disciples and apostles," *id.* ¶ 11; *see also id.* ¶ 5(a)-(n). Plaintiffs allege that the Federal Defendants "provide[] grants, direct loans of federal funds, guarantees for loans from private lenders, and work-study programs," as well as student loans, to Columbia, the Institute, and their students. *Id.* ¶¶ 55-62. Plaintiffs further allege that the Department has "delegated" to the Regents, a New York state agency that is also a defendant in this action, "the responsibility for determining which higher educational institutions are eligible for Federal student aid programs." *Id.* ¶ 53; *see also id.* ¶ 20. According to the complaint, these forms of assistance violate the First Amendment because the Federal Defendants' provision of financial support to Columbia and its supposed "support and approval" for the Regents' alleged "further[ing] [of] the religion Feminism by approving Columbia University," violate the constitutional proscription against the Government "favor[ing] any sect . . . or adopt[ing] programs or practices that aid any religion." *Id.* ¶ 23; *see also id.* ¶¶ 277-78.

Plaintiffs' Due Process Clause claim arises out of Columbia's alleged "invidious discriminatory practices" against men, *id.* ¶ 125, which include its application of the "misandry doctrine of Feminism in order to impose a unitary belief system of Feminist orthodoxy that dictates the thoughts, speech, and conduct of members of the University and society-at-large," *id.* ¶ 71. Plaintiffs claim that Columbia's teachings "demonize[] men and exalt[] women" and are used "to justify discrimination against men based on collective guilt and old fashion stereotypes," *id.* ¶ 91: men are "stereotype[d] . . . as the primary cause for most, if not all, the world's ills throughout history," while "[f]emales are credited with inherent goodness who are

3

oppressed and colonized by men," *id.* ¶ 77.  Plaintiffs further assert that Columbia does not have a "Men's Studies" department, nor do the Regents require it to have such a program, which, according to the complaint, "infers a motive of partiality against men" on behalf of the Regents, and deprives the Plaintiffs of an educational opportunity on the basis of their sex.  *Id.* ¶¶ 108-10; *see also id.* ¶¶ 210, 219, 222-25.  According to the complaint, the Federal Defendants are implicated because they "knowingly aid[] [these] invidious discriminatory practices" by providing "financial funds" to Columbia "either directly or indirectly" (*i.e.*, allegedly through the Regents or through aid to students), which violates the "equal protection clause of the 5th Amendment," *id.* ¶¶ 124-25; *see also id.* ¶¶ 281-82.

### B.    The U.S. Department of Education and Columbia University

Columbia is an eligible institution under the Higher Education Act ("HEA"), as amended, 20 U.S.C. § 1001 *et seq.*, and, as such, may participate in the programs authorized under that statute.  In order to become eligible for such programs, a college or university must meet several general criteria, including being "accredited by a nationally recognized accrediting agency or association," *see id.* § 1001(a)(5), which can be a private organization or a state agency, *see id.* § 1099b (specifying exclusive criteria for Department's recognition of private and state accrediting agencies); *see also* 34 C.F.R. § 602.1 *et seq.* (implementing regulations).  The Department last published a list of the accrediting agencies it has recognized in September of 2000.  *See* Dep't of Educ., *Nationally Recognized Accrediting Agencies and State Approval Agencies*, 65 Fed. Reg. 53,277 (Sept. 1, 2000).[1]

---

[1]The current list is available on the Department's website at http://www.ed.gov/admins/finaid/accred/index.html.

4

While the Regents is a recognized accrediting agency for institutions of higher education in New York, *see id.* at 53,282, it is not the accrediting agency that has accredited Columbia. *See* N.Y. State Bd. of Regents & Comm'r of Educ., *Handbook of Institutional Accreditation* 96-100 (June 2007) (listing all institutions of higher education accredited by the Regents and the New York State Department of Education), *available at* http://www.highered.nysed.gov/ocue/ accreditation/handbook/documents/AccreditationHandbookRevisedJune2007.pdf.[2]  Instead, Columbia, like most private colleges and universities in New York state, is accredited through the Middle States Commission on Higher Education, a private accrediting agency which is also recognized by the Department.  *See* 65 Fed. Reg. at 53,278; *see also* Middle States Comm'n on Higher Educ., *Institution Directory — Columbia University* (visited on December 31, 2008), *available at* http://www.msche.org/institutions_view.asp?idinstitution=144.

Pursuant to their authority under the HEA and other statutes, the Federal Defendants administer a variety of loan and grant programs that provide financial support to eligible colleges and universities, as well as direct or indirect financial assistance to students attending such institutions.  All of these programs are summarized in an annual guide published by the Department of Education, listing these programs alongside others benefitting other types of educational institutions (such as primary and secondary schools).  *See* Office of Commc'ns & Outreach, U.S. Dep't of Educ., *Guide to U.S. Department of Education Programs* (2008), *available at* http://www.ed.gov/programs/gtep/gtep.pdf.

---

[2]For the reasons explained below, the Federal Defendants ask the Court to take judicial notice of this report, authored by the state agencies in question, in connection with the instant motion to dismiss.  Furthermore, the Federal Defendants also ask the Court to take judicial notice of other materials cited in this section.  All of these materials are reproduced as exhibits to the Declaration of Jean-David Barnea accompanying this motion.

5

With respect to direct or indirect federal support for students, the programs in question include: (a) student loan programs, such as the Federal Family Education Loan Program, 20 U.S.C. § 1071 *et seq.*, and the William D. Ford Federal Direct Loan Program, *id.* § 1087a *et seq.*; (b) campus-based programs, administered directly by individual schools' financial aid offices, such as Federal Perkins Loan programs, *id.* § 1087aa *et seq.*, and Federal Work-Study, 42 U.S.C. § 2751 *et seq.*; (c) grant programs, such as the Federal Pell Grant Program, 20 U.S.C. § 1070a *et seq.*; (d) fellowships for graduate studies, such as the Jacob K. Javits Fellowships, *id.* § 1134 *et seq.*; (e) field-specific grants, such as for international or foreign-language study under such programs as the Fulbright-Hays program, 22 U.S.C. § 2452, or teacher training under such programs as the TEACH Grant Program, 20 U.S.C. § 1070a; and (f) aid for specific groups of students including economically disadvantaged students under programs such as Student Support Services, *id.* § 1070a-14, and minority students under programs such as the Minority Science and Engineering Improvement Program, *id.* § 1067 *et seq.* (collectively referred to herein as "student-aid programs").

In addition, the Department provides assistance directly to colleges and universities to fund certain research, certain types of schools, certain fields of study, international study, and certain types of education (such as adult education or educational opportunities for disabled students). For example, the Department administers the Fund for the Improvement of Postsecondary Education, *id.* § 1138 *et seq.*, which finances university-sponsored research into higher-education reform and various international exchanges; projects to support educational opportunities for students with disabilities, *id.* § 1140 *et seq.*; funds for Historically Black Colleges and other schools targeted to minority students, *id.* § 1060 *et seq.*; projects to improve

the education of students whose first language is not English, *id.* § 6861; and, perhaps tangentially relevant to this case, the Women's Educational Equity Program, *id.* § 7283 *et seq.*, which funds the implementation of gender-equity policies and research into issues of gender in education, *id.* § 7283b(b) (collectively referred to herein as "school grants").  As for the Women's Educational Equity Program, a review of the Department's website shows that no new grants have been made under this program since 2005, and that Columbia has never received a grant under this program since its inception in 2001.  *See* U.S. Dep't of Educ., *Women's Educational Equity–Awards* (visited December 31, 2008), *available at* http://www.ed.gov/ programs/equity/awards.html; *see also Guide to U.S. Department of Education Programs*, *supra*, at 244-25.[3]

Significantly, with respect to student-aid programs and school grants, and indeed all Department programs, the Department is statutorily forbidden — twice — from interfering with or exerting any influence over a school's curriculum:

> No provision of any applicable program shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system, or over the selection of library resources, textbooks, or other printed or published instructional materials by any educational institution or school system . . . .

20 U.S.C. § 1232a; *accord id.* § 3403(b).

---

[3]The Department has recently issued a notice inviting applications for grants under this program for 2009.  *See* Office of Innovation & Improvement, Dep't of Educ., *Women's Educational Equity Act Program (WEEA); Notice Inviting Applications for New Awards for Fiscal Year (FY) 2009*, 74 Fed. Reg. 101 (Jan. 2, 2009).

## ARGUMENT

### I.   STANDARD FOR A MOTION TO DISMISS AND JUDICIAL NOTICE

"'In ruling on a motion to dismiss for failure to state a claim upon which relief may be granted, the court is required to accept the material facts alleged in the complaint as true.'" *Buyers & Renters United to Save Harlem v. Pinnacle Group N.Y. LLC*, 575 F. Supp. 2d 499, 506 (S.D.N.Y. 2008) (quoting *Frasier v. Gen. Elec. Co.*, 930 F.2d 1004, 1007 (2d Cir. 1991)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007) (internal quotation marks, citations, and alterations omitted). "Indeed, a plaintiff must assert 'enough facts to state a claim to relief that is plausible on its face.'" *Buyers & Renters*, 575 F. Supp. 2d at 507 (quoting *Twombly*, 127 S. Ct. at 1974). "This 'plausibility standard' is a flexible one, 'oblig[ing] a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible.'" *Id.* (quoting *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007)) (alteration in original).

In deciding a Rule 12(b)(6) motion to dismiss, "the Court may consider . . . matters of which judicial notice may be taken," *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 217 (S.D.N.Y. 2008) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)), such as pursuant to Federal Rule of Evidence 201, without converting it into a summary judgment motion, *see Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991). Federal Rule of Evidence 201, in turn, permits a court to take judicial notice of matters that are

"capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Moreover, a court need not credit allegations in a complaint "if they . . . are contrary to facts of which the Court will take judicial notice." *In re Livent, Inc. Noteholders Secs. Litig.*, 151 F. Supp. 2d 371, 406 (S.D.N.Y. 2001) (internal quotation marks and alterations omitted).

Here, the Court may take judicial notice of the accreditation status of Columbia and of the programs administered by the Department, which are available from publicly available information that is not reasonably subject to dispute. *See Or. Ass'n of Homes for Aging, Inc. v. Oregon ex rel. Dep't of Human Res.*, 5 F.3d 1239, 1243 n.2 (9th Cir. 1993) (a "court may take judicial notice of records and reports of administrative bodies"); *accord Gleave v. Graham*, 954 F. Supp. 599, 605 (W.D.N.Y. 1997); *see also Trujillo v. State*, 809 S.W.2d 593, 595-96 (Tex. Ct. App. 1991) (taking judicial notice of a school's accreditation status).

A motion to dismiss a complaint for lack of the plaintiff's standing is generally brought pursuant to Federal Rule of Civil Procedure 12(b)(1). *See First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*, 218 F. Supp. 2d 369, 377-78 (S.D.N.Y. 2002). "As the party seeking to invoke the subject matter jurisdiction of the district court, the plaintiff bears the burden of demonstrating that there is subject matter jurisdiction in the case." *Jones v. Astrue*, 526 F. Supp. 2d 455, 458-59 (S.D.N.Y. 2007) (citations and internal quotation marks omitted). "In considering a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), federal courts need not accept as true contested jurisdictional allegations[;] [r]ather, a court may resolve disputed jurisdictional facts by referring to evidence outside the pleadings." *Id.* at 458 (citation and internal quotation marks omitted).

## II.     PLAINTIFFS' ESTABLISHMENT CLAUSE CLAIM MUST BE DISMISSED.

"The Establishment Clause of the First Amendment … prevents [the Government] from enacting laws that have the 'purpose' or 'effect' of advancing or inhibiting religion." *Zelman v. Simmons-Harris*, 536 U.S. 639, 648 (2002).  Plaintiff does not allege, nor is there any suggestion in the complaint, that Congress enacted the Department programs at issue for a religious "purpose."  "Thus, the [only] question … is whether [these] program[s] nonetheless ha[ve] the forbidden 'effect' of advancing or inhibiting religion."  *Id.*

Plaintiffs' complaint suggests that they believe the forbidden effect at issue the Department's provision of funding to Columbia, which allegedly proceeds in three avenues:  the Federal Defendants' provision of "funds . . . paid . . . to . . . students who then pay over the funds to Columbia," Am. Compl. ¶ 21; their provision of "funds . . . paid . . . directly to Columbia University," *id.*; and their "delegation of [the Department's] accreditation powers to the Regents, which the Regents, with [the Department's] knowledge, use to approve [Department] funds to support Columbia University's Women's Studies Department," *id.* ¶ 20.

As set forth below, none of these theories successfully states a claim under the Establishment Clause because: (1) the Department's student-aid programs do not "advance religion" for Establishment Clause purposes, but rather simply provide students with funds they may use to pursue any course of study at a participating institution, whether in a religious field or a non-religious field; (2) the Department's school grants do not directly fund Columbia's teachings (religious or not) at issue in this litigation; and (3) the Department has not delegated any authority to the Regents.  Moreover, as relevant to all of Plaintiffs' theories, (4) "Feminism" is not a religion for the purposes of the First Amendment.

10

A.   **The Federal Defendants' Assistance to Columbia and Its Students Does Not Violate the Establishment Clause**

1.   *The Student-Aid Programs Are Constitutional Because They Merely Support Students' Private Choices to Study Religious or Nonreligious Topics.*

First, with respect to the student-aid programs, the Establishment Clause does not prohibit the Government from providing funds to individuals who choose to use the funds to pursue religious education.  In the context of government funding for education, there is a material constitutional difference between, on the one hand, "government programs that provide aid directly to religious schools," and, on the other hand, "programs of true private choice, in which government aid reaches religious schools only as a result of the genuine and independent choices of private individuals."  *Zelman*, 536 U.S. at 649.  An example of the former type of program was the one declared unconstitutional by the U.S. Supreme Court in *Committee for Public Education & Religious Liberty v. Nyquist*, 413 U.S. 756 (1973).  In that case, the State of New York had enacted a law that provided direct money grants and tax benefits to private religious schools in an amount "unrelated to the amount of money actually expended by any parent on tuition," and further offered parents tuition reimbursements that gave them "an incentive … to send their children to sectarian schools."  *Id.* at 762-64, 786, 790.

By contrast, "where a government aid program is neutral with respect to religion, and provides assistance directly to a broad class of citizens who, in turn, direct government aid to religious schools wholly as a result of their own genuine and independent private choice, the program is not readily subject to challenge under the Establishment Clause."  *Zelman*, 536 U.S. at 652.  This type of program is exemplified by the program approved by the Court in the *Zelman* case: an Ohio school-voucher program that gave parents a voucher worth a certain dollar amount

11

per student, which could be used toward tuition costs at any local private school, whether religious or non-religious.  *Id.* at 645-47; *see also Witters v. Wash. Dep't of Servs. for the Blind*, 474 U.S. 481 (1986) (state vocational-assistance program for the blind constitutionally permitted a recipient to use funds to study at a religious college).

The student-aid programs at issue in this suit fall squarely on the permissible side of the *Zelman* rubric.  These programs are available to nearly every student at an eligible college or university, public or private, religious or non-religious, in the United States.  *See generally* 20 U.S.C. § 1001 (providing eligibility criteria for participating colleges and universities).  Thus, even if the Institute did offer "religious" courses, there would be nothing unconstitutional about programs supporting students' individual decisions to enroll in such courses using funds provided by the Federal Defendants.

> **2.      *Plaintiffs' Allegations of Direct Federal Funding for Columbia's Teaching at Issue Are Contrary to Judicially Noticeable Facts and Must Be Rejected.***

Second, to the extent that Plaintiffs' amended complaint can be read to allege that the Department directly funds Columbia and "benefit[s] the Women's Studies program and the furthering of Feminism at Columbia" (although their allegation that this is so is tellingly made only "[o]n information and belief"), Am. Compl. ¶ 56, this allegation does not need to be credited in light of the materials of which the Government wishes the Court to take judicial notice.  As discussed above, a court need not credit allegations in a complaint "if they . . . are contrary to facts of which the Court will take judicial notice."  *In re Livent*, 151 F. Supp. 2d at 406 (internal quotation marks and alterations omitted).

12

Here, the Federal Defendants have asked the Court to take judicial notice of the various school grant programs administered by the Department, through which it provides funds to colleges and universities.  These grants primarily fund educational research and programs that give educational opportunities to particular groups of students, and thus bear no relation to Plaintiffs' allegations that the Federal Defendants directly fund Columbia's teaching of Women's Studies and Feminism.

The only Department program that, at first blush, might seem related to Plaintiffs' allegations is the Women's Educational Equity Program, which sponsors research into gender-related issues in education and provides support for the implementation of gender-equity policies at schools.  *See* 20 U.S.C. § 7283b(b).  This program, however, could not be used to support any program that discriminates on the basis of gender, because its explicit goal is to encourage gender "equity."   Nor, in light of the statutory proscription against the Department exercising any control over schools' curricula, could any funding out of this program influence the teaching of "Feminism" at Columbia.  And, perhaps most importantly, the Department's judicially noticeable records for this program reveal that Columbia and the Institute have never received any funding through it.  *See Women's Educational Equity–Awards*, *supra*.  As a result, Plaintiffs cannot credibly allege that the Department directly funds Columbia's teachings at issue in this suit.

> **3.    *Plaintiffs' Allegation that the Federal Defendants Delegated Any "Accreditation Power" to the Regents Is Contrary to Judicially Noticeable Facts, and Insufficient as a Matter of Law to Hold the Federal Defendants Responsible for the Regents' Actions.***

Third, Plaintiffs seek to hold the Department responsible for various programs and activities of the Regents, flowing from the Department's supposed "delegation" of its

13

accreditation responsibilities to the Regents.  While the Department has indeed recognized the Regents as a recognized accreditation agency (and has no reason to believe that any of the Regents' policies are unlawful or discriminatory), it need not answer for the Regents' actions in this suit because no such delegation exists.  It is undisputed that in order to be eligible for many, if not all, of the programs at issue in this litigation, a college or university must be "accredited by a nationally recognized accrediting agency or association," *see* 20 U.S.C. § 1001(a)(5), which can be a private organization or a state agency, *see id.* § 1099b.  The materials that the Federal Defendants have asked the Court to judicially notice demonstrate that Columbia is indeed an accredited university, but that this accreditation was made by the Middle States Commission on Higher Education, a private organization, and not by the Regents, a state agency and defendant in this action.  *See supra* at 5 (citing to the Regents' and the MSCHE's respective published lists of the schools they accredit).  Thus, the Court may reject out of hand Plaintiffs' allegations detailing the Department's supposed "delegation of [its] accreditation powers to the Regents, which the Regents, with [the Department's] knowledge, use to approve [Department] funds to support Columbia University's Women's Studies Department," Am. Compl. ¶ 20, as "contrary to facts of which the Court will take judicial notice," *In re Livent*, 151 F. Supp. 2d at 406 (internal quotation marks and alterations omitted).

Moreover, regardless of which entity accredited Columbia, the Department is not responsible for the acts of a private (or state) accreditation organization simply because it conditions participation in certain grant and loan programs on such accreditation.  A *non-government entity* can be liable under a theory of "state action" if there is "such a close nexus between the [government] and the challenged action that seemingly private behavior may be

fairly treated as that of the [government] itself."  *Flagg v. Yonkers Sav. & Loan Ass'n, FA*, 396 F.3d 178, 187 (2d Cir. 2005) (internal quotation marks omitted).  All of the courts to have examined the issue have concluded that the acts of private accreditation organizations for schools and colleges, which make them eligible for government benefits or other recognition, do not subject the organizations to the "state action" doctrine.  *See, e.g.*, *Hiwassee Coll., Inc. v. S. Ass'n of Colls. & Schs.*, 531 F.3d 1333, 1335 (11th Cir. 2008); *McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ.*, 24 F.3d 519, 523-25 (3d Cir. 1994); *Rohan v. Am. Bar Ass'n*, No. 93 CV 1338 (SJ), 1995 WL 347035, at *4-*6 (E.D.N.Y. May 31, 1995), *aff'd*, 1996 WL 75767 (2d Cir. Feb. 21, 1996).  The same conclusion follows for an alleged delegation by the federal government to a state agency, a non-federal entity.

In any event, the federal government itself, as opposed to its alleged delegee, can only be held responsible to the extent that the statute authorizing the delegation in question improperly delegates "policy-making" authority to non-federal employees.  *See Mulroy v. Block*, 569 F. Supp. 256 (N.D.N.Y. 1983); *see also Ocean Conservancy v. Evans*, 260 F. Supp. 2d 1162, 1183 (M.D. Fla. 2003) ("It is well-established that federal agencies may not delegate their statutory authorities to private parties.  The ultimate test of the validity of an agency's delegation of responsibility to a private party is whether the delegating agency retains final decision-making authority." (citing *Perot v. FEC*, 97 F.3d 553, 559 (D.C. Cir.1996), and *Riverbend Farms v. Madigan*, 958 F.2d 1479, 1488 (9th Cir. 1992))).  However, the statutory scheme at issue here can hardly be described as delegating such authority to accreditation agencies: rather than delegating any policymaking authority to these entities, the Department only recognized accreditation agencies that meet certain criteria specified by statute.  *See* 20 U.S.C. § 1099b; 34

C.F.R. § 602.1 *et seq.*  The policy is thus set by statute, and the Department simply entertains and approves the applications of private (or state) accrediting agencies that meet the statutory criteria.  Thus, the Department can have no liability for any of the acts attributed the Regents in the complaint.

### B.    The Institute's Courses Are Not "Religious" for Purposes of the Establishment Clause.

Plaintiffs also fail to state a claim under the Establishment Clause because the allegations of their complaint do not show that "Feminism" is a religion — and thus, even if the Department had provided the alleged funding or support to Columbia, it would not run afoul of this provision.  Despite the complaint's implicit suggestion to the contrary, the Establishment Clause "does indeed distinguish between religious [philosophies] and secular [philosophies]." *Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454, 462 (2d Cir. 1996) (citing *Wisconsin v. Yoder*, 406 U.S. 205, 215-19 (1972)).  Although the complaint asserts that "[a] belief system need not be theistic in nature to be a religion but rather can stem from moral, ethical or even malevolent tenets that are held with the strength of traditional religious convictions," Am. Compl. ¶ 4, not every "belief system," no matter how strongly held, is a religion for constitutional purposes. Even accepting Plaintiff's somewhat bizarre characterization of the nature of "Feminis[t]" beliefs, *id.* ¶ 11 ("historical revisionism, propagandizing, unanimity of thought labeled 'politically correct,' a pantheon of idols such as Mary Wollstonecraft, *de facto* disciples and apostles"); *see also id.* ¶ 5(a)-(n), it is clear that these do not make "Feminism" into a religion. While Plaintiffs strive valiantly to shoehorn their singular notions of "Feminism" into the constitutional rubric of "religion," they ultimately fail.

16

While there is no bright line separating religious from secular belief systems, courts have laid out relevant criteria for distinguishing the two, including that religious beliefs are generally characterized by, *inter alia*, "ultimate ideas," "metaphysical beliefs," a "moral or ethical system," and the "accoutrements of religion."  *See United States v. Meyers*, 95 F.3d 1475, 1483 (10th Cir. 1996); *see also Yoder*, 406 U.S. at 215-16 ("a 'religious' belief or practice entitled to constitutional protection" is "not merely a matter of personal preference, but one of deep religious conviction, shared by an organized group, and intimately related to daily living"). Indeed, courts have specifically cautioned that defining "religion" too broadly for Establishment Clause purposes is problematic and "unworkable" because it would subject nearly any "governmental activit[y]" to potential "censure." *Alvarado v. City of San Jose*, 94 F.3d 1223, 1230 (9th Cir. 1996); *United States v. Allen*, 760 F.2d 447, 450-52 (2d Cir. 1985) (definition of religion is much narrower for Establishment Clause than for Free Exercise Clause); *see also* Scott C. Idleman, *The Underlying Causes of Divergent First Amendment Interpretations*, 27 Miss. C. L. Rev. 67, 73-81 (2007) (proposing theories regarding why courts have not adequately defined "religion" for constitutional purposes).

Regardless of the criteria used, even the most charitable reading of Plaintiff's complaint does not establish that "Feminism" is a religious belief, as opposed to a secular philosophy. Courts, for example, have rejected litigants' arguments that a high school's Earth Day ceremony unconstitutionally promotes the "Gaia" religion, *see Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 75-79 (2d Cir. 2001), or that a California city's statue of an Aztec serpent-god violates the Establishment Clause because some New Age spiritualists and Mormons ascribed some religious significance to the ancient deity, *see Alvarado*, 94 F.3d at 1229-31, or even that a criminal law

17

prohibiting destruction of government property (including nuclear facilities) establishes the religion of "nuclearism," *Allen*, 760 F.2d at 451.  Although Plaintiffs attempt to portray "Feminism" in such a way as to imbue it with traditionally religious elements — suggesting that it "[p]ropagates basic attitudes to the fundamental problems of life," for example, Am. Compl. ¶ 5(b) — like the unsuccessful plaintiffs in these Establishment Clause cases, Plaintiffs' argument collapses when it becomes clear that the philosophy in question, like those of the Earth Day organizers or New Agers, or that invented by the nuclear protesters, may "invoke ultimate concerns, [but] fail[s] to demonstrate any shared or comprehensive doctrine or to display any of the structural characteristics or formal signs associated with traditional religions."  *Alvarado*, 94 F.3d at 1230.

Moreover, with regard to the "establishment" component of the Establishment Clause, the relevant inquiry is whether the Government's intent, as determined from the perspective of a reasonable observer, is to "establish" the particular religion in question.  *See Altman*, 245 F.3d at 75.  Here, the complaint does not make any allegations that support the inference that reasonable observers believe that the purpose of federal support for Columbia is to establish the supposed religion of "Feminism" as the religion of the land.  The complaint does not even establish that Plaintiffs *themselves* believe that the intention behind the federal funding at issue is to promote "Feminism," *cf.* Am. Compl. ¶ 61, let alone establish facts to show why a reasonable observer would think so..

Accordingly, the Establishment Clause does not restrict government practices which either advance or inhibit the study of Feminism or Women's Studies.  Thus, even if the Establishment Clause prohibited the Government from providing funds to individuals who

choose to use the funds to pursue religious education (which it conclusively does not), or if the Department provided funds to support the teaching of Feminism or Women's Studies at Columbia (which it does not), or even if the Department encouraged or delegated to others the responsibility to encourage the study of Feminism or Women's Studies at colleges around the country (which it most certainly does not), these actions, as alleged in the complaint, would not run afoul of the First Amendment.

### III.   PLAINTIFFS' DUE PROCESS CLAIM SHOULD BE DISMISSED.

Plaintiffs' second claim against the Federal Defendants arises under the Due Process Clause of the Fifth Amendment.  They assert that the federal assistance to Columbia and the Institute in its teaching of Women's Studies and Feminism violates this constitutional provision because it discriminates on the basis of gender.  This claim must be dismissed for two reasons: Plaintiffs do not have standing to challenge the acts of the Federal Defendants because their complaint points to no cognizable injury they have suffered at the Federal Defendants' hands. And, even if they had standing, Plaintiffs cannot show that the federal programs at issue unconstitutionally discriminate on the basis of gender because they cannot show that the programs constitute purposeful government discrimination.

### A.   Plaintiffs Do Not Have Standing to Assert a Due Process Claim Against the Federal Defendants.

"[T]he irreducible constitutional minimum of standing contains three elements: (1) there must be an injury in fact, — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Port*

19

*Washington Teachers' Ass'n v. Bd. of Educ. of Port Washington Union Free Sch.*, 478 F.3d 494,

498 (2d Cir. 2007) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)) (internal

quotation marks omitted).  The party invoking a court's jurisdiction bears the burden of

establishing standing.  *See Lujan*, 504 U.S. at 561.  Where that party does not establish standing

to bring a claim, the court must dismiss the claim for lack of subject matter jurisdiction.  *See,*

*e.g.*, *Valley Forge Christian Coll. v.  Americans United for Separation of Church & State, Inc.,*

454 U.S. 464, 475-76 (1982).

　　Plaintiffs' complaint fails at the first of these requirements:  It fails to allege a "concrete

and particularized" injury Plaintiffs have suffered at the hands of the Federal Defendants.  The

complaint's allegation of particularized harm essentially boils down to Plaintiffs' stated interest

in enrolling in a "Men's Studies" course and consequent disappointment in learning that

Columbia did not offer any such courses.  *See* Am. Compl. ¶¶ 221, 225.  The complaint does not,

however, credibly allege that Plaintiffs were deprived of any ability to take such courses *because*

*of acts of the Federal Defendants*.  After all, no federal program can be used to "exercise any

direction, supervision, or control over the curriculum, program of instruction, administration, or

personnel of any educational institution," 20 U.S.C. § 1232a, and thus the content of the courses

offered at Columbia are outside the Department's purview.  Conversely, no student at an eligible

institution is denied federal student aid simply because he or she chooses to enroll in a particular

course, so if Plaintiffs located and enrolled in a "Men's Studies" course at an accredited

institution they might well qualify for federal student aid.

　　Indeed, the very nature of Plaintiffs' objection appears to be philosophical or political.

Plaintiffs would prefer it if the student-aid programs were not available to Columbia students

who choose to enroll in courses or degree programs at the Institute, but Plaintiffs are not directly affected by the Department's provision of such aid; and they would prefer it if Columbia offered additional courses that met with their approval, but they do not allege how the Federal Defendants influenced Columbia's decision to offer the courses in question.

Opposition to a government program for "philosophical and/or religious reasons [is a] generalized grievance, without any imminent tangible harm, [that] cannot confer standing." *Raiser v. United States*, 325 F.3d 1182, 1184 (10th Cir. 2002) (opposition to death penalty); *accord Gettman v. Drug Enforcement Admin.*, 290 F.3d 430, 435 (D.C. Cir. 2002) (support for legalization of marijuana); *see also Minn. Fed. of Teachers v. Randall*, 891 F.2d 1354, 1358-59 (8th Cir. 1989) (teachers' union's opposition to law allowing students to take classes at religious colleges was based on "philosophical concerns" to program and thus the union lacked standing).

Plaintiffs thus lack standing to assert a due process claim based on the federal programs at issue or the manner in which they are administered by the Federal Defendants. Accordingly, their due process claim should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction.

> **B.    The Federal Programs Do Not Violate Due Process Because Plaintiffs Can Point to No Purposeful Government Discrimination**

Even if Plaintiffs had standing to pursue their due process claim against the Federal Defendants, such a claim fails on the merits of the pleadings. Like their First Amendment argument, Plaintiffs' due process proceeds under three theories: that the Department provides student aid to Columbia students who enroll in courses at the Institute, *see* Am. Compl. ¶ 114; that the Department provides federal aid directly to Columbia and the Institute that supports their teaching of Feminism and Women's Studies, *see id.* ¶ 117; and that the Department delegates

certain responsibilities to the Regents, which in turn encourages Columbia's teaching of Feminism and Women's Studies, *see id.* ¶ 114.  For the reasons explained above, this Court should not credit Plaintiffs' allegations of direct federal funding for the teaching at issue or of any Department delegation of responsibility to the Regents.  *See supra* Part II.B-C.

As for the student-aid programs, it is well established that the Fifth Amendment's Due Process Clause contains an "equal protection component" that forbids the Federal Government from discriminating on the basis of sex.  *Heckler v. Mathews*, 465 U.S. 728, 730-31 (1984).[4] That constitutional rule forbids, for example, "statute[s] that classif[y] individuals on the basis of their gender," except in rare circumstances.  *Id.* at 744 (internal quotation marks omitted).  But Plaintiffs make no claim that the student-aid programs classify individuals according to gender.

"When a statute gender-neutral on its face is challenged on the ground that its effects upon [one gender] are disproportiona[tely] adverse, a twofold inquiry is . . . appropriate.  The first question is whether the statutory classification is . . . indeed neutral in the sense that it is not gender-based.  If the classification itself, covert o[r] overt, is not based upon gender, the second question is whether the adverse effect reflects invidious gender-based discrimination.  In this second inquiry, impact provides an important starting point, but purposeful discrimination is the condition that offends the Constitution."  *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 274 (1979) (citation and internal quotation marks omitted); *accord Collier v. Barnhart*, 473 F.3d 444, 448 (2d Cir. 2007).

---

[4] The "approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment," *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975), and thus cases applying either of these constitutional provisions are relied upon herein.

Here, the statutes enacting the student-aid programs contain no classifications at all potentially relating to gender, nor does the complaint suggest as much.  Thus, Plaintiffs can succeed on their due process claim only if they show that the student-aid programs, or the manner in which they are administered by the Federal Defendants, "reflect[] invidious gender-based discrimination," and that this discrimination is "purposeful."  This means that even if government conduct has a  disproportionate impact on members of one gender, a successful plaintiff must assert that "the decisionmaker … selected or reaffirmed a particular course of action at least in part *because of* not merely *in spite of* its adverse effects upon an identifiable group."  *Personnel Adm'r*, 442 U.S. at 279 (emphasis added); *accord Grimes ex rel. Grimes v. Sobol*, 832 F. Supp. 704 (S.D.N.Y. 1993), *aff'd*, 37 F.3d 857 (2d Cir. 1994).  "In alleging a claim . . . based on a constitutional violation, the '[d]iscriminatory purpose' with which a defendant must have acted 'implies more than intent as volition or intent as awareness of the consequences.'"  *Grimes*, 832 F. Supp. at 708 (quoting *Personnel Adm'r*, 442 U.S. at 279).

Even accepting Plaintiffs' characterization of the content of the courses offered at the Institute as "demoniz[ing] men and exalt[ing] women," Am. Compl. ¶ 91, they do not state a constitutional claim against the Federal Defendants when they allege that the Department provides students with the financial opportunity, but not any government mandate, to enroll in such courses if they choose to do so.  As explained above, Congress has specifically prohibited the Department from exercising any supervision or control over the content of courses offered at participating institutions of higher education, through the student-aid or other programs, 20 U.S.C. § 1232a, and thus the Federal Defendants may not deny funds to students at a

23

participating college or university based on the course of study they pursue at such an institution.

Plaintiffs allege that the Department provides "student aid to colleges and universities, including Columbia . . . , that [offer courses in] Women's Studies," Am. Compl. ¶ 114; that this aid "advanc[es] the disparate treatment of males and the harmful impact of [Women's Studies] programs," *id.* ¶ 115; that this aid contributes to societal differences in the treatment of men and women, *see id.* ¶¶ 117-22; and that this aid "directly result[s] in disparate treatment of men at Columbia," *id.* ¶ 123.  They conclude that the Department "knowingly assist[s] the prejudicial dissimilar treatment of men" through the provision of such aid.  *Id.* ¶ 124.

These allegations fall short of those needed to sustain their constitutional claim.  In particular, although the complaint alleges that the Federal Defendants "know[]" that their actions "assist the prejudicial dissimilar treatment of men," *id.* ¶ 124, it nowhere alleges that they administer the student-aid programs in this way specifically "*because of* … its adverse effects" on men, *Personnel Adm'r*, 442 U.S. at 279 (emphasis added).   That is, Plaintiffs have failed to make "specific allegations of fact necessary to sustain the claim that a discriminatory *purpose* was a motivating factor in any actions taken by defendants—that is," that the student-aid programs were enacted and administered in this way "*because* of, not merely *in spite* of, [their] allegedly detrimental effects on [men]."  *Grimes*, 832 F. Supp. at 708 (emphases in original).

An analogous claim in the race-related context was rejected several years ago in the *Grimes* case.  There, a group of African-American students charged that the New York City public school curriculum "distorts and demeans the role of African Americans and excludes the existence, contributions, and participation of African Americans in the various aspects of world

24

and American culture, sciences, history, arts and other areas of human endeavor," which as a result, discriminated against these students. *Id.* at 706 (internal quotation marks omitted). Although the school authorities had "implemented a Holocaust Curriculum and an Italian Heritage Curriculum, but did not adopt a special curriculum to focus on issues of particular importance to African Americans," the district court found that the "Plaintiffs had failed to come forward with the specific allegations of fact necessary to sustain the claim that a discriminatory *purpose* was a motivating factor in any actions taken by defendants — that is, that the curriculum was adopted *because* of, not merely *in spite* of, its allegedly detrimental effects on African American students." *Id.* at 708 (emphases in original).

Here, Plaintiffs' claims against the Federal Defendants are infinitely more remote. The complaint does not allege that Federal Defendants played any role in creating the curriculum about which Plaintiffs are concerned, and the curriculum in question is not part of a mandatory public school offering, but rather comprises elective university courses. The complaint seeks relief from the Federal Defendants merely on the ground that they provide funds by which students can defray part of the cost of attending eligible institutions of higher education, at which they may choose any available course of study. Because Plaintiffs do not thus allege sufficient facts to support an inference of intentional discrimination based on gender on the face of the student-aid programs, or in their administration by the Federal Defendants, their Fifth Amendment claim must be dismissed for failure to state a claim.

## **CONCLUSION**

For the reasons stated above, the Court should dismiss Plaintiffs' amended complaint against the Federal Defendants pursuant to Federal Rule of Civil Procedure 12(b)(1) and (b)(6).

Dated:   New York, New York
         January 9, 2009

Respectfully submitted,

LEV L. DASSIN
Acting United States Attorney for the
Southern District of New York
Attorney for the U.S. Department of Education and
         Margaret Spellings, Secretary of Education

By:      _s/ Jean-David Barnea_____
         JEAN-DAVID BARNEA
         Assistant United States Attorney
         86 Chambers Street, 3rd Floor
         New York, New York  10007
         Tel: (212) 637-2679
         Fax: (212) 637-2717
         Email:  jean-david.barnea@usdoj.gov

26