UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------------x
Roy Den Hollander, William A. Nosal,

                    Plaintiffs on behalf of themselves
                    and all others similarly situated,

                      -against-

Docket No. 08 Civ 7286
(LAK)(KNF)(ECF)

Institute for Research on Women & Gender at Columbia University;
School of Continuing Education at Columbia University;
Trustees of Columbia University in the City of New York;
U.S. Department of Education;
Margaret Spellings, U.S. Secretary of Education in her official capacity;
Board of Regents of the University of the State of New York, in his
        or her official and individual capacity;
Chancellor of the Board of Regents, Robert M. Bennett, in his official
        and individual capacity;
New York State Commissioner of the Department of Education,
        Richard P. Mills, in his official and individual capacity; and
President of the New York State Higher Education Services Corp.,
        James C. Ross, in his official and individual capacity;

                    Defendants.
-----------------------------------------------------------------------------------x

**MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANTS' MOTION TO
<u>DISMISS THE COMPLAINT</u>**

Roy Den Hollander
Attorney and co-representative
545 East 14 Street, 10D
New York, N.Y. 10009
Tel.: (917) 687-0652
Email:  rdhhh@yahoo.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 1

ARGUMENT ........................................................................................................................ 2

    I.  Defendants curtail academic freedom .................................................... 3

    II.  Columbia and the State violate Title IX, 20 U.S.C. § 1681 *et seq.*, and
        its implementing regulations ................................................................... 5

    III.  The defendants violate Equal Protection under the 5th and 14th Amendments .... 11

    IV.  Columbia's invidious discrimination occurs under the color of law,
        42 U.S.C. § 1983 .................................................................................... 18

    V.  Columbia violates N.Y. Civil Rights Law § 40-c .................................. 21

    VI.  The State and USDOE violate the Establishment Clause of the
        First Amendment .................................................................................... 21

CONCLUSION .................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

**Cases**

Adarand Constructors v. Pena, 515 U.S. 200 (1995) ……………………………….………… 18

Agostini v. Felton, 521 U.S. 203 (1997) ………………………………………………… 24, 24 n. 24

Altman v. Bedford Cent. School Dist., 45 F.Supp.2d 368 (S.D.N.Y. 1999), *revd. on other grounds,* 245 F.3d 49 (2d Cir. 2001) ……………………………….. 22, 24 n. 23

Alvarado v. City of San Jose, 94 F.3d 1223 (9th Cir.1996)……………………………….... 23

Back v. Hastings On Hudson Union Free School Dist. 365 F.3d 107 (2d Cir. 2004) …..… 13, 14

Baer v. Nyquist, 40 A.D.2d 925, 338 N.Y.S.2d 257 (A.D. 3rd Dept. 1972) ……………….. 18

Baker v. Carr, 369 U.S. 186 (1962)…………………………………………………………… 9 n. 10

Bensman v. Whitman, 523 F.3d 119 (2d Cir. 2007)……………………………………….. 3

Blum v. Yaretsky, 457 U.S. 991 (1982) ……………………………………….………… 20

Bd. of Ed. v. Allen, 20 N.Y.2d 109, 281 N.Y.S.2d 799 (1967), *affd.* 392 U.S. 236 ……. 24 n. 22

Bd. of Ed. Kiryas Joel Vil. School Dist. v. Grumet, 512 U.S. 687 (1994) …………………. 24

Brown v. Board of Education, 347 U.S. 483 (1954)………………………………………… 5 n. 5

Brown v. Henderson 257 F.3d 246 (2d Cir. 2001) …………………………………………. 11

Bryant v. Yellen, 447 U.S. 352 (1980) ……………………………………………………... 18

Burt v. Gates, 502 F.3d 183 (2d Cir. 2007) ………………………………………………… 4

Butler v. City of Batavia, 545 F. Supp. 2d 289 (W.D.N.Y. 2008) ……………….…..…….. 8

Cohen v. Brown University, 991 F.2d 888 (1st Cir. 1993), *aff'd in part,* 101 F.3d 155 (1st Cir. 1996), *cert. denied,* 520 U.S. 1186 (1997) ………………………………….……. 6, 7, 9

De La Cruz v. Tormey, 582 F.2d 45 (9th Cir. 1978), *cert den.*441 U.S. 965 (1979) …...... 7, 12, 14

Engel v. Vitale, 370 U.S. 421 (1962) …………………………………………………….. 25

Epperson v. State of Ark., 393 U.S. 97 (1968) ………………………………….....…… 25

Evers v. Dwyer, 358 U.S. 202 (1958) ……………………………………………………… 16

Everson v. Bd. of Educ., 330 U.S. 1 (1947)(Rutledge, J. dissenting) …………………… 22 n. 19

Frazier v. Coughlin, 850 F.2d 129 (2d Cir. 1988) ……………………………………...… 3

Gaddis v. Wyman, 304 F. Supp. 713 (S.D.N.Y. 1969)……………………,,,…………….. 1 n. 1

Gomes v. R.I. Interscholastic League, 469 F. Supp. 665 (D. R.I. 1979)(vacated as moot) … 7

Gratz v. Bollinger, 539 U.S. 244 (2003) ………………………………………………… 18

Grimes v. Sobol, 832 F. Supp. 704 (S.D.N.Y. 1993), aff'd, 37 F.3d 857 (2d Cir. 1994) …... 9

Grove City Col. V. Bell, 465 U.S. 555 (1984) …………………………………………… 5

Guardians Ass'n v. Civil Service Com'n of City of New York, 463 U.S. 582 (1983) ……… 9

Haffer v. Temple Univ., 678 F. Supp. 517 (E.D. Pa. 1987) ……………………………… 9

Hayden v. County Nassau, 180 F.3d 42 (2d Cir. 1999) ………………………………….. 8

Heckler v. Mathews, 465 U.S. 728 (1984) ……………………………………………….. 17

In re Optionable Securities Litigation, 577 F.Supp.2d 681 (S.D.N.Y. 2008)……………….. 3

In re U.S. Catholic Conference, 885 F.2d 1020 (2d Cir. 1989) …………………………….. 18

International Broth. of Teamsters v. U.S., 431 U.S. 324 (1977) ……………….…………… 8

Jackson v. Metro. Edison Co., 419 U.S. 345 (1974) ……………………………...…… 20

Jones v. Astrue, 526 F.Supp.2d 455 (S.D.N.Y. 2007)……………………………………….. 3

Keyishian v. Board of Regents of University of State of N. Y., 385 U.S. 589 (1967) ……… 3

Kopec v. Coughlin, 922 F.2d 152 (2d Cir. 1991)……………………………………………….. 3

LaViolette v. Daley, E.E.O.C. No. 01A01748 (Sept. 13, 2002) ……………………………….. 22

Lee v. Weisman, 505 U.S. 577 (1992) ……………………………………………… 25

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ………………………….…… 9, 10, 11 n .12

Lynch v. Donnelly, 465 U.S. 668 (1984)(O'Connor, J. concurring) ………...……………… 24

Lynn v. Regents of Univ. of Cal., 656 F.2d 1337 (9th Cir. 1981) ………………..………..… 13

Malnak v. Yogi, 592 F.2d 197 (3d Cir. 1979)(Adams, J. concurring) …………….………… 22, 23

Mass. v. E.P.A., 127 S.Ct. 1438 (2007) ……………………………………….…………..… 10

McCormick ex rel. McCormick v. School Dist. of Mamaroneck, 370 F.3d 275
(2d Cir. 2004) ……………………………………………………………………….……………. 10

Meyer v. Nebraska, 262 U.S. 390 (1923) …………………………………………….…… 17

Moore v. Bd. Regents Univ. of New York, 44 N.Y.2d 593, 407 N.Y.S.2d 452 (1978) … 2, 15, 18

Northeastern Fla. Assoc. Gen. Contractors Am. v. Jacksonville, 508 U.S. 656 (1993) ……… 18

Norwood v. Harrison, 413 U.S. 455 (1972) ………………………………………….…… 19

NOW v. Scheidler, 510 U.S. 249, 127 L.Ed.2d 99, 114 S.Ct. 798 (1994)……………….. 11 n. 12

Oklahoma v. U.S. Civ. Srvc. Comm., 330 U.S. 127 (1947) ……………………….…… 16

Powe v. Miles, 407 F.2d 73 (2d Cir. 1968) ……………………………………….…… 19

Pratt v. Ind. School Dist. 831, Forest Lake, Minn., 670 F.2d 771 (8th Cir. 1982) ………….. 12

Public Utilities Comm. v. Pollak, 343 U.S. 451 (1953) ……………………………….…….. 19

Regents of University of California v. Bakke, 438 U.S. 265 (1978) …………………….……... 5

Reitman v. Mulkey, 387 U.S. 369 (1967) ………………………………………………… 19

Ridgefield Women's Pol. Caucus v. Fossi, 458 F.Supp. 117 (D. Conn. 1978) …………... 10, 16

Robinson v. Overseas Mil. Sales Corp., 21 F.3d 502 (2d Cir. 1994) …………………….. 2

Santa Fe Ind. Sch. Dist. V. Doe, 530 U.S. 290 (2000) ……………………………………… 25

Shelton v. Tucker, 364 U.S. 479 (1960) ……………………………………..…………… 12

Stern v. Leucadia Nat'l Corp., 844 F.2d 997 (2d Cir. 1997)……………………………. 8 n. 8

Torasco v. Watkins, 367 U.S. 488 (1961) ……………………………………………... 22

U.S. V. SCRAP, 412 U.S. 669 (1973)……………………………………...…….. 17 n. 15

U.S. v. Seeger, 380 U.S. 163 (1965) …………………………………………...………… 22

Vil. Arlington Hts. v. Met. Housing Dev. Cp., 429 U.S. 252 (1977) ………………… 8, 10, 16

Wallace v. Jaffree, 472 U.S. 38 (1985)(O'Connor, J. concurring) ………………..…… 16, 25

Warth v. Seldin, 422 U.S. 490 (1975) ……………………………………………..…… 9

Washington v. Davis, 426 U.S. 229 (1976) …………………………………………..… 13

Weise v. Syracuse Univ., 522 F.2d 397 (2d Cir. 1975) ………………….…………..… 7, 20

Welsh v. U.S., 398 U.S. 333 (1970) …………………………………………………… 22

West Va. State Bd. Education v. Barnette, 319 U.S. 624 (1943) …………………….…… 3, 19

Wright v. Council City of Emporia, 407 U.S. 451 (1972) ……………………….…….. 16

Zelman v. Simons-Harris, 536 U.S. 639 (2002)……………………………………… 24 n. 24

Zorach v. Clauson, 343 U.S. 306 (1952) …………………………………….……… 23

**Statutes**

Fed R. Civ. P. 12(b)(1) ……………………………………………………..… 2

Fed R. Civ. P. 12(b)(6) …………………………………………………….…… 2

20 U.S.C. § 1070(a)(5) …………………………………………………….….. 21

20 U.S.C. § 1232a…………………………………………………….…… 6 n. 6

20 U.S.C. § 1687 ………………………………………………………..… 6, 6 n. 6

20 U.S.C. § 3402(1) …………………………………………………….…… 16

20 U.S.C. § 3403(b) ……………………………………………………… 6 n. 6

28 U.S.C. § 1367 ……………………………………………….…………… 13

N.Y. Civ. Rts. § 40 ………………………………………………...………… 21

N.Y. Educ. Law § 207 ………………………………………………..……… 18, 23

N.Y. Educ. Law § 215 ……………………………………………...…………... 19

**Regulations**

29 C.F.R. §1605.1 ……………………………………………………………………… 22

34 C.F.R. § 106 …………………………………………………………….…… 6

34 C.F.R. § 106.31 …………………………………………………………... 6, 7

34 C.F.R. § 106.41 …………………………………………………………... 6 n. 6

34 C.F.R. § 106.42 …………………………………………………………... 6 n. 6

45 C.F.R. § 86.31 …………………………………………………….……… 6, 7

8 N.Y.C.R.R. Part 52 ………………………………………………….…………… 23

8 N.Y.C.R.R.  § 52.1 ………………………………………………………….. 23 n. 21

**Other**

Cook & Sobieski, <u>Civ. Rts. Actions</u>, ¶ 17.29 …………………………………………….. 7

Farrell, <u>Does Feminism Discriminate Against Men?</u>, Oxford Univ. Press, 2008................… 4

N.Y. Civ. Rts. § 40-c, <u>Historical & Statutory Notes</u>, L.2002, c.2, § 1……………………… 21

## PRELIMINARY STATEMENT

This case is about the demise of the marketplace of ideas and the lack of equal treatment for men brought about by those in government and education who can only countenance one brand of thinking, one brand of belief, and one brand of speech—their own.[1]  State and Federal officials and Columbia University have created a climate of intolerance that effectively bans concepts and facts not considered "Feminist."  The winds of a cult-like conformity blow through the abandoned marketplace of ideas when government and centers of learning believe they have discovered the one and only truth.  Believers benefit and are encouraged to speak while dissenters are silenced and denied opportunities for advancement.  True believers even portray themselves as the victims of a "gender war," Col. Memo. p. 10, by those who disagree with Feminist tenets, and in a 1984 doublethink reversal of meaning, proclaim dissenters guilty of warring on academic freedom.  In such a climate, the enforcers of "correct thinking" audaciously declare themselves the true facilitators of education, when in reality they are fostering an Orwellian absurdity where authority proclaims all ideas equal but theirs more equal than others. [2]

## STATEMENT OF FACTS

Columbia exists as the result of a charter from the New York State Legislature and amendments to that charter require an act of the Legislature.  (Compl. ¶¶ 132-36).  The State

---

[1] The relief sought against the defendants in this putative class action are declaratory, injunctive, and nominal damages.  Putative class actions are treated as class actions for dismissal purposes until a determination is made on class certification.  Gaddis v. Wyman, 304 F. Supp. 713, 715 (S.D.N.Y. 1969).

[2] This Opposition uses the following nomenclature:  U.S. Department of Education and its Secretary as "USDOE"; the Institute for Research on Women & Gender as "IRWG," the School of Continuing Education as "Continuing Education," and "Columbia" for the entire institution of Columbia University; the Chancellor and Board of Regents of the University of the State of New York as "Regents," the New York State Commissioner of and the Department of Education as "N.Y. Education," the President of and the New York State Higher Education Services Corporation as "HESC," and all the New York State defendants collectively as "State."  The First Amended Complaint is referred to as "Compl.," Columbia's Memorandum of Law as "Col. Memo.," the New York State defendants Memorandum of Law as "N.Y. Memo.," and the Federal defendants Memorandum of Law as "U.S. Memo."  New York's institutions of higher learning, whether colleges or universities, are referred to as "colleges."

holds the power of life and death over Columbia because the State can suspend its charter for failure to follow the State's educational policies and adhere to its rules and regulations.  <u>Moore v. Bd. Regents Univ. of New York</u>, 44 N.Y.2d 593, 599-600, 407 N.Y.S.2d 452 (1978).  Since 1998, thousands of students have received Federal or State aid, which was paid directly or via students to Columbia while the University also directly received Federal and State funds. (Compl. ¶¶ 55-67, 152-54, 157).  USDOE alone provided $15.9 million in direct awards to Columbia in 2007.  (<u>Id</u>. ¶ 62).[3]

The Women's Studies program at Columbia, as made clear by its website and course guide, does much more than provide a curriculum in the Feminist belief-system.  It creates and furthers a communal and religious system for the coherence of belief focusing on acceptable thought, practices, values, traditions and ritualistic language, such as the use of "gender" instead of "sex."  Women's Studies provides followers with a faith based certainty that they are the sole possessors of the highest form of truth—Feminism.  The belief-system shapes the entirety of its followers' lives with thought patterns that make possible the description of realities, the formulation of beliefs, and the experiencing of inner attitudes, feelings, and sentiments. Feminism is advanced by Women's Studies as a worldview for dictating the thoughts, speech, and actions of all.  It provides a conscious push toward an ultimacy and transcendence that provide norms and power for the rest of life.  (Compl. ¶¶ 5-15).  In literate societies, religious beliefs tend to be codified, which is also a function of Women's Studies at Columbia.

## ARGUMENT

The allegations of the First Amended Complaint are deemed true for Columbia and the State's facial Rule 12(b)(1) motions to dismiss, *see* <u>Robinson v. Overseas Mil. Sales Corp.</u>, 21

---

[3] The plaintiffs withdraw the allegations concerning the USDOE's delegation of accrediting powers, Compl. ¶¶ 20, 23 last sentence, 53, 277, 281.  This will save the Court time from going through the voluminous exhibits USDOE submitted often without providing specific page cites.

F.3d 502, 507 (2d Cir. 1994)(citations omitted), and on their Rule 12(b)(6) motions to dismiss,

Frazier v. Coughlin, 850 F.2d 129, 129 (2d Cir. 1988).  There is no heightened pleading

standard, since this is not a securities fraud case as the State falsely implies by citing to In re

Optionable Securities Litigation, 577 F.Supp.2d 681, 688 (S.D.N.Y. 2008)(LAK), and the

Complaint need not show "subsidiary facts" as the State also falsely asserts, but only allegations

of such if certain allegations are not plausible, Bensman v. Whitman, 523 F.3d 119, 129 (2d Cir.

2007).  Further the State fails to note which allegations it wants "subsidiary facts" for.  It just

makes a conclusory allegation applying to the entire Complaint.  The Complaint's allegations are

also deemed true for USDOE's motions, since the withdrawal of certain allegations no longer

create a dispute with USDOE's voluminous exhibits, *supra n. 3*.  *See* Jones v. Astrue, 526

F.Supp.2d 455, 458 (S.D.N.Y. 2007)(citations omitted).  The Court should disregard outside

material or "give the parties notice that the motion is being converted to one for summary

judgment," Kopec v. Coughlin, 922 F.2d 152, 155-56 (2d Cir. 1991).

**I.  Defendants curtail academic freedom.**

The defendants wrap themselves in the flag of academic freedom to justify their

imposition of a unitary belief-system of Feminist orthodoxy for dictating the thought, speech,

and conduct of members of the Columbia community and society-at-large.  "If there is any fixed

star in [the] constitutional constellation, it is that no official, high or petty, can prescribe what

shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to

confess by word or act their faith therein."  West Va. State Bd. Education v. Barnette, 319 U.S.

624, 642 (1943).  The 1st Amendment does not tolerate direct or indirect government action that

casts a pall of orthodoxy over the classroom.  Keyishian v. Board of Regents of University of

State of N. Y., 385 U.S. 589, 603 (1967).

"To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation.  No field of education is so thoroughly comprehended by man that new discoveries cannot yet be made.  Particularly is that true in the social sciences, where few, if any, principles are accepted as absolutes.  Scholarship cannot flourish in an atmosphere of suspicion and distrust.  Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die."  Id.

The State's promulgation, approval, and partial financing of Columbia's Women's Studies program, USDOE's provision of financial aide that accrues to the benefit of Women's Studies, and Columbia's enthusiastic and exclusive propagation of Feminism through Women's Studies prevent countervailing masculine perspectives, such as Men's Studies, from entering Columbia's ivy tower to challenge Feminist orthodoxy.  (Compl. ¶¶ 24-53, 54-68).  The banishment of Men's Studies scholarship[4] from Columbia advances wholesale acceptance of Feminism's invidious discrimination against men, which is inimical to the defendants educational missions of fostering equal justice, ensuring a diverse student and alumni body, and helping both sexes find appropriate careers.  It also has a deleterious impact on society as a whole, since "[n]o one should underestimate the vital role in a democracy that is played by those who guide and train our youth."  Id.

The Supreme Court's academic-freedom jurisprudence protects the "marketplace of ideas" in the university, Burt v. Gates, 502 F.3d 183, 191 (2d Cir. 2007).  In Burt, the Court would not stretch academic freedom to allow the barring of military recruiters, which is much more attenuated from the free flow of ideas than barring Men's Studies.  See id.  Yet for decades the defendants have limited the marketplace of ideas to Feminism by banishing Men's Studies.

---

[4] Columbia and the State argue there is no Men's Studies scholarship for it to offer.  (Col. Memo. pp. 9-10, 20 n. 13; N.Y. Memo. p. 23).  Forty years ago there was no Women's Studies scholarship and 100 years ago no Quantum Mechanics scholarship.  Dr. Warren Farrell and other eminently qualified educators will be glad to draw up a Men's Studies program for the University.  Otherwise, Columbia can refer to Dr. Farrell's book Does Feminism Discriminate Against Men?, published by Oxford University Press.

Freedom of speech is key to the flow of ideas and forbids the State, USDOE, and Columbia, as a state actor, from invidiously treating differently those with unpopular viewpoints by suppressing their speech in favor of popular speech.  The defendants' conduct in furthering the Feminist driven Women's Studies program quashes discussion of the currently unpopular masculine perspective beneficial to males, Compl. ¶¶ 229-51.[5]

Academic freedom also does not give Columbia the right to provide a wide range of benefits to one group based on sex but not the other as a result of stereotyping.  Columbia ignores the Complaint's allegations that the Women's Studies program goes far beyond just Feminism instruction in the classroom.   (Compl. ¶¶ 3, 94, 97, 98, 181, 186-87, 189, 266-71). The program provides benefits and opportunities exclusively to adherents of that doctrine, mainly females, to the detriment of others, mainly males.  (Id.).  "Fairness in individual competition for opportunities … is a widely cherished American ethic.  Indeed, in a broader sense, an underlying assumption of the rule of law is the worthiness of a system of justice based on fairness to the individual," which still includes males.  Regents of University of California v. Bakke, 438 U.S. 265, 319 n. 53 (1978).

## II.  Columbia and the State violate Title IX, 20 U.S.C. § 1681 *et seq.*, and its implementing regulations.

Title IX applies to colleges that receive Federal financial assistance when they enroll students who receive federal funds earmarked for educational expenses.  Grove City Col. V. Bell, 465 U.S. 555, 563-70 (1984).  Title IX does not distinguish between direct institutional assistance and indirect, such as aid received by a school through its students.  Id.  Financial assistance encompasses all forms of Federal aid to education.  Id.  Columbia tries to mislead by

---

[5] Columbia objects that discovery and trial would involve the Court in reviewing a school program to determine whether it violates the Constitution or Federal statute.  (Col. Memo. p. 18).  Federal Courts have been doing that for years—most notably Brown v. Board of Education, 347 U.S. 483 (1954)(required equal educational opportunities).

claiming that Title IX only applies to college sports—it does not.  "[T]he term 'program or activity' and 'program' mean all of the operations of … a college, university, or other postsecondary institution …." 20 U.S.C. § 1687; 34 C.F.R. § 106.  Title IX also applies to "a department, agency, … or other instrumentality of a State or the entity of such State … that distributes [Federal] assistance …."  Id.  The Regents are an agency of the State, and N.Y. Education and HESC distribute USDOE assistance.  (N.Y. Memo. pp. 3, 4, 7).  Columbia receives Federal financial assistance, as does the State.  (Compl. ¶¶ 54-62; U.S. Memo. p. 6).

Further indications of the broad sweep of Title IX are found in its implementing regulations for educational programs.  45 C.F.R. § 86.31 and 34 C.F.R. § 106.31 state that treating persons differently based on sex is prohibited "under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient which receives Federal financial assistance."[6]  The Complaint alleges that Columbia's Women's Studies is such a program, and it is listed with N.Y. Education as a "Registered Program," under program coded 20233 with the full title "Women's and Gender Studies."  So whether academic, occupational training or other, Title IX applies to Columbia's Women's Studies program and the State's activities in foisting Feminism on New York's higher education.  (Compl. ¶¶ 17, 18, 30, 34, 36, 38-40, 44, 46-50, 103-112, 114).

The heart of Title IX is prohibition of sex-based discrimination in all programmatic aspects of educational institutions.  Cohen v. Brown University, 991 F.2d 888, 894 (1st Cir. 1993), aff'd in part, 101 F.3d 155 (1st Cir. 1996), cert. denied, 520 U.S. 1186 (1997).  Its focus is

---

[6] Columbia and the State misrepresent 34 C.F.R. § 106.42 as applying to educational programs when it only focuses on specific textbooks or course materials.  (Col. Memo. pp 17, 21; N.Y. Memo. p. 25).  If it applied to educational programs, then 20 U.S.C. § 1687 and the related regulations would be superfluous.  Columbia also mistakenly relies on 34 C.F.R. 106.41, which applies to athletic programs not educational programs.  (Id. pp. 21, 22).  Further, Columbia and USDOE misrepresent 20 U.S.C. § 3403(b) as preventing the application of Title IX to educational programs by their failing to refer to the section's phrase "except to the extent authorized by law."  There is nothing in 20 U.S.C. § 3403(b) repealing Title IX or any of its sections.  And USDOE misrepresents 20 U.S.C. § 1232a by deleting the last sentence limiting it to "overcome[ing] racial imbalance"—not an issue here.  (U.S. Memo. p. 7).

remedial by prohibiting ill will discrimination against the potential beneficiaries of educational programs.  Cook & Sobieski, <u>Civ. Rts. Actions</u>, ¶ 17.29.  Title IX does not tell a college what to teach or a state what curriculum to register, just that their educational operations cannot treat one group differently from another based on outmoded stereotypical characterizations of the sexes.

The alleged violations of Title IX and the implementing regulations are not the exclusion of males from Columbia's Women's Studies program.  Although the withholding by Columbia, in accordance with State policies, of facilities for the furtherance of scholarship and research in Men's Studies from the plaintiff class carries a similar degree of offensiveness as the arbitrary exclusion of a particular group.  <u>Weise v. Syracuse Univ.</u>, 522 F.2d 397, 405 (2d Cir. 1975).  The Complaint asserts the more subtle variety of discrimination that focuses on the results of the State and Columbia's conduct.  <u>De La Cruz v. Tormey</u>, 582 F.2d 45, 50 (9th Cir. 1978), *cert den.* 441 U.S. 965 (1979).  In violation of 45 C.F.R. § 86.31(b) and 34 C.F.R. § 106.31(b), Columbia and the State treat males differently than females in providing benefits and services and limit males, as compared to females, in the enjoyment of advantages and opportunities. (Compl. ¶¶ 94-109, 169-87).  The State also violates Title IX by rendering assistance to Columbia, an organization that discriminates on the basis of sex, and implementing polices that foster and validate discrimination against males in New York colleges.  (Compl. ¶¶ 36-40, 110-24).

The unmet needs of the disadvantaged sex, here males, also indicate disparate treatment. <u>Cohen</u>, 991 F.2d at 895.  A male can enroll in Women's Studies just as the boy in <u>Gomes v. R.I. Interscholastic League</u>, 469 F. Supp. 665 (D. R.I. 1979)(vacated as moot), made the girls volleyball team, but he was not allowed to play.  Males in Columbia's program are demeaned as members of a Fritz Lang underclass and effectively cut out of the benefits and opportunities

provided females.  (Compl. ¶¶ 87, 88).  No program at Columbia provides males, who are a

minority at the college, Col Memo. p. 9 n. 4, the opportunities to nurture their talents as females

have in Women's Studies because there is no Men's Studies program.[7]  The State and Columbia

simply treat males, whether in Women's Studies programs or not, less favorably than the

majority females, which in turn has a discriminatory impact.  International Broth. of Teamsters v.

U.S., 431 U.S. 324, 335 n. 15 (1977).

As for discriminatory intent, it only requires a motivating factor that can be one among

others, and that factor can be inferred from the mere differences in treatment.  Vil. Arlington Hts.

v. Met. Housing Dev. Cp., 429 U.S. 252, 265-66 (1977).  The plaintiffs allege that one

motivation on the part of the State and Columbia is ill will toward males, which is reasonably

inferred from numerous acts by Columbia and the State.  (Compl. ¶¶ 76-124).[8]

Col. Memo. p. 22 cites to Butler v. City of Batavia, 545 F. Supp. 2d 289, 293 (W.D.N.Y.

2008), where the court found the complaint allegations insufficient to allege a discriminatory

intent or purpose.  Of course, Columbia fails to compare the allegations in that case to the

allegations in this case because there is no similarity.  Col. Memo. p. 22 also misleads by citing

to Hayden v. County Nassau, 180 F.3d 42, 50 (2d Cir. 1999), as requiring "specific facts leading

to the conclusion that Columbia created a women's studies program 'because of, not merely in

spite of' adverse effects on men."  Hayden does not require "specific facts" on a motion to

dismiss, but does require that "the decisionmaker ... selected or reaffirmed a particular course of

action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an

---

[7] The State argues that advocating a Men's Studies program is the result of "decisions based on stereotypes."  (N.Y. Memo. pp. 25-26).  Assuming that is correct, then providing a Women's Studies program must also be based on stereotypes; therefore, Columbia and the State, by the State's own argument, violate Title IX.

[8] Columbia demands the plaintiffs "explain why" it is motivated in part by "anti-male bias," and that the plaintiffs tell Columbia which individuals are "prejudiced against men."  (Col. Memo. p. 22).  Plaintiffs are not expected to know the defendant's state of mind.  Stern v. Leucadia Nat'l Corp., 844 F.2d 997, 1004 (2d Cir. 1997).

identifiable group." <u>Hayden</u> at 50 (emphasis added).  Columbia left out the qualifier "at least in part" not only from <u>Hayden</u> but also from its cite to <u>Grimes v. Sobol</u>, 832 F. Supp. 704, 708 (S.D.N.Y. 1993), *aff'd*, 37 F.3d 857 (2d Cir. 1994).

Even had the Complaint not alleged discriminatory intent or purpose on the part of the State and Columbia, the allegations alone of dissimilar impact suffice to establish liability when a suit is brought to enforce Title IX's implementing regulations because that is the standard under Title VI of the Civil Right Act on which Title IX is patterned.  <u>Haffer v. Temple Univ.</u>, 678 F. Supp. 517, 539-40 (E.D. Pa. 1987); *see* <u>Guardians Ass'n v. Civil Service Com'n of City of New York</u>, 463 U.S. 582, 607 n. 27 (1983).

Any argument that the lack of a Men's Studies program merely reflects a different level of concern among males than females is nothing more than 40 year-old stereotypical notions. *See* <u>Cohen</u>, 101 F.3d 155, 178-79.  Over the past 40 years, the systemic unfair treatment of the minority—males, as compared to the majority—females, Compl. ¶ 188, has created a need for Men's Studies programs to balance the scales.  Even in Columbia programs not grounded in "gender issues," the Feminist perspective dominates and censors viewpoints.  (Compl. ¶ 176).[9]

Standing[10]

For purposes of ruling on a motion to dismiss, *see supra p. 3*, in which standing is challenged, a court accepts as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.  <u>Warth v. Seldin</u>, 422 U.S. 490, 501 (1975). Columbia cites to <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992), but <u>Lujan</u> is a

---

[9] Columbia alleges the meaning of Men's Studies programs to be that which is of "interest" to males.  By that definition, its Women's Studies program is superfluous because there are plenty of other programs at Columbia in which females are enrolled.  (Col. Memo. pp. 8-9).  An outline of a Men's Studies program is at Compl. ¶¶ 229-52.

[10] In Columbia's own words, the plaintiffs' "personal hostility to feminism," "attack," "diatribe," "[suit] to shut down women's studies program," "dislike," "disdain for feminism," "resent[ment]," "personal quarrels [with Feminism]," and "anti-feminist polemic," Col. Memo. pp. 1, 2, 4, 6, 17, 19, 20, 23, clearly assure the concrete adverseness which sharpens the presentation of issues required for standing.  <u>Baker v. Carr</u>, 369 U.S. 186, 204 (1962).

summary judgment case.  At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss, the Court presumes that general allegations embrace those specific facts that are necessary to support the claim, which is a less onerous standard than on summary judgment.  Id. at 561 (citation omitted).

The class representatives allege injury to themselves (such injury may be indirect), the injuries are ongoing and traceable to the defendants' conduct, and are redressable by the relief sought.  Vil. Arlington Hts., 429 U.S. at 261.  (Compl. ¶¶ 89-99, 101-02, 109-112, 123, 210-28, 253-61, 268-74, 275-76, 278-80, 282-86).  Title IX cases do not require that a person actually take a program to have standing.  It is the continuing absence of the opportunity for an equivalent educational experience—the benefit, or the ill will and dissimilar treatment that is the injury.  Ridgefield Women's Pol. Caucus v. Fossi, 458 F.Supp. 117, 120 n. 3 (D.Conn. 1978).  The Title IX injuries are (1) denial of access at Columbia to a Men's Studies program and (2) the ill will, disparate treatment that males receive at Columbia in and outside the Women's Studies program.  These injuries stem from the State's education policies that promulgate, approve, and finance Women's Studies programs but not Men's Studies, and Columbia's providing of Women's Studies but no Men's Studies.  Such conduct grants females a real competitive advantage that can be redressed by the implementation of a State policy and Columbia program for Men's Studies or the elimination of Women's Studies.  See Mass. v. E.P.A., 127 S.Ct. 1438, 1458 (2007)(some measure of relief suffices for redressability).

The class representatives allege their prior and continuing intent to enroll in Men's Studies at Columbia:  Mr. Den Hollander as an alumnus and Mr. Nosal as first a student and now an alumnus.  (Compl. ¶ 254).  The class representatives are affected in a personal and individual way because the lack of Men's Studies has and continues to deny them equivalent

benefits and opportunities from a masculine perspective.  *See* <u>McCormick ex rel. McCormick v.</u> <u>School Dist. of Mamaroneck</u>, 370 F.3d 275, 284-85 (2d Cir. 2004)(standing for injunction when girls who intended to play soccer in the Fall were denied the opportunity because school did not field a girls' soccer team in the Fall).

Columbia asserts there is no scholarly discipline of Men's Studies, so the lack of that relief means there is no injury.  (Col. Memo. p. 9).  Once upon a time in the Deep South, there were no places for blacks to vote, but that didn't mean no injury to their rights.  Further, the Complaint ¶¶ 229-52 provides examples of what a Men's Studies program means, and the Complaint ¶¶ 172 shows benefits now lacking.  As for other programs at Columbia providing male sensitive views, there are none[11], only ones with a Feminist view.  (Compl ¶¶ 262-65).

### III.  The defendants violate Equal Protection under the 5th and 14th Amendments.

Slamming the door in a person's face is one way to keep him out.  Another way is to make the environment within so hostile, traducing, and demeaning that he will not enter. Columbia's Women's Studies program does not physically bar males from participating in the program, but the opprobrious treatment males receive, the belligerence of castigations, the collective guilt heaped on them, and the denial to males of similar perks given females because of the program's bias effectively locks the gates to all but a few.[12]  Even outside the program, Women's Studies dissemination of Feminism throughout Columbia has created an environment for males with the attributes of a hostile work environment, Compl. ¶¶ 112, 168, similar to those

---

[11] The quote of Mr. Den Hollander in the L.A. Times, Col. Memo. p. 9 n. 6, refers to whether there were accredited college programs providing Men's Studies programs as described in the Complaint.

[12] Columbia objects that the Complaint's allegations at ¶¶ 87-88 of discrimination against males participating in the Women's Studies program do not allege different treatment and are conclusory because they lack specifics.  (Col. Memo. pp. 7 n. 3, 15 n. 9, 19, 20).  Not even Bill Clinton's spinning could deny those paragraphs allege different treatment.  Besides, "on a motion to dismiss [the courts] presume that general allegations embrace those specific facts that are necessary to support the claim."  <u>NOW v. Scheidler</u>, 510 U.S. 249, 256, 127 L.Ed.2d 99, 114 S.Ct. 798 (1994) (quoting <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561, 119 L.Ed.2d 351, 112 S.Ct. 2130 (1992)).

described by the courts under Title VII, 42 U.S.C. § 2000e *et seq*.  *See* <u>Brown v. Henderson</u> 257 F.3d 246, 252 (2d Cir. 2001).  Learning in a non-sexually discriminating environment is necessary for developing the full potential of America's citizens.

The protection of individual constitutional rights is a central part of the role assigned to the judiciary under the separation of powers.  When the Federal Government, states and state actors conflict with the Constitution, the Federal courts mandate is to intervene, especially to vindicate civil rights.  "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools."  <u>Shelton v. Tucker</u>, 364 U.S. 479, 487 (1960).  The First Amendment, at the very least, prevents authorities from imposing a "pall of orthodoxy" on classroom instruction which implicates the state in the propagation of a particular religious or ideological viewpoint.  <u>Pratt v. Ind. School Dist. 831, Forest Lake, Minn</u>., 670 F.2d 771, 776 (8th Cir. 1982)(citation omitted).

The maximization of constitutional freedoms and equality of opportunity should be the hallmarks of educational institutions, but due to the spread of Feminist orthodoxy in higher education, females are treated more "equally" than males.  Dissimilar treatment can mean, but does not only mean, that one group receives "less favorable" treatment than the other.  Different treatment also occurs when the impact of a policy falls overwhelmingly on one group.  <u>De La Cruz</u>, 582 F.2d at 47.  "Challenges which rely upon disparate impact inevitably will involve consequences which are not restricted in their operation to one group or another.  The essence of this sort of legal attack is imbalance and disproportionality.  The lack of pure gender-specificity is no bar [to an action]."  <u>Id</u>. at 57.

The Complaint alleges both less favorable treatment of the class members by the State, USDOE, and Columbia, and the disproportional effects on the class members by the State's

Women's Studies policies,[13] USDOE's funding, and Columbia's program.  (Compl. ¶¶ 70-125).

As a result of the defendants' polices and practices, educational opportunities are not made

available or are made available on an unequal basis or are of less value to the class members

because of the existence of a Women's Studies program and the lack of a Men's Studies one.

(Compl. ¶¶ 168-82, 207-74).

Even without allegations of less favorable treatment or disproportionate impact, there is

an argument analogy with employment discrimination.  "In determining whether an employee

has been discriminated against because of such individual's sex, the courts have consistently

emphasized that the ultimate issue is the reasons for the individual plaintiff's treatment, not the

relative treatment of [or impact on] different groups within the workplace."  *See* Back v.

Hastings On Hudson Union Free School Dist. 365 F.3d 107, 121 (2d Cir. 2004).  One reason

behind the State and Columbia's foisting of Feminist Women's Studies on higher education and

the USDOE's funding is their archaic stereotyping of males, which indicates an ill will

motivation that may be inferred from a totality of the Complaint's allegations, *see* Washington

v. Davis, 426 U.S. 229, 242 (1976).  Such an inappropriate reason is sufficient for finding the

defendants invidiously discriminate against the class members.

Using another analogy to employment discrimination, Columbia demonstrates a disdain

for men's issues and a diminished opinion of males concerned with those issues.  It calls the

Complaint a "parody" and "semi-facetious", Col. Memo. pp. 2, 21, which evinces a

discriminatory attitude toward men because Columbia would never dare say that about females

suing over female issues.  *See* Lynn v. Regents of Univ. of Cal., 656 F.2d 1337, 1343 (9th Cir.

---

[13] The State claims it does not have any policies or plans concerning Women's Studies because the specific term
"Women's Studies" is not contained in the policies and plans referred to by the Complaint.  (N.Y.  Memo. p 22 n.
8).  Oh please, the content of the policies and plans require higher education programs devoted to issues concerning
females and feminism.  (Compl. ¶ 40).  Besides, "What's in a name?  That which we call a rose, By any other name
would smell as sweet."  –Juliet, or as sour.

1981).  The existence of a discriminatory attitude tends to establish that it is more likely than not that Columbia's conduct is based on an impermissible criterion, and therefore tends to establish the class members' prima facie case.

The Complaint alleges discriminatory intent or purpose as a motivation inferred from the defendants conduct.  Such are deemed true for the defendants' facial Rule 12(b)(1) and Rule 12(b)(6) motions, *supra p. 3*, since it is too early to determine whether the defendants' conduct is free from a discriminatory intent or purpose.  *See* De La Cruz, 582 F.2d at 59.  Columbia asserts, however, that the Complaint's allegations of disparate treatment and ill will are "conclusory."  (Col. Memo. p. 19).  Columbia does not cite to which specific allegations are conclusory so that it can compare them with allegations that the courts have found conclusory. Columbia only makes the conclusory assertion that the allegations are conclusory.

Columbia also tries to euphemize the prejudice behind the Women's Studies program and the lack of Men's Studies by contending that Women's Studies is the same as Black or other group programs.  (Col. Memo. pp. 20-21).  This case does not concern them, only the Women's Studies program.  Sex discrimination may be shown by sex-based stereotyping, which in turn evinces a discriminatory intent.  Back, 365 F.3d at 119-120.  The Complaint alleges such stereotyping by the State, Columbia and USDOE.  (Compl. 77-79, 81, 89, 91, 92, 106-25). Whether stereotyping of different groups exist in other Columbia programs is not an issue in this case.  Besides, there's no comparison between the reasons for the Feminism propagated at Columbia and say "Contemporary Black History."  When was the last time a feminist was lynched, shot dead on the front stoop of her home, or on the balcony of the motel she was staying in?  For the past four centuries, the institutions of this nation have had their boot heels on the back of the necks of Blacks.  Over that same period, white females have received nothing but

14

preferential treatment.  Try stumbling out of the Copacabana at three in the morning and hailing

a cab if you happen to be black.  Then watch the cabbies play bumper cars as a white female

hails one.[14]

 The State argues there is no New York "statute, regulation, or other source of law that

imposes by its terms a discriminatory sex-based classification…."  (N.Y. Memo. p 21).  The

Complaint at ¶¶ 36-40 specifically cites to the Regents Statewide Plans and major policy

statements that use sex-based classification to allocate benefits unequally by promulgating

practices to foster and advance Feminism in colleges and society.  Since the Regents act as the

legislature for colleges, and N.Y. Education as the Regents' administrator, Moore v. Bd. Regents

University of New York, 44 N.Y.2d at 600, the Statewide Plans and policy statements are in

effect laws, rules or regulations that cultivate misandry, which indicates a motivating factor of

prejudice toward men.  By inspecting and re-registering Columbia's Women Studies program,

N.Y. Education continues to apply and enforce the Regents invidiously discriminatory policies,

and HESC continues to provide financing, without both of which the program would not exist.

Part of the motivation behind the State fostering Feminism and Women's Studies in

colleges is partiality toward females and enmity toward males.  Evidence of the State's enmity

towards men is that for nearly thirty years, the Regents have never advocated Men's Studies

programs but only Women's Studies that propagate the misandry of Feminism.  The State claims

it is only requiring equity in higher education for females, but its measurement of such equity is a

quota system that has shown since the 1980s that more females attend and graduate college in

New York than males.  (Compl. ¶¶ 40, 103-05).  The State even admits this in its "Equity for

Women in the 1990s" at p. 3 and its "2004 Statewide Plan" at p. 70.  The only reasonable

---

[14] Columbia also argues that because all the other Ivy League colleges have Women's Studies programs, there is no
"anti-male animus" factor behind its program.  (Col. Memo. p. 23).  Sixty years ago in the South, every bus
company treated blacks different than whites, and most people thought that was okay.

inference to draw from the State treating females preferentially, when the State's own measurements show males are the disadvantaged group, is a motivation of ill will toward males. *See* Vil. Arlington Hts., 429 U.S. 252, 265-67 (factors taken into account in determining whether discriminatory purpose was a motivating factor). "The existence of a permissible purpose cannot sustain an action that has an impermissible effect," Wright v. Council City of Emporia, 407 U.S. 451, 462 (1972), and it is the duty of the courts "to distinguish a sham secular purpose from a sincere one." Wallace v. Jaffree, 472 U.S. 38, 75 (1985)(O'Connor, J. concurring).

Congress created USDOE, in part, to "strengthen the Federal commitment to ensuring access to equal educational opportunity for every individual …." 20 U.S.C. § 3402(1). USDOE fails to do that by providing financing to Columbia and the State. USDOE knows that by financing Columbia it is also indirectly supporting Feminist Women's Studies, so USDOE is complicit in furthering the ill will, disparate treatment of males by Columbia. USDOE has the power to fix the terms on which its money allotments are disbursed, *see* Oklahoma v. U.S. Civ. Srvc. Comm., 330 U.S. 127, 142-43 (1947); therefore, it has the authority to prevent the expenditure of Federal dollars to fund unequal educational opportunities for males. USDOE has chosen not to, which creates another inference of its bias motivation against males. Public financial benefits and assistance from the State and student aid from USDOE not only help support Columbia's Women's Studies invidious discrimination but also discriminate in their own right because their impact benefit females without any comparable benefit to males. Ridgefield, 458 F.Supp. at 122.

Standing   Fifty years ago when a black man wanted to take a bus from one location to another, he could only do so by sitting in the back. Evers v. Dwyer, 358 U.S. 202 (1958). Today, when any man wants to take his education to another level in the area of "gender studies" he's

16

relegated to the back of the bus of Women's Studies—the only transportation available to an education in "gender studies" and the attendant benefits.  Education and acquisition of knowledge are matters of supreme importance and liberty interests that should be diligently promoted.  Meyer v. Nebraska, 262 U.S. 390, 399-400 (1923).  The defendants continue to obstruct those interests of the class members by doing the contrary with respect to Men's Studies but promoting Feminism through Women's Studies.  "Discrimination itself, by perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' and therefore as less worthy participants in the political community, … can cause serious noneconomic injuries to those persons who are personally denied equal treatment…." Heckler v. Mathews, 465 U.S. 728, 739-740 (1984)(citation omitted).

USDOE's financial assistance facilitates[15], State policies aid and approve, and Columbia's Women's Studies provide:  (1) instruction, training, and preparation in Feminism that leads to undergraduate degrees and graduate certifications; (2) a post-baccalaureate program in Feminism; (3) alumni auditing of Feminist courses; (4) networking and career opportunities within the Feminist establishment; and (5) support from a Feminist perspective.  No such backing and opportunities are provided for males from a masculine perspective.  The dominance of Feminism achieved by Women's Studies and the lack of the countervailing viewpoint of Men's Studies results in obstacles for males obtaining education, knowledge, career opportunities, training, acquiring skills, and developing their mental abilities and moral character in order to not only lead productive, self-satisfying lives but to counter the Feminist establishment and its antipathy against males.[16]

---

[15] USDOE funds accrue to the benefit of a program that as alleged disadvantages the plaintiffs, which is a closer connection than the one the Supreme Court found standing for in U.S. V. SCRAP, 412 U.S. 669, 668-89 (1973).

[16] Establishment means a unitary belief system held by enough influential persons so that it dominates over other beliefs in a society.  In America today, that belief system is Feminism.  (Complaint ¶¶ 212, 226).

The defendants ongoing, one-sided propagation of Feminism is not only offensive and stigmatizing to the class representatives but denies them equal treatment by preventing them from pursuing Men's Studies and competing on an equal footing with females in education, the work place, the courts, the culture, and society as a whole. *See* Northeastern Fla. Assoc. Gen. Contractors Am. v. Jacksonville, 508 U.S. 656, 666-67 (1993); In re U.S. Catholic Conference**,** 885 F.2d 1020, 1025, 1028-31 (2d Cir. 1989)(concerning competitive advocate standing)(citations omitted). The injury is males <u>not</u> being considered equally because of discriminatory obstacles that cause the plaintiffs to suffer a continuing loss of opportunities. *See* Bryant v. Yellen, 447 U.S. 352, 366-67 (1980). Immediacy is the plaintiffs alleging they will enroll in Men's Studies when offered. Adarand Constructors v. Pena, 515 U.S. 200, 211 (1995). Causality exists because the class representatives are able and ready to pursue Men's Studies that the defendants prevent by not supporting or not providing. Gratz v. Bollinger, 539 U.S. 244, 262 (2003). And the remedy is restoring equality, which can occur by withdrawing the benefits and opportunities provided by the Feminist Women's Studies program that disadvantages males, or extending similar opportunities and benefits to adherents of masculinity through a Men's Studies program. Either will profit the plaintiffs in some personal way.

**IV. Columbia's invidious discrimination occurs under the color of law, 42 U.S.C. 1983.**

The Regents act as a legislature over higher education in New York that sets statewide education polices and enacts rules for carrying its policies into effect. N.Y. Educ. Law § 207. The Regents periodically develop a master plan for the development and expansion of higher education in New York, Moore, 44 N.Y.2d 593, 598, which has included promulgating Feminism through Women's Studies programs. The Regents also determine in which subject areas, such as Women's Studies, tenure will be offered. Baer v. Nyquist, 40 A.D.2d 925, 926,

338 N.Y.S.2d 257 (A.D. 3rd Dept. 1972).  Further, the Regents and N.Y. Education have the

power to visit, examine, inspect, and require reports from colleges as often as the Regents desire,

which can request whatever information the Regents want.  N.Y. Educ. Law § 215.  Any refusal

or undue delay in providing information, or violation of a policy or implementing rule and the

Regents may suspend the charter or any rights and privileges of that college.  Id.  The State's

involvement with Columbia is much more than Columbia pretends, but the key point is the

State's connection to the Feminist Women's Studies program that has an invidiously

discriminatory impact on the class members by treating males differently than females.

The Regents' Statewide Plans of 1984 and 2004, based in part on Columbia's master

plans, and the Regents' major policy statements of 1972, 1984, and 1993 approved and

encouraged the ill will treatment and prejudicial impact of Columbia's Women's Studies

program on males.  The Regents knew of the program's practices because it was patterned on the

Regents' requirements for higher education to support programs in Women's Studies for

instituting Feminist tenets and to remake New York into the Feminist image.  (Compl. ¶ 40).

The Regents euphemistically called their policies "equity for women."  But even if that were the

objective, "[t]he equal protection clause would be a sterile promise if state involvement in

possible private activity could be shielded altogether from constitutional scrutiny simply because

its ultimate end was not discrimination, but some higher goal."  Norwood v. Harrison, 413 U.S.

455, 466-67 (1972).

State action exists where the state (1) authorizes or encourages the invidiously

discriminatory activities, Reitman v. Mulkey, 387 U.S. 369, 375 (1967); or (2) is involved with

the activity that discriminates, Powe v. Miles, 407 F.2d 73, 81 (2d Cir. 1968)(Friendly, J.); or (3)

affirmatively approves discrimination through its regulatory powers, Public Utilities Comm. v.

Pollak, 343 U.S. 451, 462 & n. 8 (1953), by in effect placing a state's imprimatur on the

prohibited activities, Jackson v. Metro. Edison Co., 419 U.S. 345, 357 (1974).  In determining

state action in sex discrimination cases, the standard is a less onerous one than used in the

college cases cited by Columbia, Col. Memo. pp. 11-14.  Weise, 522 F.2d at 405-06.

  Columbia ignores the tests and asserts that for state action to exist, the State is required to

be "responsible" for the specific conduct alleged as discriminatory.  (Col. Memo. pp. 11-13).

Columbia cites to a N.Y. Southern District Court case for its "responsible" proposition, but omits

that case's cite to Blum v. Yaretsky, 457 U.S. 991 (1982).  As is often the situation in the law,

courts provide specific meanings to every day words in order to avoid confusion that might result

from the common understanding of a word.  The Supreme Court in Blum defined what it meant

by the word "responsible" in the area of state action, and that is how the Southern District Court

used the term.  Blum, citing in part to Jackson, ruled that "a State normally can be held

responsible for a private decision only when it has exercised coercive power or has provided

such significant encouragement, either overt or covert, that the choice must in law be deemed to

be that of the State."  Id. at 1004 (emphasis added).  The common use of "responsible" does not

include "encouragement."  Columbia knew this, but chose to mislead this Court by failing to

provide the original citation that defined "responsible" or indicate the citation's omission.

  Given the extent of the Regents and N.Y. Education's power over higher education, the

Regents' plans and policies calling for preferential treatment of females, the Regents' detailed

requirements for instilling Feminist tenets into higher education, the Regents' creation of

Feminist agents called "affirmative action officers" to enforce and punish those for not dutifully

adhering to the Regents' Feminist polices, the Regents and N.Y. Education not regarding their

functions as ministerial, and the Regents' approval of Columbia's master plan for education by

incorporating its Women's Studies section into the Regents' Statewide Plans, Compl. ¶¶ 31-41, 146—the Regents and N.Y. Education plainly authorize, encourage, and involve themselves in the invidiously discriminatory practices of Columbia's Women's Studies program.  In addition, by reviewing, approving, re-reviewing and re-approving every aspect of the Women's Studies program at Columbia to assure it complies with the Regents' policies and plans, Compl. ¶¶ 44-48, N.Y. Education stamps the State's imprimatur on a program known to practice and promote invidious discrimination.[17]  Since here the State is involved with the very activities that discriminate, the many cases cited by Columbia that held no such involvement do not apply.

Further, without the State's authorization, encouragement, involvement, and stamp of approval on the Feminist misandry activities at Columbia, the University could not grant credit or degrees in Women's Studies, nor receive financing, either directly or indirectly, for the continuation of the Women's Studies program.

## V.  Columbia violates N.Y. Civil Rights Law § 40-c.

Section 40-c prohibits discrimination against persons based on sex by any institution in New York State that fails to provide equal opportunity, whether because of prejudice, discrimination or inadequate education opportunities.  N.Y. Civ. Rts. § 40-c, Historical & Statutory Notes, L.2002, c.2, § 1.  "Institution" includes colleges supported in whole or in part by contributions solicited from the general public.  N.Y. Civ. Rts. § 40.  Columbia launched a major fundraising campaign in 2006 that solicits contributions from the general public. (Compl. ¶ 203).

## VI.  The State and USDOE violate the Establishment Clause of the First Amendment.

The Complaint alleges that Feminism propagated by Columbia and aided by the State and USDOE is a religion, Complaint ¶¶ 4-15.  On the defendants' motions to dismiss, the allegations

---

[17] Columbia essentially argues the Complaint's allegations of the State's involvement in Columbia's Women's Studies program are untrue.  (Columbia Memo. pp 12-14).  But on the defendants' motions to dismiss, the allegations are assumed true.

are accepted as true, *supra p. 3*.  All the cases, except for two,[18] cited by the State and USDOE

dealing with whether a belief-system is a religion are decisions made after trial, hearings, or on

summary judgment motions and therefore had the benefit of an evidentiary record that does not

exist here.  USDOE's voluminous exhibits do not deal with religion.

<u>Religion</u>

      Religion for establishment clause purposes is not as narrow a concept as the State and

USDOE argue.  (State Memo. pp. 8-14; U.S. Memo. 16-19).  In <u>Torasco v. Watkins</u>, 367 U.S.

488, 495 n. 11 (1961), the Supreme Court in dictum rejected the view that religion is defined

solely in terms of a Supreme Being by noting that Ethical Culture, Secular Humanism and other

non-theistic belief-systems are religions.  In two conscientious objector cases determining

whether the objectors' beliefs amounted to a religion, the Supreme Court held that secular beliefs

of a purely ethical or moral source and content which impose a duty of conscience can function

as a religion.  <u>Welsh v. U.S.</u>, 398 U.S. 333, 340 (1970); <u>U.S. v. Seeger</u>, 380 U.S. 163, 184-85

(1965).  Intense personal convictions that may appear incomprehensible or incorrect come within

the meaning of religious belief.  <u>Id</u>.  The Equal Employment Opportunity Commission in Title

VII employment cases includes as religion moral or ethical beliefs sincerely held with the

strength of traditional religions.  <u>LaViolette v. Daley</u>, E.E.O.C. No. 01A01748 (Sept. 13, 2002);

29 C.F.R. §1605.1.  In <u>Altman v. Bedford Cent. School Dist.</u>, 45 F.Supp.2d 368, 378, (S.D.N.Y.

1999), *revd. on other grounds,* 245 F.3d 49 (2d Cir. 2001), the Court used a definition of religion

for establishment clause cases from <u>Malnak v. Yogi</u>, 592 F.2d 197, 208-210 (3d Cir.

1979)(Adams, J. concurring).[19]   USDOE falsely claims that the definition for religion is "much

---

[18] Of the motions on the pleadings cases, the two cited by the State and USDOE did not involve the issue of defining religion.

[19] Judge Adams's concurring opinion is one of the better reviews of the establishment clause cases for determining religion, and his guidelines have been adopted by the Third, Eighth, Ninth and Tenth Circuit Courts of Appeals.

narrower" in establishment cases, U.S. Memo. p. 17, when the courts have never ruled such. <u>Alvarado v. City of San Jose</u>, 94 F.3d 1223, 1230 n. 6 (9th Cir.1996).[20]

     The <u>Malnak</u> test looks at three indicia: whether the belief-system (1) addresses fundamental and ultimate questions having to do with deep and imponderable matters, (2) is comprehensive in nature, (3) has formal and external signs such as structure, organization, efforts at propagation, and observance of holidays. Not all of the indicia need be satisfied for a belief-system to be a religion, but in the case of Feminism, all three are. (Compl. ¶¶ 4-15).

     While N.Y. Education § 207 prohibits the State from regulating doctrinal instruction in seminaries, the State clearly regulates the Feminist doctrine in Women's Studies under 8 N.Y.C.R.R. Part 52, which reaches content.[21] But that does <u>not</u> mean Feminism is <u>not</u> a religion. Governments often do things they don't have the authority to do, such as the Vietnam War, wire tapping citizens without court orders, or foisting the religion of Feminism in colleges.

<u>Aiding the religion Feminism</u>

     The State and USDOE argue that even if Feminism is a religion, their conduct does not aid it. The ban on aiding a religion means "[g]overnment may not finance religious groups nor undertake religious instruction nor blend secular and sectarian education nor use secular institutions to force one or some religion on any person." <u>Zorach v. Clauson</u>, 343 U.S. 306, 314 (1952). "[T]he heart of the Establishment Clause, [is] that government should not prefer one

---

Judge Adams also argued, as did Justice Rutledge in his dissent in <u>Everson v. Bd. of Educ.</u>, 330 U.S. 1, 32 (1947), for the same definition of religion in establishment and free exercise cases.

[20] USDOE even goes so far as to compare Feminism to a statute of an Aztec figure. (U.S. Memo p. 18).

[21] The State mistakenly claims that registration of <u>non</u>-seminary instruction does not involve content. 8 N.Y.C.R.R. § 52.1(b)(3) states that to register curricula, "[t]he content and duration of curricula shall be designed to implement" a curriculum's purposes; § 52.1(c) requires curricula to be consistent with the Regents Statewide Plan; and § 52.1(h) states that new registration is required for any curriculum in which changes affect the title, focus, design or requirements. So whether a course teaches Arianism, Donatism, pro-slavery, or anti-slavery, it impacts its registration. (<u>Contra</u> N.Y. Memo. p. 16).

religion to another, or religion to irreligion." Bd. of Ed. Kiryas Joel Vil. School Dist. v. Grumet,

512 U.S. 687, 703 (1994)(N.Y. State created a separate school district for a religious faith).

Beginning in 1972, the State started to remake higher education and New York society in

accordance with Feminist tenets by promulgating Feminism through its Statewide Plans and

policy statements and implemented by Women's Studies programs.  The State promoted,

approved, registered, and the State and USDOE financed Feminist Women's Studies programs,

either directly or indirectly.[22]  While the type of benefits provided for the instruction of Feminist

doctrine are similar to those given mathematics, or other programs, the benefits granted

Women's Studies end up indoctrinating a religion promulgated by the State and partly funded by

USDOE.[23]  Government benefits—approval, registering, and financing, even through neutral

means, cannot further a government end to advance and endorse a religion.  See Agostini v.

Felton, 521 U.S. 203, 222-23 (1997).[24]  The establishment clause prohibits such government

endorsement of religious activities because "endorsement sends a message to nonadherents that

they … are outsiders of the political community, and … to adherents that they are insiders,

favored members of the political community."  Lynch v. Donnelly, 465 U.S. 668, 688

(1984)(O'Connor, J. concurring).

> "The Establishment Clause, unlike the Free Exercise Clause, does not depend upon any
> showing of **direct** governmental compulsion and is violated by the enactment of laws
> which establish an official religion whether those laws operate directly to coerce
> nonobserving individuals or not….  When the power, prestige and financial support of
> government [are] placed behind a particular religious belief, the **indirect** coercive

---

[22] The N.Y. Court of Appeals in Bd. of Ed. v. Allen, 20 N.Y.2d 109, 116, 281 N.Y.S.2d 799 (1967), *affd.* 392 U.S. 236, held that it did not matter for establishment clause purposes whether the means of attaining the prohibited end of aiding religion is described with "the words 'direct' [or] 'indirect.'"

[23] USDOE falsely states that the *Lemon* test is satisfied if a reasonable person finds a secular purpose in its financing.  (U.S. Memo. p. 18).  The reasonable person test determines whether the effect of USDOE's financing aids Feminism, it does not determine the purpose. Altman v. Bedford Sch. Dist., 245 F.3d 49, 75 (2d Cir. 2001).  If Feminism is a religion, then providing funds that accrue to its benefit is aiding it by any reasonable person's view.

[24] N.Y. Bundy dollars and some USDOE funds go directly into the coffers of Columbia, Compl. ¶¶ 21, 56, 59, 62, which distinguishes this case from Agostini, 521 U.S at 228 and Zelman v. Simons-Harris, 536 U.S. 639, 649 (2002).  Such funds free up other money in Columbia's treasury for spending on Women's Studies.

pressure upon religious minorities to conform to the prevailing officially approved religion is plain.  But the purposes underlying the Establishment Clause go much further than that….  The history of governmentally established religion, both in England and in this country, showed that whenever government had allied itself with one particular form of religion, the inevitable result had been that [government] had incurred the hatred, disrespect and even contempt of those who held contrary beliefs."  <u>Engel v. Vitale</u>, 370 U.S. 421, 430-31(1962)(emphasis added).

Nor can government prohibit theories that are deemed antagonistic to a particular dogma, such as Feminism, which the State and USDOE have done by failing to set policies or provide aid for Men's Studies.  <u>Epperson v. State of Ark.</u>, 393 U.S. 97, 106-07 (1968).  By aiding only Women's Studies, they use social pressure to enforce orthodoxy, which is just as impermissible as more direct means," <u>Lee v. Weisman</u>, 505 U.S. 577, 594 (1992), and do nothing to protect the minority views of males, <u>Santa Fe Ind. Sch. Dist. V. Doe</u>, 530 U.S. 290, 304 (2000).

<u>Standing</u>

The values protected by the establishment clause are fundamental liberty interests, such as the individual freedom of conscience to embrace the right to select any religious faith or <u>none</u> at all.  <u>Wallace</u>, 472 U.S. at 52-53.  The "preservation and transmission of religious beliefs and worship is a responsibility and a choice committed to the private sphere," not the government.  <u>Lee v. Weisman</u>, 505 U.S. at 589.

**CONCLUSION**

When government and institutions channel unpopular concepts out of education, a curtain of ignorance falls across the academic landscape of inquiry.  The accepted ideology of the day takes precedence over facts, and subjective experiences trump science all because those in positions of authority believe their views are "correct" and others are wrong.

For the reasons stated, the Complaint should <u>not</u> be dismissed.

Dated: February 14, 2009
      New York, N.Y.

/S/
_____

Roy Den Hollander, Esq. (1957)
Class attorney and representative
545 East 14 Street, 10D
New York, N.Y. 10009
(917) 687-0652