UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------x
Roy Den Hollander and William A. Nosal,

            Plaintiffs on behalf of themselves
            and all others similarly situated,

Docket No. 08 Civ. 7286
(LAK)(KNF)(ECF)

        -against-

Institute for Research on Women & Gender at Columbia University;
School of Continuing Education at Columbia University;
Trustees of Columbia University in the City of New York;
U.S. Department of Education;
Margaret Spellings, U.S. Secretary of Education in her official capacity;
Board of Regents of the University of the State of New York, in his
    or her official and individual capacity;
Chancellor of the Board of Regents, Robert M. Bennett, in his official
    and individual capacity;
New York State Commissioner of the Department of Education,
    Richard P. Mills, in his official and individual capacity; and
President of the New York State Higher Education Services Corp.,
    James C. Ross, in his official and individual capacity;

        Defendants.
--------------------------------------------------------------------------------x

**OBJECTIONS TO MAGISTRATE JUDGE KEVIN N. FOX'S REPORT AND RECOMMENDATIONS**

      Attorney and plaintiff class-representative Roy Den Hollander and plaintiff class-representative William A. Nosal, on behalf of themselves and all others similarly situated, ask this Court to reconsider the Magistrate Judge's Report and Recommendation, and file these objections in accordance with Fed. R. Civ. P. 72(b).

      1.     Magistrate Judge Kevin N. Fox recommended on April 15, 2009 that the defendants' motions to dismiss the First Amended Complaint ("Complaint") should be granted under Fed. R. Civ. P. 12(b)(1) for lack of standing, specifically for failure to allege an injury-in-fact to the Class Representatives Den Hollander and Nosal ("Class Representatives").

2. The Class Representatives, on behalf of themselves and all others similarly situated, file these objections to the Magistrate's Report and Recommendation ("Recommendation").

3. If a party timely objects to a Magistrate Judge's recommendation, the district court must make a *de novo* determination of the objectionable portions of the recommendation. The district court may then accept, reject, or modify, in whole or in part, the recommendation. Fed. R. Civ. P. 72(b).

4. Class Representatives object to the Recommendations for the following reasons:

   a. the Magistrate failed to disclose an appearance of partiality, ¶¶ 5-9;

   b. the Magistrate mistakenly believed this action is *pro se*, ¶¶ 10-12;

   c. the Magistrate wrongly inferred this is not a class action, ¶¶ 13-15;

   d. the Magistrate apparently disregarded the Class Representatives' Memorandum of Law in Opposition, ¶¶ 16-17;

   e. the Magistrate mistakenly applied an evidentiary standard when there is no evidence, ¶¶ 18-19;

   f. the Magistrate apparently disregarded allegations supporting standing, failed to consider the purpose behind standing, ignored the requirements at the pleading stage, and applied a formulaic determination for standing, ¶¶ 20-38;

   g. the Magistrate failed to address injury allegations traceable to violations of the Establishment Clause, ¶ 39;

   h. the Magistrate failed to address injury allegations from Columbia violating New York Civil Rights Law § 40-c, ¶ 40; and

2

          i.    the Magistrate jumbled together his mistaken analyses of Equal Protection and Title IX injuries, ¶¶ 41-59.

**<u>The Magistrate failed to disclose an appearance of partiality.</u>**

5.      According to the New York County Lawyers Association, Magistrate Fox is an alumnus of Columbia University ("Columbia"), which is the key party in this action, but Magistrate Fox failed to disclose that to the parties before making his recommendation.

6.      Under 28 U.S.C. § 455(a), recusal may be justified when the appearance of partiality stems from an external source.  <u>Liteky v. United States</u>, 510 U.S. 540, 552, 114 S.Ct. 1147, 1156 (1994); <u>United States v. Occhipinti</u>, 851 F. Supp. 523, 525 (S.D.N.Y. 1993).  The purpose of 8 U.S.C. § 455(a) is to promote public confidence in the impartiality of the judiciary. <u>Liljeberg v. Health Servs. Acquisition Corp.</u>, 486 U.S. 847, 864, 108 S.Ct. 2194, 2205 (1988).

7.      Neither the Martindale-Hubbell New York City Law Directory nor the Almanac of the Federal Judiciary provides any biographical information on Judge Fox that would have enabled the Class Representatives to determine his connection to Columbia.

8.      A graduate of Columbia might be a loyal alumnus, a disgruntled one, or have a neutral view of the University, so in two out of three cases there exists the appearance of partiality.  Even if the Court considers two out of three a toss-up, close recusal questions favor the judge withdrawing from the case.  *See* <u>United States v. Helmsley</u>, 760 F. Supp. 338, 341 (S.D.N.Y. 1991).

9.      Prior to expending judicial resources on this case, Judge Fox should have at least disclosed his connection with Columbia to allow the Class Representatives, and even Columbia, assuming it did not already know, sufficient time to investigate and decide whether a reasonable person might question the Judge's impartiality.

### **The Magistrate mistakenly believed this action is *pro se*.**

10.     The Magistrate mistakenly asserts that this is a *pro se* action—it is not. Recommendation pp. 1, 6.

11.     Roy Den Hollander is an attorney admitted to this court (RDH 1957) and represents William A. Nosal and the putative class as well as himself.  The Complaint and Opposition to Defendants' Motions to Dismiss were drafted by attorney Den Hollander, which is good enough for the U.S. Supreme Court that this is not a *pro se* case.  *See* Hughes v. Rowe, 449 U.S. 5, 10 n. 7, 101 S.Ct. 173, 176 n. 7 (1980).

12.     The *pro se* standard requires the Court to interpret a complaint as raising the strongest arguments because of its "obligation ... to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." Abbas v. Dixon, 480 F.3d 636, 639 (2d Cir. 2007).  The Magistrate, however, not only did not interpret the Complaint as making the strongest arguments, but also did not even interpret it in the light most favorable to the Class Representatives.  He failed to consider many of the allegations of injury in the Complaint, which, along with his apparent lack of impartiality, contradict that such a standard was actually used.  Moreover, the Magistrate knew Den Hollander was an attorney admitted to practice before this Court, so claiming the *pro se* standard was used makes no sense, since it is not consistent with its purpose.

### **The Magistrate wrongly inferred this is not a class action.**

13.     The Magistrate twice expressed his disbelief over whether this case is a putative class action by saying "plaintiffs style the litigation a 'class action.'" Recommendation pp. 3, 9.

14.     "[A] suit brought as a class action should be treated as such for purposes of dismissal or compromise, until there is a full determination the class is not proper." *See e.g.*

4

Kahan v. Rosentiel, 424 F.2d 161, 169 (3rd Cir. 1970); Gaddis v. Wyman, 304 F. Supp. 713, 715 (S.D.N.Y. 1969).

15. There has been no determination in this case that the class is not proper. The Magistrate's apparent inattention to the law results in a mistaken inference.

**The Magistrate apparently disregarded the Class Representatives' Memorandum of Law in Opposition.**

16. The Magistrate apparently gave the Class Representatives' legal arguments short shrift by saying their Memorandum of Law in Opposition only "reiterate[s] the assertions made in the amended complaint." Recommendation pp. 2-3.

17. The Memorandum of Law in Opposition did not reiterate the factual allegations in the Complaint. It did what opposition memoranda of law are supposed to do: set forth the points of law and authorities relied on in opposing the motions to dismiss. S.D.N.Y. Local Civ. R. 7.1. To contend the Opposition merely restated the Complaint could only mean the Opposition was given short shrift, which is borne out by the paucity of legal analysis—a mere two pages that fails to distinguish Title IX injury from Equal Protection injury and ignores injuries from violation of the Establishment Clause and N.Y. Civil Rights Law § 40-c. Failure to duly consider both sides evinces a lack of impartiality and apparent inattentiveness to the Class Representatives' legal arguments.

**The Magistrate mistakenly applied an evidentiary standard when there is no evidence.**

18. The Magistrate says, "[t]he plaintiff bears the burden of showing, by a preponderance of the evidence, that subject matter jurisdiction exists. *See* Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000)." Recommendation p. 6.

19. In Makarova the district court relied on evidence outside the pleadings to determine whether sovereign immunity protected the U.S. from suit. The evidence was that the

5

U.S. is a sovereign and the Federal Tort Claims Act did not waive sovereign immunity under the facts alleged. Here, the Magistrate does not refer to any evidence outside the pleadings, so the reference to the preponderance of evidence standard makes no sense.

**The Magistrate apparently disregarded allegations supporting standing, failed to consider the purpose behind standing, ignored the requirements at the pleading stage, and applied a <u>formulaic determination for standing.</u>**

**Standing Allegations**

20.  The Magistrate says "the plaintiffs contend they possess standing, since they 'allege injury to themselves (such injury may be indirect), [and] the injuries are ongoing and traceable to the defendants' conduct.'" <u>Recommendation</u> p. 3. The internal quotation clearly looks like a bare and conclusory allegation insufficient to support standing. The problem is the internal quotation is not an allegation from the Complaint. It is the application of a case rule to certain factual allegations in the Complaint; those specific allegations are cited following the quoted words in the Opposition at p. 10. The Magistrate failed to provide the cites or even indicate the cites were missing, so here they are: Compl. ¶¶ 89-99, 101-02, 109-112, 123, 210-28, 253-61, 268-74, 275-76, 278-80, 282-86.

21.  Throughout the <u>Recommendation</u>, the Magistrate provides no cites to the Opposition or the Complaint that would facilitate the rechecking of his representations of both. For example, the Magistrate mistakenly quoted from the Complaint as though it were an injury allegation. <u>Recommendation</u> p. 4 (quoting Compl. ¶ 87). That paragraph, as do the ones surrounding it, concerns discriminatory motivation, which goes to the issue of intent—not injury. The Magistrate's failure to cite the Complaint or Opposition (1) thwarts referencing whether his quotes refer to injury or other elements of the causes of action, <u>Recommendation</u> p. 4, and (2) enforces the misleading impression from his selective quotations that the Class Representatives

only allege injury of an overly sensitive and generalized nature, Recommendation p. 5. This is another indication of lack of impartiality and apparent inattentiveness.

22. The Magistrate inappropriately tried to narrow the alleged discriminatory impact of Columbia's Women's Studies Program to only those males who enroll in its courses.[1] He argued that since the Class Representatives did not enroll in any such courses, they suffered no injury. Recommendation p. 8-9. That is not what the Complaint alleges. For example, "Columbia's Women's Studies program not only creates a hostile learning environment for males, but has engendered such a hostile environment throughout the University. Columbia's learning environment for males has taken on attributes similar to the hostile work environments that the courts have repeatedly found discriminatory." (Compl. ¶¶ 94-96, 99, 112, 168). The Complaint also alleges non-enrollment injures at ¶¶ 30, 40 (r)(u)(v)(x), 70, 115, 116, 168-176, 180-182, 184-187, 190, 200, 207, 210-228, 229-231, 237-55, 257-261, 266-273.

23. Injury-in-fact for standing purposes means an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, but not conjectural or hypothetical. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136 (1992)(citations omitted). The Magistrate's Recommendation at p. 8 fails to expand on any of these terms.

24. A "particularized" injury is one that affects the plaintiff in a personal and individual way. Lafleur v. Whitman, 300 F.3d 256, 269 (2d Cir. 2002). The Class Representatives do not refer to themselves throughout the Complaint only by their names, but are included when the Complaint alleges harm to males and class members, or such references are

---

[1] Women's Studies programs are much "broader than what happens in the classroom," and work "to transform [college] curriculum, the campus environment, and society at large," according to the National Women's Studies Association, www.nwsa.org/center/index.php, of which Columbia is an institutional member. (Compl. ¶ 3).

understood.  With this in mind, the Complaint alleges personal and individual harm to the Class Representatives at ¶¶ 93-96, 98, 99, 100-102, 110, 112, 113, 115, 116, 168-176, 180-182, 184-187, 190, 200, 207, 210-228, 229-231, 237-55, 257-261, 266-273.

25. An "imminent" injury is determined on a case specific basis where the greater the harm the lower the probability that is necessary.  Baur v. Veneman, 352 F.3d 625, 637 (2d Cir. 2003).  Here the injuries are to rights under Title IX and the fundamental rights of speech, religion, and not to be treated in a discriminatory fashion.  Given the importance of such rights, lower probability of harm suffices.  The Class Representatives allege imminent and significant harm in the Complaint at ¶¶ 95, 96, 98, 99, 101, 112, 113, 171, 172, 181-182, 190, 210-212, 217, 224, 225, 227, 229-231, 238-253, 257, 259, 261, 269, 273, most of which the Magistrate apparently ignored.

**Standing Purpose**

26. Standing requires an injury-in-fact to a legally protected interest.  W.R. Huff Asset Mgmt. Co. v. DeLoitte & Touche, 549 F.3d 100, 106-07 (2d Cir. 2008).  The purpose of this requirement is that "a personal stake in the outcome of the controversy … assure[s] that concrete adverseness … sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.  This is the gist of the question of standing."  Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703 (1962).

27. The Magistrate's selective recounting of the Complaint's allegations makes perfectly clear the Class Representatives' "adverseness" to the defendants' support of Women's Studies Programs and failure to support Men's Studies.  Recommendation  pp. 3-6.

28. The Magistrate relies on Laird v. Tatum, 408 U.S. 1, 13-14, 92 S.Ct. 2318, 2325-26 (1972), for "[a]llegations of a subjective chill are not an adequate substitute for a claim of

8

specific present objective harm or a threat of specific future harm....," but leaves out the remainder of the quote that gives the reason, which is Article III courts do not give advisory opinions.  Recommendation p. 8, 9.  The reason they don't give advisory opinions was addressed in footnote 7 in Laird that appears right before the partial quote used by the Magistrate.  The Magistrate apparently ignored footnote 7, which states, "if [plaintiffs] themselves are not chilled, but seek only to represent those 'millions' whom they believe are so chilled, respondents clearly lack that 'personal stake in the outcome of the controversy' essential to standing."  The internal quote is from Baker v. Carr, 369 U.S. 186, 204, 82 S. Ct. 691, 703.  The full internal quote is whether a party has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions?  This is the gist of the question of standing."  So the Magistrate's reliance on "subjective chill" to find no injury really boils down to whether there is sufficient adverseness.  As argued *supra* at ¶ 27, the Class Representatives are plenty adverse to the violation of their rights by the defendants.

29. Moreover, Laird actually stated, "constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights."  Laird at 11.  The Complaint at ¶¶ 176, 198, 266, 267 alleges infringement of the Class Representatives' speech, and the Opposition at p. 3, 5 raises the issue.

30. The Magistrate even resorted for support to find no standing from a case concerning taxpayers challenging an action by the Executive Branch of the Federal Government: Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 102 S. Ct. 752 (1982).  Recommendation p. 9.  Ignoring the unique situation for

9

standing in taxpayer suits and the lack of similarity with this case, the Magistrate stated, "exercising judicial authority over this case would 'convert the judicial process into no more than a vehicle for the vindication of the value interests of concerned bystanders,' and would ignore 'a due regard for the autonomy of those persons likely to be most directly affected by a judicial order." Recommendation p. 9 (internal quotes from Valley at 473).

31. The "convert the judicial process into … bystanders" quote actually comes from a case that found standing for students challenging the Department of Commerce's increase in transportation rates. U.S. v. SCRAP, 412 U.S. 669, 688, 93 S.Ct. 2405, 2416 (1973). The students had standing because there prospective use and enjoyment of parks would be harmed by the recycling industry reducing the availability of recyclable goods due to a decrease in profits caused by the higher rates. As a result, the public would buy less recyclable goods but more of the cheaper non-recyclable goods, which are discarded as refuse in national parks. Also, manufacturers would use more natural resources to meet the demand for the non-recyclable goods. Based on this chain of events, the Supreme Court found harm to the students' use and enjoyment of nature. Id. 412 U.S. at 686-88, 93 S.Ct. at 2415-16. The chain of connection to harm in this case is much less attenuated than the SCRAP case that the Magistrate was really quoting.

32. The Magistrate's fear that to allow standing is contrary to "also reflect[ing] a due regard for the autonomy of those persons likely to be most directly affected by a judicial order" makes no sense. If anything, standing would allow those most directly affected by the discriminatory harm of the Women's Studies Program to fight for equal treatment. True, any success would reduce the benefit that such discrimination provides Columbia female students and female alumni, but that is no justification for disparate treatment. "The existence of a

permissible purpose cannot sustain an action that has an impermissible effect." Wright v. Council City of Emporia, 407 U.S. 451, 462, 92 S.Ct. 2196, 2203 (1972).

**Standing at the Pleading Stage**

33.     The Supreme Court has stated that "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 2137 (1992)(quoting Lujan v. National Wildlife Federation, 497 U.S. 871, 889, 110 S.Ct. 3177, 3189 (1990)).  Although the Magistrate refers to Lujan v. Defenders of Wildlife, his failure to consider all the injury allegations and to examine the ones he did quote as embracing specific facts shows he failed to apply this Supreme Court standard.  Recommendation pp. 3-6, 7.

**Standing Not a Mechanical Exercise**

34.      The Magistrate apparently engaged in a mechanical exercise in finding no injury by <u>not</u> comparing the Complaint to similar complaints as the Supreme Court and Second Circuit advise.  Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3325 (1984); Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1091-92 (2d Cir. 1995).  The Magistrate compared this case to one in which a person was not injured because he had no legal interest in his clients' claims.  W. R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100, 106-07 (2d Cir. 2008).  Here, the legally protected interests of equal protection, rights under Title IX, free speech, and religion are those of the Class Representatives, not some third party.

35.     The Magistrate also finds no injury because the alleged injuries are "'shared in substantially equal measure by ... a large class of citizens.'"  Recommendation p. 8 (citing Gladstone Realtors v. Vil. Of Bellwood, 441 U.S. 91, 100, 99 S.Ct. 1601, 1608 (1979).  The

11

quote used in Gladstone came from Warth v. Seldin, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205-06 (1975), but Gladstone, as did the Magistrate, left out the important qualifier that it must be a "generalized grievance" that is shared by a large group.  So the Magistrate's mechanical reliance on the claimed "large class of citizens" prohibition is not fully accurate.  "[W]here a harm is concrete, though widely shared, the Court has found 'injury in fact.'"  F.E.C. v. Akins, 524 U.S. 11, 24, 118 S.Ct. 1777, 1786 (1998).

36.     The Complaint is very specific in describing the putative class as "all males who were students, full or part time, at some point in time during the three years prior to the filing of this action or all males who currently maintain the status of student or alumni, or all males who will in the future acquire the status of student or alumni...." (Compl. ¶ 196).  That's a lot of people, especially when looking into the future, but to deny standing for that reason would repeal nearly all class actions seeking prospective relief under Fed, R. Civ. P. § 23(b)(2).

37.     Another example of the Magistrate's formulaic approach based on an apparent lack of attention to this case is his statement, "[i]n a circumstance such as this, where some, but not all, defendants in an action move to dismiss a complaint for lack of standing," the Court considers standing as to all defendants.  Recommendation p. 7.  There are three sets of defendants here:  Columbia, New York State, and the U.S. Department of Education.  The attorneys for all three requested dismissal by arguing a lack of standing under Fed. R. Civ. P. 12(b)(1).  Apparently, the Magistrate overlooked that fact.

38.     This men's rights case, as with most if not all cases advocating that men are human beings endowed with rights when in conflict with the preferential treatment of the opposite sex, is apparently irrelevant in the eyes of the Southern District Court.  Although the importance and protection of individual constitutional rights is a central part of the role under

separation of powers assigned to the judiciary—where "[t]he touchstone to justiciability is injury to a legally protected right," Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 140-41, 71 S. Ct. 624, 632 (1951)(citations omitted), and "traditionally thought to be capable of resolution through the judicial process," Flast v. Cohn, 392 U.S. 83, 97, 88 S.Ct. 1942, 1951 (1968)—constitutional and statutory rights apparently no longer apply to men.

### The Magistrate failed to address injury allegations traceable to violations of the Establishment Clause.

39. The Magistrate failed to address the injury allegations traceable to New York State and the U.S. Department of Education's violation of the Establishment Clause. Those allegations are in the Complaint at ¶¶ 5(f), 22, 93, 198, 207, 212, 266.

### The Magistrate failed to address injury allegations from Columbia violating New York Civil Rights Law § 40-c.

40. The Magistrate failed to address the allegations of Columbia's violation of N.Y. Civil Rights Law § 40-c. Section 40-c prohibits discrimination against persons based on sex by any institution in New York State that fails to provide equal opportunity, whether because of prejudice, discrimination or inadequate educational opportunities. The Complaint alleges Columbia's discrimination based on sex at ¶¶ 70-89, and that Columbia fails to provide equal educational opportunities at ¶¶ 169-175, 180-182, 186, 187.

### The Magistrate jumbled together mistaken analyses of Equal Protection and Title IX injuries.

41. While brushing aside the injury allegations caused by Establishment Clause and Civil Rights Law § 40-c violations, the Magistrate failed to distinguish his legal analysis of Equal Protection injury and Title IX injury.

42.     The Magistrate's mixing of the two found no injury because the Class Representatives did not enroll in a Women's Studies course nor were they denied admission to the program. Recommendation p. 8, 9.

43.     By not enrolling in a course, the Magistrate says the Class Representatives did not "suffer a <u>direct</u> injury occasioned by firsthand exposure to the content of the Women's Studies course(s)…." Id. at 8, 9 (emphasis added). The Supreme Court, however, holds differently. For standing purposes "[t]he injury may be indirect …." Vil. Arlington Hts. v. Metro. Hous. Dev. Corp, 429 U.S. 252, 261, 97 S.Ct. 555, 561 (1977)(citation omitted).[2]

44.     As for the Class Representatives not being denied admission, slamming the door in a person's face is not the only way to keep him out. Another way is to make the environment within so hostile, traducing, and demeaning that it will deter his entrance. Columbia's Women's Studies Program does not physically bar males from participating in the program, but the opprobrious treatment males receive, the belligerence of castigations, the collective guilt heaped on them, and the denial to males of similar perks given females because of the program's bias effectively locks the gates to all but a few. (Compl. ¶¶ 70-91).

45.     The Magistrate also failed to discern that the Complaint asserts the more subtle variety of discrimination that focuses on the results of the defendants' conduct. De La Cruz v. Tormey, 582 F.2d 45, 50 (9th Cir. 1978), *cert den.* 441 U.S. 965 (1979). Harm from different treatment occurs when the impact of a policy falls overwhelmingly on one group. Id. at 47. The harmful results of the defendants' support for Columbia's Women's Studies Program fall mainly on males, such as the Class Representatives. The defendants treat males differently than females

---

[2] For standing under the Establishment Clause, which the Magistrate failed to address, the 1st Amendment does not tolerate direct or indirect government action that casts a pall of orthodoxy over the classroom. Keyishian v. Board of Regents of University of State of N. Y., 385 U.S. 589, 603, 87 S. Ct. 675, 683 (1967); Engel v. Vitale, 370 U.S. 421, 430-31, 82 S. Ct. 1261, 1267 (1962).

in providing benefits and services and limit males, as compared to females, in the enjoyment of advantages and opportunities. (Compl. ¶¶ 96-109, 115, 123, 124, 169-87).

46. The Magistrate, as did Columbia, apparently ignored the Complaint's allegations that the harmful impact of the Women's Studies program goes far beyond just Feminism instruction in the classroom. (Compl. ¶¶ 3, 94, 97, 98, 181, 186-87, 266-71). The program provides benefits and opportunities outside the classroom exclusively to adherents of Feminism, mainly females, to the detriment of others, mainly males. (Id.). Even in Columbia programs not grounded in "gender issues," the Feminist perspective dominates and censors opposing viewpoints. (Compl. ¶ 176). "Fairness in individual competition for opportunities … is a widely cherished American ethic. Indeed, in a broader sense, an underlying assumption of the rule of law is the worthiness of a system of justice based on fairness to the individual," which should include males. Regents of University of California v. Bakke, 438 U.S. 265, 319 n. 53, 98 S. Ct. 2733, 2763 n. 53 (1978).

**Equal Protection**

47. The defendants' ongoing, one-sided support and propagation of Feminism through the Women's Studies Program denies the Class Representatives equal treatment. The disparate treatment is that the Women's Studies Program with all its incidents of benefits gives females a competitive advantage that prevents males from competing on an equal footing in education, the work place, the courts, the culture, and society as a whole. In re U.S. Catholic Conference, 885 F.2d 1020, 1028-31 (2d Cir. 1989)(citations omitted).

48. The Class Representatives face obstacles to competing on an equal footing with females because there is no Men's Studies program. (Compl. ¶¶ 30, 98, 99, 100-102, 110, 112, 113, 115, 254, 260, 261). Those discriminatory obstacles result in a continuing loss of

15

opportunities. <u>Bryant v. Yellen</u>, 447 U.S. 352, 366-67, 100 S. Ct. 2232, 2240-41 (1980)(farm workers had standing because favorable decision would give them the opportunity to buy farm land, and it did not matter that the farm workers couldn't presently afford the land). The dominance of Feminism achieved by Women's Studies and the lack of the countervailing viewpoint of Men's Studies results in obstacles for males obtaining education, knowledge, career opportunities, training, acquiring skills, and developing their mental abilities and moral character in order to not only lead productive, self-satisfying lives but to counter the Feminist establishment and its antipathy against males.

49. Fifty years ago when a black man wanted to take a bus from one location to another, he could only do so by sitting in the back. <u>Evers v. Dwyer</u>, 358 U.S. 202, 79 S.Ct. 178 (1958). Today, when any man wants to take his education to another level in the area of "gender studies" he's relegated to the back of the bus of Women's Studies—the only transportation available to an education in "gender studies" and its attendant benefits. As in <u>Evers</u>, the Class Representatives are not required to ride that bus "in order to demonstrate the existence of an 'actual controversy'…." <u>Id.</u> at 204.

50. Education and acquisition of knowledge are matters of supreme importance and liberty interests that should be diligently promoted. <u>Meyer v. Nebraska</u>, 262 U.S. 390, 399-400, 43 S. Ct. 625, 626-27 (1923). The defendants continue to obstruct those interests of the Class Representatives by doing the contrary with respect to Men's Studies but promoting Feminism through the Women's Studies Program.

51. While the Magistrate considers the discriminatory obstruction of liberty interests for males as "no more than a 'subjective chill,'" <u>Recommendation</u> p. 9, the Supreme Court takes a different view. "Discrimination itself, by perpetuating 'archaic and stereotypic notions' or by

16

stigmatizing members of the disfavored group as 'innately inferior' and therefore as less worthy participants in the political community, … can cause serious noneconomic injuries to those persons who are personally denied equal treatment…." Heckler v. Mathews, 465 U.S. 728, 739-740, 104 S. Ct. 1387, 1395 (1984)(citation omitted).

52.     The U.S. Department of Education's financial assistance facilitates, New York State policies aid and approve, and Columbia's Women's Studies provide: (1) instruction, training, and preparation in Feminism that leads to undergraduate degrees and graduate certifications; (2) a post-baccalaureate program in Feminism; (3) alumni auditing of Feminist courses; (4) networking and career opportunities within the Feminist establishment; and (5) support from a Feminist perspective. (Compl. ¶¶ 40, 97, 84, 175).  No such backing and opportunities are provided for males from a masculine perspective. (Compl. ¶ 72, 172, 253, 259).  Standing is valid when public benefits are extended in a way that discriminate.  Ridgefield Women's Pol. Caucus v. Fossi, 458 F.Supp. 117, 120 n. 3 (D.Conn. 1978).

53.     Under equal protection, immediacy of the harm is the plaintiffs alleging they will enroll in Men's Studies when offered.  Adarand Constructors v. Pena, 515 U.S. 200, 211, 115 S.Ct. 2097, 2104-05 (1995).  Causality exists because the Class Representatives are able and ready to pursue Men's Studies, which the defendants prevent by not supporting nor providing. Gratz v. Bollinger, 539 U.S. 244, 262, 123 S. Ct. 2411, 2423 (2003).  And the remedy is restoring equality, which can occur by withdrawing the benefits and opportunities provided by the Feminist Women's Studies Program that disadvantages males, or extending similar opportunities and benefits to adherents of masculinity through a Men's Studies program.  Either will profit the plaintiffs in some personal way.

**Title IX**

54.     Title IX applies to sports, academic, research, occupational, and other educational programs or activities of a university.  20 U.S.C. § 1687; 34 C.F.R. § 106.  It also applies to "a department, agency, … or other instrumentality of a State or the entity of such State … that distributes [Federal] assistance …."  Id.

55.     Title IX cases do not require that a person actually enroll in a program or be denied admission to one in order to have standing.  The Magistrate holds the contrary at Recommendation, p. 8,9.  It is the continuing absence of the opportunity for an equivalent educational experience—the benefit, or the ill will and dissimilar treatment that is the injury.  20 U.S.C. § 1681(a).  When a college only has a male rugby team, the injury to females who want to play rugby is that there is no female team.  By failing to field a Men's Studies program that effectively accommodates the interests and abilities of males in the university community, Columbia creates a barrier for male students and alumni.  Pederson v. Louisiana State Univ., 213 F.3d 858, 871 (5th Cir. 2000).  "[A]n institution may violate Title IX simply by failing to accommodate effectively the interests and abilities of student athletes of both sexes."  Roberts v. Colorado State Bd. of Agriculture, 998 F.2d 824, 828 (10th Cir. 1993)(college required to reinstate female softball team with all the incidental benefits of a varsity team).

56.     The Title IX injuries are (1) denial of access at Columbia to a Men's Studies program and (2) the ill will, disparate treatment that males receive at Columbia in and outside the Women's Studies Program.  No program at Columbia provides males, who are a minority at the college, the opportunities to nurture their talents as females have in the Women's Studies Program because there is no Men's Studies program.  Further, the State and Columbia simply treat males, whether in the Women's Studies Program or not, less favorably than the majority

18

females, which in turn has a discriminatory impact.  *See* International Broth. of Teamsters v. U.S., 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 (1977).

57.     These injuries stem from the State's education policies that promulgate, approve, and help finance Women's Studies programs but not Men's Studies, and Columbia's providing of Women's Studies but no Men's Studies.

58.     The Class Representatives have been denied and are continuing to be denied opportunities and benefits comparable to those offered female alumni and female students of Columbia.  (Compl. ¶¶ 172, 215-255, 257-261, 268).  The Class Representatives are affected in a personal and individual way because the lack of Men's Studies continues to deny them equivalent benefits and opportunities from a masculine perspective.  *See* McCormick ex rel. McCormick v. School Dist. of Mamaroneck, 370 F.3d 275, 284-85 (2d Cir. 2004)(standing under Title IX for injunction when girls who intended to play soccer in the Fall were denied the opportunity because school did not field a girls' soccer team in the Fall).

59.     The specific Title IX injuries that the Magistrate failed to address are in Section VI. of the Complaint under the heading that refers to "Title IX," ¶¶ 169-175, 180-82, 185-87, 190, 200, and Section VIII. of the Complaint under "Injury," ¶¶ 230, 238-241, 243-253, 257-259, 268-273.  The Magistrate did refer to but failed to give the specific cites to ¶¶ 210, 211, 219, 224, 225, 229, 231, 233, 235, 237, 242.

## Conclusion

60.     The Courts are supposed "to protect unpopular individuals … and their ideas from suppression—at the hand of an intolerant society,' McIntyre v. Ohio Elections Com'n, 514 U.S. 334, 357, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995), but today in America, they are apparently so

19

fearful of the Feminist Establishment, that the rights of men are often written out of the laws of the land under the rubric of judicial activism.

      61.    If there is any doubt about the former statement, then imagine an action before this Court in which a college has a Men's Studies program but no Women's Studies program. Would female students or alumni be granted standing—yes.

Dated: April 21, 2009
      New York, N.Y.

/S/
_____
Roy Den Hollander, Esq. (RDH 1957)
Class attorney and representative
545 East 14 Street, 10D
New York, N.Y. 10009
(917) 687-0652
rdhhh@yahoo.com